UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DIOVANNI CARTER,

Defendant

CRIMINAL No. 19-cr-10104-ADB-1

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER**[1]

The United States respectfully requests that this Court deny the defendant, Diovanni Carter's motion for revocation of the Detention Order issued by Magistrate Judge Hennessy. As grounds therefore, the government states that the defendant offers no basis to disturb the Magistrate Judge's careful review of the evidence developed during the detention hearing. The Magistrate Judge determined by clear and convincing evidence that the defendant's release would pose a danger the community and by a preponderance of evidence that he presented a risk of flight. Ex. 2, p. 4-5 (referencing standards), 6, 9. The Magistrate further concluded that "there is no condition or combination of conditions that will reasonably assure Defendant's appearance as required, or the safety of any other person or the community." Ex. 2, p. 10.

The defendant does not claim any error in the Magistrate's factual findings, and does not identify any legal error, except to argue that conditions of release will reasonably assure the

[1] References to: the electronic docket are by number and, where appropriate, page ("ECF #__, __"); the transcript of the April 22, 2019, hearing by page ("Tr. __"), exhibits from the April 22, 2019 by exhibit number and, where appropriate, page ("H.Ex. __, p. __"); the defendant's memorandum in support of revocation of the detention order by page ("D.Mem. __"); and exhibits appended to this opposition by number and page ("Ex. __, __"). The government has redacted the name of a cooperating witness, whose identity is known to the defendant.

safety of the community and his appearance. Because the defendant offers no factual basis to revoke the Magistrate's prior Order of Detention, and does not articulate any factual or legal error, the motion should be denied.

## FACTUAL BACKGROUND

### I. TESTIMONY AND EVIDENCE FROM THE APRIL 22, 2019, DETENTION HEARING

On January 26, 2019, at about 7:11 p.m., three men armed with guns entered a T-Mobile store in Brockton (Tr. 8-15; H.Exs. 1-2). The store surveillance captured the incident and descriptions of the robbers (Tr. 8-15; H.Ex. 1). The first man, later identified to be Darius Carter,[2] was wearing a black sweatshirt with a white logo on the breast, black sweatpants with a white logo on the thigh, white gloves with black accents, and black and white Jordan sneakers (Tr. 8-15; H.Exs. 1-2). The second man, later identified to be Rosser-Stewart, wore a black top, jeans, fuchsia underpants (visible when he bent over), off-grey sneakers and carried a black duffel bag (Tr. 8-15; H.Exs. 1-2). The third man, later identified to be Dennis Martin, wore a navy blue sweatshirt, navy blue sweatpants and white sneakers (Tr. 8-15; H.Exs. 1-2).

All three men also held firearms: Darius held a large frame silver firearm, later identified to be an Armi Fratelli 9mm; Rosser-Stewart held a small frame silver, later identified to be a Jennings .22 caliber; and Dennis Martin held a black Ruger .380 caliber firearm with a visibly extended magazine (Tr. 13; H.Ex. 1). As they entered the store, Darius and Rosser-Stewart drew their firearms, pointed them at the employee, and directed him to the back, where the inventory was kept (Tr. 8-15; H.Exs. 1-2). Martin entered last (Tr. 8-13, H.Ex. 1). While the robbery took

[2] The government distinguishes the Carter brothers by first name.

place, Diovanni Carter remained in a rented white Chevrolet Malibu that the robbers used to get to Brockton (Tr. 15, 19, 62-63).

While entering the code, Darius Carter struck the employee in the head with his firearm (Tr. 13). Once in the back room, the employee opened the large cabinet that contained the inventory of phones and tablets (Tr. 12-16). Martin held the employee at gunpoint, while Rosser-Stewart emptied the cabinet into the duffel bag (Tr. 12-16). Darius went to the front of the store and checked another room (Tr. 11-16). Martin obtained a clear plastic trash bag from a bin and the men put additional phones, tablets and cash into that bag as well (Tr. 10-18).

