UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 19-CR-10104-ADB |
| DIOVANNI CARTER. | |
| Defendant | |

## GOVERNMENT'S TRIAL BRIEF

The United States respectfully submits its trial brief in the above-referenced case, which is scheduled for trial on March 2, 2020.

## I.   BACKGROUND

The defendant, Diovanni Carter, is charged in the Superseding Indictment with the following crimes:

- Count One, Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a);

- Count Two, Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a);

- Count Three, Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c);

- Count Four, Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1); and

- Court Five, Felon in Possession of Firearms, in violation of 18 U.S.C. § 922(g)(1).

The charges arise from a January 26, 2019, robbery of a cellular phone store in Brockton, Massachusetts. The defendant is alleged to have conspired to commit the robbery, planned the robbery, physically provided at least one firearm, and served as the driver of the vehicle used to travel to the robbery and to get away from the robbery.

## II.   **ELEMENTS OF THE OFFENSES**

### A.   **Conspiracy to Interfere with Commerce by Robbery**

The elements of Conspiracy to Interfere with Commerce by Robbery are:

> First,   that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to commit robbery and that the robbery as agreed-to, would have had an effect on interstate commerce, if successful; and

> Second,   that the defendant willfully joined that agreement.

"Evidence of an overt act is not required to establish a Hobbs Act conspiracy."  United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000).

 "Robbery" means unlawfully taking or obtaining personal property from another, against his or her will, by means of actual or threatened force, or violence, or fear of injury to his or her person or property, or property in his or her custody or possession, or the person or property of a relative or member of his family or of anyone in his or her company at the time of the taking or obtaining.  18 U.S.C. § 1951(b)(1).

"To establish a Hobbs Act violation, the government need not show an actual deprivation of assets, but only that a deprivation of the victim's assets would have occurred had the defendant succeeded in the [robbery]." United States v. Capozzi, 347 F.3d 327, 337 (1st Cir. 2003) ("the government must show only that the ... conduct created a realistic *70 probability of a de minimis effect on interstate commerce"); United States v. Kattar, 840 F.2d 118, 122 (1st Cir.1988) ("Attempted extortion is also proscribed by [the Hobbs Act] so that it is not material ... whether the property was in fact obtained by the defendant.").

Here, the defendants successfully robbed the T-Mobile of its cellular phones, tablets, and money - in other words, had they achieved the objective of the conspiracy - the "assets" of an

2

"entity" doing business in interstate commerce were depleted when they left the store with the property.  See United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001) ("All that matters is that [the defendant] entered a conspiracy whose objective was to steal the assets of an entity in interstate commerce. That the conspiracy failed to accomplish such objective is irrelevant."); United States v. Turner, 501 F.3d 59, 69-70 (1st Cir. 2007).

### B.      Interference with Commerce by Robbery

The elements of Interference with Commerce by Robbery are:

| | |
|---|---|
| First, | that the defendant knowingly and willfully obtained property from a person or corporation; |
| Second, | that the defendant did so by means of robbery; and |
| Third, | that the robbery affected interstate commerce. |

First Circuit Pattern Jury Instructions, 4.18.1951; United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005).

With respect to the third element, affecting interstate commerce, the extent of the effect upon interstate commerce not need be significant. The commerce element of a § 1951(a) offense extends to the limit of Congress's Commerce Clause authority. See Stirone v. United States, 361 U.S. 212, 215 (1960) (noting that Congress's intent in enacting the Hobbs Act was "to use all [its] constitutional power ... to punish interference with interstate commerce by extortion, robbery, or physical force").  Thus the government need only prove that the "conduct created a 'realistic probability of a de minimis effect on interstate commerce.'" Capozzi, 347 F.3d at 335 (quoting United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992)).  The government does not need to prove that the defendant intended to affect commerce. See United States v. Rivera-Rivera, 555 F.3d 277, 286-291 (1st Cir. 2009) (upholding a jury instruction stating: "It is not necessary for you to find that the defendants knew or intended that their actions would affect

commerce.  It is only necessary that the natural consequences of the acts committed by the defendants as charged in the indictment would affect commerce in any way or any degree"); United States v.  Jiménez-Torres, 435 F.3d 3, 9–10 (1st Cir. 2006).

A business is engaged in interstate commerce for purposes of this test when the business purchases products from out of state.  See Rivera-Rivera, 555 F.3d at 287–88 (finding the interstate commerce nexus satisfied where it was established that the lottery machines put out of service by the robbery, as well as associated equipment, were interstate purchases); Jiménez-Torres, 435 F.3d at 8 (concluding that a gas station was involved in interstate commerce where, in the two months preceding robbery, the station had purchased a substantial amount of gasoline from outside of Puerto Rico); Capozzi, 347 F.3d at 337 (concluding that evidence that a car dealer purchased vehicles from out of state was sufficient to establish the interstate commerce nexus).

It is enough that "the defendant's activity 'minimally depletes the assets of an entity doing business in interstate commerce.'"  Capozzi, 347 F.3d at 337 (quoting United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)).  It does not matter that the amount stolen is relatively small.  See United States v. Brennick, 405 F.3d 96, 100 (1st Cir. 2005) (robbery of $522.37 from a Wal-Mart store with gross monthly sales of $8.5 million); United States v. Ossai, 485 F.3d 25 (1st Cir. 2007) (robbery of $782 from a Dunkin Donuts).  The government need not prove that "the precise funds stolen were certain to be used in future business purchases."  Ossai, 485 F.3d at 31 (quoting Nguyen, 246 F.3d at 55); United States v. Jamison, 299 F.3d 114, 119 (2d Cir. 2002) (affirming Hobbs Act conviction even though the victim stated that some unspecified portion of the stolen money might not have been used for future interstate purchases).  And a temporary

deprivation of assets is enough. Capozzi, 347 F.3d at 337; see also United States v. Stillo, 57 F.3d 553, 559 (7th Cir. 1995) ("[T]he temporary depletion of . . . assets until repayment and the risk of non-payment would be sufficient to satisfy the *de minimis* interstate commerce requirement."); United States v. Lewis, 797 F.2d 358, 365 (7th Cir. 1986) ("Even a temporary loss of the use of money constitutes a deprivation of property under [the Hobbs Act].").

Similarly, the temporary closure of a business engaged is interstate commerce is sufficient.  See United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir. 2005) (sustaining a Hobbs Act conviction where a robbery of employees at a business caused a business engaged in interstate commerce to close for one day).  Finally, the closure need not be immediate.  See United States v. Nguyen, 155 F.3d 1219, 1225 (10th Cir.1998) (holding that effect on commerce in Hobbs Act prosecution was established where, after robbery, business steadily declined and eventually closed); see also United States v. Guerra, 164 F.3d 1358, 1361 (11th Cir. 1999) (similar); United States v. Jennings, 195 F.3d 795, 802 n.8 (5th Cir. 1999) (similar).

### C.  Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence

As an initial matter, for a Section 924(c) enhancement, a "particular defendant need not have physically carried the gun for liability to attach."  United States v. Bucci, 525 F.3d 116, 132 (1st Cir. 2008).  Rather, under Pinkerton v. United States, 328 U.S. 640 (1946), the Government may show "that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant."  Flecha-Maldonado, 373 F.3d at 179.

The elements of Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence are:

First,        that the defendant committed a crime of violence, in this case Interference with Commerce by Robbery, charged in Count Two; and

| Second, | that the defendant knowingly possessed, used or carried a firearm, brandished a firearm, or discharged a firearm; and |
|---------|-----------------------------------------------------------------------------------------------------------------------|
| Third, | that the defendant did so during and in relation to the commission of that crime. |

See United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004).

Interference with Commerce by Robbery (Hobbs Act robbery) is categorically a crime of violence under Section 924(c)(3)(A) (the force clause) because it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  See United States v. Garcia-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018) ("we therefore hold that because the offense of Hobbs Act robbery has as an element the use or threatened use of physical force capable of causing injury to a person or property, a conviction for Hobbs Act robbery categorically constitutes a 'crime of violence' under section 924(c)'s force clause").

To the extent that government also proceeds on a theory of aiding and abetting a violation of 924(c), as specified in the Superseding Indictment, the government must establish: (1) the defendant knows and intends that the principals would be using, brandishing or discharging a gun, and (2) he willingly took some action to facilitate that commission of the crime. United States v. Medina–Roman, 376 F.3d 1, 6 (1st Cir. 2004), cert. denied, 543 U.S. 993 (2004); see also United States v. Bennett, 75 F.3d 40, 45 (1st Cir. 1996), cert. denied, 519 U.S. 845 (1996); United States v. Luciano–Mosquera, 63 F.3d 1142, 1150 (1st Cir. 1995).  "An active participant in [the underlying crime] has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun," such as "the driver in an armed robbery." Rosemond v. United States, 572 U.S. 65, 77-78 (2014).  The Supreme Court explained that the facilitation element pertains to "helping to bring about one part of the offense," which includes either the underlying crime of violence or drug trafficking offense, or the use, brandishing and discharge of the firearm.  Id. ("the commission of a drug trafficking (or violent) crime is—no

less than the use of a firearm—an essential conduct element of the § 924(c) offense.") (internal quotes omitted)

The defendant does not need to have specifically intended that the firearm be discharged during the commission of the offense; intentional or accidental discharge satisfies the enhancement.  See Dean v. United States, 556 U.S. 568, 577 (2009) ("The 10–year mandatory minimum applies if a gun is discharged in the course of a violent or drug trafficking crime, whether on purpose or by accident.").

Under either theory of criminal liability (Pinkerton or Aider and Abettor), the question of whether the defendant is guilty of discharging the firearms and brandishing them, as charged in the Superseding Indictment, must be submitted to the jury. See United States v. LaPrade, 673 F. App'x 198, 204 (3d Cir. 2016).

As reflected in the government's proposed jury instructions, these questions should be submitted to the jury as a special interrogatory on the verdict slip.

**D.      Felon in Possession of a Firearm and Ammunition**

The elements of the offense are:

First,          that the defendant has been and knows that he has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year.

Second,       that defendant knowingly possessed the firearm or ammunition described in the indictment.

Third,         that the firearm or ammunition, at any time after it was manufactured, moved from one state to another or from a foreign country into the United States.

### E. Theories of Liability

The government will request that the Court instructs the jury as to additional theories of liability for Counts Two and Three. Specifically, the government requests instructions as to Pinkerton liability and aider and abettor liability, as detailed in its proposed Jury Instructions.

## III.   SUMMARY OF THE ANTICIPATED TRIAL EVIDENCE

The government provides the following summary of the anticipated evidence, which the government may introduce at trial. For purposes of this Trial Brief, the government refers to a cooperating witness whose identity has been disclosed to the defendants as Person 1. An unindicted coconspirator whose identity has been disclosed to the defendant is referred to as J.B.

### A.   The Day of the Robbery

In the afternoon of January 26, 2019, at approximately 2:21 PM, J.B. walked into the T-Mobile located on Belmont Street in Brockton, MA.[1] Surveillance shows that J.B. was wearing a grey Nike sweatshirt, grey sweatpants, and white sneakers. Surveillance video depicts J.B. walking into the middle of the store, then immediately retrieving a cellular phone from his pocket and placing it to his ear as he walked around the store. J.B. remained in the store until approximately 2:24 PM, when he interacted with the salespersons at the front, and then left the premises.

The CSLI for the phone associated with J.B. ending in 3998, the phone associated with Diovanni Carter ending in 2207 and the phone associated with Rosser-Stewart ending in 6983 demonstrated that all three phones employed cell sites in the City of Brockton at times proximate to 2:22 PM on January 26, 2019.

---

[1] Absent stipulation, the government intends on authenticating the surveillance video of the store through testimony of the store manager, G.D., who is also the victim of the armed robbery, through other employees or potentially a keeper of the record of the entity.

On March 13, 2019, ATF executed a search warrant at J.B.'s residence located at 82 Carl Avenue, Brockton, MA, and seized the grey Nike sweatshirt, the grey sweatpants, and white sneakers worn by J.B. during the visit at 2:21 PM.

### B.      The Night of the Robbery

#### 1.      6:00 PM to 7:10 PM: The Plan

On the evening of January 26, 2019, Person 1 was in the area of East Street in Dorchester, MA.  Around 6:10 PM, Rosser-Stewart called Person 1 and asked Person 1 what he was doing that evening.[2]  Person 1 provided his current location and Rosser-Stewart indicated that he was about to arrive at Person 1's location.  Person 1 was in a vehicle with a female associate, known only as Amanda.

Shortly thereafter, Rosser-Stewart arrived in a white Chevrolet Malibu with Diovanni Carter, and Darius Carter. Diovanni Carter was driving, Rosser-Stewart was seated in the front passenger seat, and Darius Carter was seated behind Rosser-Stewart.  Person 1 entered the white Malibu and sat behind Diovanni Carter. Person 1 knew Rosser-Stewart and Diovanni Carter, but was less familiar with Darius Carter.  Once in the Malibu, the group discussed committing a robbery that night.