Within three minutes, the men left the store with Martin carrying the clear plastic bag and Rosser-Stewart carrying the duffel bag (Tr. 14-17). In total, they stole approximately $20,000 worth of cellular telephones and tablets, and approximately $4,500 in currency (Tr. 10). Among the stolen items was a covert tracking device that alerted a security company when it travelled beyond the area of the store, and provided real-time tracking information of its whereabouts to the security company (Tr. 16-19; H.Ex. 1).

The three robbers got back into the white Malibu: Diovanni drove, Rosser-Stewart was in the front passenger seat, Martin sat in the rear behind the driver's seat, and Darius sat in the rear on the passenger side (Tr. 16-25). The tracking device reported the location and speed of the device as it travelled through downtown Brockton onto Crescent Street, and turning onto Lyman Street, at which point it entered a residential neighborhood (Tr. 19-22; H.Ex. 1). This information was reported to Brockton Police who identified the white Malibu as the getaway vehicle and attempted to stop the car (Tr. 19-24). The vehicle would not stop and travelled into the residential neighborhood, speed over 50 MPH, making quick turns on short streets (Tr. 19-

25; H.Ex. 1). Ultimately, the Malibu turned onto Summer Street, a long, relatively straight road (Tr. 19-23; H.Ex. 1).

While on Summer Street the tracking device reported speeds well over 70 MPH (Tr. 19-22; H.Ex. 1). The lead officer in pursuit reported that a person fired gunshots at his cruiser (Tr. 21-28). The City of Brockton ShotSpotter system, which is a series of microphones placed through the city that monitor and record sound frequencies consistent with gunfire, reported a total of nine gunshots being fired at 7:20 p.m. and located the source of the gunfire as Summer Street, consistent with the location of the tracking device at the time (Tr. 23-27; H.Ex. 1, 3). The lead officer pulled back, but continued to follow the Malibu as it turned onto Carl Avenue and came to a stop at the intersection of Carl Avenue and Bristol Avenue (Tr. 27-32; H.Ex. 1).[3]

The occupants fled down the area of Bristol Avenue and officers were in pursuit (Tr. 27-32; H.Exs. 1, 4). Darius was apprehended shortly after abandoning the vehicle, in a wooded area across Baker Street (Tr. 29-32; H.Ex. 4). Darius was wearing the exact same clothing as depicted in the store video, but was not wearing gloves (Tr. 30-32; H.Exs. 1, 10-11).[4] Martin was arrested closer to the Malibu than Darius, at 44 Baker Street, hiding behind a fence (Tr. 29-30; H.Ex. 4). Rosser-Stewart was apprehended down the street in the area of 149 Carl Avenue (Tr. 35; H.Ex. 4). Diovanni was not apprehended that night, and a warrant was sought for him subsequent to the robbery; he remained wanted on the warrant until March 5, 2019 (Tr. 38).

About five yards from where Darius Carter was apprehended, the silver Armi Fratelli 9mm firearm (the firearm held by Darius), and the black Ruger .380 firearm with the extended magazine (the firearm held by Martin) were found wedged underneath a rock (Tr. 32-34, H.Ex.

---

[3] Brockton Police did not return fire (Tr. 28).

[4] In the rear passenger-side area of the Malibu, investigators found the white gloves with black accents that Darius wore during the robbery (Tr. 30-32, 35-36; H.Exs. 6, 10).

12). There was no ammunition in the Armi Fratelli and there were multiple rounds of .380 ammunition in the black Ruger (Tr. 32-37; H.Ex. 12). A 9mm casing was recovered from Summer Street, and tool-marking comparisons identified the Armi Fratelli firearm as having fired the recovered 9mm casing (H.Ex. 14). A few days after the robbery, a Jennings .22 caliber firearm was recovered in the area of Litchfield Street, close to where the Malibu was abandoned (Tr. 33-37; H.Exs. 4, 13). This firearm was consistent with the firearm used by Rosser-Stewart, and matched the caliber of casing located in the front passenger seat (Tr. 34-36; H.Ex. 4).