At one point during the discussion, Diovanni Carter mentioned a T-Mobile store in Brockton that would be a good target.  Diovanni Carter was familiar with Brockton, and Person 1 knew him to be in Brockton frequently.  Diovanni Carter indicated to the group that he frequently goes by the T-Mobile, and the store would be an easy target.  Darius Carter, Rosser-Stewart and Person 1 all agreed to the plan.

---

[2] Call detail records indicate calls from a phone associated with Rosser-Stewart (ending in 6983) to a phone associated with Person 1 (ending in 8349) at approximately 6:06 PM and 6:10 PM.

Person 1 then left the white Malibu in order to conduct a sale of marijuana.  Person 1 returned to the vehicle that Amanda was in, and the white Malibu left the area.  As Person 1 was conducting a sale of marijuana, Rosser-Stewart called him to coordinate meeting up again.[3] Following the marijuana sale, Person 1 returned to East Street and waited for the group.  The white Malibu arrived with Diovanni Carter driving, Rosser-Stewart in the front passenger seat and Darius Carter behind Rosser-Stewart.  Person 1 entered the white Malibu and sat behind Diovanni Carter.

Diovanni Carter then turned around and handed Person 1 a black .380 caliber handgun with an extended magazine.  Person 1 observed Darius Carter seated next to him in the back seat holding a large silver handgun.  The group discussed the plan to drive to Brockton, rob the T-Mobile store for the cell phones. Person 1 put the black gun down and walked over to Amanda, who was in the other vehicle, and told Amanda to follow the white Malibu.  Person 1 gave Amanda his cellular phone associated with the number ending in 8349 for her to use. Person 1 retained a second cellular phone associated with a number ending in 9101 that he would use to contact Amanda.

Person 1 then returned to the white Malibu and the group left East Street and headed towards Brockton travelling on I-93 to Route 24.  CSLI for phones associated with Diovanni Carter (ending in 2207), Rosser-Stewart (ending in 6983), Darius Carter (ending in 7918) and Person 1 (ending in 9101) indicated the use of cell sites consistent with being in the area of the area of East Street, Dorchester, MA, around 6:40 PM.  Around 6:45 PM, the phones commenced using cell sites consistent with their contemporaneous travel to Brockton, MA, arriving in the

---

[3] Call detail records indicate a call from a phone associated with Rosser-Stewart (ending in 6983) to a phone associated with Person 1 (ending in 8349) at approximately 6:33 PM.

immediate vicinity of the T-Mobile store around 7:05 PM.[4]  At some point during the trip,

Person 1 noticed that Amanda was no longer behind them. Person 1 called Amanda on the 8349

phone and provided information as to their whereabouts.[5]

At some point during the ride, Person 1 was given a pair of gloves. While travelling to

the store, Diovanni Carter mentioned that there would only be one or two employees in the store

and that it would be closing soon.

### 2.      7:10 PM to 7:15 PM: The Robbery of the T-Mobile

At approximately 7:06 PM, a camera from a dentist office across the street from the T-

Mobile store on the corner of Winnifred Road and Torrey Street captured a vehicle matching the

description[6] of the white Malibu drive by the T-Mobile store, and stop at a red light on Torrey

Street. The camera depicted the lit-interior of the T-Mobile store.  As they drove by the store,

Diovanni Carter informed the group that this was the location and that the time was right because

there was little activity visible in the store. The white Malibu then ultimately drove around side

streets to stop on Winnifred Road, out of view of the dentist office camera.

---

[4] This cell site location information includes engineering data kept by Sprint for the phone
ending in 2207 associated with Diovanni Carter, known as per-call measurement data.  This
engineering data provides estimated distances of the device from the cell site, and estimated
precision location information. An engineer from Sprint is anticipated to testify as to the manner
and methods by which this data is generated, and the engineering purposes that such data serves
for the Sprint cellular network.

[5] Call detail records indicate calls between the two phones associated with Person 1 (one of
which used by Amanda) at approximately 6:46 PM, 6:56 PM, 6:59 PM, and 7:10 PM.  Of note,
at 6:56 PM the phone used by Amanda employed a cell site beyond the exit to Route 24 (west of
the exit), consistent with missing the exit.

[6] This vehicle matches the body style, light patterns, and wheels of the white Malibu. This
vehicle also has the driver and front passenger visors down and visible through the windshield,
consistent with the white Malibu that contained the stolen phones.

At approximately 7:11 PM, the dentist office camera captured Darius Carter, Stephan Rosser-Stewart and Person 1 walking down Winnifred Street, crossing over to Torrey Street, and entering the T-Mobile store. The white Malibu, with Diovanni Carter in the driver's seat, waited on Winnifred Street out of camera view.

Darius Carter and Rosser-Stewart entered the store first and pointed their firearms at the store manager, G.D., who was alone inside. Darius Carter carried a large silver firearm, later identified to be an Armi Fratelli 9mm. Rosser-Stewart carried a small silver firearm, later identified to be a Jennings .22 caliber, and a duffel bag. Person 1 followed a few seconds behind.

Darius Carter and Rosser-Stewart forced G.D. from the front to the door of the rear inventory room and demanded access to the phones and other valuables. With the gunmen pressed close to him, G.D. entered the code to the rear inventory room and, while doing so, was struck in the head by one of the gunmen with a firearm.[7] At this point, Person 1 entered the store carrying the black Ruger .380 caliber firearm he received from Diovanni Carter and went to the rear inventory room. As the group entered the rear room, G.D. opened the inventory cabinets, and Rosser-Stewart emptied the cabinet into the duffel bag while Person 1 pointed his firearm at G.D.. Person 1 obtained a clear plastic trash bag that was used to carry more stolen devices. Darius Carter left the rear area, checked the front of the store and then returned to the inventory and assisted.

Collectively, the robbers stole cellular phones and tablets valued at $20,079 and $4,683 in cash. The cash was comprised of $500 in the change fund and $4,183 in deposits. Unbeknownst to the robbers, among the phones was a covert GPS tracking device that was designed to send

---

[7] Medical records of G.D. at Good Samaritan reveal he suffered a hematoma. The government intends to offer these medical records pursuant to a certificate of authenticity, pursuant to Fed. R. Evid. 803(3), (4), (6), & 902(11), and also may potentially offer testimony of the treating nurses.

real time location updates to a security company when it was removed from the vicinity of the

store.  At approximately 7:13 PM, the robbers left the store, crossed over Torrey Street and

returned to the white Malibu that was on Winnifred Street.

### 3.     7:15 PM to 7:21 PM: The Chase and Gunfire

Everyone returned to the same seats in the white Malibu and Diovanni Carter started

driving.  The records of the covert GPS device indicated that the device started travelling north

on Winnifred Street at 7:14:01 PM.  Once the car started moving, Diovanni Carter spoke on the

phone with another individual, and told the person in sum and substance that he was in

possession of the stolen eletronics, and instructed the person to whom he was speaking to call his

associates.[8]  Diovanni Carter drove the vehicle north on Winnifred Street and then took a right

onto West Elm Street travelling towards downtown Brockton at a slow rate of speed.

Geographically, from the T-Mobile store, the highway is the opposite direction from downtown

Brockton.

At some point during the drive, Person 1 voiced his concern that they did not appear to be

heading toward the highway. Diovanni Carter replied, in sum and substance, that he knew what

he was doing and told Person 1 to relax.  As they drove and neared Brockton center, police sirens

and cruisers could be heard in the area.  At some point, a police cruiser drove by them and

Diovanni Carter told the occupants to stay calm, and began driving down side avoid police.

After driving through the center of Brockton and onto Crescent Street, the police were behind the

---

[8] Call detail records for the 2207 phone associated with Diovanni Carter shows an outgoing call
at 7:12:56 PM and an incoming call at 7:15:03 PM.  Cell site location information for these calls
indicate that Diovanni Carter's phone employed a cell site located less than 2000 feet from the T-
Mobile store, and employed a sector facing the T-Mobile store and downtown Brockton.

white Malibu.  The officers had been alerted to the location of the covert GPS device and had

identified the white Malibu as the getaway car.

At the area of Crescent Street and Lyman Street, the chase started in earnest and multiple

cruisers joined in the pursuit.  The Malibu picked up speed reaching 55 mph on two-lane dense

residential streets.  The Malibu took a right onto Wendell Avenue, crossed over Crescent Street,

reaching about 50 mph, and then took a sharp right onto Addison Avenue, which is an extremely

narrow and densely populated street with on-street parking.  The vehicle sped down Addison

Avenue, took a sharp left onto Sprague Avenue, a quick right onto Pine Street and then a hard

left onto Summer Street.  All of these turns happened in short succession and demonstrated the

driver's attempts to lose the police in the residential neighborhood.  Officer Sylverson Robinson

was in the lead cruiser.

As the Malibu turned onto Summer Street, the defendant picked up speed, reaching over

75 mph.  During the chase, the defendant told the other people in the car that they needed to get

the police off them.  At this point, Darius Carter rolled down the window, extended his torso out

of the window, and fired the Armi Fratelli 9mm at the pursuing officers.  Diovanni Carter urged

Darius Carter on as he fired the shots, stating in sum and substance "Yeah, D."  Rosser-Stewart

then rolled down his window and started firing his gun at the police as well.  Person 1 did not

fire at police.

Brockton ShotSpotter recorded a multishot incident with an estimated total of eight

gunshots being fired along the area of Summer Street at a time consistent with the location of the

GPS device being on Summer Street.  No rounds struck the pursuing officers, and Brockton

Police did not return fire. The officers continued their pursuit. The Malibu then took a left onto

Edson Avenue and a quick right onto Carl Avenue.  The Malibu came to a stop at the

intersection of Bristol Avenue and Carl Avenue.[9]  Importantly, the Malibu came to a stop

approximately less than 1,000 feet from 82 Carl Avenue, which is where J.B. resided.[10]

### 4.      7:21 PM to 11:00 PM: The Search for the Suspects

Once the Malibu came to a stop, all four occupants got out and ran from the vehicle.

Person 1 left the black Ruger firearm behind.  As Person 1 ran down Bristol Avenue, Diovanni

Carter was right behind him and stepped on his sneakers, causing Person 1 to run out of them.

The sneakers were later recovered.  Darius Carter, Diovanni Carter, and Person 1 continued west

down Bristol Avenue, while Rosser-Stewart continued in a more southerly direction.

As Person 1 climbed over a fence, Diovanni Carter remained right behind him and fell on

Person 1 as they vaulted the fence. Ultimately, Person 1 remained behind, hiding behind a fence

in the yard, while Darius Carter and Diovanni Carter continued on and crossed Baker Street into

the woods.

Brockton Police remained in pursuit and attempted to establish a perimeter and search for

the suspects.  Numerous units converged on the scene.  At approximately 7:30 PM, Darius Carter

was found in the woods south of 47 Baker Street and taken into custody.  He was wearing the

exact same clothing and sneakers as depicted in the surveillance video. Though officers were not

aware of this that evening, Darius Carter had been shot by Rosser-Stewart during the gunfire and

was bleeding from his left shoulder.  Darius Carter's clothing revealed a hole consistent with a

---

[9] The covert GPS data revealed that the device came to a stop at the intersection of Carl Avenue and Bristol Avenue at 7:21:31 PM.

[10] This will be proven by Mass. RMV records listing 82 Carl Avenue as the address associated with J.B.'s license, Sprint subscriber records listing 82 Carl Avenue as the address for J.B.'s account associated with a phone ending in 3998, and testimony concerning the execution of a search warrant at 82 Carl Avenue on March 13, 2019, where J.B. was present with his belongings and a phone associated the 3998 number was seized.

bullet hole, and a booking image taken at the Plymouth County jail revealed two wounds to his left shoulder consistent with a through-and-through bullet wound. Darius Carter did not inform the Brockton Police or Plymouth Sheriff's Office that he had been shot.

Later that night, officers and a K-9 located the black Ruger .380 firearm used by Person 1 during the robbery and the silver Armi Fratelli 9mm firearm used by Darius Carter during the robbery a few yards away from where he was arrested.  The two firearms were wedged underneath a rock and concealed with leaves.  The black Ruger .380 was loaded with thirteen rounds of ammunition, and the silver Armi Fratelli 9mm had no ammunition.

At approximately 7:33 PM, three minutes after Darius Carter was arrested, Person 1 was taken into custody. Person 1 immediately began to cooperate and provide information to the officers.  Person 1 confirmed that there were four persons involved in the robbery, and gave the last-known location and descriptions of the suspects who were not yet apprehended, including the physical characteristics of Diovanni Carter such as his height, light skin complexion and beard.[11] This information was broadcasted over the radio and captured on the turret tape.