In the Malibu, investigators found mail addressed to Diovanni Carter, and a Hertz rental agreement identifying him as an authorized operator (Tr. 36-39; H.Exs. 5, 7). In the front passenger area, investigators located a spent .22 caliber shell casing, a black jacket consistent with that worn by Rosser-Stewart during the robbery, and the black duffel bag containing phone and tablets and currency (Tr. 36-39; H.Ex. 5). In the rear of the vehicle, investigators located the clear plastic trash bag containing the phones and tablets (Tr. 36-39; H.Ex. 5). An inventory comparison was conducted and it was determined that all of the stolen items and the covert tracking device were recovered in the vehicle (Tr. 37-39; H.Ex. 9). Investigators also lifted a fingerprint of Diovanni Carter from the rear passenger side door (Tr. 56).

Records from Hertz for the white Malibu revealed that the car had been rented on January 16, 2019, in the name of Carshana Graham (Tr. 38-40; H.Exs. 7-8). Though rented in the name of Graham, Diovanni Carter was listed as an authorized driver of the Malibu, and a phone number ending in 2207 was listed as a contact number (Tr. 39-40; H.Ex. 8). The 2207 number was identified to be Diovanni Carter's number: this number was listed in the subscriber information for the DIORMAURICECARTER@GMAIL.COM Google account, and he had

provided this same number to Express Employment Professionals ("EEP") on January 21, 2019, as his contact number (Tr. 40; H.Exs. 15, 17).[5]

Google records for the DIORMAURICECARTER@GMAIL.COM account were obtained; subscriber records for account listed the same 2207 phone number and the name "DIOR CARTER" (Tr. 56-62; H.Ex. 17). A summarized Google Search History for the account, indicated that on the morning of January 26, 2019, ten searches were made for "t mobile near me" (Tr. 56-62; H.Ex. 18). Additionally, at 5:13 a.m., the account searched for "xtreme rentals brockton ma" and visited Mapquest for that location (Tr. 56-62; H.Ex. 18). Extreme Rentals is a located essentially one or two businesses down from the T-Mobile that was robbed (Tr. 58; H.Ex. 18). About two hours after the shooting, the account visited the Brockton Enterprise crime news section, and then made a series of searches for "channel 7 breaking news brockton" (Tr. 56 -62; H.Ex. 18). Later, on February 1, 2019, the account visited Boston Globe articles concerning the robbery and arrests of the suspects (H.Ex. 18).

Records from EEP were obtained and the contact log indicated that EEP had phone contact with Diovanni on January 21, 2019, January 25, 2019, and January 28, 2019 (Tr. 38-45; H.Ex. 15). Call detail records for the 2207 phone showed calls with the number for Express on those dates, consistent with the log (Tr. 43-44). In particular, the log for January 28, 2019, noted that Diovanni was quitting, with the note reading: "[e]nding assignment today, has a lot going on in his life right now and cant work" "[w]ill call when he is ready to work again" (Tr. 42-46; H.Ex. 15). Also of note, on November 5, 2018, while on pretrial release for a firearm case in

[5] EEP had in fact emailed Diovanni Carter at the DIORMAURICECARTER@GMAIL.COM address on January 25, 2019, related to a temporary position starting on January 28 (Tr. 42). Diovanni responded by emailing and calling EEP back (H.Ex. 15).

Dorchester District Court,[6] the EEP log notes: "looking for work- offered simplisafe and asked when he could start but then mentioned that he really only needs a letter stating that he is working for his parole officer but said that we cannot provide that since he hasn't worked with us since 2016" (Tr. 45; H.Ex. 7).

Investigators obtained cell site location information ("CSLI") for the defendant's 2207 phone, and a number of maps pertaining to the CSLI for January 26, 2019, were marked as an Exhibit (Tr. 45-53; H.Ex. 16). Those maps showed that the defendant's phone employed cell towers consistent with presence in Brockton at approximately 3:00 p.m. (H.Ex. 16). The maps also showed the defendant's phone employed cell sites consistent with travel from Boston to Brockton from 6:45 p.m. to 7:05 p.m. (H.Ex. 16). From 7:05 p.m. to 7:15 p.m., the CSLI indicated that the defendant's phone employed a cell tower within a few hundred meters of the T-Mobile store and a sector directly facing the T-Mobile store (Tr. 47-52; H.Ex. 16).