At approximately 8:00 PM, Trooper Eric Resendes of the Massachusetts State Police encountered Rosser-Stewart walking on Carl Avenue.  Rosser-Stewart was about to knock on the door to a residence and was sweating profusely and wearing the same jeans and sneakers that were depicted in the store surveillance video. Rosser-Stewart also had an inconsistent and suspicious story concerning his presence in the area.  After interacting with Rosser-Stewart, Trooper Resendes detained him and Brockton Police transmitted a photograph of Rosser-Stewart

---

[11] The government may introduce this descriptive information provided by Person 1 on the scene because the government is not intending on offering it for its truth, as opposed to the fact that it was said at that time in those particular circumstances.  See Fed. R. Evid. 801(d)(1)(B).

to officers who were with Person 1. Person 1 identified Rosser-Stewart as being involved in the robbery.[12]

The search, involving K-9 units, continued on for hours, and the Massachusetts State Police (MSP) Air Unit used forward looking infrared (FLIR) cameras to search the woods for Diovanni Carter. Despite an intensive search, Diovanni Carter was not apprehended that evening. That night, law enforcement and Person 1 were not aware of the involvement of J.B., and Person 1 was not familiar with him.[13]  The video of the MSP Air Unit's FLIR camera depicted the search efforts being focused in the wooded area south of Baker Street and Davis Commons, and not in the area of Carl Avenue or the residences along that street.[14]

A warrant would later be sought for Diovanni Carter, but he would not be apprehended until March 5, 2019.

### C.      At the Station

Darius Carter, Rosser-Stewart and Person 1 were transported to the Brockton Police station and booked.  The booking videos of Darius Carter, Person 1 and Rosser-Stewart captured them wearing the same clothing as depicted in the surveillance video. Rosser-Stewart was not wearing the same jacket, but was wearing the same pink/fuschia underpants that were observed in the surveillance video.

---

[12] The government intends to elicit this statement of prior identification.  See Fed. R. Evid. 801(d)(1)(C).

[13] Call detail records for the phones associated with Person 1 and J.B. show no connectivity between the phones. Additionally, Person 1 is not listed as a contact in the device obtained from J.B., and is not listed as a contact in the iCloud contact list associated with J.B.'s iCloud account.

[14] The government intends to elicit testimony from Trooper Kristopher Malm of the Air Unit, and play portion of a video depicting the FLIR camera activity to document the activity, the scope of the search and the focus of the efforts not being on the area of 82 Carl Avenue, but on the woods nearby.

All three suspects' hands were swabbed for gunshot residue, but those tests came back negative. The government anticipates expert testimony stating gunshot residue would not penetrate gloves, and the circumstances of firing a weapon out of the window of a fast-moving automobile would reduce the chance of gunshot residue being present on the shooters hands.

Person 1 waived Miranda and provided a recorded statement. During the statement, Person 1 recounted details of the robbery and shooting. Ultimately, Person 1 positively identified Diovanni Carter through an eight-photo array.[15]

While in the holding cells, Person 1, Darius Carter and Rosser-Stewart discussed the potential whereabouts of Diovanni Carter.  Rosser-Stewart suggested that Diovanni Carter had gotten away to another person's residence that Rosser-Stewart knew.[16]  Darius Carter also informed Rosser-Stewart that Rosser-Stewart had shot Darius Carter.  Upon hearing this, Rosser-Stewart replied that it was only a .22.

      D.      **The Getaway Vehicle**

           1.      **Evidence Within the White Malibu**

Brockton Officers and Deputies of the Plymouth County Bureau of Criminal Investigation processed the white Malibu. Within the Malibu, they located all of the stolen cell phones and tablets, the covert GPS device, and all of the cash that was stolen from the T-Mobile store.  These tablets and cell phones were manufactured outside of the United States and shipped

---

[15] The government intends to introduce this as a prior statement of identification. <u>See</u> Fed. R. Evid. 801(d)(1)(C).

[16] Call detail records indicate extensive connectivity between Rosser-Stewart and J.B., and the forensic extraction of J.B.'s phone shows communication between them and mention of Diovanni Carter.  Conspicuously absent from the image of the J.B. phone are communications between J.B. and the 2207 phone, that are known to exist from call detail records, suggesting purposeful deletion.

to the store for sale by T-Mobile from a distribution center located outside of Massachusetts.  An employee conducted an inventory and determined that all of the stolen items and cash had been recovered from the white Malibu.  After recovery, some of the tablets and phones were not fit for sale and were returned to T-Mobile.

In the front passenger area, there was a spent .22 caliber casing, the black duffel bag and a jacket on the seat, consistent with what Rosser-Stewart was wearing during the robbery. Officers also located two pieces of mail addressed to Diovanni Carter in the vehicle, including a jury summons and letter from Capital One.  Additionally, a Hertz rental agreement was located for the white Malibu, which listed Carshana Graham as the renter and Diovanni Carter as the authorized driver. On the rental agreement, the phone ending is 2207 was listed.

Also among the items located inside the vehicle were the gloves worn by Darius Carter in the rear by the passenger side door. In the rear, driver's side door compartment, officers located a wallet belonging to Terrell Jackson and a driver's license belonging to Person 1.[17]

On the rear passenger side door, a fingerprint was located that was matched to Diovanni Carter. Another fingerprint was recovered from an individual named Andy Sousa, who was not involved in the robbery or present in the vehicle during the robbery.

The government obtained and served a search warrant to obtain OnStar records for the vehicle, but was informed that such records were not maintained historically by OnStar.

The government obtained and executed a search warrant to search the on-board computer system of the white Malibu, but the system proved to be incapable of forensic analysis.

---

[17] Jackson had left his belongings in the Malibu when Diovanni Carter and Person 1 had given Jackson a ride a few days before the robbery. Cell site location information for Terrell Jackson showed that his phone was in Boston at the time of the robbery. Jackson had called Diovanni Carter at the 2207 phone a few times but was unable to make contact and retrieve his belongings.

### 2.      Provenance of Getaway Vehicle, Records, Testimony

The white Malibu getaway vehicle was a Hertz rental vehicle.

An email obtained from Diovanni Carter's Gmail account through a search warrant to Google showed that the rental had been reserved by Diovanni Carter on January 16, 2019, through his DIORMAURICECARTER@GMAIL.COM email address using "Tickets At Work," an employee benefits service available to a woman named Carshana Graham that provides discounts for purchases such as car rentals. Graham was listed as the renter on the reservation confirmation email sent to the DIORMAURICECARTER@GMAIL.COM email, but the phone number associated with Diovanni Carter ending in 2207 was listed as the contact information. The reservation confirmation number on the email was "H9131656981."

On January 16, 2019, at approximate 4:04 PM and 4:05 PM, Diovanni Carter called the number for Hertz at 30 Park Plaza, Boston, MA.

On January 16, 2019, Graham and Diovanni Carter travelled to 30 Park Plaza, Boston, MA, in Graham's vehicle.[18]  Graham served as the actual renter of the white Malibu, while Diovanni Carter was listed as an authorized driver. Diovanni Carter signed the paperwork as the authorized driver.[19]  The rental was due to be returned on January 23, 2019.  The reservation number on the records for the rental of the white Malibu stated "H9131656981."  Once the rental

---

[18] Graham is an anticipated trial witness.  Given Graham's affinity and relationship with the defendant, the government may seek to have her designated as a hostile witness, or witness identified with an adverse party depending on the nature of the examination.  See Fed. R. Evid. 611(c)(2).

[19] CSLI for the Diovanni Carter phone ending in 2207 show that the device used cell sites near 30 Park Plaza, Boston, MA, around this time.

paperwork was completed at 5:45 PM, Graham provided Diovanni Carter with the keys to the vehicle and had no involvement in the vehicle until after the robbery.

On January 21, 2019, call detail records for Diovanni Carter's phone ending in 2207 showed a call from Diovanni Carter to the phone number ending in 1500 for the Hertz branch at 30 Park Plaza, Boston, MA, ending in 1500 at 10:56 AM.

Call detail records for Graham's phone ending in 8447 showed a two second call to Diovanni Carter's phone ending in 2207 on January 27, 2019.  Phone records did not show any other communications between the two numbers after the date of January 26, 2019, through February 4, 2019.

Records obtained from Hertz indicated that Carshana Graham was the renter of the vehicle and that Diovanni Carter was listed as the authorized driver. Diovanni Carter's phone number was also associated with the rental, but on the final documents, a different email was associated with the record.  According to the records, the white Malibu was due to be returned on January 23, 2019, but was not returned until after it was impounded by Brockton Police.

E.      **Interstate Commerce**

The T-Mobile at 521 Belmont Street in Brockton was in fact a branded location operated by Express Stores LLC, which is an East Brunswick, New Jersey based business that operates sales locations for the cell phone service company, T-Mobile.  Express Stores operates approximately 21 stores in Massachusetts.  All of the payroll, hiring, and other business operations are handled in New Jersey.  Only the physical stores are operated in Massachusetts, and there is no non-retail presence of Express Stores in the state of Massachusetts.  T-Mobile itself is a company based in Bellevue, Washington, and is owned by Deutsche Telecom, based in Germany.

The particular T-Mobile store on Belmont Street in Brockton, MA, stocked and sold cell phone service plans, cellular phones, tablets, and other accessories.  None of the items sold by the T-Mobile store or stolen by the robbers were manufactured in Massachusetts. In fact, T-Mobile actually owned the inventory on-site, and if the items were not recovered, Express Store would have incurred a loss and had to pay for the stolen inventory.  T-Mobile ships and replenishes inventory for the various stores, including the store on Belmont Street, in Brockton, MA, from its Texas shipment headquarters.

Transactions conducted at the T-Mobile store on Belmont Street in Brockton, MA, included credit card transactions and cash transactions.  The cash transacted by the store is retrieved by a courier employed by T-Mobile and is deposited directly into a T-Mobile bank account.

The T-Mobile store sold cell phone service plans that permitted the customers to access facilities of interstate commerce, including the T-Mobile nationwide cellular telephone network. Additionally, transactions conducted by the store included credit card transactions that employed facilities of interstate commerce to be accomplished.

After the robbery, the T-Mobile store closed approximately 45 minutes early, as it was due to close at 8:00 PM that evening.  No sales were conducted or customers were served during this period when the store was closed. The robbery caused numerous employees of Express Stores located in New Jersey to respond and provide assistance to the internal investigation.

H.      **Phone and Email Attribution for Diovanni Carter**

1.      **Express Employment Records**

Diovanni Carter had stints of employment with Express Employment Solutions (EES), a temporary staffing company. On January 21, 2019, Diovanni Carter provided an updated cell phone number ending in 2207 to EES.

On January 25, 2019, Diovanni Carter received an email at the DIORMAURICECARTER@GMAIL.COM (the Google account) address from EES.[20] In the email, EES offered Diovanni Carter a position starting on January 28, 2019, in Braintree at SimpliSafe.  Shortly thereafter, Diovanni Carter sent a responsive email to EES, through the Google account, indicating that he will be at the assignment.

Records of EES show phone contact with Diovanni Carter on January 21, 2019, January 25, 2019, and January 28, 2019.  Call detail records of the 2207 phone show calls with the phone number for EES on those dates as well.

The entry in the Express Employment records for January 28, 2019, indicates communication with Diovanni Carter concerning the SimpliSafe assignment. The entry states that Diovanni Carter was ending his assignment that day because he has a lot going on in his life. Call detail records for the 2207 phone show that Diovanni Carter called the EES number at approximately 4:55 PM.  A witness from Express Employment will testify to a phone conversation with Diovanni Carter on Monday January 28, 2019, consistent with the call notes that Diovanni Carter was ending his temporary employment assignment.  Call detail records showed that this call to Express Employment was made with the 2207 phone.  This evidence is

---

[20] The government intends to introduce this email through both the business records of EES and from the Google data obtained via search warrant.

being offered to show that Diovanni Carter remained in possession of the 2207 phone before,

during and after the robbery.

### 2.   Capital One Records

The government intends to introduce records from Capital One concerning an application

for a credit card ending in 7687, received on February 1, 2019 submitted by Diovanni Carter,

with the same date of birth and social, listing the 2207 phone number, and the

DIORMAURICECARTER@GMAIL.COM email address.

### 3.   Google Account

The government intends to introduce certain portions of content received from Google in

response to a search warrant that was obtained for Diovanni Carter's Google Account.  This

information is self-authenticating through a sworn certificate and its integrity is confirmed by the

MD5 hash of the data. See e.g., Fed. R. Evid. 902(13) & (14).  The government intends to

introduce this evidence through Special Agent Matthew Kelsch, an expert in digital forensics and

digital investigations.

### a.   Attribution of Account

The government obtained the content of a Google Account associated with the

DIORMAURICECARTER@GMAIL.COM account (the Google Account).  The subscriber

information for this account indicates that the account was created on November 11, 2018, and

lists "Dior Carter" as the name. The associated "SMS" number listed for the subscriber which is

the phone number used to receive text messages from Google concerning the account is the

phone number ending in 2207.