Additionally, data used by Sprint, known as per-call-measurement-data ("PCMD"), provided an estimated distance of the device from the cell tower (Tr. 46-53). This PCMD was visualized as a series of arcs radiating from the location of the cell tower that estimated distance of the device from the tower (Tr. 46-53; H.Ex. 16). From 7:05 p.m. through 7:15 p.m., the PCMD estimate the distance of the defendant's phone from the cell tower to be consistent with the location of the T-Mobile store (Tr. 46-53; H.Ex. 16). After the Malibu was abandoned, the CSLI showed that the defendant's phone employed cell towers and sectors consistent with the area of Brockton where the Malibu was abandoned, and the maps depicted the defendant's phone continuing to employ cell towers in this area of Brockton for an extended period of time following robbery (Tr. 50-53; H.Ex. 16, p. 8-9).

---

[6] See Pretrial Services report (Docket 1807CR002568).

Investigators also learned that after the Malibu was abandoned, the defendant had a series of calls to and from a phone ending in 3998, which was associated with a person identified as J.B.[7] (Tr. 52; H.Ex. 16, p. 8). The calls were noted at 7:37 p.m., 7:46 p.m., and 7:43 p.m., which was after the vehicle was abandoned (Tr. 52; H.Ex. 16, p. 8).[8] J.B. resided at 82 Carl Avenue, which was approximately 300 yards from where the Malibu was abandoned, and a few houses down from where Rosser-Stewart was apprehended (Tr. 46-53; H.Ex. 4, 16).

The most specific information concerning Diovanni Carter's involvement came from a codefendant (Tr. 9-10, 15, 62-63). On January 26, 2019, the codefendant, who the government refers to as Person 1, identified Diovanni Carter as the leader of the group ("orchestrated"), the driver of the getaway car, and stated that Diovanni Carter handed him one of the firearms (Tr. 9-15, 62-65, 78-80).[9]

Lastly, the government introduced a series of historical Boston Police reports related to the defendant (H.Ex. 20). The Magistrate Judge reviewed these reports and noted the repeated nature of the defendant's assaultive behavior towards police, and firearms offenses (Ex. 2, p. 9).

**<u>STANDARD OF REVIEW</u>**

After an order of detention issues, the Bail Reform Act offers a defendant two choices: a motion for review of the detention order under 18 U.S.C. § 3145(b), or a motion to reopen the

---

[7] In accordance with the Local Rules, the government employs the initials for an unindicted coconspirator, and has redacted the name to the initials in the transcript. <u>See</u> LR 116.1(c)(1)(E) ("If subsequent litigation requires that the name of any such unindicted coconspirator be referenced in any filing directly with the court, that information must be redacted from any public filing and be filed under L.R. 7.2 pending further order of the court.").

[8] The tracker stopped moving at approximately 7:21 p.m. (H.Ex. 1).

[9] Person 1 has cooperated with the government, pled guilty and is awaiting sentencing. The identity of Person 1 and materials reflecting his agreement with the government were disclosed to defense counsel prior to the detention hearing.

detention hearing under 18 U.S.C. § 3142(f). See United States v. Reynolds, 609 F.Supp.2d 108, 110 (D.Me. 2009) (citing United States v. Rebollo-Andino, 312 Fed.Appx. 346, 347-48, 2009 WL 565697, *1-2 (1st Cir. Mar. 6, 2009)). Under Section 3145(b), the District Court reviews a Magistrate Judge's detention order under Section 3145(b) *de novo*, but is not required to conduct a hearing. See, e.g., United States v. Tortora, 922 F.2d 880, 883 n.4 (1st Cir.1990) (standard for district court's review of magistrate's detention findings under Section 3145(b) is *de novo*); Rebollo-Andino, 312 Fed.Appx. at 348 (unpublished) (district court was not required to convene hearing on defendant's motion for *de novo* review under Section 3145(b)); United States v. Pierce, 107 F.Supp.2d 126, 127 (D. Mass. 2000) ("Section 3145(b) of Title 18 does not provide for a hearing as a matter of right and this Court declines to grant one"); United States v. Foley, 07-10390-RGS, 2009 WL 458558, *3, n.3 (D. Mass. Feb. 24, 2009) (declining to convene evidentiary hearing).