As part of the content associated with the Google Account, the government obtained the

contents of emails. The emails are consistent with ownership of the account by Diovanni Carter,

including communications with Express Employment on January 25, 2019, and Tickets At Work

for the reservation of the white Malibu.[21]

### b.      Content of Search History

Also among the content obtained from the Google Account was the Google Search

History. The Google Search History is the accumulated list of items that were searched for by

devices that were logged into the Google Account.[22]  Access to the Google Account would

require the email and associated password for the account.

In total, there were 1113 entries contained in the Google Search History of the Google

Account from the period of November 16, 2018 through February 2, 2019.  The government

intends to offer a summary chart that accurately reflects the underlying data, and testimony

derived from review of the data.  See Fed. R. Evid. 1006.  Some of the pertinent entries and

circumstances within the search history that government intends to emphasize are:

- On January 16, 2019, at 4:04 PM, Diovanni Carter conducted a search for "hertz
  rental car 30 park plaza boston ma", the location from where the white Malibu was
  rented.

---

[21] Should the defendant contest the attribution of the Google account, the government would
introduce other emails from the account for purposes of proving that Diovanni Carter was the
person controlling the account. Such emails include some concerning music and an individual
named "Steel" that precede and post-date January 26, 2019.  For example, at the detention
hearing, the defendant claimed to be employed by a music studio and the owner of the studio
identified "SteelStaxx" as an artist for which Diovanni Carter was responsible. See ECF #27-1.
Additionally, the Google Account shows activity with other online services such as
SingleParentMeet.com, and emails from UrbanBeatsDaily that address the user as "Diovanni."

[22] Google provided this information in a comma separated value format, which is unsuitable for
court presentation because the data is separated by commas, and no other visual distinguisher,
and is also produced in UTC time. The government intends on introducing the original
information and an accurate version with the values formatted and delimited into columns and
headers, and the time zone converted to Eastern Standard Time (EST).  This formatted chart of
the search history is anticipated to be substantively admissible once authenticated to be accurate
by a competent witness, or alternatively, would constitute a summary chart if the chart
completely and accurately depicts the underlying data and information.  See Fed. R. Evid. 1006;
United States v. Milkiewicz, 470 F.3d 390, 395-401 (1st Cir. 2006).

- On January 21, 2019, at 10:55 AM, Diovanni Carter searched for "hertz rental car 30 park plaza boston ma", the location from where the white Malibu was rented.

- On the morning of January 26, 2019, at 5:13 AM, Diovanni Carter conducted a search for "xtreme rentals brockton", Xtreme Rentals is a business located two buildings down the street from the T-Mobile store that was robbed later that day.[23]

- On the morning of January 26, 2019, from 6:31 AM through 10:58 AM, Diovanni Carter conducted 10 searches for "t mobile near me". The Google Search history encompasses three months of search history, with over 1113 activity entries. These searches on January 26, 2019, are the only date on which Diovanni Carter conducted a search relating to "t mobile" and no searches for other permutations such as "tmobile" or "t-mobile" were ever conducted.

- On January 26, 2019, at 4:35 PM, Diovanni Carter searched for "hertz rental car 30 park plaza boston ma" the location from which the white Malibu was rented.

- On January 26, 2019, at 5:30 PM, Diovanni Carter searched for "glock 47", which is a brand of firearm.

- On January 26, 2019, at 5:31 PM, Diovanni Carter visited a website associated with instructions on how to build your own "ak-47", "glock" or "ar", which are firearms.

- On January 26, 2019, at 9:19 PM, 9:21 PM, and 9:41 PM, Diovanni Carter visited the website "enterprisenews.com" which is the website for the local Brockton newspaper the Brockton Enterprise. At 9:21 PM and 9:41 PM, Diovanni Carter visited the specific portions of the Brockton Enterprise website for crime articles: "enterprisenews.com/news/crime". Of the more than three months of search history, and 1113 activity entries, this is the first date in which Diovanni Carter conducted a search related to the Brockton Enterprise or visited their website, or the portions specifically associated with crime news.

- On January 26, 2019, at 10:15 AM, Diovanni Carter visited a series of websites, including enterprisenews.com, enterprisenews.com/news, and enterprisenews.com/top-stories.

---

[23] This business is located a few hundred feet from the T-Mobile store, essentially behind the dentist office from which surveillance video was obtained.

- On January 26, 2019, at 10:20 PM and 10:21 PM, Diovanni Carter searched for "channel 7 breaking news", and "channel 7 breaking news brockton".

- On January 27, 2019, at 6:53 AM, Diovanni Carter visited enteprisenews.com.

- On January 27, 2019, at 6:56 AM, Diovanni Carter searched for "breaking news" and then "breaking news channel 7".

- On January 27, 2019, at 6:56 AM, Diovanni Carter visited "whdh.com/news/local" which is the website for a local Boston news station.

- On February 1, 2019, at 1:34 PM, 3:29 PM, and 5:22 PM, Diovanni Carter visited the Boston Globe website associated with an article on the January 26, 2019 robbery.

**F.      Phone Records Analysis and Testimony**

**1.      Subscriber Records**

According to Sprint records, the 2207 phone associated with Diovanni Carter was a line activated on an account owned by Lorie Major. Another line of the same account held by Lorie Major was the 7918 phone associated with Darius Carter.[24]

According to Sprint records, the 3998 phone used by J.B. was associated with a Sprint account held by J.B. that lists 82 Carl Avenue, Brockton, MA, as the address.

**2.      Cell Site Location Information**

The government intends to introduce historical cell site location information (CSLI) for a total of eight phones. The phones for which CSLI will be introduced are:

- Phone number ending in 2207 used by Diovanni Carter, serviced by Sprint;

- Phone number ending in 6983 used by Rosser-Stewart, serviced by AT&T;

---

[24] Lorie Major is listed as the mother of both Diovanni Carter and Darius Carter on records of the Plymouth County Correctional Facility that were completed by Darius Carter and Diovanni Carter.

- Phone number ending in 7918 used by Darius Carter, serviced by Sprint;

- Phone number ending in 8349 used by Person 1, serviced by T-Mobile;

- Phone number ending in 9101 used by Person 1, serviced by T-Mobile;

- Phone number ending in 9144 used by Terrell Jackson, serviced by T-Mobile;[25]

- Phone number ending in 8447 used by Carshana Graham, serviced by T-Mobile; and

- Phone number ending in 3998 used by J.B., serviced by Sprint.

The locations contained within the CSLI for the various phones were plotted by and visualized by FBI Special Agent Ryan Burke, who the government intends to offer as an expert witness in disciplines related to phone records analysis, cell phone operation, cell site location information and data, and the visualization of such data.  Through SA Burke, the government intends to introduce maps that plot the CSLI for each of the phones during pertinent periods, and also potentially introduce video animations of the CSLI over time.  SA Burke and Sprint RF Engineer Justin Darrow are expected to provide expert testimony as to the operations of cellular phone networks, general principals of radio signal propagation, the general applicability of the technology to cellular phones (through roaming and other services), the general range of a cell site in Massachusetts, and the factors which affect the range of a cell site. In particular, Darrow is anticipated to also provide testimony as to Per-Call Measurement Data (PCMD) and describe the processes by which PCMD is generated and stored, and its significance for Sprint network personnel and engineers in maintaining and administering the cellular network.

---

[25] The government anticipates attribution of this phone number to Jackson through his own testimony. The government may call the booking officer in Quincy Police who noted this number on the booking sheet for Jackson's arrest for an unrelated offense. Alternatively, the government may seek to admit the booking sheet under Fed. R. Evid. 803(8)(B).  See United States v. Dowdell, 595 F.3d 50, 72 (1st Cir. 2010) (admitting booking sheet under Fed. R. Evid. 803(8)(B)); United States v. Haughton, 235 Fed.Appx. 254, 255 (5th Cir. 2007). It is the government's understanding that the 9144 phone was seized by Quincy Police.

In the early morning of January 26, 2019, the CSLI for the 2207 phone used by Diovanni Carter and the 6983 phone used by Rosser-Stewart showed use of cell sites consistent with contemporaneous travel from Boston, MA to Brockton, MA.  The CSLI for these two phones showed use of cell sites consistent with leaving Boston, MA at approximately 4:45 AM, use of cell sites along I-93 and Route 24, and then use of cell sites in Brockton, MA, commencing at approximately 5:00 AM.  The two phones continued to use cell sites in Brockton, MA, until approximately 5:15 AM, when both phones commenced using cell sites consistent with contemporaneous travel to Boston, MA. The two phones employed cell sites along Route 24 and I-93, and then commenced using cell sites in Boston, MA, at approximately 5:30 AM.

Shortly after noon on January 26, 2019, the CSLI for the 6983 phone used by Rosser-Stewart and the 2207 phone used by Diovanni Carter showed use of cell sites consistent with contemporaneous travel from Boston, MA to Brockton, MA,. The CSLI for these two phones showed use of cell sites consistent with leaving Boston, MA at approximately 12:45 PM, use of cell sites along I-93 and in Holbrook, and then use of cell sites in Brockton, MA, commencing at approximately 1:10 PM.  The two phones continued to use cell sites in Brockton, MA, until approximately 3:45 PM, when both phones commenced using cell sites consistent with contemporaneous travel to Boston, MA, and then commenced using cell sites in Boston, MA, at approximately 4:00 PM.

Later that night, the CSLI for the phones used by Darius Carter (ending in 7918), Diovanni Carter (ending in 2207), Rosser-Stewart (ending in 6983), and Person 1 (ending in 8349) all indicated use of cell sites consistent with simultaneous travel from the area of East Street in Dorchester to the vicinity of the T-Mobile store in Brockton during the period of approximately 6:40 PM to 7:05 PM.  From 7:05 PM through 7:15 PM, the 2207 phone

repeatedly employed a cell site approximately 1500 feet away from the T-Mobile store; the sector of the cell site used for this activity faced towards the T-Mobile store. The PCMD data for the 2207 phone showed that the estimated distance of the device from the cell site around 7:05 PM and 7:10 PM was consistent with being in the vicinity of the T-Mobile store.

The CSLI for those four phones was also consistent with travel from the vicinity of the T-Mobile to the area of Carl Avenue during the time of the chase.  Lastly, the CSLI for those four phone was consistent with presence in the area where the vehicle was abandoned at the time when the vehicle was abandoned.  During the time of the search for suspects after the white Malibu was abandoned, the CSLI showed that the 2207 phone employed cell sites in Brockton, MA, within approximately 2 miles from the intersection of Carl Avenue and Bristol Avenue. The 2207 phone employed sectors of cell sites facing toward the area of Brockton where the white Malibu was abandoned.  The 3998 phone associated with J.B. and the 2207 phone associated with Diovanni Carter continued to employ cell sites and sectors facing 82 Carl Avenue throughout the evening until the next morning.

On the morning of January 27, 2019, the 2207 phone associated with Diovanni Carter and the 3998 phone associated with J.B. simultaneously started using cell sites consistent with contemporaneous travel from Brockton, MA, to Boston, MA. For example, the 2207 phone associated with Diovanni Carter and the 3998 phone associated with J.B. both employed cell sites in the Brockton area until approximately 9:00 AM on January 27, 2019.  At approximately 9:00 AM, both phones commenced using cell sites consistent with travel to Boston at the same time, and both phones employed cell sites in the Boston area commencing at approximately 10:00 AM on January 27, 2019.

3.      **Call Detail Analysis**

The government also intends to introduce testimony from SA Burke concerning analysis of the call detail records obtained for the phones used by Diovanni Carter, Darius Carter, Rosser-Stewart, Person 1, J.B., Graham and Jackson. The government intends on offering a chart of call frequency to show the contact between certain number and the lack of contact between certain numbers.

At approximately 7:38 PM, about 17 minutes after abandoning the vehicle, and minutes after the arrest of Darius Carter and Person 1, Diovanni Carter called J.B.  J.B. called Diovanni Carter at 7:43 PM. Diovanni Carter then placed two calls to J.B.  at 7:46 PM.  All of these calls between Diovanni Carter and J.B. employed cell sites in the Brockton area, within 2.5 miles of the intersection of Carl Avenue and Bristol Avenue and used sectors facing towrad Carl Avenue.

After Diovanni Carter evaded the police and reached a point of safety, Diovanni Carter and J.B. began a coordinated sequence of phone calls to two of the arrested codefendants:[26]

- At approximately 9:35 PM, the Diovanni Carter phone ending in 2207 placed a call to the Darius Carter phone ending in 7918.

- At approximately 9:38 PM, the J.B. phone ending in 3998 placed a call to the Darius Carter phone ending in 7918.  Review of records for the J.B. phone from January 5, 2019 through February 20, 2019 showed that J.B. had never called the 7918 phone prior to January 26, 2019 at 9:38 PM.