Since the defendant does not request a hearing (and offers no basis for why one would be necessary), the Court should decline to convene an evidentiary hearing and consider detention *de novo* by reviewing the record below. See, e.g., Pierce, 107 F.Supp.2d at 127; Foley, 97-10399-RGS, 2009 WL 458558, *2-3; United States v. Hernandez, 14-10367-RGS, 2015 WL 4448094, *1 (D. Mass. July 20, 2015).[10] Accordingly, "[w]here, as here, a court examines the detention order without taking new evidence, a degree of deference to the factual determinations of the Magistrate tempers the independent review." United States v. McForbes, 109 F.Supp.3d 365, 367 n.2 (D.Mass. 2015) (Hillman, J.).

[10] The record below includes the Transcript of the Detention Hearing (Tr. 1-94) (appended as Exhibit 1), the detention exhibits (H.Exs. 1-18, 20), the defendant's criminal history, and the Pre-Trial Services report documenting the defendant's criminal history and recommending that the defendant be detained as both a danger to the community and individuals, and because of the risk of flight he presents.

## ARGUMENT

Under the Bail Reform Act of 1984, detention of a defendant is required if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government is required to demonstrate, by a preponderance of the evidence, that a defendant poses a risk of flight or, by clear and convincing evidence, that he is a danger to the community. United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991). In considering the government's motion to detain the defendant, the Court must determine whether any condition or combination of conditions will reasonably assure "the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).[11]

In making the determination for both grounds, the Court must consider the factors set out in 18 U.S.C. § 3142(g), which include the nature and circumstances of the offense charged; the weight of the evidence against defendant; defendant's character, financial resources, past conduct, and criminal history; and the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. As detailed below, and consistent with the Magistrate Judge's determination, Ex. 2, the factors set forth in 18 U.S.C. § 3142(g), compel defendant's detention on both dangerousness and risk of flight.

[11] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*." S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also* United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991).

## I. THE DEFENDANT IS A DANGER TO THE COMMUNITY AND A RISK OF FLIGHT

Consistent with the determination of the Magistrate Judge, the evidence adduced at the detention hearing provided sufficient basis on essentially all of the bail factors to support detention of the defendant.

### A. NATURE AND CIRCUMSTANCES OF THE CHARGED OFFENSES

As the Magistrate noted, Hobbs Act Robbery is a crime of violence, and the charged crimes involve the use of multiple firearms against the employee of T-Mobile, and police, and were extremely violent. See Ex. 2, p. 6-7; Tr. 7-63. The charges also carry significant potential sentences not only for the underlying crime of violence (Count 2),[12] but also the mandatory minimum of ten years consecutive to that offense, for the discharge of the firearms used in the offense.[13] Consequently, as the Magistrate Judge concluded, the nature and circumstances of the charged offenses and potential penalty weigh in favor of detention, and the insufficiency of any conditions of release. See Ex. 2, p. 7.

---

[12] Specifically, the government currently calculates the total offense level for the underlying crime of violence to potentially be at least 31, (or 35 (if 3B1.1(a) leadership is attributed)), and the defendant's criminal history to be category IV. See USSG §§ 2B3.1(a) (base offense level 20); 2B3.1(b)(3)(A) (+2, victim suffered bodily injury); 2B3.1(b)(7)(B) (+1, loss amount $25,000); 3A1.2(c)(1) (+6, fired at officers during flight); 3B1.1(a) (+4, organizer or leader of criminal activity involving five or more participants); 3C1.2 (+2, reckless endangerment during flight). As such, if convicted as charged, the defendant faces a potential guidelines sentence range of 168-210 months, followed by 120 months (offense level 31), (or 262-327 months followed by 120 months (offense level 35)).

[13] Though the government's anticipated evidence does not include the defendant firing the weapon himself, he is charged with the substantive offenses through a Pinkerton theory and also as an aider and abettor. See United States v. Bucci, 525 F.3d 116, 132 (1st Cir. 2008) (Pinkerton liability; noting that a "particular defendant need not have physically carried the gun for liability to attach"); Rosemond v. United States, 134 S.Ct. 1240, 1243 (2014) (aiding and abetting; "the Government makes its case by proving that the defendant actively participated in the underlying ... violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission.").