- At approximately 9:40 PM, the J.B. phone ending in 3998 placed a call to the Rosser-Stewart phone ending in 6983.

- At approximately 9:49 PM, the Diovanni Carter phone ending in 2207 placed a second call to the Darius Carter phone ending in 7918.

---

[26] This series of calls were facilitated through cell sites located within 2.5 miles of 82 Carl Avenue, and sectors that generally faced 82 Carl Avenue.

### G.      The Recovery of the Firearms and Ballistics Evidence

#### 1.      9mm casing found on Summer Street

On January 27, 2019, Baltazar Gonsalves, a resident who lives on Summer Street, found a spent 9mm shell casing near his driveway and gave it to police. MSP Trooper Cochrane conducted a tool marking comparison and determined that the 9mm shell casing was fired by the silver Armi Fratelli firearm.

#### 2.      Silver Jennings .22 caliber firearm

On February 5, 2019, a resident of Litchfield Street named Matthew Brewer located a silver Jennings .22 caliber firearm near his residence and called police. Officers arrived on scene and collected the firearm. One round of ammunition was found within the gun.  This firearm was consistent with the weapon used by Rosser-Stewart.

A tool marking comparison of the .22 caliber casing was conducted in comparison to the Jennings firearm. While there was agreement among all discernible class characteristics, there were insufficient quality and quantity of tool markings to individualize the casing as having been fired by the silver Jennings .22 caliber weapon. The government anticipates testimony from the ballistics expert that rim-fired ammunition of the .22 caliber size is not a common source of tool marking matches due to the size and nature of the tool markings made during the firing of such rounds.

#### 3.      Fingerprinting

The black Ruger, the silver Armi Fratelli, and the silver Jennings (including magazines and ammunition) were tested for fingerprints by Troopers William Watson and Peter Bengston with no latent prints being recovered.  The government anticipates testimony that fingerprints are

not frequently found on firearms or ammunition due to the nature of the surfaces and materials used in firearms, and other factors.

>   **H.**      **The Search at 82 Carl Avenue and Recovery of J.B. Phone**

On March 13, 2019, ATF executed a search warrant at 82 Carl Avenue, Brockton, MA. Investigators located J.B. in the residence and recovered the clothing worn by J.B. when he entered the T-Mobile at 2:21 PM on January 26, 2019, including the grey Nike sweatshirt, grey sweatpants, and all white sneakers.  ATF also recovered the phone associated with the number ending in 3998 (the J.B. phone).

The J.B. phone was forensically extracted by members of the advanced device branch of the ATF.  ATF SA Matthew Kelsch, an expert in forensic phone extraction will testify to the process of searching the phone, the contents of the J.B. phone that were recovered during the search, and the significance of this particular type of data within the context of a digital device.

The J.B. phone listed a contact "Darius" as being associated with the number ending in 7918.

The J.B. phone listed a contact named "Puff" as being associated with the number ending in 6983.

The J.B. phone had no entry or activity associated with the numbers associated with Person 1 (ending in 9101 and 8349), Terrell Jackson (ending in 9144), or Carshana Graham (ending in 8447).

The J.B. phone had a contact that was created after the robbery and before the coordinated calls to the codefendants at approximately 9:30 PM. The J.B. phone listed a contact named "Ma" as being associated with a number ending in 1312.  This contact for "Ma" was created on January 26, 2019, at 9:27 PM EST (UTC -5).  Sprint subscriber records for the phone

ending in 1312 showed that it is a phone associated with Lorie Major, Diovanni Carter's mother. Records from Plymouth County Correctional Facility demonstrated that Darius Carter and Diovanni Carter identified the phone number ending in 1312 to be Lorie Major, their mother.[27]

There was also a text message conversation with a phone ending in 6720, which the government describes below and intends to offer as the statements of the defendant through a new phone he obtained while in warrant status.

## I.      Recorded Jail Calls After Arrest of Diovanni Carter

The government intends to offer a number of recordings of jail calls.  The recordings contain voice exemplars that precede each call, and are made through the use of the jail PIN system. The government anticipates testimony that these calls were made by the accounts associated with Darius Carter or Diovanni Carter, respectively.

On March 5, 2019, the day that Diovanni Carter was apprehended, Darius Carter made a call to his mother, Lorie Major, on a recorded line. During that call, Darius Carter instructed an individual believed to be his father to tell "Dio" to "keep his fucking mouth closed", and that Dio "can't be fucking talking" because they "already got the co-d snitching" and "that's the most we need right now."[28]

On March 17, 2019, Diovanni Carter made a call on a recorded line. At some point, a multi-party call was initiated with an inmate housed in Walpole, which is a state prison.  During the call, Diovanni Carter inquired of the Walpole inmate whether a person matching the characteristics of Person 1 was present in that facility.  Diovanni Carter described the characteristics of Person 1 such as the fact that Person 1 was from "around Puffy's way"

---

[27] The subscriber information from Sprint also indicated this same association.

[28] The government addresses the admissibility of this call in a motion *in limine*.

(meaning Rosser-Stewart), and that Person 1 was previously in "Nash" meaning Nashua Street jail with Diovanni Carter and the Walpole inmate. Person 1 is anticipated to testify that he is from the same area of Boston as Rosser-Stewart and came to know Diovanni Carter better while in custody with him.  Diovanni Carter also stated during the recording that he "doesn't want to say" Person 1's "name over the phone."  Diovanni Carter informed the Walpole inmate that Person 1 was "playing that role", which the government will argue, from circumstances and context, is a veiled reference to cooperating with the prosecution. After the Walpole inmate expressed an understanding of who Diovanni Carter was referring, the Walpole inmate indicated that Person 1 is not at Walpole. Diovanni Carter then suggested other federal detention facilities where Person 1 could be housed besides Walpole, including Dedham, and Wyatt.  At the time, Person 1 had been charged federally and was then in federal custody.

## J.      Consciousness of Guilt

The government also intends to offer evidence of the defendant's consciousness of guilt that arose during the period while he was wanted on a state court warrant for his arrest.  The state court warrant for his arrest issued on January 28, 2019, and the defendant was not apprehended until March 5, 2019.  The government intends on offering testimony and court records demonstrating that the warrant for the arrest of Diovanni Carter was obtained on January 28, 2019, and that the defendant was not apprehended until March 5, 2019.

### 1.      Knowledge that He was Wanted

On March 7, 2019, while incarcerated at Plymouth House of Correction, Diovanni Carter made a phone call on a recorded line and discussed his efforts to avoid apprehension while he was wanted on the warrant.  Specifically, Diovanni Carter stated: "I don't know how they got

me"; "I had been there for some days, I haven't been outside or nothing"; "Who wants to keep running around ducking them, and ducking this… who wants to do that."

On March 8, 2019, while incarcerated at Plymouth HOC, Diovanni Carter made a phone call on a recorded line and discussed his efforts to avoid apprehension while he was wanted on the warrant. Specifically, Diovanni Carter stated: "There's only like two people that knew I was over there," and "nobody knew I was over there," referring to the location where he was arrested.

## 2.   Intent to Evade Apprehension

On or about February 2, 2019, while in warrant status on the underlying Brockton District Court complaint, Diovanni Carter stopped making outgoing calls using the number ending in 2207. The J.B. phone extraction contained a series of contacts and messages showing other phone numbers being communicated to J.B. in order to contact Diovanni Carter after January 28, 2019. This included messages from persons informing J.B. of Diovanni Carter's new phone numbers, including phone numbers ending in 0819 and 8889.[29]

On February 7, 2019, J.B. had contact with the phone ending in 8889 via text message. In that conversation, Diovanni Carter informed J.B. of his new address, and asked J.B. to meet his grandmother in Brockton, MA.

On February 10, 2019, Diovanni Carter's grandmother, Nancy Carter who resided in Brockton, MA, a short distance from the T-Mobile store obtained a Motorola cellular phone at AT&T associated with a phone number ending in 6720.[30] When arrested on March 5, 2019,

---

[29] These communications are not hearsay, because the government does not offer these text messages for the truth of the matter asserted.

[30] Diovanni Carter listed Nancy Carter as his grandmother in the records of Plymouth County Correctional Facility, and listed a separate number for her on his phone contacts.

Diovanni Carter was in possession of a Motorola phone that matched the make, model, and IMEI (ending in 8837) of the device associated with the 6720 phone number.[31]

On February 13, 2019, Diovanni Carter, using the 6720 number, contacted J.B. via text message.  This conversation was obtained from the J.B. phone.  In this text message, Diovanni Carter identified himself as "troub", which is short for his nickname Trouble.  Diovanni Carter identified the new phone number as his "trap jack" meaning the phone used for criminal activity.  During the conversation, Diovanni Carter stated, "Yo I need like 200 if u can add to the 100 so I can go half on this rental so I can go out of town."  J.B. responded that he did not have the money.

### K.      Apple iCloud Data

The Apple iCloud account data for accounts associated with Diovanni Carter was obtained.  This data indicated a series of contacts saved in the Diovanni Carter's iCloud account.  The contacts included:

- the number ending in 8349 being associated with the first letter of Person 1's first name;

- the number ending in 3998 being associated with "J.B.";

- the number ending in 6983 bring associated with "Puffy"; and

- the number ending in 7918 being associated with "Bro".

There was no contact associated with the 9144 phone number for Terrell Jackson.

### L.      Y-STR DNA Analysis Matches to Diovanni Carter

The black Ruger .380 firearm, magazine, and ammunition tested positive for the presence of DNA material.  From that DNA material, a Y-STR profile for a major contributor was

---

[31] This device was subject to a search warrant (Crim. No. 19-MJ-4207) but not able to be accessed or searched due to passcode protection.

developed and documented in a report dated March 21, 2019.  A Y-STR profile is a DNA profile developed from the presence of a Y chromosome haplotype within a DNA sample by using the STR method, which stands for short tandem repeating. Barring mutation, all male patrilineal relatives carry an identical Y chromosome.  As such, brothers sharing the same father have the same Y chromosome and Y-STR analysis cannot distinguish between them.

As such, the statistical significance of a match to a profile predicated upon the Y chromosome haplotype is less than a profile predicated upon autosomal or nuclear DNA, which can range into the billions or quintillions.  Though the statistical significance of an included contributor (a match) is reduced, the statistical significance of excluding a potential contributor is as definitive as an exclusion predicated upon autosomal or nuclear DNA.

Saliva samples were taken from Diovanni Carter, Darius Carter, Rosser-Stewart and Person 1 for the purposes of comparing them to the Y-STR profile developed from the black Ruger .380 firearm.  A DNA report dated January 22, 2020[32] included Diovanni Carter as a potential contributor of the major DNA profile. The statistical significance of the match was calculated by comparison to a Y-STR database, and it was determined that it was at least 1229 time more likely that the profile originated from Diovanni Carter or a male patrilineal relative than a randomly selected individual.  According to the report, 99.9% of the male population can

---

[32] Like the other later-developed forensic and digital evidence, the November 2019, date of the DNA report is significant.  This report and DNA match post-dates the initial identification of Diovanni Carter by Person 1, and the date when Person 1 provided the information that Diovanni Carter gave Person 1 the black Ruger .380.

be excluded from the major profile.  Darius Carter,[33] Rosser-Stewart and Person 1 were excluded as contributors of the DNA profile found on the black Ruger .380.[34]

### M. Diovanni Carter Previously Convicted of a Felony

Certified records from Suffolk Superior Court prove that on February 24, 2011, Diovanni Carter was convicted of, inter alia, possession of a loaded firearm, in violation of Mass. Gen. Laws c. 269, § 10(a), and sentenced to a term of three years to three years and one day in state prison.  The crime of possessing a firearm without a license carries a maximum penalty of five years in state prison.  The government anticipates potential stipulation as to this point.

## IV. ANTICIPATED EVIDENTIARY ISSUES

As the government has noted in other filings, the evidentiary presentation in this trial is expected to include numerous areas of expert testimony and multiple different types of evidence. The government offers a broad overview with respect to the types of evidence that may raise objection and the government's anticipated foundation and manner or manners of introduction. Additionally, the government intends to file motions *in limine* with respect to the introduction of the Darius Carter jail recording and coconspirator statements.

### A. Certain Digital Evidence

The government anticipates seeking authentication pursuant to certification under Fed. R. Evid. 902(11), (12), and (13) of certain items in advance of trial. These certificates pertain: 1) phone provider records, including the subscriber records, call detail records, cell site location information. and per-call measurement data for AT&T, Sprint, and T-Mobile; 2) electronic

---

[33] The exclusion of Darius Carter means that they do not share the same father, unless their Y Chromosome was subject to mutation.

[34] All of the defendants and Person 1 were excluded as contributors of a DNA profile developed from a sample obtained from the Jennings .22 caliber.  The government intends to introduce this result in order to demonstrate the completeness of the investigation.

communication service provider records, including subscriber records, emails, and search history

for Google, and subscriber information and stored content for Apple; 3) business records for

Hertz, Express Employment, and Liberty Mutual, and 4) the forensic image of a cellular phone.