### B. WEIGHT OF THE EVIDENCE

The weight of the evidence also supports detention. See Ex. 2, p. 7; Tr. 7-63; H.Ex. 1-18, 20. To be sure, the testimony of Person 1, if called as a witness, will likely face impeachment on the same basis that essentially every cooperating witness does, including prior inconsistent statements, and promises, rewards and inducements. The government readily acknowledges this. However, at this juncture, Person 1 has pled guilty and faces considerable jeopardy should he present untruthful testimony at trial. Moreover, the government has obtained extensive evidence corroborating Person 1's account of the defendant's involvement.[14]

Even without the benefit of the full scope of now-anticipated trial evidence, the small portion of digital and physical evidence presented at the detention hearing provided overwhelming corroboration of Person 1's identification of the defendant. See Ex. 2, p. 7. As the detention order noted, "the cell site and vector maps place Defendant's phone not just in Brockton, but within 500 meters of the cell site nearest the T-Mobile store precisely when the robbery occurred," Ex. 2, p. 7. The CSLI also placed the defendant's phone in Boston prior to the robbery, and then also in the area of the chase and abandoned vehicle after the robbery, all consistent with Person 1's identification of the defendant. Tr. 9-15, 62-65, 78-80; H.Ex. 16.[15]

Beyond the CSLI, Google records for the defendant's account showed that he searched for T-Mobile stores the morning of the robbery, searched and visited site for a business located essentially next to the store he later robbed, and, "within two hours of the arrests," "searched

---

[14] Without belaboring this point, at trial the government anticipates a far more fulsome and detailed presentation of the evidence corroborating the testimony of Person 1, as compared to the extremely brief version provided for purposes of the detention hearing.

[15] Significantly, the EEP and call detail records proved that the defendant possession of the 2207 phone before and after the robbery. See Tr. 40-46 (calls to EEP on January 25, 2019 and January 28, 2019 from 2207 phone); cf. Tr. 88 (defendant arguing that "maybe other people had access to that phone as well").

Brockton new sources," and crime reports. Ex. 2, p. 7; Tr. 58; H.Ex. 18. Call detail records showed that about 15 minutes after abandoning the vehicle on Carl Avenue, the defendant had a series of calls with J.B., an individual who resided a few hundred yards down Carl Avenue. See Tr. 52; H.Exs. 2 (GPS stopped moving at 7:24 p.m.), and 16, p. 7 (calls to/from 3998 number).

These highly incriminating pieces of digital evidence were not in the possession of the government or Person 1, and not known to exist or to have been retained by Sprint or Google, when Person 1 first identified the defendant on the night of January 26, 2019. Tr. 79-80. Yet, when this evidence was obtained through search warrants weeks later, these digital evidence sources directly corroborated Person 1's identification of the defendant. See Tr. 79-80. Similarly, the agreement and business records of Hertz, and the mail found in the vehicle all supported Person 1's identification of the defendant as the driver (Tr. 36-40; H.Ex. 7-8). This is evidence that Person 1 did not know existed, and would not know the police would recover.

Apart from their value as corroborative evidence, the anticipated trial presentation of the extensive CSLI,[16] call detail records, Google search history, and physical evidence all independently supports the defendant's participation in the robbery. Indeed, even without the testimony of Person 1, the weight of the evidence at trial would be more than sufficient to convict. Accordingly, the weight of the evidence favors detention.

**C. HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

As the pretrial services report indicates, the Magistrate noted in the decision (Ex. 2, p. 8), and the defendant acknowledged in his motion, the defendant has an extensive criminal history

[16] At trial, for example, the government anticipates presenting CSLI for the phones of all four occupants of the vehicle, demonstrating the use of cell sites consistent with contemporaneous travel from Boston to an area of Brockton near the store at the time of the robbery, and then use of cell sites consistent with the path of vehicle to the area of Brockton, where Carl Avenue is located.