The government reserves the right to call the authenticating witnesses (and anticipates doing so

for the phone records and Hertz records for example), but is proceeding in this manner to ensure

the flexibility of not needing do so.  The related certifications and associated data or records have

been produced to counsel.

### 1.      Phone Records (Call Detail and CSLI/PCMD) and Related Maps

The government intends on introducing subscriber information, call detail records, and

CSLI and PCMD for the various phones at issues in this case.  These types of records, once

authenticated, do not present hearsay concerns. As an initial matter, the call detail records and

CSLI records are computer-generated.  Moreover, they do not assert any statement and are not

capable of being truthful or not truthful.  Rather, they are the computer-generated product of an

accurate process.

The government anticipates SA Burke and RF Engineer Justin Darrow testifying as

expert witnesses as to the manner and means of how cellular networks operate, the technologies

used, estimated ranges of cell sites, how the range of a cell site is affected by certain factors, and

other related topics more specifically described in the expert witness disclosures.  Darrow will

also describe what PCMD is and the digital processes by which PCMD is generated and stored

by Sprint and the purposes for which it is used.  <u>See</u> Fed. R. Evid. 901(b)(1), (3), (9).

SA Burke is anticipated to testify that the maps he generated from the T-Mobile, Sprint

and AT&T records accurately visualize the locations signified in the records.  SA Burke will

testify that his maps accurately depict the locations of cell sites and the particular cell sites that

the CSLI and PCMD records denote as being used by the certain phones at issue at certain times.

SA Burke's testimony will include an opinion, as embodied in the maps admitted in evidence

that the phones employing certain cell sites were in the general area of the cell site at the time the

cell site was used and certain sequences of cell sites being used are consistent with travel at

speed.  See, e.g., United States v. Lewisby, 843 F.3d 653, 659-60 (7th Cir. 2016) ("[u]sing call

records and cell towers to determine the general location of a phone at specific times is a well-

accepted, reliable methodology"); United States v. Jones, 918 F.Supp.2d 1, 4-6 (D.D.C. 2013)

(giving examples of courts that have found historical cell site location evidence reliable and

admissible).  Additionally, given the review of CSLI and PCMD for the 2207 phone, the

government anticipates an opinion from SA Burke and Darrow that "though he cannot say that

the defendant's cell phone was located at the address of the carjacking, he can say that the

historical cell tower records allow him to opine that the location of the [defendant's] phone was

'consistent with' the location of the crime scene" during the time of 7:05 PM through 7:14 PM.

United States v. Medley, Crim. No. 17-242, 312 F. Supp. 3d 493, 502-503 (D.Md. 2018) (motion

in limine discussing use of per-call measurement data reviewed by expert witness at trial in

forming opinion as to location of cellular phone at location consistent with the crime).

SA Burke may also testify as to a summary chart of call frequency generated from the

call detail records for the various phones the underlying records for which will be in evidence.

See Fed. R. Evid. 1006.  SA Burke may also provide summary testimony as to the presence or

absence of certain call detail connectivity (i.e., certain phone numbers have called or have not

called other phone numbers) based upon his review of the phone records.  See id.

### a. AT&T

The government anticipates filing a certificate pursuant to Fed. R. Evid. 902(11), (13), (14), concerning the authentication of the subscriber information, call detail records, and CSLI pertaining to the Rosser-Stewart phone ending in 6983 and the Diovanni Carter "trap phone" ending in 6720 obtained by his grandmother in February 2019.  Additionally, the government anticipates a keeper of the record testifying concerning the manner and means by which certain of the records are generated and accurately maintained.

### b. T-Mobile

The government anticipates filing a certificate pursuant to Fed. R. Evid. 902(11), (13), (14), concerning the authentication of the subscriber information, call detail records, and CSLI pertaining to: the Person 1 phones ending in 8349 and 9101; the Graham phone ending in 8447, and the Jackson phone ending in 9144.  Additionally, the government anticipates a keeper of the records testifying concerning the manner and means by which certain of the records are generated and accurately maintained.

### c. Sprint

The government anticipates filing a certificate pursuant to Fed. R. Evid. 902(11), (13), (14), concerning the authentication of the call detail, and CSLI pertaining to: the Diovanni Carter phone ending in 2207; the J.B. phone ending in 3998, and the Darius Carter phone ending in 7918.  Additionally, the government anticipates a keeper of the record testifying concerning the manner and means by which certain of the records are generated and accurately maintained.

Moreover, the government may call Justin Darrow, a radio frequency engineer testifying, as an expert witness as to the manner and means of the Sprint cellular network operates, the

technologies used, an explanation of PCMD,[35] the manner and means by which PCMD is generated, the business purposes of PCMD, the general estimated ranges of cell sites and how the range of a cell site is affected by certain factors, the general principals of radio frequency propagation in the context of cellular phones, and other related topics described in the expert witness disclosures.

SA Burke is anticipated to testify as to the accuracy of maps that he has generated from the Sprint records and a summary chart of call frequency generated from the call detail records.

### 2.    Google Data

The government intends to introduce the Google content through the testimony of SA Kelsch who is an anticipated expert witness in digital forensics.  The government anticipates testimony that he has reviewed digital files produced by Google and compared the unique MD5 hash of the files to the MD5 identified in Google's sworn Fed. R. Evid. 902(11), (13), (14) certification, and that the MD5 hash of the files he reviewed match those in the Google certification.

SA Kelsch is also anticipated to testify that the Google content is relevant in that the circumstances and content demonstrate that it is Diovanni Carter's Google account.  Those circumstances are described above and include association with the 2207 phone, recent emails to and from Diovanni Carter related to Express Employment and the rental of the white Malibu, and other emails addressed to "Diovanni" among other items.[36]

---

[35] Per-call measurement data generated by Sprint has been admitted in other courts by expert witnesses.  See e.g., United States v. Medley, 312 F.Supp.3d 493, 502-3 (D.Md. 2018) (admitting FBI agent testimony as expert witness to express opinion in part based on per-call measurement data).

[36] See also United States v. Bertram, No. 3:15-cr-14-GFVT-REW, 2017 WL 1375184, *1-2 (E.D. Ky., April 14, 2017) (Emails authenticated based on email addresses and content unique to communication participants); United States v. Brinson, 772 F.3d 1314, 1320 n.3 (10th Cir. 2014)

The emails which are to be offered include the reservation email for the white Malibu and the emails to and from Express Employment.

SA Kelsch is also anticipated to testify as to a summary chart of the Google Search History, which was generated from underlying data produced in the Google Account and accurately reflects the data in a readable form by the jury. The summary chart will make the Google Search History easily legible and account for time zone changes to Eastern Time (which is -5) from the original data produced by Google in UTC.  The underlying data in the format produced by Google will be admitted, along with the formatted summary chart in order to permit jury comparison for accuracy.  See Fed. R. Evid. 901(b)(3) (permitting authentication by "A comparison with an authenticated specimen by an expert witness or the trier of fact.").  SA Kelsch will testify to the manner by which the summary chart was made and that the summary chart accurately reflects the underlying data.  See Fed. R. Evid. 902(b)(1), 1006.

### 3.     Apple iCloud Data

The government intends to introduce the Apple content through the testimony of SA Kelsch who is an anticipated expert witness in digital forensics.  The government anticipates testimony that he has reviewed digital files produced by Apple and compared the unique MD5 hashof the files to the MD5 identified in Apple's sworn Fed. R. Evid. 902(11), (13), (14) certification, and that the MD5 hash of the files matches that in the Apple certification.

---

(Facebook messages authenticated under FRE 901(b)(4) where account was linked to a known email address and defendant used own name in postings); United States v. Siddiqui, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (allowing the authentication of an e-mail entirely by circumstantial evidence, including the presence of the defendant's work e-mail address, content of which the defendant was familiar with, use of the defendant's nickname, and testimony by witnesses that the defendant spoke to them about the subjects contained in the e-mail).

SA Kelsch is also anticipated to testify that the Apple content is relevant in that the circumstances and content demonstrate that it is Diovanni Carter's Google account.  Those circumstances are described above, and include association with the 2207 phone and other related contacts.[37]

### 4.    J.B. Phone Extraction

The government anticipates authenticating certain data that was forensically extracted from the J.B. phone by personnel of the ATF digital forensic branch through the use of sworn certifications provided by Fed. R. 902(13), (14).  The government anticipates testimony that SA Kelsch reviewed the reports from ATF digital forensic branch personnel and compared the MD5 hash of the forensic image and compared it to the image that he reviewed and that the MD5 hash matched.  Alternatively, in the event that there is an objection or unwillingness to proceed by stipulation as to authenticity, the government may call the ATF digital forensic personnel who created the extraction as expert witnesses.

SA Kelsch will testify to his review of the content of the J.B. phone extraction and the association of the device to the phone number ending in 3998, presence of certain activity, content, and information in the phone. Certain content may be admitted to prove the phone belonged to J.B. and demonstrate his connection to the other members of the conspiracy.  See United States v. Benford, No. CR-14-321-D, 2015 WL 631089, at *5-6 (W.D. Okla. Feb. 12,

---

[37] See also United States v. Bertram, No. 3:15-cr-14-GFVT-REW, 2017 WL 1375184, *1-2 (E.D. Ky., April 14, 2017) (Emails authenticated based on email addresses and content unique to communication participants); United States v. Brinson, 772 F.3d 1314, 1320 n.3 (10th Cir. 2014) (Facebook messages authenticated under FRE 901(b)(4) where account was linked to a known email address and defendant used own name in postings); United States v. Siddiqui, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (allowing the authentication of an e-mail entirely by circumstantial evidence, including the presence of the defendant's work e-mail address, content of which the defendant was familiar with, use of the defendant's nickname, and testimony by witnesses that the defendant spoke to them about the subjects contained in the e-mail).

2015) (text messages authenticated because they related information uniquely tied to the defendant).

With respect to the contact lists in the cell phones, the government states that contact lists do not constitute "statement[s]" within the meaning of Fed. R. Evid. 802. As such, the contact lists do not constitute hearsay.  See United States v. Munguia, 273 Fed. Appx. 517, 521-22 (6th Cir. 2008) (cited pursuant to Fed. R. App. 32.1) (affirming admission of cell phone contact list and call log as non-hearsay and finding it no different than a scrap of paper); United States v. Fuentes, 368 Fed. Appx. 95, 99-100 (11th Cir. 2010) ("testimony regarding Martinez's cell phone and the contact list therein containing Fuentes's first name and the number to the cell phone that he was using" admitted to show "the relationship between the co-conspirators").

### B.    Certain Business Records

#### 1.    Liberty Mutual

The government may seek to admit Liberty Mutual records relating to an accident involving Darius Carter. The government anticipates authentication of the records through the testimony of a keeper of records if the defendant objects or otherwise questions the authenticity of the records.

In records obtained from Liberty Mutual for the claim, Darius Carter provided the phone number ending in 7918.  The records are substantively admissible as business records pursuant to Fed. R. Evid. 803(6), though the government would state that there is no statement being offered for the truth of the matter asserted because the nature of the accident and insurance policy are irrelevant to the charges.  Rather, the government is offering the records in order to further associate Darius Carter with the phone number ending in 7918, which is relevant to the guilt through the comprehensive CSLI and call detail analysis described above.

2.      **Capital One Records**

The government intends to introduce records from Capital One showing the application for a credit card submitted by Diovanni Carter that is dated February 1, 2019.  The application is in the name and date of birth for Diovanni Carter with the 2207 phone number, and the DIORMAURICECARTER@GMAIL.COM email address.  These records are certified by an affidavit that complies with Fed. R. Evid. 803(6).  The government may also call a keeper of the record to testify.

3.      **Good Samaritan Hospital**

The government intends to offer the medical records for G.D.'s treatment at Good Samaritan hospital. The records were produced with a sworn certificate that complies with Fed. R. Evid. 803(6). The government may also call the treating nurses and potentially a keeper of the record to testify.

C.      **911 Call and Turret Tapes**

The government intends on introducing the 911 call from the victim to the police following the robbery.  The government anticipates calling a competent keeper of the record from the Brockton Police to authenticate various documents, booking video, and the turret tapes. The declarant of the 911 call, G.D., is anticipated to be trial witness and can also authenticate his own voice.  Furthermore, the recording of the call evinces sufficient alarm and excitement and contextually occurs seconds after the robbers leave the store such that it would qualify as an excited utterance and statement of mental, emotional and physical condition.  See Fed. R. Evid. 803(2), (3).[38]

---

[38] See, e. g., United States v. Cadieux, 500 F.3d 37 (1st Cir. 2007), cert. denied, 552 U.S 1190 (2008) (statements identified location and type of emergency and attempted to identify perpetrator).