(D.Mem. 3). The Magistrate found that this factor supported detention under dangerousness. See Ex. 2, p. 9. Most relevant to the instant case involving the use of firearms, the defendant has three prior firearms convictions, and six prior charged cases alleging possession or use of firearms, dating back to 2005, including a matter involving the theft of his grandmother's Boston Police service weapon. See Docket DL05D1233; H.Ex. 20, p. 7-12, 16-17, 21-23 of 36.

The defendant also has prior convictions for possession of class B substances, possession to distribute class D substances, and prior juvenile delinquency findings for receiving stolen property, resisting arrest, and unarmed robbery. For his juvenile offenses, the defendant was committed multiple times to DYS custody, ultimately until age 21. For his adult offenses, the defendant has been sentenced to state prison, and multiple house of corrections sentences. As the Magistrate Judge noted, and the criminal history confirms the "Defendant violated every probationary sentence imposed." Ex. 2, p. 9. The Magistrate Judge cogently summarized the Boston police reports as "repeated episodes of firearms possession, aggressive, even confrontational incidents with police officers, and an allegation with some support, that as recently as July 2018, Defendant fired shots in the direction of three individuals." Ex. 2, p. 9.

Of course, the defendant also acknowledges a prior criminal conviction from 2013 in Georgia, in the Barrow County Superior Court, where he was convicted of battery, and providing false information to law enforcement (D.Mem. 3).[17] This out of state conviction involved the defendant's use of the name 'Clarence Sanders,' and further supports both dangerousness and risk of flight.

[17] The entries on the interstate criminal history also reflect he was charged, at one point, as a fugitive from justice. This information is contained in the defendant's interstate criminal history, which the government understands is made available to the Court by pretrial services. See 18 U.S.C. §§ 3142(g)(3)(A)("judicial officer" "shall" "take into account the available information concerning" "criminal history"), 3154.

Moreover, the defendant has at least four defaults on his record, including a default on an indicted case in Suffolk Superior Court (Docket 1684CR00407). Some of the defaults lasted for significant periods, including the default on a Quincy District Court, presumably while in custody on the Suffolk Superior Court firearm case (Docket 1656CR004906), and a Stoughton District Court Possession of Class B case, which lasted from June 25, 2013 until March 17, 2014 (Docket 1355CR000945).[18] For the instant case, a warrant was sought for the defendant's arrest after he was identified by Person 1, but remained at large until March 5, 2019. See Tr. 38.

In the pretrial service report that defendant does not list an employer, but noted he had worked most recently for Express Employment as a temporary worker. Originally, the defendant sought to return to work at that entity (Tr. 90). Now, he abandons that proposed condition. Indeed, the exhibits from the detention hearing reveal that the defendant had rarely worked for Express Employment, and in November 2018, had in fact asked that entity to generate a false letter concerning his employment in order to provide it to his "parole" officer. See H.Ex. 15. The defendant's criminal history reveals that he was on pretrial probation and conditions of release related to the August 2018 shooting case until January 4, 2019 (noted as "PTCOR-B" on the criminal history entry).[19] See Mass. Gen. Laws 276, § 87 (authorizing pretrial probation conditions.).

---

[18] The defendant presumably was incarcerated as of January 2014, when arraigned on the murder indictment.

[19] In the detention order, the Magistrate Judge did not rely on the fact that the defendant was on pretrial release at the time. See Ex. 2, p. 9 ("Despite the November 2018 note from the temp agency reproduced above, no evidence indicates that Defendant was on probation or parole at the time of offense or his arrest.").

One of the defendant's substantive arguments appears to relate to the length of time since his last conviction.[20] To start, it has been about five and one-half years since his Stoughton conviction, for which he was sentenced to nine months (Docket 1355CR000945, March 2014). However, the defendant fails to acknowledge the various crimes for which he was charged since then, and that he was held in custody for a significant portion of the period.