The government may also seek to introduce portions of the recorded police radio broadcasts (also known as the turret tape).  These portions include: (1) the radio broadcast of Officer Sylverson Robinson informing other officers of the chase, the streets they are on, and the fact of shots being fired during the chase, and (2) the broadcast of the descriptions of the two outstanding suspects which was provided to police by Person 1.

The government would offer the broadcast of the high-speed chase shots being fired as a present sense impression by the declarant, an excited utterance, and statement of mental, emotional and physical condition.  See Fed. R. Evid. 803(1), (2), (3).  Officer Robinson is anticipated to testify and can also identify his own voice.

The government would offer the descriptions of there being four suspects, and identifying descriptions provided by Person 1 as statements of prior identification, Fed. R. Evid. 801(d)(1)(B). The turret tapes where the descriptions were relayed are being offered not for their truth, but for the limited purpose of the fact that they were said at a certain time, i.e., minutes after arrest and prior to the time and opportunity to fabricate the involvement of a fourth individual matching the description of Diovanni Carter.  See Fed. R. Evid. 801(d)(1)(C).  This description included one description matching Rosser-Stewart, and another matching Diovanni Carter, both of which were broadcasted over the radio: "one of the males is gonna be described having long braids, about 5', 8"… 6 feet medium build, dark complexion; possibly named earl. And the second suspect is gonna be over six feet, light skinned with a long beard."  See ECF #91-1 and 91-6 (19.57.37) (second suspect being consistent with Diovanni Carter).

### D.      Covert GPS Tracker from 3Si

The government intends to introduce the GPS data from the covert tracking device through Robert Stevens, an employee of 3Si, the company that provides the service.  The

government has identified Mr. Stevens as an expert witness in GPS technology and the

technology used by the covert GPS trackers sold by 3Si.  Mr. Stevens will testify concerning his

experience with the GPS devices sold by 3Si, the accuracy of the GPS technology employed by

the devices, and the accuracy of the process by which the GPS data is generated by the device

and transmitted to 3Si where it is stored and accurately reproduced.  See Fed. R. Evid. 901(b)(9).

Though Mr. Stevens has considerable expertise and experience with GPS technology

generally and as specifically applied to the covert trackers, expert testimony is not necessary to

explain it, or authenticate the video he generated that accurately depicts the GPS data.  See

United States v. Espinal-Almeida, 699 F.3d 588, 610-613 (1st Cir. 2012), cert. denied, 569 U.S.

936 (2013) (expert witness not needed to explain GPS technology and maps made of GPS data);

United States v. Brooks, 715 F.3d 1069, 1078 (8th Cir. 2013) (affirming admission at bank

robbery trial of GPS data from 3Si, and judicial notice of facts of GPS technology); United

States v. Mitchell, No. 15-CR-47, 2015 WL 5513075, at *3 & n.4 (E.D. Wis. Sept. 17, 2015)

(use of 3Si tracker found reliable in suppression context).  "Commercial GPS units are widely

available, and most modern cell phones have GPS tracking capabilities. Courts routinely rely on

GPS technology to supervise individuals on probation or supervised release, and, in assessing the

Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the

technology's accuracy."  Brooks, 715 F.3d at 1078.

If the Court is not inclined to permit lay testimony related to the mapping of the 3Si data,

the government will offer Mr. Stevens as an expert,[39] and also the expert testimony of SA Ryan

Burke concerning his familiarity with GPS, and the accuracy of the maps generated from the

---

[39] See United States v. Thompson, 393 Fed. Appx. 852, 858 (3d Cir. 2010) (holding that the trial
court properly allowed a lay witness to testify to the results of GPS tracking where the witness
had particularized knowledge of the GPS's reliability by virtue of his experience using it).

GPS data.  See Espinal-Almeida, 699 F.3d at 613 (reasonable likelihood standard for authentication of the data and software generated maps was satisfied by lay testimony). Moreover, the government anticipates eyewitness testimony from Officer Robinson and Person 1, and the turret tape recording of the chase, which will corroborates the GPS data, turn by turn.

Stevens will also authenticate the data generated by the covert device on January 26, 2019 and the integrity of the data that was stored and provided in this case.  See Fed. R. Evid. 901(b)(1), (4), (9).  Stevens will also authenticate a video of the plotted locations and times and the speed that were captured by the GPS receiver in the device and transmitted to the 3Si through the operation of its system.  See Espinal-Almeida, 699 F.3d at 613 (reasonable likelihood standard for authentication of the data and software generated maps was satisfied by lay testimony).  SA Burke will testify to the inclusion of the raw GPS data (longitude, latitude) in his maps that also display CSLI and PCMD for the pertinent periods.

E.      ShotSpotter

The government intends to offer the testimony of Walter Collier, an employee of ShotSpotter as an expert witness in the ShotSpotter system.  The government will offer testimony concerning the ShotSpotter system, as detailed in the report, specifically, what ShotSpotter is, its accuracy, authentication of the audio recordings of the gunfire, and the expert's opinion of the source of the gunfire through the multilateration calculations detailed in the report. Ultimately, Mr. Collier will provide an opinion through the accurate processes that the gunfire for this incident originated in the area of Summer Street in Brockton, MA, at approximately 7:20 PM.

**F.      Search Warrant for Vehicle Computer**

The government intends on introducing limited testimony that a search warrant was

executed on the white Malibu to search the vehicle's computer. Sergeant Timothy Laham of

Boston Police will testify that he attempted to execute the warrant but the internal computer was

incapable of being accessed forensically with the tool known as BERLA.  The government will

offer this testimony to prove the completeness and thoroughness of the investigation.

The government also offer records obtained from OnStar through a keeper of the records

demonstrating that no records were maintained by OnStar for the time of the rental and robbery.

**G.      Prior Consistent Statements of Person 1**

**1.      Prior Statements of Identification**

The government may seek to introduce prior statements of identification made by Person

1.  While substantively admissible by rule, they also serve a nonhearsay purpose of establishing

the fact that Person 1 made such identifications at certain times.  Specifically, these

identifications took place well before additional forensic (DNA) and digital evidence (CSLI) of

Diovanni Carter's involvement, which corroborate the credibility of Person 1.

**a.      ID of Rosser-Stewart by Single Photograph**

On the night of January 26, 2019, Person 1 identified Rosser-Stewart from a single

photograph taken and transmitted by the officers who had detained Rosser-Stewart.  This

identification is admissible as prior statement of identification under Fed. R. Evid. 801(d)(1)(C).

This identification was made minutes after the abandonment of the getaway vehicle while

police were searching for the suspects.  At the time, Rosser-Stewart was detained and police had

not collected or reviewed the surveillance video, and no other description was provided from the

surveillance video.  The timing and circumstances of this identification corroborate the

51

credibility of Person 1, who identified a coconspirator immediately and whose identification was later corroborated by video evidence that was not yet then in possession of the police, including the booking video and clothing worn by Rosser-Stewart.

### b.      ID of Diovanni Carter post-Miranda

After the arrest of three suspects on January 26, 2019 (early January 27, 2019), Person 1 waived Miranda and identified Diovanni Carter as the driver of the vehicle through a blindly-administered photo array consisting of eight photographs.  This identification is admissible under Fed. R. Evid. 801(d)(1)(C).

Additionally, this identification is admissible for non-hearsay purposes in order to show when the identification was made, which is of probative value to Person 1's basis of knowledge because it precedes the later developed evidence.  See Fed. R. Evid. 801(c)(2).  The timing and circumstances of this identification corroborate the credibility of Person 1, who identified a coconspirator and whose identification was later corroborated by evidence that was not yet then in possession of the government, including the CSLI evidence and DNA match.

### 2.      Grand Jury Testimony Offered Substantively

Person 1 testified before the grand jury on March 27, 2019, and the substance of that testimony underlies the summary of evidence above.  This testimony includes a description of the robbery, identification of the codefendants, a statement that the defendant handed Person 1 the black Ruger .380 firearm, a description of the defendant's role in planning the crime, identification of the defendant serving as the driver of the vehicle, among other facts.  This testimony is admissible on two grounds, Fed. R. Evid. 801(d)(1)(B).

The grand jury testimony is also admissible under Fed. R. Evid. 801(d)(1)(B), if Person 1 testifies consistently and after the defendant attacks the credibility of Person 1, in opening,

during cross-examination or at closing.  After Person 1's trial testimony, if consistent with the testimony before the grand jury, the government anticipates seeking to introduce Person 1's grand jury substantively, pursuant to Fed. R. Evid. 801(d)(1)(B).

Rule of Evidence 801(d)(1)(B) permits introduction of a prior statement "consistent with the declarant's testimony" in order to "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying" or "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Given the nature of the anticipated defense opening and cross-examination, the government believes that the grand jury testimony will be substantively admissible under this rule for, at a minimum, the specific areas where Person 1's credibility is attacked.

### H.      Massachusetts RMV Records and Images

The government intends to offer certified Massachusetts RMV records and images of Diovanni Carter, Darius Carter, Rosser-Stewart, J.B. and Person 1, and potentially others.  These records contain the photos of the individuals and list the residential and mailing addresses, including 82 Carl Avenue, Brockton, MA for J.B., and 19 Elmhurst Street, Boston, MA, for Diovanni Carter and Darius Carter.  These records have been certified by the record keeper of the government agency and are self-authenticating.  See Fed. R. Evid. 902(4).

### I.      Diovanni Carter Prior Conviction

Absent a stipulation, the government intends to offer the certified court papers from Suffolk County Superior Court in order to prove that Diovanni Carter was previously convicted of felony and that Diovanni Carter was aware that the crime for which he was convicted carried a penalty greater than one year.  See Rehaif v. United States, 588 U.S. __, __ (2019) (government must prove defendant knew the maximum period of incarceration was greater than one year).

The certified court records from Suffolk County Superior Court prove that on February 24, 2011, the defendant was convicted of Mass. Gen. Laws c. 269, § 10(a) and sentenced to a term of three years to three years and one day in state prison.  Certified copies of court records are self-authenticating.  See Fed. R. Evid. 902(4); Fed. R. Crim. P. 27; Fed. R. Civ. P. 44.  The government will ask the court to take judicial notice of the 5 year state prison potential maximum penalty for conviction under Mass. Gen. Laws c. 269, § 10(a).  See Fed. R. Evid. 201(b)(2).  The government will prove that the defendant knew his crime carried a penalty greater than one year of incarceration because he was sentenced to three years of incarceration.

J.      **Fingerprint Evidence**

The government anticipates the testimony of four fingerprint technicians. First, Deputy Fowler developed latent prints from the white Malibu and dusted the stolen items and vehicle for other prints. Two viable prints from the white Malibu were matched by Deputy Files. One was matched to Andy Sousa, an individual who is anticipated to testify that he had no involvement in the robbery. The other was matched to Diovanni Carter.

Trooper Bengston and Trooper Watson processed the three firearms, magazines, and ammunition for fingerprints. While they located friction ridge detail, the detail was not sufficient either in quality, quantity, or both for comparison.  They are also anticipated to provide testimony that given the nature of firearms, fingerprints suitable for comparison are not commonly recovered from those firearms.

K.      **Gunshot Residue**

Gunshot residue (GSR) tests were conducted on the hands of Darius Carter, Rosser-Stewart, and Person 1.  The tests were negative for the presence of GSR.  The government intends to introduce the negative finding to show the completeness of the investigation.  The

government also intends on eliciting expert testimony concerning the use of gloves and firing out of a fast moving vehicle, and how such circumstances and factors would affect GSR propagation and presence.

**L.      DNA Analysis and YSTR Comparison**

The government anticipates expert testimony concerning the DNA testing of the three firearms, magazines, and ammunition (the "firearms").  See Fed. R. Evid. 702.  This expert testimony is expected to be detailed and include the criminalist who processed the firearms, magazines, and ammunition for the sample and the DNA analysts who developed the profile from the sample on the black Ruger .380.

For the black Ruger .380, the government also anticipates testimony concerning the collection of known saliva samples that were taken from the defendants, and Person 1. The government also anticipates expert testimony related to the development of DNA profiles from the known saliva samples.  The government also anticipates expert testimony related to the comparison of the known DNA samples to the major Y-STR DNA profile developed from the genetic material recovered from the black Ruger .380 firearm.  The government anticipates expert opinion testimony as to the inclusion of Diovanni Carter as the contributor to the YSTR DNA profile recovered from the black Ruger .380 and the statistical significance of that match being 1 in 1229, with 99.9% of the male population being excluded (and the female population being incapable of leaving YSTR DNA).  The government also anticipates expert opinion testimony that Darius Carter and Person 1 were definitively excluded as potential contributors.

This DNA testing as to the black Ruger .380 sample is ongoing with respect to the Rosser-Stewart known sample.  As such, the government anticipates expert testimony that will potentially include an opinion as to Rosser-Stewart either being included or excluded as a

contributor. Additionally, there is ongoing DNA testing with respect to the profile developed from the Jennings .22 caliber.