Since the Stoughton conviction, he was indicted on murder charges and inferably held in custody from January 2014, through April 2015. After the *nolle prosequi* to the murder indictment, the defendant was charged in Suffolk Superior Court with a firearms offense, and defaulted in the case on August 2016 (Docket 1684CR00407). A warrant issued and he was later arrested on that default warrant, and charged with receiving the stolen motor vehicle he was operating at the time (Docket 1607CR003337). See H.Ex. 20, p. 22-23 of 36. The Suffolk Superior Court firearms offense case was not disposed until November 30, 2017, by a not guilty verdict. Less than a year later, in August 2018, the defendant was charged with a shooting and firearms offenses (Docket 1807CR002568), and the case remained pending until January 4, 2019, when it was dismissed. As such, the defendant's argument concerning the length of time since his last conviction is belied by the fact that he has been repeatedly charged with serious criminal offenses since March 2014, and inferably detained for at least a portion of the intervening five years.

### D. NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The evidence of the defendant's involvement in this case properly supports a determination that the defendant presents a serious danger if released. Furthermore, his violent

---

[20] See D.Mem. 7 ("While he does have a record, it has been more than six years since his last criminal conviction, and the safety of the community can reasonably be safeguarded through the imposition of appropriate conditions of release.").

criminal history, past convictions for firearms and drug offenses, and the violent offenses for which he is currently charged more than suffice to demonstrate the danger that this defendant poses. See Ex. 2, p. 9 (noting the defendant's particular danger to community reflected in his criminal history and past assaultive conduct and firearms possession); H.Ex. 20. Indeed, the defendant has flagrantly violated every previously imposed probationary sentence through the commission of new and serious offenses. See Ex. 2, p. 9. ("Defendant violated every probationary sentence imposed."). In sum, history has proven that no conditions of release can curtail the danger presented by this defendant, or assure his appearance at court.[21]

**E. LENGTH OF DETENTION**

The only new argument apparently raised by the defendant in his motion is that his detention for the past six months impliedly suggests conditions of release are now more appropriate than before. See D.Mem. 7 ("Moreover, Carter has already been locked up in this case for more than six months, and no trial date has yet been set."). The length of current or anticipated detention is not a proper consideration and, therefore, the defendant's principal argument is irrelevant. See U.S. v. Digiacomo, 746 F. Supp. 1176, 1182 (D.Mass. 1990) (Wolf, J.); see also U.S. v. Hare 873 F.2d 796, 799 (5th Cir.1989) (the length of a current or potential future detention cannot be considered under this section since it is not material to the issue of risk of flight or dangerousness).[22]

---

[21] See United States v. Carswell, 144 F.Supp. 2d 123, 138 (N.D.N.Y. 2001) ("elaborate conditions dependent upon good faith compliance are sometimes insufficient when a defendant's criminal history provides no basis for believing good faith will be forthcoming").

[22] In Digiacomo, the court addressed whether the prospect of protracted pretrial detention is a factor which may properly be considered as weighing in favor of release. U.S. v. Digiacomo, 746 F. Supp. 1176, 1182 (D.Mass. 1990). The court concluded it would not be appropriate to consider the inevitability of prolonged pretrial detention, and that it was the Speedy Trial Act Trial Act, 18 U.S.C. 3161 et seq., and not the detention provision of the Bail Reform Act that is the vehicle chosen by Congress to regulate the length of pretrial delays. Id.

Furthermore, the government notes that the only substantive motions filed in the case before October 1, 2019, were filed by the defendant, Diovanni Carter. He was the only defendant to litigate, and now re-litigate his release from detention. ECF #27, 61, 62. He also filed a discovery motion that was denied without a hearing, and he opposed the compulsion of a buccal swab. See ECF #49, 54. Even so, though it has been only five months since the initial appearances, the case is now scheduled for trial in March 2020. As such, the age of the case provides no basis to reconsider the detention order.

## CONCLUSION

For the foregoing reasons, and in light of the evidence presented at the detention hearing, and the findings of fact by Chief Magistrate Judge Hennessy that all of the factors supported detention on dangerousness and risk of flight, the defendant, Diovanni Carter's motion for revocation of detention order should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

List of Exhibits
1. Transcript of April 22, 2019 Hearing (redacted)
2. May 3, 2019 Detention Order (redacted)

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date: October 1, 2019