### M.    Ballistics Analysis

The government intends to offer expert testimony concerning tool marking comparison. Trooper Cochrane is the government's anticipated ballistician who will testify as to the test-firing of the firearms and tool marking comparison of test-fired casings to the recovered casings. Two shell casings, one being a 9mm casing and the other a .22 caliber casing, were recovered and compared to the recovered firearms matching those calibers.

Tool marking comparison has been widely admitted in this District and elsewhere. See, e.g., United States v. Monteiro, 407 F. Supp. 2d 351, 359 (D. Mass. 2006) (concluding that the underlying scientific principle behind firearm identification is valid after six-day Daubert hearing; "The Court concludes that the methodology of firearms identification is sufficiently reliable."). The use of ballistics evidence has, in fact, become so routine that its admissibility is more often presumed than litigated.[40]

---

[40] See, e.g., United States v. Hicks, 389 F.3d 514, 526 (5th Cir. 2004) ("[W]e have not been pointed to a single case in this or any other circuit suggesting that the methodology ... is unreliable" and "the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades."); United States v. Willock, 696 F.Supp.2d 536, 568 (D. Md. 2010) ("[E]very federal court to have examined the issue in a written opinion ... [has] concluded that [ballistic toolmark analysis] is sufficiently plausible, relevant, and helpful to the jury to be admitted in some form."); United States v. Diaz, 2007 WL 485967, at *5 (N.D. Cal. Feb. 12, 2007) (noting that "[a]t least 37 jurisdictions have approved [firearm toolmark identification] by appellate opinion" and "[n]o reported decision has ever excluded firearms identification expert testimony under Daubert."); United States v. Santiago, 199 F. Supp. 2d 101, 111 (S.D.N.Y. 2002) ("The Court has not found a single case in this Circuit that would suggest that the entire field of ballistics identification is unreliable.") (Marerro, J.); see also United States v. Sheffer, 523 U.S. 303, 313 (1998) (contrasting polygraph evidence with more established, reliable evidence, such as ballistics); United States v. Davis, 103 F.3d 660, 672 (8th Cir. 1996) (upholding the use of firearms identification testimony to link bullets from a crime scene to a firearm associated with the defendant); United States v. O'Driscoll, 2003 WL 1402040, at *2 (M.D. Pa. 2003) ("[T]he field of ballistics is a proper subject for expert testimony and meets the requirements of Rule 702."); United States v. Cooper, 91 F. Supp. 2d 79, 82

### 1.     9mm Casing from Summer Street

As noted above, a civilian residing on Summer Street called the police and provided a 9mm casing that he found in his driveway.  Brockton Police took custody of the casing and it was transmitted to the MSP Crime Laboratory, where the tool markings were analyzed by Trooper Cochrane

Trooper Cochrane compared the tool markings imprinted upon the 9mm casing to a test-fired casing that was test-fired from the Armi Fratelli 9mm firearm recovered from the woods near Baker Street. Trooper Cochrane determined that the 9mm casing was fired from the Armi Fratelli 9mm firearm.

### 2.     .22 Caliber Casing from White Malibu

The government anticipates expert testimony from Trooper Cochrane concerning the tool marking comparison of the .22 caliber casing recovered from the front passenger to a casing test-fired by the Jennings .22 caliber.  The government anticipates "non-exclusion testimony," that is expert testimony that there is agreement among all characteristics, but insufficient quantity for an individualized opinion that the Jennings .22 caliber fired the recovered casing.

### N.     Plymouth County Correctional Facility Records

The government anticipates a Keeper of the Records testifying to authenticate the audio recordings as being the recordings produced by Plymouth County Correctional Facility (PCCF) and any booking records, booking photos or business records of the Plymouth County

---

(D.D.C. 2000).  Nor is the Government aware of any state court that has precluded expert ballistics testimony. See People v. Givens, 30 Misc. 3d 475, 478, 912 N.Y.S.2d 855, 857 (N.Y. Sup. Ct. 2010) ("This Court was unable to find any cases where firearms and toolmark identification was found to be unreliable or no longer scientifically acceptable. Nor were there instances where the testimony was ruled to be inadmissible.");

Correctional Facility, including booking photos, phone lists identifying numbers and relationship with the phone number.

### 1.    Booking and Phone Records

The government intends to offer records of the PCCF, including the booking records of Diovanni Carter, Darius Carter, and Rosser-Stewart.  The government intends to call a witness from the PCCF to authenticate these items and lay the business record foundation.  See Fed. R. Evid. 803(6).  The government intends to introduce the booking photos of Darius Carter taken on January 28, 2019.

The booking sheets contain identification of: Diovanni Carter's Boston address and street name being "Troub" and "Trouble," and Rosser-Stewart's address and street name being "Puffy."  The booking sheet also identifies the defendant's grandmother being Nancy Carter and her address in Brockton, MA, which matches the information from the records for the 6720 phone.  These records are admissible as business records of the facility.

The visitor records indicate that an attorney named Jessica Tripp came to visit the defendant.  The defendant searched the internet for this individual in the early morning of January 27, 2019, which demonstrates his consciousness of guilt.  The approved call list contains an entry for Lorie Major on a number ending in 1312.  The association of this number with Lorie Major is relevant to the call detail analysis.

### 2.    Recorded Calls

The government intends to offer recordings of phone calls made by the defendant and Darius Carter while they were detained at PCCF.  Each of the calls commences with an identification statement by the caller prior to the call being accepted, permitting the voice of Darius Carter and Diovanni Carter to be identified in the recording itself.  See Fed. R. Evid.

901(b)(3), (4), (6).  The government anticipates testimony from the keeper of the record at the PCCF concerning the manner of inmate calls are made and paid for through personal identifying numbers, how only calls to certain numbers are permitted for inmates after verification, and how the voice exemplar is taken from the assigned inmate during the creation of the account.

The government intends to offer a number of recordings of the defendant, some of which are described above, which are statements of a party opponent.  See Fed. R. Evid. 802(d)(2)(A); United States v. Aviles-Colon, 536 F.3d 1, 23 (1st Cir. 2008) (under Rule 801(d)(2)(A), "an out-of-court statement is not hearsay if it is offered against the party and it is the party's own statement").

Additionally, the government intends to offer a recording of Darius Carter, instructing his mother to tell the defendant to keep his mouth closed.  The government will address the admissibility of this statement in a motion in limine.

**O.     ATF Interstate Analysis**

Special Agent Patrick Briody will provide expert testimony that all three firearms and the 9mm, .22 caliber and .380 ammunition recovered in this case were manufactured outside of the state of Massachusetts, and would provide an opinion that they had travelled in interstate commerce.  SA Briody will testify as to his examination of the firearms and ammunition and provide an opinion that they meet the definition of firearm and ammunition under federal law.

**P.     ShotSpotter**

The government anticipates expert testimony from William Collier concerning the ShotSpotter system in the City of Brockton.  See United States v. Godinez, Crim. No. 18-278 (N.D. Ill. Oct. 2, 2019) (Leinenweber, J.) (admitting expert testimony on multilateration and general area of ShotSpotter located origin of gunfire); State v. Hill, 288 Neb. 767, 792 (Neb.

2014) (admitting ShotSpotter employee as expert witness). Specifically, this testimony will relate to the existence of the system, the manner of its operation, and its capabilities to geo-locate the source of gunfire through multilateration, which is essentially comparison of times when gunfire incidents are recorded by microphones located throughout the city.

There will be testimony concerning the reported multi-shot gunfire incident on January 26, 2019, at 7:20 PM and an expert opinion based upon the application of multilateration principals that the gunfire originated in the general area of Summer Street in Brockton.  This will be consistent with the officer testimony that he was being fired at from the white Malibu, the turret tape concerning the timing of the report of gunfire, the GPS data from the covert tracker that the white Malibu was on Summer Street at 7:20 PM, and the 9mm shell casing recovered from 323 Summer Street, Brockton, that was matched to the Armi Fratelli 9mm firearm recovered near the site of Darius Carter's arrest. The audio recordings of the multi-shot gunfire incident on January 26, 2019, at 7:20 PM, will be authenticated and played.

## V.      LIMITATIONS ON DEFENDANTS' EXAMINATION AND EVIDENCE

### A.      Prior Criminal Conduct of Cooperating Witness

The government anticipates that defense counsel may attempt to cross-examine Person 1 by inquiring as to the facts surrounding the prior convictions of the witness. The defendant, of course, may impeach witnesses with their prior criminal convictions that are deemed permissible under Rule 609.  The Court, however, should limit questions that are designed to impugn the character of government witnesses by eliciting testimony regarding the details of prior crimes. See Fed. R. Evid. 611; United States v. Lopez, 979 F.2d 1024, 1033-34 (5th Cir. 1993), cert. denied, 508 U.S. 913 (1993) (discussing application of Rule 608, 609, and 611).

Additionally, the government notes that the prior armed robbery convictions and related sentences for violation of probation resulted in the incarceration of Person 1. One of these periods of incarceration was a principal basis by which Person 1 came to know and earn the trust and confidence of the defendant.  The government would argue that this incarceration was the basis for which Person 1 and the defendant became sufficiently known to one another that they would be willing to conspire and engage in an armed robbery together.

### B.      Preclusion of Defenses of Alibi

Rule 12.1 of the Federal Rules of Criminal Procedure requires that a defendant provide the government with notice of any alibi or similar defense that a defendant intends to raise, including any defense asserting the defendant's unavailability on or near the dates named in the indictment (Rule 12.1).  On or about May 3, 2019, the government sent a letter to the defendant requesting notice pursuant to Rules 12.1 of any alibi defense. The government specified the following locations:

| Date | Time (approx.) | Location (approx.) |
|------|----------------|--------------------|
| 1/26/2019 | 5:00 am to 5:15 am | Brockton, MA |
| 1/26/2019 | 1:35 pm to 4:35 pm | Brockton, MA |
| 1/26/2019 | 4:45 pm to 5:30 pm | Area of East Street, Dorchester, MA |
| 1/26/2019 | 6:30 pm to 6:45 pm | Area of East Street, Dorchester, MA |
| 1/26/2019 | 6:45 pm to 7:05 pm | Travelling from Dorchester, MA to Belmont Street, Brockton, MA |
| 1/26/2019 | 7:10 pm to 7:14 pm | Vicinity of 521 Belmont Street, Brockton, MA |
| 1/26/2019 | 7:14 pm to 7:24 pm | Travelling from the vicinity of 521 Belmont Street, Brockton, MA to Carl Avenue and Bristol Avenue, Brockton, MA |
| 1/26/2019 | 7:24 pm to 11:59 pm | General area of Southeast Brockton, MA |
| 1/27/2019 | 12:00 am to 9:00 am | General area of Southeast Brockton, MA |
| 1/28/2019 | 8:50 am to 5:00 pm | General area of 100 Messina Drive, Braintree, MA |

The government reiterated this request in its letter of January 17, 2020.  The defendant has not notified the government of his intent to raise any such defense. See Fed. R. Crim. P. 12.1(a)(2).  As such, the government thus requests that the defendant be prohibited from

introducing evidence or argument relating to such defenses, particularly any related to alibi, at trial. <u>See</u> Fed. R. Crim. P. 12.1(e) ("If a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness regarding the defendant's alibi. This rule does not limit the defendant's right to testify.").

## VI.   STIPULATIONS

The only potential stipulation that has been conveyed to the government is as to the element of counts four and five that the defendant was previously convicted of a felony offense. However, the defendant has not signaled whether or not he will stipulate to the additional requirement that the he knew the crime for which he was previously convicted carried a maximum penalty greater than one year of imprisonment. Absent such a complete stipulation, the government will proceed with proof as to this element.

In correspondence dated February 5, 2020, Mr. Sultan indicated that it is not his "practice to stipulate to anything in a criminal trial."  As such, government does not anticipate any stipulations of admissibility, stipulations of fact, or stipulations of authenticity, except with respect to the fact of a prior qualifying felony conviction.

## VII.   VOIR DIRE

The government has filed proposed voir dire questions separately.

## VIII.   PROPOSED JURY INSTRUCTIONS

The government will file proposed jury instructions separately. In large measure, the government's instructions mirror the pattern instructions for the First Circuit, with adaptations in accordance with authority cited.

**IX.     SPECIAL REQUESTS**

Given the anticipated length and number of witnesses, and the involvement of certain out of state witnesses who are travelling to the District for purposes of trial, the government anticipates that it may need to call some witnesses out of order, and potentially have such witnesses testify and admit their testimony *de bene*, consistent with the overall presentation described herein, if the relevance of certain testimony has not yet been established.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:     */s/ Philip A. Mallard*
        Philip A. Mallard
        Glenn A. MacKinlay
        Assistant U.S. Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

*/s/ Philip A. Mallard*
Philip A. Mallard
Assistant U.S. Attorney

Date: February 7, 2020