<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2


 3                                    )
 4   UNITED STATES OF AMERICA,        )
                                      )
 5          Plaintiff,                )
                                      )   Criminal Action
 6   v.                               )   No. 1:19-CR-10104-ADB-1
                                      )
 7   DIOVANNI CARTER,                 )
                                      )
 8          Defendant.                )
                                      )
 9

10          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT JUDGE
11

12                        JURY TRIAL
                           DAY 5
13

14                       March 6, 2020
                          9:49 a.m.
15

16        John J. Moakley United States Courthouse
                   Courtroom No. 17
17                 One Courthouse Way
               Boston, Massachusetts 02210
18

19

20

21             Linda Walsh, RPR, CRR
           Kathleen Mullen Silva, RPR, CRR
22              Official Court Reporters

23        John J. Moakley United States Courthouse
                   One Courthouse Way
24             Boston, Massachusetts 02210
                 lwalshsteno@gmail.com
25                kathysilva@gmail.com
</pre>

1    APPEARANCES:

2    On Behalf of the Government:

3        UNITED STATES ATTORNEY'S OFFICE
         By: AUSA Philip A. Mallard
4            AUSA Glenn A. MacKinlay
         One Courthouse Way
5        Boston, Massachusetts 02210
         617-748-3674
6        philip.mallard@usdoj.gov
         617-748-3215
7        glenn.mackinlay@usdoj.gov

8    On Behalf of the Defendant:

9        RANKIN & SULTAN
         By: James L. Sultan, Esq.
10           Kerry A. Ferguson, Esq.
         151 Merrimac Street, Second Floor
11       Boston, Massachusetts 02114-4717
         617-720-0011
12       jsultan@rankin-sultan.com
         khaberlin@rankin-sultan.com

13

14

15
                    Proceedings reported and produced
16                   by computer-aided stenography.

17

18

19

20

21

22

23

24

25

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SAMUEL FILES | | | | |
|     By Mr. MacKinlay | 5-17 | | | |
|     By Mr. Sultan | | 5-34 | | |
| SCOTT GAMBLE | | | | |
|     By Mr. MacKinlay | 5-39 | | 5-60 | |
|     By Mr. Sultan | | 5-57 | | |
| ANDY SOUSA | | | | |
|     By Mr. Mallard | 5-60 | | | |
|     By Mr. Sultan | | 5-63 | | |
| COSMOS NANOS | | | | |
|     By Mr. Mallard | 5-64 | | | |
| MONICA HORAN | | | | |
|     By Mr. Mallard | 5-75 | | | |
|     By Mr. Sultan | | 5-85 | | |
| JACQUELINE MUH | | | | |
|     By Mr. Mallard | 5-87 | | | |
|     By Mr. Sultan | | 5-94 | | |
| CHRISTOPHER MALM | | | | |
|     By Mr. Mallard | 5-96 | | | |
| MATTHEU KELSCH | | | | |
|     By Mr. Mallard | 5-121 | | 5-185 | |
|     By Mr. Sultan | | 5-177 | | 5-188 |

E X H I B I T S

| | RECEIVED |
|---|---|
| GOVERNMENT EXHIBITS | |
| 44 ......................................... | 5-26 |

1

EXHIBITS (continued)

2

52 ........................................  5-49

3

73 ........................................  5-103

4

82 ........................................  5-80

5

94.1 ........................................  5-52

6

94.2 ........................................  5-68

7

94.3-94.6 ........................................  5-54

8

95.1 ........................................  5-45

9

95.2 ........................................  5-70

10

96.1-96.4 ........................................  5-47

11

104.2 ........................................  5-142

12

104.3 ........................................  5-148

13

104.4 ........................................  5-144

14

105.1 ........................................  5-137

15

105 ........................................  5-146

16

106 ........................................  5-151

17

111 ........................................  5-161

18

112 ........................................  5-164

19

113 ........................................  5-166

20

114 ........................................  5-92

21

115 ........................................  5-93

22

116 ........................................  5-170

23

144 ........................................  5-150

24

25

```
 1                    P R O C E E D I N G S
 2              (The Jury and defendant are not present for the
 3         following.)
 4              MR. SULTAN:  I expect that through Agent Kelsch today,
 5    the government is going to offer some pieces of an extraction
 6    of Mr. Boddie's phone, and I just thought it would be helpful
 7    to talk about those now.
 8              We're going to be objecting to Exhibits 105 through
 9    109 of those.  I would like to address the Court on this.
10              THE COURT:  All right.  He's objecting to the Boddie
11    extractions.
12              MR. SULTAN:  Not the contacts list, Your Honor, which
13    is 104, but the substantive conversations.
14              THE COURT:  Yes.  On hearsay grounds, I take it?
15              MR. SULTAN:  Well, basically, yeah.  Some of
16    them -- not all hearsay, Your Honor, because -- could I go
17    through them quickly?  Is that all right?
18              THE COURT:  Yes, in the next ten minutes.
19              MR. SULTAN:  It won't take me ten minutes, Your Honor.
20              THE COURT:  Perfect.  That's what you have.
21              MR. SULTAN:  So 105 did not occur during the pendency
22    of the conspiracy, in any event.  So these are statements -- I
23    guess they're allegedly between Boddie and Puff, who I think
24    the Court could find is Stewart-Rosser, Rosser-Stewart, but
25    they're all -- none of them are during the pendency of the
```

1    conspiracy.  So, to me, they are not co-conspirator statements.

2    They're hearsay.  That's 105.  106 through 109 --

3            MR. MALLARD:  It might be better to go back and forth

4    on this.

5            MR. SULTAN:  Of course.  Go ahead.

6            THE COURT:  Yes.

7            MR. MALLARD:  Your Honor, I think the best thing for

8    us to do with this is I only really would like to get number

9    one, text message number one in, which is a statement of 5 Page

10   Street from the Puff phone to Boddie.

11           THE COURT:  All right.  Are these in the transcript

12   book or the exhibit book?

13           MR. MALLARD:  The exhibit book.  And we sent updated

14   exhibits to counsel last night but not to the Court, but I can

15   provide the Court with a copy right here.

16           THE COURT:  All right.  You're giving me 105 to 109?

17   He's not objecting to 104.

18           MR. SULTAN:  Right.

19           MR. MALLARD:  And the only real ones that I'm looking

20   to get out of 105 are text message number one, which is a

21   statement of an address, which is 5 Page Street, which I think

22   helps attribute the number to Mr. Rosser-Stewart, which would

23   come in on the Mass. RMV.  And then also number 30, which is --

24   I agree, it's before the conspiracy, "You and Trub don't have

25   to hit me up anymore.  I'm good."  And that's sent from Boddie

1   to Puff.  And I don't think there was any hearsay content

2   there.  I just am offering it to show the connection between

3   Puff, Trouble, and Boddie.

4           MR. SULTAN:  Well, number one certainly has

5   substantive content.  I mean, it's an assertion of a street

6   address.  That's -- I mean, if the implied assertion is "My

7   address is 5 Page Street," that's hearsay.

8           THE COURT:  I'm not sure that's the assertion.

9           MR. SULTAN:  What is the assertion, then, that they're

10  trying to get it in for?  That's what I understood Mr. Mallard

11  just said.

12          MR. MALLARD:  The fact that it was said by the person

13  with the number.

14          THE COURT:  I'm not sure it's coming in -- like,

15  what's the truth of that?

16          MR. SULTAN:  Well, they said it matches up with some

17  other documents.  So they're trying to establish that this is

18  somebody's true address.  Otherwise, it has no relevance to

19  anything.  The truth -- "My address is 5 Page Street," that's a

20  factual assertion.

21          THE COURT:  It could be, like, "Let's meet at 5 Page

22  Street" or "I was at" -- like, I'm not sure -- it's just coming

23  up to show that it's not a familiar address, right?

24          MR. SULTAN:  Maybe Mr. Mallard could explain how it

25  connects up.  I thought he just did.

1          MR. MALLARD:  The Mass. RMV is going to say that

2     it's -- it's a separate document.  Mr. Stephan Rosser-Stewart

3     lives at 5 Page Street.  The mere fact that the phone number

4     associated with Puff saying 5 Page Street, by itself I think

5     has value that is nonhearsay from the fact that it was said.

6          MR. SULTAN:  The fact that it was said means nothing.

7     It's only significant if it's a truthful statement of his

8     address.  That's what it's being offered for.  Mr. Mallard just

9     confirmed that's what -- I mean, they keep saying it's not

10    hearsay.  Something offered for the truth is hearsay.  If it's

11    not being offered for the truth, it's not relevant.  It's just

12    a number and a street name.  What does that have to do with

13    anything?  So I say it's --

14          THE COURT:  I'll think about that one.

15          THE CLERK:  Do you want him out?

16          THE COURT:  Sure.

17          (The Defendant is present for the following.)

18          MR. SULTAN:  30, I mean, I guess all -- I guess what I

19    would say about 30 is 403.  I mean, 403 and relevance.  It

20    doesn't say anything.  It doesn't say anything of value to the

21    jury in determining anything --

22          THE COURT:  It shows the relationship between the

23    three of them.  30 I am going to allow.

24          MR. SULTAN:  So on 106 through 109, I guess they're

25    going to argue that these are statements by the defendant.

1   There hasn't been any evidence so far connecting the defendant

2   to these phone numbers.  These documents are not -- the

3   statements are not self-authenticating; that is, 106, 107, and

4   108 are not self-authenticating, and 109 isn't

5   self-authenticating.

6        109 says -- suggests that it's not the defendant,

7   "Hey.  Dio doesn't have his phone right now.  Dio isn't around

8   me.  Okay."  I mean, that's hearsay.  It's all hearsay.

9        THE COURT:  All right.  You have four minutes left,

10  Mr. Mallard, or else you're going to have to resume this at

11  noon.

12       MR. MALLARD:  I think what I'll do, Your Honor, is

13  I'll concede -- I don't think there's much probative value for

14  108, 109, and 107.  I'm going to tell you that 106, Your Honor,

15  the subscriber information --

16       THE COURT:  Wait.  108, 109, 107.  That leaves us with

17  106, right?

18       MR. MALLARD:  106.  The initial text message on this

19  says, "Yo, bro.  This Trub," which I think is fairly going to

20  be linked to Trouble, the defendant's street name, which has

21  already been established by a witness here today, will also be

22  established by one of the keepers of the record from the jail

23  who's going to have the street name come in.

24       Additionally, the subscriber info for this phone is

25  going to be in the name of Nancy Carter, 108 Moraine Street, an

1    address with which Mr. Sultan has already put in as being

2    associated with the defendant.  And I think Trooper Sullivan

3    described it as his nana's house.

4            THE COURT:  Where did this phone come from?

5            MR. MALLARD:  This phone number?

6            THE COURT:  The phone.  Is it an extraction from the

7    phone or an extraction from, like, the phone company?

8            MR. MALLARD:  This is Boddie's phone from Boddie's

9    house at 82 Carl Avenue.

10            THE COURT:  Which messages are you trying to get in on

11   106?

12            MR. MALLARD:  I would offer all of these messages as

13   statements of the defendant except for the -- well, there's

14   only one or two statements from James Boddie in response, and

15   I'd offer them for context.

16            MR. SULTAN:  Your Honor, I would submit there's no

17   proof that this is the defendant.  If the Court wants to let it

18   in de bene, and they take the risk that they're not going to be

19   able to connect the phone up to him, I would understand that.

20            MR. MALLARD:  I can also tell the Court that the

21   device associated with this number was seized through the

22   defendant at his arrest.  It's a Motorola phone matching the

23   IMEI.  The evidence officer who received it -- Trooper Sullivan

24   testified that he took the phone from the defendant.

25            MR. SULTAN:  He didn't testify to anything about this

1  phone.

2          MR. MALLARD:  Thank you, Counsel.

3          Trooper Sullivan took a phone and it went into

4  Brockton evidence.  We are going to have an evidence officer

5  say it was a black Motorola with a certain IMEI.  The IMEI is

6  going to match the subscriber information associated with this

7  phone number.  There's going to be a full link -- it's probably

8  going to be the most proven beyond all possible doubt that this

9  is, in fact, the phone that was on the defendant when he was

10  arrested.

11          MR. SULTAN:  If they can do it, they can do it.

12          THE COURT:  Okay.

13          MR. SULTAN:  Last thing, Your Honor.  One minute.

14  Something else.  They're going to try to put in a Google search

15  history.  This is Exhibit 116.1, I think.  I think that's the

16  one they are going to put in.  This is a search history on what

17  they claim is Mr. Carter's Google account.  It's goes for two

18  and a half months, from 11/16/18 to 2/2/19.  It's, I don't

19  know, pages and pages and pages long.  It's everything that was

20  ever searched for under that account.

21          It is -- 99.9 percent of it is clearly not relevant.

22  It's got a lot of stuff in there that I wouldn't want the jury

23  to see because I think it's unfairly prejudicial and has zero

24  probative value.  So, to me, they should absolutely not be able

25  to put in the entire search history.

1          And then, more specifically, I pointed to, I think, on

2    January 26th and 27th there were searches for "Glock 47,"

3    "Build your own Glock."  There's no Glock involved in this

4    case, Your Honor.  I think under 403 and under 401, those

5    should not be admissible.

6          And, finally, there were searches on January 27th for

7    Jessica Tripp.  Jessica Tripp is a criminal defense lawyer.  To

8    me, it is an impingement on -- I don't know whether it was

9    Mr. Carter or somebody else looking up Jessica Tripp's name,

10   but to suggest there was some kind of inference that can be

11   drawn against the defendant --

12          THE COURT:  What date was that?

13          MR. MALLARD:  The next morning, Your Honor, about

14   9:30.

15          MR. SULTAN:  Inadmissible.

16          THE COURT:  How are you intending on using this?

17   Because if they want to put in that he, you know, searched for

18   a T-Mobile store in the days before or the day --

19          MR. SULTAN:  Somebody did.  I agree, that's relevant.

20          THE COURT:  So some of it is definitely going to come

21   in.  If they want to put in that no one searched for T-Mobile

22   store any other time, that's fine, too.  But I take his point,

23   that there's things in here that are probably -- you want this

24   in for chalk?  You want to redact it?  Like, how do you want to

25   do it?

```
 1          MR. MALLARD:  I'm open to what the Court thinks is
 2   permissible.  I just think it's important for the jury to
 3   understand that there is a complete and full record of all this
 4   activity.  "T-Mobile" does not appear any time before that
 5   January 26th.
 6          If we have to redact out the content for the Court to
 7   be comfortable with the admission, I would suggest that the
 8   redactions start -- go from whatever November period it starts
 9   until January 16th when the car is in his possession and then
10   continue on.
11          MR. SULTAN:  I have a simple suggestion, Your Honor.
12   I have no problem with Agent Kelsch, who is going to put this
13   in, saying "I reviewed the entire search history from November
14   to February, and the only day that 'T-Mobile' was mentioned was
15   January 26th."  Then it's in.  We don't have to try to create a
16   three-line document out of a 30-page document.
17          THE COURT:  Let me ask you this:  Would you stipulate
18   to that, what's in the document?
19          MR. SULTAN:  I won't contest it.  I hate the word
20   "stipulation."
21          THE COURT:  I know.  Let's just say that they want
22   something to corroborate his testimony, right?  I mean, they do
23   have corroborating documents, but I take your point on it.  And
24   I think they're entitled to have the information corroborated
25   by the paper.
```

```
 1              MR. MALLARD:  There's also an attribution issue,
 2   Judge.  He's contesting whether or not, I'm assuming, that
 3   these are his searches, and there's a frequent pattern that
 4   this defendant does of searching for "Universal Hub"
 5   essentially every morning.  And that happens.  Boom.  Universal
 6   Hub, Universal Hub.
 7              There are searches for "Capital One," which we already
 8   know now from other testimony is pertinent to this defendant.
 9              There's other searches for "Hertz" during other dates
10   that all attribute this device and this issue to this defendant
11   that I think merit coming in, especially when he's contesting
12   identity.
13              THE COURT:  All right.  Let's -- the jury is here, so
14   Karen is going to go get them.  What we'll do is we'll mark it
15   for identification.  We'll sort out how it comes in later,
16   either at lunch or next week.
17              MR. MALLARD:  I anticipate him testifying this
18   afternoon.
19              THE COURT:  That's fine.  I don't think it makes -- I
20   mean, there's parts of this that you want to show him, right?
21              MR. MALLARD:  I would like to show the jury, as well.
22              THE COURT:  So there's part of it that are going to
23   come in, in some form or another.  I'm going to let him show
24   those parts to the jury.
25              MR. SULTAN:  What parts are those, Your Honor?
```

1          THE COURT:  I want you to finesse around it.  So

2     figure out what you're going to show them, and I'll rule on it

3     if I need to.  Or if you want to show them, like, those

4     searches, you can show them that.

5          MR. MALLARD:  I think my time period of focus is going

6     to be -- the time period I really want to focus on is January

7     25th forward.  But, you know, to the extent that there's other

8     pieces that tend to show identity in who's using the device,

9     which I think the pattern is there -- I just don't want to be

10    in a position where the Court is making a judgment about

11    excluding it, and then at closing I get to hear about how they

12    haven't shown you that this is his account.

13         THE COURT:  I'm not going to exclude it, but I want --

14    I mean, there is no relevance to this case to lots of these

15    searches.

16         MR. MALLARD:  I certainly agree.

17         THE COURT:  I don't know what they say.  I haven't

18    looked at them, but there's pages and pages of him talking

19    about drug trafficking.  That should not go to the jury.

20         MR. MALLARD:  I don't disagree with the Court on that.

21         THE COURT:  So what I want to figure out is what you

22    need, whether it's admissible, and how we're going to get it

23    admitted.  But the jury is here.  Nobody raised this until ten

24    minutes before they were coming in.  I can't go through it line

25    by line.

1          So what I'm suggesting is that either we sort it out

2     at lunch, if there's time to do it, or we just mark it for

3     identification and you show them what -- the parts that we can

4     agree are going to come in, in some form or another.

5          MR. MALLARD:  I think lunch might be the best

6     opportunity.

7          THE COURT:  Mr. Sultan, my suggestion is that you look

8     at everything from January 25th forward and figure out if

9     there's anything that you're objecting to.

10         THE CLERK:  All rise for the jury.

11         (The Jury is present for the following.)

12         THE CLERK:  Court is in session.  Please be seated.

13         THE COURT:  Resuming with Mr. Files.

14         MR. MacKINLAY:  Walking through at this time, Your

15    Honor.

16         THE COURT:  Welcome back, everyone.  Happy Friday.

17         THE JUROR:  Good morning.

18         THE COURT:  Just a reminder, you are still under oath.

19    For the jury, you notice I don't say that to people after lunch

20    break or after a recess.  I always say it to them after a

21    night.  That's my line.  So I'm just reminding you, you are

22    still under oath.

23         THE WITNESS:  Thank you.

24         THE COURT:  When you're ready, Mr. MacKinlay.

25         SAMUEL FILES, having been previously duly sworn by the

 1   Clerk, was examined and testified as follows:

 2                      DIRECT EXAMINATION, Continued

 3   BY MR. MacKINLAY:

 4   Q.   Mr. Files, when we left off, you were describing the

 5   fingerprint process, the latent fingerprint examination that

 6   you've conducted in this matter; do you remember that?

 7   A.   Yes.

 8   Q.   And we also left off, in particular, you were discussing a

 9   case that you were assigned under your Case Number 19PCS463; do

10   you remember that?

11   A.   That's correct, yes.

12   Q.   And we put some photographs of your examination in, but we

13   didn't really talk about them; would that be true?

14   A.   Yes.

15   Q.   I want to bring up one of the exhibits that we did admit

16   yesterday and have you discuss what you did with respect to

17   this photograph in your examination, okay?

18   A.   Yes.

19           MR. MacKINLAY:  May I have Exhibit 43.2, please.

20   BY MR. MacKINLAY:

21   Q.   What is depicted in this Exhibit 43.2, Mr. Files, and how

22   did you use it during your examination in latent fingerprinting

23   comparison?

24   A.   Sure.  So what this is is a screenshot of the AFIS system

25   that I used during my work.  This specifically is a case 463.

1    Every case that I get has its own set of evidence.  So this is

2    one of the latents from 463 that I scanned in.

3              So this is from -- I received essentially a clear

4    piece of plastic with a piece of tape over it that has the

5    actual latent lift on it.  And I would scan that into the

6    system using a scanner, and it comes up like this.  At which

7    point these yellow little circles with tails here, those are

8    marking for minutiae.

9              So essentially wherever I click, it creates a circle,

10   and then I drag the tail.  And depending on whether it's a

11   bifurcation where a ridge splits into two or if it's a ridge

12   ending, where a ridge stops, I will pull the tail to a

13   different direction just to mark whether it's one or the other.

14             And once I reach a certain number of points, I will

15   submit it.  So once I submit it -- I basically tell the

16   computer to spin it 360 degrees and check it against every

17   record that it has in its system.

18   Q.   And, again, when you started, you said you scanned in the

19   latent image from the latent lift, correct?

20   A.   That's correct.

21             MR. MacKINLAY:  Can I have the monitor, please, for

22   the witness only.  Can I have Exhibit 34, please.

23   BY MR. MacKINLAY:

24   Q.   I'm showing you what we've marked as Exhibit 34.  Do you

25   recognize that?

1    A.   Yes, I do.

2    Q.   What is it?

3    A.   That is the plastic piece of -- the piece of plastic that

4    I receive latents on if they are powdered and taken from a

5    scene.

6    Q.   And that's a photograph of the latent lift itself?

7    A.   Yes, it is.

8    Q.   Does it fairly and accurately show the markings of the

9    latent lift that you processed and later input into the

10   computer to assist in Exhibit 43.2?

11   A.   It doesn't look quite as clear as in person, but it is the

12   same lift, yes.

13           MR. MacKINLAY:  I would offer 34 into evidence,

14   please, Your Honor.

15           MR. SULTAN:  It's in, Your Honor.

16           THE COURT:  I have it as already in.

17           MR. MacKINLAY:  I'm sorry, Your Honor?

18           THE COURT:  It's already been admitted.

19           MR. MacKINLAY:  34, thank you.

20           THE COURT:  Through Mr. Fowler, I believe.

21           MR. MacKINLAY:  Thank you, Your Honor.

22           Request to publish Exhibit 34.

23   BY MR. MacKINLAY:

24   Q.   Can you describe for the jury what's listed in Exhibit 34,

25   please.

1    A.    So when an officer goes to a scene and they are looking

2    for fingerprints, they'll use a type of powder that essentially

3    sticks to the residue left behind by a fingerprint.  And if

4    they do find something that they think is of value, they

5    essentially have lifting tape.  It's clear tape that they stick

6    on top of it and pull it off, and it will come up with the

7    ridges that they found.  At which point, they'll put it onto a

8    clear piece of paper, put it into a sealed envelope, and that's

9    what I receive to analyze.

10          MR. MacKINLAY:  Exhibit 43.2, please.

11   BY MR. MacKINLAY:

12   Q.    And, essentially, that's the image of the latent lift that

13   you just described, correct?

14   A.    Correct.

15   Q.    What's the next step in your examination process of the

16   latent fingerprint?

17   A.    So once I've submitted a print, it takes time.  Obviously,

18   the computer needs to go through the records that it has, and

19   there are quite a lot.  And it will give me back a -- within a

20   separate screen I have a list of all of my pending cases, and

21   these pending cases will have a list of candidates within them,

22   which I will then look at one to one to compare the minutia to

23   each other.

24   Q.    Were you requested to make a comparison to a particular

25   ten print card following your receipt of these potentials?

1    A.   Yes.  So originally the way that the computer system works

2    is if it thinks that a candidate is a match, it will give the

3    best card within the system, but that isn't necessarily the

4    only card within the system.  And in this case, I was requested

5    to use a card from the Plymouth County facility.

6    Q.   And did you do that?

7    A.   Yes, I did.

8         MR. MacKINLAY:  Could I have Exhibit 44 for the

9    witness only, please.

10   BY MR. MacKINLAY:

11   Q.   I'm showing you an item and ask you if you'd take a moment

12   and look at it.  Do you recognize that?

13   A.   Yes, I do.

14   Q.   We brought it --

15        MR. MacKINLAY:  Zoom in on the top piece just so we

16   can see it a little clearer, please.

17   Q.   Again, do you recognize that, Mr. Files?

18   A.   Yes, I do.

19   Q.   What do you recognize it to be?

20   A.   That is the tenprint card that I was requested to use to

21   make my comparison.

22   Q.   And does it -- is the card a card taken from the booking

23   at the Plymouth County Correctional Facility?

24        MR. SULTAN:  Objection, Your Honor.  How does he know?

25        THE COURT:  Well, if he knows.  If he doesn't know, he

1    doesn't know.

2    A.   So you can see here --

3         MR. SULTAN:  Objection.  He's doing it from looking at

4    the document.  Foundation, Your Honor.  The document is not in.

5         MR. MacKINLAY:  May he answer the question, Your

6    Honor, and he'll explain that?

7         THE COURT:  Answer the question, and then we'll see

8    where we are.

9    A.   Sure.  So cards all have an OBTN number, which is right

10   there.  OBTN numbers are specific to where the card was created

11   during booking.  JPHC is for the Plymouth Correctional

12   Facility, which is also a contributing department and agency

13   here.  And we also have Wayne Carol, who works within the

14   Plymouth Correctional Facility, who does booking there and

15   takes these fingerprints.

16   BY MR. MacKINLAY:

17   Q.   Are fingerprint cards like this made in the ordinary

18   course of business at the Plymouth County Correctional

19   Facility?

20   A.   Yes, they are.

21   Q.   Are they a regular part of the booking procedure?

22   A.   Yes, they are.

23   Q.   And are they kept by the facility in the ordinary course

24   of business?

25   A.   Yes, they are.

1    Q.   And are they accurate -- is the information included on it

2    accurate at the time it's inputted into the system?

3    A.   Yes, they are.

4              MR. MacKINLAY:  I would offer Exhibit 34 into

5    evidence.

6              MR. SULTAN:  I would object, Your Honor.  Wrong

7    witness.  And there's also something specific on here, if the

8    Court is going to admit it, that I would like to address the

9    Court on at sidebar.

10             THE COURT:  All right.  Come up to sidebar.

11             (At sidebar.)

12             MR. SULTAN:  My first objection is that this

13   fingerprint analyst can't possibly authenticate a fingerprint

14   card somebody else made somewhere else.

15             Number two, if the fingerprint part is the part he's

16   going to be dealing with, tied to the defendant's name, that

17   stuff has to be off.

18             THE COURT:  The alias portion needs to be redacted.

19   Are you putting on the fingerprint taker?

20             MR. MacKINLAY:  I'm putting on a keeper of records.

21   It will be the next witness who will authenticate the card as a

22   the keeper of records from the booking department.  So at

23   worse, Your Honor, we could take it de bene.

24             MR. SULTAN:  I agree.

25             THE COURT:  It's out of order.

1          MR. MacKINLAY:  I just didn't have a chance to give

2    counsel a heads-up this morning that that was the order that I

3    had in here yesterday.

4          THE COURT:  That's fine.

5          MR. SULTAN:  This needs to come off?

6          THE COURT:  That needs to be redacted.

7          MR. MacKINLAY:  I disagree on that.

8          THE COURT:  Why?

9          MR. MacKINLAY:  Because that's the usual part of the

10   process.

11         THE COURT:  Where did it come from?

12         MR. MacKINLAY:  Him.

13         MR. SULTAN:  How does he know?

14         THE COURT:  Where did it come from?

15         MR. MacKINLAY:  It came from the defendant.  That's

16   booking information.  The booking officer will say the same

17   thing.

18         THE COURT:  Is the booking officer going to testify

19   that the defendant provided that information?

20         MR. MacKINLAY:  During the usual course of booking,

21   they asked the alias; they provided the alias; they imported it

22   into the system; it's on the booking sheet.

23         THE COURT:  If it doesn't come from him, I'm not

24   running a past criminal history and extract --

25         MR. MacKINLAY:  Let me take another -- I don't mean to

1   interrupt the Court.  He has a tattoo with the name "Trouble"

2   on his arm, Judge.

3           MR. SULTAN:  They can get that in through the booking

4   officer.

5           THE COURT:  I just don't -- I don't know where that

6   comes from.  I don't know if it comes from the criminal record

7   or if it comes from --

8           MR. MacKINLAY:  Booking.  And his tattoo is "Trouble"

9   on his forearm.

10          THE COURT:  They asked him what his alias or street

11  name was, and he said "Trouble"?

12          MR. MacKINLAY:  How else would they get their alias?

13          THE COURT:  It comes off the criminal history.

14          MR. MacKINLAY:  They don't do that, though.  They take

15  the information --

16          THE COURT:  Before that comes in, somebody needs to

17  testify about where that came from.

18          MR. MacKINLAY:  Okay.  So make the document de bene

19  and let his testimony go forward, and we'll hold off on that

20  until such time --

21          MR. SULTAN:  And don't show it.

22          THE COURT:  I will admit it, not de bene, because I'm

23  entrusting you are going to do what you say you are going to

24  do.  So I'm going to admit the exhibit.  My suggestion is you

25  put a piece of tape or paper over that until we can sort out if

1  it properly comes in.

2          MR. MacKINLAY:  I understand.  I'll do that now rather

3  than using the doc cam -- I'll use the doc cam rather than the

4  computer system for this exhibit.

5          THE COURT:  That's fine.

6          And if you want, either -- so do I have that exhibit

7  in my book?

8          MR. MacKINLAY:  This?

9          THE COURT:  Yeah.

10          MR. MacKINLAY:  Yes.

11          THE COURT:  So I'm willing to pull mine out and just

12  black it out, and now I'll do it for you.

13          MR. MacKINLAY:  We can always print --

14          THE COURT:  Because it may come in.  I want you to

15  not --

16          MR. MacKINLAY:  We can print another one, but thank

17  you very much.

18          THE COURT:  All right.

19          (End of sidebar.)

20          MR. MacKINLAY:  Your Honor, I would offer Exhibit 44

21  into evidence at this time.

22          THE COURT:  Yes, it's admitted.

23          (Government Exhibit 44 received in evidence.)

24          MR. MacKINLAY:  And request to publish using the

25  document camera.

1          THE COURT:  Yes.

2          THE CLERK:  You just need to turn it on.

3          THE COURT:  Well done, Mr. MacKinlay.

4    BY MR. MacKINLAY:

5    Q.    Do you recognize this document, sir?

6    A.    Yes, I do.

7    Q.    Okay.  Is this the tenprint card that you used in your

8    examination to make the comparison to one of the latent lifts

9    that you received to analyze in this case?

10   A.    Yes.

11   Q.    What's the next step in your procedure when you have a

12   tenprint card and you have a latent lift input into the

13   system -- your computer system that you've described?

14   A.    I will look at the latent print next to the known print,

15   and I will essentially look for something called a target

16   group.  This is usually a core or a delta within a fingerprint.

17   It's a focal point.  It's something that I can recognize easily

18   in both prints.  And from there, I will start to look at the

19   minutiae to look for either similarities or dissimilarities

20   between the prints.

21          MR. MacKINLAY:  Can I have a split screen, please,

22   Exhibit 43.3 and 43.4.  And, again, this will be for the jury,

23   as well.  These were all admitted yesterday, Your Honor.

24   BY MR. MacKINLAY:

25   Q.    Do you see what's in front of you, sir?

1   A.    Yes, I do.

2   Q.    What is it?

3   A.    This is what my comparison screen would look like.  I

4   get -- the prints on -- usually it starts as, like, a single

5   screen.  I blow it up so that I can see it on two separate

6   screens just for ease of use.  I have some tools there to just

7   zoom in on the prints and maybe change the contrast a little.

8   But that's essentially the comparison screen that I'm working

9   with.

10  Q.    And so, just to orient us, on the left side is what?

11  A.    The left side is the latent.

12  Q.    And on the right side is what?

13  A.    The known print that is the candidate for comparison to

14  the latent.

15  Q.    And, essentially, the right side is the image of Exhibit

16  44?

17  A.    Yes, specifically a finger nine.

18  Q.    Very well.

19          MR. MacKINLAY:  Can I have Exhibits 43.5 and 43.6 side

20  by side again, please.

21  BY MR. MacKINLAY:

22  Q.    Do you recognize these photographs?

23  A.    Yes, I do.

24  Q.    Describe in your process of evaluating and examining the

25  latent print to the tenprint card what you did utilizing these

1  photographs, please.

2  A.   Sure.  So once I get those blank -- the blank comparison,

3  I will -- so here I will look at the target group.  So here the

4  target group would be the core here.  You can see the little,

5  like, recurve there.  So I can start there with my target

6  group, and I will essentially look for any minutiae I can find.

7  From there, I will look for minutiae that's close to it.  I

8  will go back and forth between the two, looking for similar

9  minutiae and noting any discrepancies between the two prints.

10  Q.   What did you do next in your examination?

11  A.   So once I had reached a sufficient number of points that I

12  believed that there was an individualization I could make, I

13  would print out these sheets, both the blank and the filled

14  ones, and I would give the blank ones to Paul Sousa for

15  verification.

16  Q.   Did you do that -- did you reach that conclusion relative

17  to your examination of these latents in this tenprint card?

18  A.   Yes, I did.

19  Q.   And did you give it to Paul Sousa for purposes of

20  verification?

21  A.   Yes, I did.

22  Q.   Do you have an opinion, based on your training and

23  experience, as to the evaluation of an examination of the

24  latent fingerprint that was submitted to the tenprint card that

25  we just described?

1    A.   Yes.  I was able to make an individualization with this

2    latent to finger nine of Diovanni Carter.

3    Q.   Finger nine is which finger, again?

4    A.   Finger nine is the left ring finger.

5    Q.   Did you go on in your examination to look at other prints

6    from the tenprint card?

7    A.   So, in this case, you can see over here on this print,

8    where I've drawn that line, the left side of it is not very

9    clear.  And there is some clear minutiae on the left side of

10   the latent, so I did do a second analysis on finger nine.

11          So when you get a tenprint card, they do a roll of

12   each of the fingers, and then at the bottom of the card they

13   slap fingers down.  It's called a slap.  And I did do a

14   comparison to the finger nine slap as well as the finger nine

15   roll.

16          MR. MacKINLAY:  May I have Exhibit 43.7 and 43.8 split

17   screen, please.

18   BY MR. MacKINLAY:

19   Q.   Again, what did you do -- what is the significance of

20   these two photos in your examination, the second examination of

21   what you described as the flat scan or flat print?

22   A.   Yeah, a rolled print.  This is a slap print.  Again, it's

23   just they lay the fingers flat at the bottom of the tenprint

24   card.

25          And the main reason that I did do this was because

1    the left side of this slap over here is much clearer than the

2    roll.  So I wanted to just look at that side, as well.

3    Q.   And did you conduct that comparison, again utilizing the

4    points that you described in your computer program, from both

5    images?

6    A.   Yeah.  I redid the comparison using the same methods.

7          MR. MacKINLAY:  May I have Exhibit 43.9 and 43.10

8    split screen, please.

9    BY MR. MacKINLAY:

10   Q.   What is depicted on these two exhibits, sir?  And describe

11   your analysis of the items utilizing those photographs.

12   A.   So this is my comparison of the latent to the finger nine

13   slap from the same card.  And I, again, came to the same

14   conclusion, that it was an individualization.

15   Q.   And the individualization was to whom?

16   A.   Diovanni Carter.

17   Q.   And which finger?

18   A.   Finger nine.

19   Q.   Now, you had another latent print that was submitted to

20   you for analysis, as well?

21   A.   Yes.  So latent four was another print that was of value

22   that I did do an analysis and comparison of.

23   Q.   Did you follow the same procedure with this?

24   A.   Yes, I did.

25   Q.   And did you reach an individualization relative to the

1   other print?

2   A.   Yes.  So this print came back to a civilian.  So I did not

3   have a name at the time I did a comparison to it, and I got it

4   verified by Paul Sousa.

5          MR. SULTAN:  Objection.  Move to strike on

6   verification by somebody else.

7          THE COURT:  Sustained.

8   BY MR. MacKINLAY:

9   Q.   The process was followed, the same process you described?

10  A.   Yes.

11  Q.   You analyzed it in the same way that you analyzed this,

12  correct?

13  A.   Yes.

14  Q.   And the -- what tenprint card did you use to make the

15  comparison to the latent print of this item?

16  A.   So the tenprint card was -- it was a civilian card, and it

17  has -- I don't have the tenprint card because it's kept within

18  the AFIS system.  I can't get civilian cards.

19  Q.   But the card itself was a Massachusetts State Police --

20  A.   That's correct.

21  Q.   -- card, correct?

22  A.   Yes.

23  Q.   And did you follow the same analysis utilizing the same

24  procedure and imaging of the latent print to the tenprint card

25  that was provided?

1    A.    Yes.

2    Q.    And was the process or your outcome verified by Paul Sousa

3    who works for your department?

4              MR. SULTAN:   Objection.   Same objection, hearsay.

5              THE COURT:   I understand the objection, Mr. Sultan.

6    BY MR. MacKINLAY:

7    Q.    Does the documentation of ACE-V require verification?

8    A.    Yes.

9    Q.    Did you review the documentation of the V section of your

10   processing methodology?

11   A.    Yes.

12   Q.    Who did the V section in this case of the second latent

13   print, as well?

14   A.    Paul Sousa.

15             THE COURT:   Overruled.

16   BY MR. MacKINLAY:

17   Q.    That individualization that you did, again, just to be

18   clear, did you have an opinion based on your training and

19   experience relative to the second latent print in terms of the

20   comparison to the tenprint card that you described?

21   A.    Yes.   It was an individualization to that civilian card.

22   Q.    At some point did you determine the name of the person

23   through the verification process of that civilian?

24   A.    Yes.   So I don't get the name when I do the search, but we

25   do request the name of civilian cards.   We have to submit a

1    request to the state identification arm, and they will give us

2    a name back if we have a sufficient reason.  So in this case,

3    because we were making an ID to the civilian card, we were

4    given back the name Andy Sousa.

5              MR. MacKINLAY:  Just one moment, please, Your Honor.

6              (Pause.)

7              MR. MacKINLAY:  Nothing further.

8                             CROSS-EXAMINATION

9    BY MR. SULTAN:

10   Q.   Good morning, Mr. Files.

11   A.   Good morning.

12   Q.   So you have some latent prints that you were given to

13   analyze, right?

14   A.   That's correct.

15   Q.   Okay.  And in this case you were given six prints -- is

16   that what you call them?  Do you have another name for them?

17   A.   Latent lifts is a --

18   Q.   Lifts.  That's the name.

19   A.   Sure.

20   Q.   All right.  You were given six lifts that -- and you were

21   told that those six lifts came from a particular vehicle,

22   right?

23   A.   Two came from a cell phone box.

24   Q.   Oh, okay.

25   A.   Three came from the vehicle, and one came from an iPhone.

1    Q.    Okay.  I apologize.  You were told that three of them came

2    from the vehicle?

3    A.    That's correct.

4    Q.    Okay.  And the three that came from the vehicle were Lifts

5    3, 4, and 5; is that right?

6    A.    That's correct.

7    Q.    Okay.  So you've got those lifts, and now you're going to

8    make a comparison, right?

9    A.    Correct.

10   Q.    Okay.  So where do you get -- what are you making a

11   comparison to?

12   A.    A tenprint card, so a specific finger from a tenprint

13   card.

14   Q.    So you're given tenprint cards?

15   A.    Well, so the way that the AFIS system works is I would

16   create -- when I analyze the print, I create a geometric

17   pattern, which is essentially the minutiae and their

18   relationship to each other.  The computer system uses that.

19          And when it gets a tenprint card, it does an analysis

20   of all of the prints on that tenprint card.  And it would

21   compare the pattern that I created to the pattern on the cards.

22   Q.    So you have got to input certain tenprint cards into the

23   system; is that right?

24   A.    I don't input any tenprint cards into the system.  They

25   are inputted during booking by the officers.

1  Q.   Okay.  So that's why you had Diovanni Carter's tenprint

2  card, right?

3  A.   That's correct.

4  Q.   Okay.  And you said before, you're not given names.  Did I

5  hear you correctly?

6  A.   On civilian cards I'm not given names.  Otherwise, I have

7  to look down at the demographics.  It doesn't give me a name

8  initially.  I have to go in and look at the details of the

9  specific comparison.

10  Q.   Well, you testified on direct that you knew that this

11  was -- you said that you individualized one of these

12  fingerprints to Diovanni Carter, right?

13  A.   That's correct.

14  Q.   So you knew his name, right?

15  A.   Right.

16  Q.   Okay.  Now, did you have a tenprint card for Terrell

17  Jackson?

18  A.   I'm not sure.  I can search the database for specific

19  tenprint cards.  But in this case, I didn't search for any

20  specific tenprint cards.

21  Q.   So you didn't do a specific search for Terrell Jackson?

22  A.   I did not.

23  Q.   When you say "civilian," what's a civilian?

24  A.   So in the AFIS system, there's basically two kinds of

25  cards.  There are cards from bookings, which is when someone is

1    arrested and booked, they get their fingerprints taken.  There

2    are other reasons cards may end up in the AFIS system.  I don't

3    know an exhaustive list of all of the reasons, but one of the

4    main reasons is firearm licensing.

5    Q.   Okay.  So you were searching a system that has got

6    millions of people's fingerprints in it; is that correct?

7    A.   I don't know how many people are in the system.

8    Q.   Okay.  Now, the latent print that you connected to my

9    client, Diovanni Carter, that came from a certain location on

10   the car, right?

11   A.   That's correct.

12   Q.   Okay.  It didn't come from the driver's side of the car,

13   did it?

14   A.   No, it did not.

15   Q.   It came from the right side of the car, right?

16   A.   I believe it was the right rear side of the car.

17   Q.   Okay.  The right rear side of the car?

18   A.   Yeah, passenger side --

19   Q.   Okay.

20   A.   -- rear.

21   Q.   Okay.  And am I correct that you ran -- that you -- this

22   was not a good print, was it?

23   A.   It's a reasonable print.  I've seen far worse.

24   Q.   Well, did you say it was a fair quality?

25   A.   Yeah.  I usually use -- so when I analyze prints, if I

1    believe that they are of value, I call them fair.  The only

2    time something is a good quality print is if it is of the

3    quality that I would expect from, like, a tenprint card.  Like,

4    if it is a full fingerprint with all the detail there, I would

5    call it good quality.  Otherwise, I call it fair quality if I

6    think it's still of value.

7    Q.   Okay.  And do fingerprints kind of fade over time?

8    A.   Yes.  So any sort of weather will cause them to fade over

9    time.  The material that they're on might.  It depends on sort

10   of the situation that they're left in.

11   Q.   So you get a better fingerprint if it's left like short --

12   a few minutes before the lift is taken, right?

13   A.   Not necessarily.  But, yes, the fresher the fingerprint

14   is, I'm sure the better the quality would be.

15   Q.   Thank you, sir.

16        MR. MacKINLAY:  No further questions.

17        THE COURT:  Did you say no further?  Or there are

18   further?

19        MR. MacKINLAY:  No further questions.

20        THE COURT:  You are excused.  Thank you.

21        THE WITNESS:  Thank you so much.

22        MR. MacKINLAY:  One moment, please, Your Honor.

23        (Pause.)

24        MR. MacKINLAY:  Thank you, Your Honor.  The government

25   calls Scott Gamble.

```
 1              THE CLERK:  Will you please raise your right hand.
 2              (Witness sworn.)
 3              THE WITNESS:  I do.
 4              THE CLERK:  Thank you.  You can be seated.
 5              Can you please state your name and spell your last
 6    name for the record.
 7              THE WITNESS:  First name is Scott.  Last name is
 8    Gamble, G-a-m-b-l-e.
 9              SCOTT GAMBLE, having been duly sworn by the Clerk, was
10    examined and testified as follows:
11                          DIRECT EXAMINATION
12    BY MR. MacKINLAY:
13    Q.   Where do you work, sir?
14    A.   With the Plymouth County Correctional Facility in
15    Plymouth, Massachusetts.
16    Q.   How long have you worked there?
17    A.   I've worked there since 2007.
18    Q.   What is your position?
19    A.   I'm a booking officer.  I've been in that position -- in
20    my 11th year.
21    Q.   What do you do as a booking officer at the Plymouth County
22    Correctional Facility, Sheriff's Department?
23    A.   We book in new arrests from the police departments,
24    new -- people that come back from court that are sent to us.
25    Q.   And have you conducted bookings in the booking department
```

1    of the Sheriff's Department in your 11 years in the department?

2    A.    Yes.

3    Q.    How many times?

4    A.    We get -- sometimes we get immigration inmates.  We can

5    get 100 guys in a day.  So I have no idea the amount of people

6    that we get.

7    Q.    A lot?

8    A.    A lot.

9    Q.    Can you describe to the jury generally the procedure used

10   at the facility to book someone in.

11   A.    When somebody arrives at our facility, they come into a

12   sally port.  If it's a court arrest, we have a court docket.

13   We match up the person with the docket sheet with their name,

14   their social security number, their date of birth.  We verify

15   that with them.

16            Then they are brought into the facility.  That

17   paperwork is put into the computer with their charges, the

18   docket number, the person's name, date of birth, social

19   security number.  We pat them down.  They are stripped

20   searched.  They are sent through a body scanner.  They're

21   called to -- somebody will grab the folder.  They are called to

22   a booking station.  We ask them demographic questions.

23   Q.    Hold on right there for a minute, would you, sir?

24   A.    Yes, sir.

25   Q.    Let's catch up with you a little bit.  The booking

1    questions, tell us about the booking procedure more

2    specifically.  Is there a booking officer present?

3    A.    Yes.

4    Q.    And is there -- the person being booked in is present?

5    A.    Correct.

6    Q.    And how is the information obtained during the booking

7    procedure to input into the booking sheet?

8    A.    The criminal charges are reported based on the court

9    docket sheet that we get.  The information that we put in as

10   far as demographic is based on an interview conducted with the

11   individual.

12   Q.    Who asks the questions?

13   A.    The booking officer will ask the questions.

14   Q.    Who gives the answers?

15   A.    The defendant.

16   Q.    What's the process for inputting the answers into the

17   system?

18   A.    We enter them into a computer database.

19   Q.    How does -- it populate sections on the computer system?

20   A.    Yes.  There's, like, queues you go through.  And you

21   basically fill out a questionnaire, would be the simplest terms

22   to put it, and we can print that out into a booking sheet.

23   Q.    Okay.  And the information, is it accurate as it's being

24   input from the person being booked into the system?

25   A.    Correct.

1    Q.   Is there checks on the accuracy of the information during

2    the process, as well?

3    A.   It's run through -- we run through CJIS after we've input

4    the information, like when we do the fingerprints, if that's

5    what you're asking.

6    Q.   Is the information received accurate when it's entered

7    into the system?

8    A.   Correct.

9    Q.   And does the booking sheet contain biographic background,

10   demographic-type information?

11   A.   Correct.

12   Q.   What is the next step in the process generally in the

13   booking?

14   A.   After we conduct the interview, we photograph the

15   individual.  So we do a photo array.  So we do a front-facing

16   head shot, a right profile, left profile.  And then we

17   photograph any tattoos, scars, or marks.

18   Q.   After the photographs are taken, what's the next stop?

19   A.   There's an iris scan that we do.  So the demographic

20   information that we've already put in gets large scanned of the

21   photographs.  It's also large scanned to an iris scan system.

22   So all their information, their name, all that is on the

23   screen.

24          We have them walk forward.  They look into -- they

25   look into -- it looks almost like binoculars.  It takes a

1    photograph of their irises, and that's matched up to the

2    person.

3              After that process, we do the fingerprints.

4    Q.   Tell us about the fingerprint procedure.

5    A.   The information in the computer gets large scanned over to

6    a fingerprint machine.  So the person fingerprinting will look

7    into the computer.  They will pull the person's name up.

8    They'll call the person over.  They'll verify their name and

9    the picture that shows up on the screen.  This is Joe Smith.

10   "This is your picture?  This is you?  Okay."  We do a tenprint

11   card, and we print the card out for the --

12   Q.   So you do the tenprint card.  Can you describe that in a

13   little more detail.

14   A.   So we do thumbprints.  We roll the thumbs.  Four finger

15   slap.  Roll all the fingers.  And we do a top part of your palm

16   fingerprint, a lower part of the palm print, and a side of the

17   palm print.

18   Q.   Now, those aren't done with ink anymore, are they, sir?

19   A.   No.  It's in the computer system.  It's automated.  It

20   looks like a flat -- almost a flat computer screen or an iPad

21   screen that you roll them on.

22   Q.   Does that populate into --

23   A.   It populates into the computer system.

24   Q.   Now, the top of the computer system for the tenprint card,

25   does it include a section for identification information --

1    A.    Correct.

2    Q.    -- who the person is?

3    A.    Correct.

4    Q.    You mentioned that's populated from booking; is that true?

5    A.    That's true.

6    Q.    Following the fingerprint procedure, is the person then

7    assigned a unit and essentially booked into the facility?

8    A.    Yes.  The next step is we give -- we print out an ID card.

9    They see a nurse from the medical department.  Once they're

10   cleared through the nurse, they stop at property.

11            And they go to a housing unit based on the questions

12   they answered when we interviewed them, whether they need to be

13   in segregated housing, they are requesting protective custody,

14   or they can go in just the general population.

15            MR. MacKINLAY:  Could I have Exhibit 95.1 for the

16   witness only, please.  95.1.

17   BY MR. MacKINLAY:

18   Q.    I am showing you an item.  It appears on your screen.  Two

19   pages.  I ask you if you recognize it?

20   A.    Yes.  It's a booking report.

21   Q.    Is this a booking sheet that is from the Plymouth County

22   Correctional Facility?

23   A.    Yes, sir.

24   Q.    And is it regarding an individual named Darius Carter?

25   A.    It is.

1    Q.   And was this prepared in the same manner that you have

2    described with the input of information during the booking

3    procedure?

4    A.   Yes, sir.

5    Q.   Is the information made and kept in the ordinary course of

6    business by the facility?

7    A.   Yes, it is.

8    Q.   Is it, again, made -- is it accurate when it was input

9    into the system?

10   A.   Yes, sir.

11   Q.   Made in good faith?

12   A.   Yes.

13            MR. MacKINLAY:  Your Honor, I would offer into

14   evidence the booking sheet, Exhibit 95.1.

15            MR. SULTAN:  No objection.

16            THE COURT:  Admitted.

17            (Government Exhibit 95.1 received in evidence.)

18            MR. MacKINLAY:  I would request to publish it to the

19   jury at this time, as well.

20            THE COURT:  Yes.

21   BY MR. MacKINLAY:

22   Q.   Sir, we're going to zoom in and highlight a couple of

23   sections of this, if that's okay?  And I'll ask you a few

24   questions about it.

25   A.   Sure.

1   Q.   First, at the top left, who is the individual that was

2   booked on this particular day?

3   A.   Darius Marquis Carter.

4   Q.   Does it provide an address?

5   A.   It does.

6   Q.   What address did he provide?

7   A.   19 Elmhurst Street, Boston, Mass.

8   Q.   And the phone number was provided, as well?

9   A.   Correct.

10  Q.   Next I want to go down to the personal information, the

11  height, weight description.  Do you see that personal

12  information?

13  A.   I do.

14  Q.   Can you just read for the jury what's depicted in that

15  section of the personal information.

16  A.   Personal information:  Sex, male; black hair; brown eyes;

17  height, 5'11"; weight, 200 pounds; race is listed as black;

18  ethnicity, African.

19          MR. MacKINLAY:  One moment, please.

20          (Pause.)

21  BY MR. MacKINLAY:

22  Q.   Relative to that booking, was there a date that that

23  booking took place, sir?

24  A.   Yes.

25  Q.   What date was that?

1  A.   The screen is a little fuzzy.  I can't really...

2  Q.   We'll blow it up and make it a little bit easier for you.

3  Commit date?

4  A.   Commit date, 1/28 of 2019.

5  Q.   Now, as a part of this booking of Darius Carter, were

6  photographs also taken in the usual course?

7  A.   Yes.

8        MR. MacKINLAY:  Could I have Exhibits 96.1 to 4 for

9  the witness only, please.

10  BY MR. MacKINLAY:

11  Q.   I will scroll through these and see if you recognize

12  these.

13  A.   Yes.

14  Q.   What do you recognize them to be?

15  A.   Photographs of Darius's tattoos.

16  Q.   Are these photographs, again, part of -- taken as a part

17  of the booking procedure of that individual on that day?

18  A.   Correct.

19        MR. MacKINLAY:  I would offer them into evidence, as

20  well, Your Honor.

21        MR. SULTAN:  No objection.

22        THE COURT:  Did you say objection or no objection?

23        MR. SULTAN:  No objection.

24        THE COURT:  Admitted.

25        (Government Exhibits 96.1 through 96.4 received in

```
 1              evidence.)
 2    BY MR. MacKINLAY:
 3    Q.   With respect to 96.4, tell us what you observed in the
 4    area of the top left of his shoulder.
 5    A.   Besides the tattoo, there appears to be an injury or a
 6    wound, two different spots on his shoulder.
 7    Q.   You mentioned medical.  When would an individual with a
 8    wound see medical?
 9    A.   They would see medical as soon as the booking process is
10    over unless, for some reason, they need to see medical as soon
11    as they come in the door.  We assess them at the door when we
12    are verifying their name and information.  Obviously, if
13    somebody is in need of immediate care, medical would trump the
14    booking process.  They would see him immediately.  But in
15    standard procedure, they would see them after we completed the
16    fingerprints and given an ID card.
17    Q.   Thank you.
18              Was -- did you look at any additional materials
19    regarding other individuals booked on or about that same time?
20    A.   Yes, sir.
21              MR. MacKINLAY:  Can I have Exhibit 52 for the witness
22    only, please.
23    BY MR. MacKINLAY:
24    Q.   I show you the first page and the second page, as well.
25    Again, do you recognize this document?
```

1   A.   Yes, sir.

2   Q.   What do you recognize this document to be?

3   A.   It's a Plymouth County Correctional Facility inmate

4   summary or inmate booking report.

5   Q.   And, again, was this also created in the same way you've

6   described?

7   A.   Yes, sir.

8           MR. MacKINLAY:  I would offer Exhibit 52 into

9   evidence, please, Your Honor.

10          MR. SULTAN:  No objection.

11          THE COURT:  Admitted.

12          (Government Exhibit 52 received in evidence.)

13  BY MR. MacKINLAY:

14  Q.   I want to ask you a question before we actually turn to

15  it.  Where does alias information come from?

16  A.   Alias information is usually provided to us.

17  Q.   Okay.  So it does not come from the individual itself?

18  A.   No.

19  Q.   How does the information come to you?

20  A.   Oftentimes it's -- when somebody comes in the facility and

21  we book them, they run an intake report.  So when they are on

22  the intake report, they run through the CJIS system, and

23  anything that shows up on the Board of Probation, any alias

24  information will be provided to us.

25  Q.   You are not getting it from the individual.  You are

```
 1   getting it from other means?
 2   A.   No, correct.
 3   Q.   I direct your attention to a couple of sections on this.
 4   First, the name on the top left-hand corner, can you please
 5   provide that to the jury?
 6   A.   Stephan Rosser-Stewart.
 7   Q.   Address, please?
 8   A.   5 Page Street, Apartment 2, Dorchester, Mass.
 9   Q.   And, first of all, the personal information?
10   A.   Sex, male; hair, black; eyes, brown; 5'7"; weight, 150;
11   race, black; and ethnicity is blank.
12   Q.   Who would have provided this information, by the way, on
13   this section?
14   A.   Who provides it?
15   Q.   Yes.
16   A.   The individual we're booking in.
17   Q.   Lastly, the commit date and arrest date?
18   A.   The commitment date was 1/28, and the arrest date was 1/28
19   of 2019.
20   Q.   You looked at a third group of materials relative to a
21   booking conducted at your facility?
22   A.   That's correct.
23   Q.   And regarding a Diovanni Carter?
24   A.   That's correct.
25             MR. MacKINLAY:  Start with Exhibit --
```

```
 1              MR. SULTAN:  Can we approach on this one, Your Honor?
 2              THE COURT:  You didn't give an exhibit number.
 3              MR. MacKINLAY:  Excuse me?
 4              THE COURT:  I don't think you gave an exhibit number
 5    just now.
 6              MR. MacKINLAY:  94.1.
 7              THE COURT:  94.1.
 8              MR. MacKINLAY:  I'm sorry, Your Honor.
 9              THE COURT:  That's okay.  And?
10              MR. SULTAN:  Well, I can wait for him to offer it,
11    Your Honor, but I really am -- I want to anticipate the
12    testimony so I suggest I see the Court briefly at sidebar, if
13    the Court will see us.
14              THE COURT:  All right.
15              (At sidebar.)
16              MR. SULTAN:  Your Honor, I have no problem with Page
17    1.  My problem is the same problem with Page 2.
18              MR. MacKINLAY:  The only thing I would say about that,
19    Your Honor -- that's fine because I stand corrected that it
20    didn't come from him, and so we can agree that that can come
21    out.  I do intend to offer a photograph --
22              MR. SULTAN:  That's fine.
23              MR. MacKINLAY:  -- from a different source.
24              THE COURT:  Yes.
25              (End of sidebar.)
```

```
 1              MR. MacKINLAY:  Can I have the document camera,
 2   please, for the witness only.
 3   BY MR. MacKINLAY:
 4   Q.   I am showing you a sheet that we've marked as Exhibit
 5   94.1.  Do you recognize that?
 6   A.   I do.
 7   Q.   What do you recognize that to be?
 8   A.   Plymouth County Correctional Facility inmate summary or
 9   booking report.
10   Q.   Is that also created in a way that you described earlier
11   with the other booking materials?
12   A.   Absolutely.
13              MR. MacKINLAY:  I would offer 94.1 into evidence,
14   please, Your Honor.
15              MR. SULTAN:  No objection based on our discussion at
16   sidebar, Your Honor.
17              THE COURT:  Admitted.
18              (Government Exhibit 94.1 received in evidence.)
19   BY MR. MacKINLAY:
20   Q.   I am going to zoom in on a couple of sections, if I could,
21   sir.
22   A.   Sure.
23   Q.   The name of the person and address in the top left-hand
24   corner?
25   A.   It is.
```

1   Q.   Please read it.

2   A.   Diovanni Maurice Carter.

3   Q.   At the bottom, is there a section for the personal

4   information?

5   A.   There is.

6   Q.   Please read that.

7   A.   Personal information:  Sex, male; hair, black; eyes,

8   brown; height, 6 feet; weight, 194; race, black; and then

9   ethnicity is blank.

10  Q.   Is there a section marked "Scars, Marks, Tattoos"?

11  A.   There is.

12  Q.   Read that, please.

13  A.   Scars, marks and tattoos:  Tattoos, the first one is

14  Trouble.  Mob with a bird.  M-o-b with a bird, and then there's

15  a skull.

16          MR. MacKINLAY:  May I please have 94.3 to 6 for the

17  witness only.

18  BY MR. MacKINLAY:

19  Q.   I am showing you a group of items, and I'm going to scroll

20  through them and see if you recognize what I've shown you.  Do

21  you recognize the photographs that --

22  A.   I do.

23  Q.   What do you recognize them to be?

24  A.   Photographs of Diovanni.

25  Q.   Were those photographs taken during the course of the

1    booking procedure and, in particular, the tattoos in the area

2    of the hands?

3    A.    Yes.

4          MR. MacKINLAY:  I would offer them into evidence,

5    please, Your Honor.

6          MR. SULTAN:  No objection.

7          THE COURT:  They're admitted.

8          (Government Exhibits 94.3 through 94.6 received in

9          evidence.)

10          MR. MacKINLAY:  I request to publish them to the jury

11    at this time, Your Honor.

12          THE COURT:  Yes, that's fine.

13          MR. MacKINLAY:  94.3, again, 94.4, and 94.5, 94.6.

14          Thank you.  May I have the document camera again,

15    please, for the witness only.

16    BY MR. MacKINLAY:

17    Q.    I want to show you a group of photographs, Officer, that

18    we have marked as 94.7.  Do you recognize them?

19    A.    I do.

20    Q.    What do you recognize them to be?

21    A.    A photo array of tattoos of Diovanni Maurice Carter.

22    Q.    In particular, is this one on the left different or new,

23    additional?

24    A.    It is.

25    Q.    Again, are these photographs part of the same booking

1   photographing procedure utilized for Diovanni Carter?

2   A.   Yes, those are the same.

3   Q.   And does the date at the top appear to be the date that

4   they were taken?

5   A.   Correct.

6          MR. MacKINLAY:  I would offer them into evidence,

7   please, and request to publish them to the jury at this time.

8          MR. SULTAN:  No objection.

9          THE COURT:  Admitted.  It can be published.

10         (Government Exhibit 94.7 received in evidence.)

11  BY MR. MacKINLAY:

12  Q.   I want to zoom in on one of them, sir.  Do you see that

13  Photograph 1 of the tattoos of Mr. Diovanni Carter?

14  A.   Yes, sir.

15  Q.   And can you indicate what it appears to say?

16  A.   It appears to say "Trouble."  Just as a side note --

17         MR. SULTAN:  No side notes, Your Honor.  Thank you.

18         THE COURT:  He'll ask you.

19         THE WITNESS:  That's fine.

20  BY MR. MacKINLAY:

21  Q.   Now, you also discussed the booking fingerprinting

22  procedure; is that true?

23  A.   Yes.

24  Q.   And by that, I mean the taking of tenprint card

25  information relative to individuals who are booked, true?

1    A.    Correct.

2    Q.    I am showing you an item we marked previously as Exhibit

3    44.  I ask you to take a moment and look at that.  I am going

4    to zoom in at the top here the best I can.  Do you recognize

5    this item?

6    A.    I do.

7    Q.    What do you recognize this to be?

8    A.    It's a fingerprint card that we would produce at the jail.

9    Q.    Is it a tenprint card of Diovanni Carter?

10   A.    It is.

11   Q.    Does it indicate the date that this was taken, the

12   approximate date?

13   A.    I believe it does to the left side.  It has a date of

14   arrest on it, which gets entered in for a fingerprint card.

15   The date of booking -- the date of arrest, it appears he was

16   arrested the day before he was booked in our facility.  So he

17   would have been arrested out at the police station, gone to

18   court, come in the next day, and then fingerprinted.

19           The date on the booking sheet indicates the 6th.  But

20   the date of arrest is what they want on the fingerprint cards,

21   and that's why it has the 5th.

22   Q.    Was this record taken in the same way you described in the

23   booking process involving Diovanni Carter on or about that date

24   or a few days later than March 5th, 2019?

25   A.    It was.

```
 1            MR. MacKINLAY:  No further questions, Your Honor.
 2                         CROSS-EXAMINATION
 3   BY MR. SULTAN:
 4   Q.   Good morning, sir.  Is it Deputy Gamble?
 5   A.   It's Officer Gamble.  That's fine.
 6   Q.   Good morning, Officer Gamble.
 7   A.   Good morning.
 8   Q.   So let me -- a few minutes ago you testified about booking
 9   sheets for various people who came in your facility, right?
10   A.   Correct.
11   Q.   And one of those individuals was named Darius Carter,
12   right?
13   A.   Correct.
14            MR. SULTAN:  Could I have 95.1, please.  And with the
15   Court's permission, may we publish that to the jury, as well?
16   It's in evidence.
17   BY MR. SULTAN:
18   Q.   That's the booking sheet for Darius Carter?
19            THE COURT:  Yes.
20            MR. SULTAN:  I'm sorry.
21            THE COURT:  I just wanted to make sure it was in
22   evidence.
23   A.   Yes, sir.
24   BY MR. SULTAN:
25   Q.   That's the booking sheet for Darius Carter?
```

1    A.    Yes, sir.

2          MR. SULTAN:  Could you zoom in on the family

3    information section, please.  Move it over a little bit to the

4    right so we can see it.  Thank you.

5    BY MR. SULTAN:

6    Q.    So this is information that's contained on the booking

7    sheet as a matter of standard practice, right?

8    A.    Correct.

9    Q.    Okay.  So who is Darius Carter's mother, please?

10   A.    It says "Lori Major."

11   Q.    And who is Darius Carter's father?

12   A.    Craig Carter.

13         MR. SULTAN:  Okay.  Now, could I have 94.1, please.

14   And could this be shown to the jury, Your Honor, as well?

15         THE COURT:  Yes.

16         MR. SULTAN:  Would you zoom in on the family

17   information, please, again.

18   BY MR. SULTAN:

19   Q.    Who is Diovanni Carter's mother?

20   A.    Lori Major.

21   Q.    Who is Diovanni Carter's father?

22   A.    Craig Carter.

23   Q.    Same mother, same father?

24   A.    From the first sheet?  I wasn't comparing the two, but I

25   remember Craig Carter.  I'm not sure if the mother was a

1    different last name.

2    Q.    Okay.  Now, with respect to tattoos, you've been booking

3    people for a long time to your facility?

4    A.    Yes.

5    Q.    Thousands of people.  Tattoos are pretty popular these

6    days?

7    A.    Unfortunately, yes.

8    Q.    You see thousands of people and thousands of tattoos,

9    right?

10   A.    Correct.

11   Q.    People have all kinds of tattoos?

12   A.    Yes.

13   Q.    Different words that may be important to them?

14   A.    Correct.

15   Q.    Different names that may be important to them?

16   A.    Correct.

17   Q.    Pictures, right?

18   A.    Yes.

19   Q.    Symbols, right?

20   A.    Right.

21   Q.    All kinds of things, right?

22   A.    Correct.

23           MR. SULTAN:  Thank you, sir.

24           MR. MacKINLAY:  Just a couple of questions, Your

25   Honor.

```
 1                     REDIRECT EXAMINATION
 2   BY MR. MacKINLAY:
 3   Q.   The family information, who provides that?
 4   A.   It's provided by the person we're interviewing, the person
 5   we're booking.
 6   Q.   There's no other investigation concerning that.  It's
 7   literally from the individual themselves?
 8   A.   That's from the individual themselves.
 9            MR. MacKINLAY:  Nothing else, Your Honor.
10            THE COURT:  Any cross, Mr. Sultan?
11            MR. SULTAN:  No, Your Honor.  Thank you.
12            THE COURT:  You are excused.  Thank you.
13            THE WITNESS:  Thank you, ma'am.
14            MR. MALLARD:  The government calls Andy Sousa.
15            THE CLERK:  Please raise your right hand.
16            (Witness sworn.)
17            THE WITNESS:  Yes, I do.
18            THE CLERK:  Thank you.  You can be seated.
19            Can you please state your name and spell your last
20   name for the record.
21            THE WITNESS:  Andy Sousa, S-o-u-s-a.
22            ANDY SOUSA, having been duly sworn by the Clerk, was
23   examined and testified as follows:
24                      DIRECT EXAMINATION
25   BY MR. MALLARD:
```

```
1    Q.   Good afternoon, sir.  I'm sorry.  Good morning, sir.
2              Where are you from?
3    A.   I'm from Brockton, Massachusetts.
4    Q.   And how old are you?
5    A.   Twenty-three.
6    Q.   And how long have you been in Brockton?
7    A.   Fifteen years.
8    Q.   What do you do for a living?
9    A.   I work at a software company called LogMeIn.  I'm an
10   information technology help desk technician.
11   Q.   Have you ever been arrested?
12   A.   No.
13   Q.   Ever been convicted of any crime at all?
14   A.   No.
15   Q.   I want to draw your attention back to the first week or so
16   in January of 2019, okay?  Do you remember that time?
17   A.   Yes.
18   Q.   Did you ever come in contact with a white Chevy Malibu?
19   A.   Yes.
20   Q.   Tell us about that.
21   A.   I got into the vehicle and went to Wendy's to grab food.
22   Q.   What part of the vehicle did you get into?
23   A.   The passenger side.
24   Q.   And where did you sit?
25   A.   The passenger side.
```

1    Q.    The front or the back?

2    A.    The front.

3    Q.    And how long were you in the car?

4    A.    About an hour and a half.

5    Q.    Were you involved in an armed robbery on January 26th,

6    2019?

7    A.    No.

8    Q.    Do you know who Diovanni Carter is?

9    A.    No.

10   Q.    Do you know who Darius Carter is?

11   A.    No.

12   Q.    Do you know who Stephan Stewart is?

13   A.    No.

14   Q.    Do you know who Dennis Martin is?

15   A.    No.

16   Q.    Do you know who Carshana Graham is?

17   A.    No.

18   Q.    Do you know who James Boddie is?

19   A.    No.

20   Q.    Do you know who Terrell Jackson is?

21   A.    No.

22   Q.    And what was your phone number back then?

23   A.    774-297-9205.

24         MR. MALLARD:  No further questions for this witness.

25         MR. SULTAN:  Very briefly.

```
 1                        CROSS-EXAMINATION
 2   BY MR. SULTAN:
 3   Q.   Good morning, Mr. Sousa.  You just told us you've never
 4   been arrested, right?
 5   A.   No.
 6   Q.   Any idea how your fingerprints got in the hands of the
 7   police?
 8   A.   I was in -- I enlisted into the military when I was 18
 9   years old.
10            MR. SULTAN:  Thank you, sir.  And thank you for your
11   service.
12            THE COURT:  Redirect?
13            MR. MALLARD:  No.  Nothing for this witness, Your
14   Honor.
15            THE COURT:  You may be excused.
16            MR. MALLARD:  The government calls Cosmos Nanos.
17            THE CLERK:  Will you please raise your right hand.
18            (Witness sworn.)
19            THE WITNESS:  Yes.
20            THE CLERK:  Thank you.  You can be seated.
21            Can you please state your name and spell your last
22   name for the record.
23            THE WITNESS:  Sure.  My name is Cosmos Nanos,
24   N-a-n-o-s.
25            COSMOS NANOS, having been duly sworn by the Clerk, was
```

1    examined and testified as follows:

2                         DIRECT EXAMINATION

3    BY MR. MALLARD:

4    Q.    Good morning, sir.

5    A.    Good morning.

6    Q.    Tell us where you work.

7    A.    I work at the Plymouth County Sheriff's Department.

8    Q.    How long have you been there?

9    A.    About 19-and-a-half years.

10   Q.    What's your current assignment?

11   A.    I am the lieutenant of the inner perimeter security team.

12   Q.    What's that?

13   A.    That is a division of the sheriff's department where we

14   conduct investigations, staff investigations, narcotics

15   investigations, assaults.  We are also the keepers of the

16   records for phone calls and video.

17   Q.    And that's how you're appearing today, as well, as a

18   keeper of the records for some records kept by the IPS

19   department of Plymouth County; is that fair to say?

20   A.    Yes.

21   Q.    Now, you talk about phone calls.  What type of phones are

22   you talking about?  What kind of phones are kept by the

23   facility?

24   A.    Basically inmate phones, inmate calls that are made.  Each

25   inmate that comes in is assigned a unique identification

1    number.  No matter how many times they come into the facility,

2    they have that same number.  And they use that PIN number also

3    to access their phones and make phone calls with.

4    Q.   Is it also tied to sort of a balance system and cash that

5    they can keep at the facility?

6    A.   Yes.  They can -- they can make calls, and it can be

7    deducted from their balance or the people that they are calling

8    can set up accounts from the outside of the facility.

9    Q.   Are those calls monitored?

10   A.   Yes, they are.

11   Q.   Are they recorded?

12   A.   Yes, they are.

13   Q.   How are they recorded?

14   A.   They're recorded by a secured server, which is accessed by

15   the members of our team, which is limited to about seven

16   people, and that is also kept in a secure location.

17   Q.   Now, you talked about a PIN list, but does a person have

18   to do anything else to get certain numbers approved to make

19   calls?

20   A.   Inmates are given a list, and they can add up to ten

21   people on that list.  They provide names, phone numbers, and

22   relationships of those people.  Those get turned in and then

23   are verified by our phone administrator.

24   Q.   So there's only a certain universe of phone numbers that

25   can be called by a certain PIN; is that correct?

1    A.   Correct.

2    Q.   And where do those phone numbers come from that you put

3    into the list of accessible phone numbers?

4    A.   Those are generated by the inmate.

5    Q.   And do you keep the copies of the lists that the inmates

6    provide for you for the purposes of generating those accessible

7    call lists?

8    A.   Yes.

9    Q.   I'm showing -- and you keep those in the usual course of

10   business?

11   A.   Yes.

12   Q.   Do you regularly -- and do you record them and keep them

13   as soon as they are made and provided to you by the inmates?

14   A.   Correct.

15   Q.   Are they kept accurately in your system?

16   A.   Yes.

17   Q.   Do you keep them in good faith?

18   A.   Yes.

19        MR. MALLARD:  If I could have the witness for the --

20   the screen for the witness, Madam Clerk.  If I could have

21   Exhibit Number 94.2.

22   BY MR. MALLARD:

23   Q.   Sir, do you know what this document is?

24   A.   Yes.  That is inmate Diovanni Carter's phone list.

25   Q.   And where would this information have come from?

1    A.    Come from the inmate.

2    Q.    And it looks like it's typed in this version.  How does it

3    get typed?

4    A.    A phone administrator gets the handwritten form that the

5    inmate fills out, and then he inputs it into the computer

6    system.

7    Q.    Is there a second page to that document that I'm showing

8    you now?

9    A.    Yes.  That is the handwritten list.

10   Q.    Okay.  And is -- are these two documents the documents

11   that we discussed?

12   A.    They are.

13   Q.    And are these accurate copies of the documents for

14   Diovanni Carter that were kept and maintained by the county

15   system?

16   A.    Yes.

17   Q.    And do you see a date on when the handwritten document was

18   submitted to the system on the second page there on the bottom

19   right?

20   A.    That is March 7th, 2019.

21   Q.    It would have been signed by the inmate, as well?

22   A.    Correct.

23         MR. MALLARD:  Your Honor, I'd offer this document as

24   the next exhibit.

25         MR. SULTAN:  No objection.

```
 1              THE COURT:  It's admitted.

 2              (Government Exhibit 94.2 received in evidence.)

 3    BY MR. MALLARD:

 4    Q.   If we could turn to the first page.  Let's just look at a

 5    couple of phone numbers here, if we could.

 6              MR. MALLARD:  Can we zoom in on the first three

 7    columns, please.

 8    BY MR. MALLARD:

 9    Q.   I draw your attention down to the entry --

10              MR. MALLARD:  Well, if I could get the actual

11    "Relationship" column, as well, to be zoomed in.  I'm sorry.

12    BY MR. MALLARD:

13    Q.   If we could look at the first entry -- first named entry

14    there.  Do you see that?

15    A.   Yes.  Miss Nancy Carter.

16    Q.   That's a phone number ending in 8445?

17    A.   Yes.

18    Q.   What's the relationship listed there for that entry?

19    A.   Grandmother.

20    Q.   Where would that information about the relationship have

21    come from?

22    A.   That would come from the inmate.

23    Q.   Now, jumping down to the entry ending in 1312, do you see

24    that there?

25    A.   I do.
```

1    Q.   What is that entry?

2    A.   That is Lori Major.

3    Q.   And it's 617-704-1312?

4    A.   Yes.

5    Q.   And the relationship for this entry?

6    A.   That is the inmate's mother.

7    Q.   Okay.  And then the entry right below that?

8    A.   That is Shaatrona Sims, and it's listed as the inmate's

9    fiancée.

10        MR. MALLARD:  If I could go back to the witness screen

11   for just the witness, Madam Clerk.  If I could show Exhibit

12   95.2.

13   BY MR. MALLARD:

14   Q.   What are we looking at here?

15   A.   That is Darius Carter's phone list.

16   Q.   Okay.  And looking at the first and second page, are these

17   similar to the lists that we just discussed before?

18   A.   They are.

19   Q.   And what day did these -- what day was the handwritten

20   list completed by Darius Carter?

21   A.   It looks like February 11th, 2019.

22   Q.   Are these accurate copies of the records maintained by the

23   Plymouth County Correctional Facility for Darius Carter, much

24   in the same manner as in the prior exhibit for Diovanni Carter?

25   A.   They are.

1              MR. MacKINLAY:  Your Honor, I would move this in as

2      the next exhibit.

3              MR. SULTAN:  No objection.

4              THE COURT:  Admitted.

5              (Government Exhibit 95.2 received in evidence.)

6              MR. MALLARD:  If we could turn to the first page and

7      publish to the jury, please.

8      BY MR. MALLARD:

9      Q.   If you could focus down to the entry ending in 1312.

10     A.   Yes.  Ms. Lori Major.

11     Q.   It appears to be the same entry as before?

12     A.   Correct.

13     Q.   The same relationship?

14     A.   Yes.

15     Q.   Let's go down to one entry below that.  Do you see that

16     entry there?

17     A.   Yes.  Tyrell Murphy.

18     Q.   And that's ending in a 4053?

19     A.   Yes.

20     Q.   What's the relationship on that?

21     A.   Cousin.

22             MR. MALLARD:  Okay.  Now, if I could clear the screen,

23     please.

24     BY MR. MALLARD:

25     Q.   Now, you talked a little bit about the phone system now.

1    Those lists that we just discussed are the only permissible

2    phone numbers that can be dialed for a certain PIN; is that

3    right?

4    A.   That is correct.

5    Q.   So, for example, on the Darius Carter list, only those

6    numbers that are listed there could be called through Darius

7    Carter's PIN; is that right?

8    A.   That is correct.

9    Q.   And the calls that are made are recorded and monitored

10   during the course of the time that they are made?

11   A.   They are.

12   Q.   Is there an advisement about that at the beginning?

13   A.   Yes.  There is a recording before every call.

14          MR. MALLARD:  And, if I may approach, Your Honor?

15          THE COURT:  Yes.

16          MR. MALLARD:  Exhibit 97.

17   BY MR. MALLARD:

18   Q.   Sir, I'm showing you a compact disc.  Do you know what

19   this is?

20   A.   Yes.  That is a disc of a call that Mr. Darius Carter

21   made.

22   Q.   Is this call sort of excerpted down to just a small

23   portion of the call?

24   A.   It is.

25   Q.   And what call is that?

1    A.   This is call number 33.

2    Q.   And do you know the date in which the call was made?

3    A.   It was made on March 5th, 2019.

4    Q.   And do you know to whom the call was made?

5    A.   I believe it was to Ms. Lori Major.

6    Q.   And do you see an indication of the phone number that it

7    was called to on the disc there?

8    A.   Yes.  Ending in 1312.

9    Q.   And have you had a chance to review the contents of the

10   call?

11   A.   I have.

12   Q.   And do you know who's speaking on the call?

13   A.   It sounds to me like --

14        MR. SULTAN:  I object, Your Honor.

15        THE COURT:  Sustained.

16   BY MR. MALLARD:

17   Q.   In the course of your work in the IPS department, have you

18   had a chance to listen to calls made by Darius Carter that have

19   been recorded variously besides just this call?

20   A.   I have.

21   Q.   And have you had a chance to listen to calls made to

22   various numbers by the same PIN number associated with Darius

23   Carter?

24   A.   Yes.

25   Q.   Have you become familiar with his voice based upon that

1   activity?

2   A.   Yes.  I've listened to several calls, and it does sound as

3   though the same person is making these calls from this unique

4   PIN that belongs to Mr. Carter.

5   Q.   And this particular excerpt here that we're talking about,

6   based upon your experience listening to calls made by Darius

7   Carter, do you have an opinion as to whose voice it is on the

8   call?

9   A.   In my opinion, I do believe that it is Mr. Darius Carter.

10          MR. MALLARD:  Your Honor, I'd ask that Exhibit Number

11   97 be marked in evidence.  It conforms with the Court's order

12   on this issue.

13          MR. SULTAN:  The Court has already ruled on this, so I

14   have nothing to say, Your Honor, at this point.

15          THE COURT:  Okay.

16          (Government Exhibit 97 received in evidence.)

17          MR. MALLARD:  If we could, I have transcripts that I

18   could pass out to the jury quickly.

19          THE COURT:  That's fine.  I just remind the jury that

20   the transcripts are not evidence.  They are just an aid.

21          Did you want her to pass them out to the jury?

22          MR. MALLARD:  That was my intent.

23          I think everyone has their copy.  If we could proceed

24   to play the call.  I just want to make sure the sound is right.

25          (Audio playing.)

1    BY MR. MALLARD:

2    Q.    Is this the initial portions that happened during the

3    course of the call?

4    A.    Yes.

5    Q.    That signifies it's being recorded by the system?

6    A.    Correct.

7              (Audio playing.)

8              MR. MALLARD:  Pause it right there.

9    BY MR. MALLARD:

10   Q.    Now, that's the portion that precedes pretty much all the

11   calls; is that right?

12   A.    Yes.

13   Q.    In this excerpt, portions have been removed and redacted

14   out; is that fair to say?

15   A.    Yes.

16             MR. MALLARD:  Please continue.

17             (Audio playing.)

18             MR. MALLARD:  I'll collect the transcripts, Madam

19   Clerk.  We're all set.

20             I have no further questions for the witness.

21             MR. SULTAN:  No questions, Your Honor.

22             THE COURT:  You're excused.  Thank you.

23             THE WITNESS:  Thank you.

24             MR. MALLARD:  The government calls Monica Horan.

25             THE CLERK:  Can you please just raise your right hand.

 1              (Witness sworn.)

 2              THE WITNESS:  I do.

 3              THE CLERK:  Thank you.  You can be seated.

 4              Can you please just state your name and spell your

 5      last name for the record.

 6              THE WITNESS:  Monica Horan, H-o-r-a-n.

 7              MONICA HORAN, having been duly sworn by the Clerk, was

 8      examined and testified as follows:

 9                           DIRECT EXAMINATION

10      BY MR. MALLARD:

11      Q.   Good morning, ma'am.  Hi.  How are you?

12      A.   Good.

13      Q.   Tell us a little bit about your background.  Where are you

14      from?

15      A.   I'm an owner of Express Employment Professionals, a

16      full-service staffing agency located in Braintree.

17      Q.   What's a full-service staffing agency?

18      A.   We are paid by companies to find individuals to work for

19      them, either on a temporary or permanent basis, and we help

20      people that are looking for work.  They can utilize our

21      services, but they never pay a fee.

22      Q.   You said a full service and temporary.  What's the

23      difference between full service and temporary?

24      A.   We place people in permanent positions where a company

25      hires them on and just pays us a fee for that service of

1    locating that person, or we also place people on a temporary

2    basis where clients hire us to recruit workers for them.  We

3    are the employer of record, so we take care of all wage and

4    hour compliance.  We pay the individual, but they work on an

5    assignment at a client's location.

6    Q.    So Express Employment Professionals, is that sort of a

7    single entity?  Multiple entities?  What's the corporate

8    structure there?

9    A.    We're a franchise of Express Services.  They're a

10   35-year-old company with approximately 800 offices in four

11   countries.

12   Q.    And they don't have anything to do with selling cellular

13   phones, right?

14   A.    No, nothing.

15   Q.    They just also have the name "Express."  It's just called

16   Express Services?

17   A.    Express Services, Inc., that's the corporate name.  And

18   then Express Employment Professionals is the name that the

19   individual offices use because all the offices are

20   independently owned and operated.

21   Q.    And you own the one that you mentioned in Braintree?

22   A.    Correct.

23   Q.    What's the main phone number for that branch?

24   A.    781-848-2324.

25   Q.    How long has that been the number?

A.   Over ten years.

Q.   How many employees do you have working for your actual company?

A.   I have three people that work in my office.

Q.   And is Jacqueline Muh one of them?

A.   She was.  She left our employment December 1, 2019.  But she had worked there for approximately four years.

Q.   How long have you owned the place?

A.   I've owned it for over ten, since October 2009.

Q.   So how does one become an employee or -- not an employee of Express Employment, but, I guess, a customer or client of your entity?

A.   We call them associates.  So people that are looking for work will contact us by phone or e-mail, and typically they fill out an application either on paper or online.  They go through our process of being interviewed, reference checked. We E-Verify to ensure that they're legally able to work in the U.S., and then we help them find a job.

Q.   So they provide you with a good amount of information to start with?

A.   Oh, yes.

Q.   What do you do with that information when you receive it?

A.   All the information is contained in a database that is called Q4.  We use that system actually to store all the associate information that we get, so all of the people that

1    are looking for work that have been through our process.  And

2    we also use it to store client information and information to

3    the various jobs that we are filling for clients.

4    Q.   So it's basically a large database that your company uses?

5    A.   Yes.

6    Q.   Does the database accurately store information?

7    A.   Yes.

8    Q.   And how often do you query the database in the course of

9    your business?

10   A.   Every minute.  It's the lifeblood of our business.  It's

11   the only system that we use to track every activity that we do.

12   Q.   What type of contact info do you keep for your associates?

13   A.   So we capture information from the application.  So we

14   have names, addresses, telephone numbers, e-mail addresses.

15   You know, any type of contact information.  Work history.  If

16   they've done any testing of any sort, we keep the results of

17   that.

18   Q.   Let me ask you this, too:  What if someone updates their

19   phone number or updates their e-mail?

20   A.   So any time someone contacts us, we make a record in the

21   database that includes the date that we were contacted and what

22   information was provided to us, and that could be from a phone

23   call, an e-mail, a text.  So if someone changes their basic

24   information, they notify us.  Or if it's someone we hadn't

25   heard from in a while, we'll ask them, "Did any of your

 1   information change?  Because we want to make sure that we have

 2   accurate contact information."

 3   Q.   When you get that new information, do you immediately put

 4   it into the system?

 5   A.   Immediately, yes.

 6   Q.   That's sort of your practice, to quickly put the stuff

 7   into the Q4 system once you receive it?

 8   A.   Exactly.

 9   Q.   I want to draw your attention to an individual named

10   Diovanni Carter, okay?  Are you familiar with that individual?

11   A.   I'm familiar with his record, you know, in our system, and

12   that he is an associate of Express Employment.

13   Q.   As part of your appearance today, did you produce some

14   documents that pertain to his application and work with your

15   company?

16   A.   Yes.

17        MR. MALLARD:  If I could have for the witness, Madam

18   Clerk, Exhibit Number 82.

19   BY MR. MALLARD:

20   Q.   If we could just page through each one of these pages a

21   little bit slowly here, and I ask you to just take a look at

22   these documents and let us know if you're familiar with them.

23   A.   Yes, I'm familiar with all those documents.

24   Q.   Are those the documents that Express Employment

25   Professionals kept and maintained with respect to Diovanni

1    Carter's work with the company?

2    A.   Yes.

3    Q.   And the records that they reflect, are they kept -- are

4    they made or kept at or near the time for information that's

5    received by your company?

6    A.   Yes.

7    Q.   Are they kept in the regular course of your business?

8    A.   Yes.

9    Q.   And is making these records and keeping them a regular

10   practice of your business?

11   A.   Yes.

12        MR. MALLARD:  Your Honor, I'd ask these be admitted as

13   the next exhibit.

14        MR. SULTAN:  No objection.

15        THE COURT:  Admitted.

16        (Government Exhibit 82 received in evidence.)

17        MR. MALLARD:  Let's go to the first page.  If I could

18   have it for the jury, as well.

19   Q.   Looking at the first page here, what is this?

20   A.   This was a handwritten application for employment by

21   Diovanni Maurice Carter dated August 13th, 2015.

22   Q.   Is that the date on which he became an employee or an

23   associate, so to speak?

24   A.   Yes.  Either on that date or very shortly thereafter, he

25   would have been interviewed by one of my staff.

1    Q.    Okay.  Let's fast-forward to Page 11, if we could.  Do you

2    know what's on this page?

3    A.    This is a report that is generated out of the system that

4    produces all -- it basically prints out all the data that is in

5    our system.  So this page indicates that, you know, he has a

6    high school diploma.  It provides his street address, cell

7    phone number, and e-mail address.

8    Q.    Okay.  And if we could just zoom in on the contact

9    information there, what particular information was provided for

10   an address?

11   A.    108 Moraine Street, Brockton, Massachusetts 02301.

12   Q.    What about for a cell phone?

13   A.    Cell phone, 617-704-2207.

14   Q.    What about for e-mail?

15   A.    Diormauricecarter@gmail.com.

16   Q.    Does Express Employment Professionals' e-mail with its

17   associates?

18   A.    We do.

19   Q.    And I want to draw your attention --

20           MR. MALLARD:  If I could just have a second, Your

21   Honor?

22           (Pause.)

23           MR. MALLARD:  If we go to the -- it looks like

24   the -- I apologize.  The fifth page in the document -- sixth

25   page.  I'm sorry.  And one more.  If we could zoom in on the

1    entry for January 21st, 2019.

2    BY MR. MALLARD:

3    Q.   You indicated a phone number was entered there ending in

4    2207 for the prior page; is that right?

5    A.   Yes.

6    Q.   And do you know when that entry was updated in the file,

7    in the system?

8    A.   January 21st, 2019.

9    Q.   And is that what this entry here and another piece of the

10   record reflects?

11   A.   Yes.

12   Q.   What happened on January 21, 2019, according to the

13   recordkeeping?

14   A.   Another employee of mine, Maggie Giusti, received a call

15   from Mr. Carter indicating that he was available for work.  He

16   was checking in to see if we had anything available for him,

17   and he provided an updated phone number.

18   Q.   Okay.  Was there any further contact with Mr. Carter about

19   work availability?

20   A.   There was.

21   Q.   What was that?

22   A.   Jacki Muh contacted Mr. Carter to let him know that we

23   were currently looking for associates to work at a warehouse in

24   Braintree for one of our clients.

25            MR. MALLARD:  If we could zoom in on the entry for

1    January 25th, 2019.

2    BY MR. MALLARD:

3    Q.    Is that activity reflected there in that entry?

4    A.    Yes.  That Jacki Muh had reached out to Mr. Carter and

5    told him about the, you know, the opportunity.  "Simpli" in the

6    entry refers to a company called SimpliSafe, and we were

7    recruiting warehouse workers for them in Braintree.  And he

8    indicated that he could start work on the following Monday.

9    Q.    January 25th was a Friday.  What was the following Monday?

10   A.    January 28th.

11   Q.    If we could turn to Page 4 of the records, please.  Do you

12   see what that is there?

13          MR. MALLARD:  If we could just highlight on from the

14   top quarter of that -- a little further down, please, down.

15   Right there would be great.

16   BY MR. MALLARD:

17   Q.    Do you know what this document is?

18   A.    Yes.  This is an e-mail from Jacki Muh to Mr. Carter.

19   Every time that we do give an assignment, we like to confirm

20   that someone is going to be able to start on -- and, you know,

21   that they have all the information they needed.  So we

22   indicated the name of the company, where it's located, who he

23   was to ask for, and the date and time that he was supposed to

24   be there.

25   Q.    Okay.

1          MR. MALLARD:  If we could turn back to two pages down

2     the road that we were just back on.  Sorry.  One more page

3     forward, back.  If we could enter into the entry for January

4     25th, the short one.

5     BY MR. MALLARD:

6     Q.    What does this entry indicate here on January 25th?

7     A.    Typically what we would do is cut and paste any

8     communications that we receive back, and we'd document them in

9     the system.  So here is an entry where Jacki received an e-mail

10    that said, "Yes, I've received your e-mail, and I will be there

11    Monday."

12    Q.    Okay.  What happened on Monday?

13    A.    Mr. Carter appeared for work at our client's location in

14    Braintree.

15    Q.    And did you ever receive documentation about the amount of

16    hours that were worked that day for purposes of your billing

17    and payment systems?

18    A.    Yes, we did.

19    Q.    What was that?

20    A.    Our client representative sent us the hours that

21    Mr. Carter had worked, and they send us the hours that every

22    associate works every week because we process payroll once a

23    week for all of our temporary associates.

24    Q.    How many hours did Mr. Carter work that week according to

25    the records that you received for purposes of your payment?

1    A.    Five hours.

2    Q.    On what day?

3    A.    The 28th.

4    Q.    So just that one day?

5    A.    Yes.

6          MR. MALLARD:  If we could zoom in on the entry on

7    January 28th there.

8    BY MR. MALLARD:

9    Q.    What does this entry reflect?

10   A.    This represents a phone call that Jacki Muh received from

11   Mr. Carter saying that he was going to end the assignment that

12   day, that he has a lot going on in his life right now and can't

13   work.  Will call when he is ready to work again.

14         MR. MALLARD:  May I have just one moment, Your Honor?

15         (Pause.)

16         MR. MALLARD:  I have no further questions for this

17   witness.

18                         CROSS-EXAMINATION

19   BY MR. SULTAN:

20   Q.    Good morning, Ms. Horan.

21   A.    Good morning.

22   Q.    You own your own business?

23   A.    I do.

24   Q.    Diovanni worked for your company as an associate.  He

25   applied in 2015, right?

1    A.    Yes.

2    Q.    And he went through your company's vetting process, right?

3    A.    Yes.

4    Q.    And you hired him as a temporary associate, right?

5    A.    Yes.

6    Q.    Okay.  And he was still an associate at your company four

7    years later in 2019, right?

8    A.    Correct.

9    Q.    Okay.  And you told us that he worked -- he reached out

10   looking for whether a position was available, right?

11   A.    Yes.

12   Q.    And you found a position for him?

13   A.    We did.

14   Q.    And he reported to work on the morning of Monday, January

15   28th, 2019, right?

16   A.    Yes.

17   Q.    And he worked five hours that day, right?

18   A.    Yes.

19   Q.    Okay.  And after he worked that day, he called one of your

20   employees and said, "I've got a lot going on, and I'm -- I

21   can't continue with this assignment.  I'll call back when I'm

22   ready for another assignment," right?

23   A.    Yes.

24   Q.    So he gave you notice, right?

25   A.    He did, yes.

1          MR. SULTAN:  Thank you, ma'am.

2          THE COURT:  Redirect?

3          MR. MALLARD:  I have nothing for this witness, Your

4    Honor.

5          THE COURT:  You're excused.  Thank you.

6          MR. MALLARD:  The government calls Jacqueline Muh.

7          THE CLERK:  Can you please raise your right hand.

8          (Witness sworn.)

9          THE WITNESS:  I do.

10          THE CLERK:  You can be seated.

11          Will you please state your name and spell your last

12    name for the record.

13          THE WITNESS:  Jacqueline Muh, and the last name is

14    M-u-h.

15          JACQUELINE MUH, having been duly sworn by the Clerk,

16    was examined and testified as follows:

17                      DIRECT EXAMINATION

18    BY MR. MALLARD:

19    Q.   Good morning, ma'am.  How are you?

20    A.   Good.

21    Q.   Can you tell us about your background.  Where you're from?

22    A.   I am originally from Weymouth, Massachusetts.  I'm

23    currently living in Hingham.

24    Q.   What do you do for work?

25    A.   I currently am working at a recreation center.  But

1    formerly, I was working at Express Employment in Braintree.

2    Q.   If you'd do us all a favor and move the microphone and

3    speak right into it.

4    A.   Sorry.

5    Q.   You said you worked for Express Employment Professionals?

6    A.   Yes.

7    Q.   For what period of time?

8    A.   I was there from May 1st of 2015 to November 1st of 2019.

9    Q.   What is that business?

10   A.   It's a full-service staffing agency.  We help people find

11   jobs and companies find people for their jobs.

12   Q.   And you worked directly for the company itself, right?

13   A.   Correct.

14   Q.   You weren't a person that they were hiring to other

15   companies?

16   A.   No.

17   Q.   What was your role there?  What was your job?

18   A.   As a staffing consultant.

19   Q.   And what does that mean?

20   A.   That I was the person who would bring somebody in,

21   interview them, and then place them out on the jobs.

22   Q.   Did Express have any sort of recordkeeping system that you

23   guys would use?

24   A.   Yes.  We would use Q4.  It was an internal system that

25   every office in Express throughout the country would use.

1  Q.   Did you become familiar with it?

2  A.   Yes.

3  Q.   Would you use it?

4  A.   Yes.

5  Q.   How frequently?

6  A.   Daily.  It was pretty much that and Outlook were the only

7  things that we had up on our computers all day long.

8  Q.   I want to draw your attention to an individual named

9  Diovanni Carter, okay?

10  A.   Yes.

11  Q.   Are you familiar with that individual?

12  A.   Yes.

13  Q.   I want to draw your attention back to January 2019, all

14  right?

15  A.   Yes.

16  Q.   Do you recall some activity with him and your business

17  around that period?

18  A.   Yes, I do.

19  Q.   Tell us about that.

20  A.   He checked in for work saying that he was available.  We

21  had a position that was open that we were looking for multiple

22  people for.

23  Q.   How did he check in for work?

24  A.   I believe he called.

25  Q.   All right.

1   A.   And then -- so he told us that he was available for work.

2   We had a position that we were currently trying to fill, and we

3   placed him in that position.

4   Q.   And what was that position?

5   A.   It was SimpliSafe in Braintree.

6   Q.   Did you have any back and forth with him about the job and

7   things like that?

8   A.   Yes.  We spoke with him on the phone about the position.

9   And then before we send anybody to a position, we send out a

10  confirmation e-mail giving them all the information that they

11  need.

12  Q.   Did he reply to that e-mail?

13  A.   Yes, he did.

14        MR. MALLARD:  If I could have for the witness, Madam

15  Clerk, Exhibit Number 114.

16  BY MR. MALLARD:

17  Q.   Take a look at that and tell us if you know what that is.

18  A.   That is my e-mail with all of the information, the

19  position, the location that he's going to, who to ask for, job

20  description.

21        MR. MALLARD:  Why don't we zoom in on the from, to,

22  subject area.

23  BY MR. MALLARD:

24  Q.   Whose e-mail is this coming from?

25  A.   That's from my e-mail.

1    Q.   That's you, jacki.muh@expresspros.com?

2    A.   Yes.

3    Q.   To whom are you sending it?

4    A.   It's diormauricecarter@gmail.com.

5    Q.   Is that the e-mail you had for Diovanni Carter?

6    A.   Yes, it is.

7    Q.   What, generally speaking, are you telling him in this

8    e-mail?

9    A.   I'm telling him that we're confirming the position that he

10   was going to be working on that following Monday.

11   Q.   And what time did you send that e-mail?

12   A.   I can't see it.

13   Q.   Sometime around Friday?

14   A.   Yeah, on Friday, January 25th.

15           MR. MALLARD:   Okay.  If we could continue on.  If I

16   could have Exhibit Number -- first, I'd move --

17   BY MR. MALLARD:

18   Q.   Is this Exhibit Number 114 that you've been looking at an

19   accurate copy of the e-mail that you sent to diormauricecarter

20   on that date about the job?

21   A.   Yes, it is.

22           MR. MALLARD:   Your Honor, I move this in as the next

23   exhibit.

24           MR. SULTAN:   No objection.

25           THE COURT:   Admitted.

1           (Government Exhibit 114 received in evidence.)

2           MR. MALLARD:  Can we just quickly publish this to the

3    jury and focus on the top header piece again.

4    BY MR. MALLARD:

5    Q.   And that was the date in which you e-mailed it --

6    A.   Yes.

7    Q.   -- was Friday, January 25th?

8    A.   Yes.

9           MR. MALLARD:  If I could have for just the witness

10   Exhibit Number 115.

11   BY MR. MALLARD:

12   Q.   Do you know what this is, ma'am?

13   A.   That is the reply back to the e-mail that I sent.

14   Q.   Why don't we zoom in a little bit.  From whom is the

15   reply?

16   A.   From diormauricecarter@gmail.com.

17   Q.   And what does the content say?

18   A.   It's replying back saying "Yes, I received your e-mail,

19   and I will be there on Monday."

20   Q.   Okay.  So it looks like there's something of a negative

21   eight on the time stamp there.  If you were to plus eight to

22   the nine, that's about 15:28; is that right?

23   A.   Yes.

24   Q.   And that previous e-mail that we looked at was at a

25   zero-zero time stamp; is that fair to say?

 1   A.    Yes.

 2   Q.    Is this a true and accurate copy of the e-mail that you

 3   received back from the diormauricecarter@gmail address?

 4   A.    Yes, it is.

 5              MR. MALLARD:  Your Honor, I move this as Exhibit 115.

 6              MR. SULTAN:  No objection.

 7              THE COURT:  Admitted.

 8              (Government Exhibit 115 received in evidence.)

 9              MR. MALLARD:  Can we quickly publish it to the jury?

10   BY MR. MALLARD:

11   Q.    What happened on Monday with respect to the job?

12   A.    On Monday we called the company.  We do first day

13   check-ins.  So we called the company to check in -- we had

14   multiple people starting that day -- to see who was there, if

15   anybody was late.  And we heard that he was one of the ones

16   that was there that day.

17   Q.    Okay.  Did you have any other contact with Diovanni Carter

18   that day?

19   A.    He did call later on that day saying that he was no longer

20   going to be able to be working there and was going to be

21   leaving the jobsite.

22   Q.    Did he tell you why?

23   A.    He said that he had a lot going on at the time and was not

24   able to commit to the schedule.

25              MR. MALLARD:  I have no further questions -- actually,

 1    just one moment, Your Honor.

 2              (Pause.)

 3              MR. MALLARD:  No further questions, Your Honor.

 4                        CROSS-EXAMINATION

 5    BY MR. SULTAN:

 6    Q.   Good morning, Ms. Muh.

 7    A.   Good morning.

 8    Q.   So Diovanni went to work on Monday, January 28th, right?

 9    A.   Yes.

10    Q.   And he called at the end of the day, right?

11    A.   I believe it was the middle of the day.

12    Q.   Did he talk to you?

13    A.   Yes, he did.

14    Q.   Okay.  And did he tell you he had some personal family

15    issues and couldn't continue in that position?

16    A.   I believe he just said that he had a lot going on.  I

17    don't think he went directly into what family issues.

18    Q.   Okay.  But he gave you notice, right?

19    A.   Yes, he did.

20    Q.   In your experience, have you had associates who simply

21    didn't show up for work?

22    A.   Frequently.

23    Q.   That happens, right, and that can create kind of a problem

24    for your company?

25    A.   Yes.

1    Q.   But that didn't happen in this case, right?

2    A.   Correct.

3    Q.   He did the responsible thing by calling you, right?

4    A.   Correct.

5    Q.   Thank you, ma'am.

6              THE COURT:  Redirect?

7              MR. MALLARD:  Nothing further, Your Honor.

8              THE COURT:  You're excused.  Thank you.

9              THE WITNESS:  Thank you.

10             MR. MALLARD:  Your Honor, now I think -- this is when

11   we are going to get to the point of the issue that Mr. Sultan

12   raised before the jury came out.

13             THE COURT:  I don't think their lunch is here yet.

14             THE CLERK:  I can check.

15             THE COURT:  Is there anything else we can do in the

16   next 15 minutes?

17             MR. MALLARD:  There is.  I just want to confer with my

18   co-counsel for a second.

19             THE COURT:  All right.

20             (Attorneys confer.)

21             MR. MALLARD:  Your Honor, I think I have a witness

22   that could go about 25 or 30 minutes if that would be

23   sufficient?

24             THE COURT:  They've been sitting for two hours.  So I

25   think I would like to recess for lunch at 12:00, and that

```
 1    person can be finished right after lunch.  Is that all right?
 2              MR. MALLARD:  I can probably condense it.
 3              THE COURT:  I don't like -- I think it's a lot to ask
 4    the jury to sit for more than two hours at a stretch.
 5              MR. MALLARD:  That's fine, Your Honor.
 6              THE COURT:  And their lunch is hot today.  So I don't
 7    want it to get cold.
 8              MR. MALLARD:  I just want to make sure the witness is
 9    in the hallway and not -- the government calls Trooper
10    Christopher Malm.
11              THE CLERK:  Can you raise your right hand.
12              (Witness sworn.)
13              THE WITNESS:  I do.
14              THE CLERK:  Can you please state your name and spell
15    your last name for the record.
16              THE WITNESS:  Christopher Malm, M-a-l-m.
17              CHRISTOPHER MALM, having been duly sworn by the Clerk,
18    was examined and testified as follows:
19                             DIRECT EXAMINATION
20    BY MR. MALLARD:
21    Q.   Good morning, sir.
22    A.   Good morning.
23    Q.   Where do you work?
24    A.   I'm employed by the Massachusetts State Police.
25    Q.   And how long have you been there?
```

1    A.    Approximately six years.

2    Q.    And what's your current assignment?

3    A.    I'm assigned to the Massachusetts State Police Airwing out

4    of Lawrence.

5    Q.    And what does that particularly entail in terms of duties?

6    A.    We operate one of the four helicopters owned by the State

7    Police.

8    Q.    One of the four?

9    A.    Yes.

10   Q.    What's your role in the helicopter?

11   A.    Currently I'm an aircraft commander, and before that I was

12   a tactical flight officer.

13   Q.    Which particular kind of helicopter do you operate?

14   A.    A Eurocopter EC135, now owned by Airbus.

15   Q.    What are some of the pieces of equipment that are on the

16   helicopter that you use in the course of your duties?

17   A.    Some of the equipment we use is the FLIR camera,

18   forward-looking infrared.  It's our primary piece of equipment

19   that we use for searching for people.  We also have a

20   spotlight, microwave downlink, other technology.

21   Q.    Microwave downlink, like to heat things up?

22   A.    No.  To broadcast a video signal.

23   Q.    So not a regular microwave?

24   A.    No.

25   Q.    So tell us about the FLIR camera.

1    A.   The forward-looking infrared, or FLIR, is a camera that

2    combines several different lenses or cameras into one.  It can

3    see color camera, like a normal TV broadcast, but also, more

4    importantly, it can detect infrared radiation in the form of

5    heat.

6    Q.   Now, sir, let's talk about sort of what FLIR actually is

7    and how it operates.  Have you been trained on what FLIR is?

8    A.   I have.

9    Q.   And tell us about your training and experience in that

10   area.

11   A.   When I first came into the Airwing approximately three

12   years ago, I immediately began training on the FLIR camera, one

13   of our most important pieces of equipment.  You operate the

14   camera with a handheld controller, and you are able to adjust

15   it to magnify or intensify the differences between heat.  So

16   different objects will give off a different infrared heat

17   signature.

18          Now, in addition to the training that I received

19   hands on, I've also trained with the company FLIR for infrared

20   technology and have received certificates from them.

21   Q.   Have you used the camera yourself?

22   A.   I have, many times.

23   Q.   How many hours would you say you've logged on the camera?

24   A.   I would say at least 500.

25   Q.   And what are some of the -- I guess, if we could just

1    clear up some of the details about how it works.  Does it allow

2    you to see through walls or into buildings?

3    A.    No.  It cannot see through a pane of glass.  It can't see

4    through a wall.

5    Q.    Why is that?

6    A.    The technology that allows FLIR to work is that it --

7    although you may see a recognizable figure on the screen, it's

8    not a color camera.  It's not looking at that figure.  It's

9    actually looking at infrared heat.  So something like a pane of

10   glass would simply reflect outside heat.  A wall is just going

11   to show the temperature of that wall.  Now, if there was a heat

12   source directly behind a pane of glass or wall, sure, the wall

13   would look warmer or the glass would look warmer, but you would

14   not be able to see what was beyond it.

15   Q.    I guess theoretically you could tell if a house was heated

16   or not?

17   A.    Exactly.

18   Q.    But you couldn't determine whether a person was inside?

19   A.    No.

20   Q.    What about in terms of through, like, an obstacle like a

21   vehicle or into the back of a trunk or something like that?

22   A.    No.  Again, if you'd been driving a vehicle and the heat

23   had been on for a couple of hours, the glass on the outside of

24   that vehicle is going to appear much warmer than a vehicle

25   that's been parked.  However, it's impossible for me to see if

1    someone is seated inside or inside at all.

2    Q.   I guess the distinction is if the object is hot or hotter

3    than the ambient temperature, it's visible on the FLIR camera?

4    A.   That's correct.

5    Q.   But in terms of -- the FLIR camera can't penetrate through

6    any surface or anything to determine what the signature -- heat

7    signature is of something behind some sort of surface?

8    A.   No.  In fact, the technology is so limited that something

9    even a few inches below the surface of the water, submerged,

10   you wouldn't be able to see it all.

11   Q.   What is the best application for a FLIR, and what are some

12   of the manners in which you put it to use?

13   A.   Our primary use of the FLIR is looking for someone in a

14   wooded area, an area that would be difficult to search on the

15   ground.

16   Q.   What are some of the environmental factors that make the

17   use of the FLIR camera more efficient or more effective?

18   A.   Well, if you or I were standing in the woods, our body is

19   producing heat.  And so that infrared radiation that you're

20   putting off is going to be much warmer than the environment

21   around you.  So either an animal or a human being is going to

22   look a lot different on the FLIR camera than, say, a tree or

23   leaves or the ground.

24   Q.   What about in a tropical environment where the ambient

25   temperature is almost consistent with body temperature?

1    A.    It can be difficult.   In fact, the same thing with hot

2    summer days, something called solar loading.   So the sun has

3    been heating up the environment around you.   That can be much

4    more difficult, which is why colder days and specifically after

5    dark are the most effective times to use the FLIR.

6    Q.    Okay.   And I want to draw your attention over to January

7    26th of 2019, that evening.   Do you recall that date?

8    A.    I do.

9    Q.    What were you doing?

10   A.    I was working out of the Lawrence Air Base as a tactical

11   flight officer, with the primary responsibility of using the

12   FLIR camera from 3:00 p.m. to 11:00 p.m.

13   Q.    And what happened with respect to your assignment or duty

14   assignment that night?

15   A.    I recall that it was actually a very busy night.   And one

16   of the calls that we did get was to respond to Brockton for a

17   search.

18   Q.    Okay.   And what time did you get there, roughly, based

19   upon your best memory?

20   A.    I believe we received the call about 7:15 p.m.   And so it

21   would have been, you know, 10 or 15 minutes to start the

22   helicopter and get on our way and then flight time from

23   Lawrence to Brockton.

24   Q.    So, once you got there, what were you directed to look

25   for?   Where were you looking?

1    A.   While we were on the way to Brockton, I believe that we

2    were given limited information, that we were looking for one,

3    possibly two, people who had fled from a vehicle, I believe in

4    the area of Carl Ave.  And our attention specifically was drawn

5    to a wooded area that abutted that road.  We were asked to

6    search that area.

7            MR. MALLARD:  If I could have it just for the witness,

8    Your Honor -- I'm sorry, Madam Clerk, Exhibit Number 72.

9    Sorry, 73.

10   BY MR. MALLARD:

11   Q.   Do you know what this is that's being played on Exhibit

12   Number 73 there for just you?

13   A.   I do.

14   Q.   Is it a clip of a larger capture of the FLIR camera?

15   A.   Yes, it does appear to be.

16   Q.   And have you had a chance to view -- first, does the FLIR

17   camera record when it's in operation?

18   A.   So we have a recording device on the helicopter.  It's

19   separate from the FLIR camera.  So it's -- you have to be -- it

20   has to be independently turned on with a switch.

21   Q.   Was that done so this night in the city of Brockton for

22   that search in the Brockton area?

23   A.   It was.

24   Q.   Is Exhibit Number 73 that you're viewing a portion of the

25   larger clip that was made of the FLIR camera that night?

1    A.   Yes, it is.

2    Q.   And just to cut to the chase, did you locate the

3    individual that you were searching for that evening?

4    A.   No, we did not.  Despite our exhaustive efforts, we did

5    not locate anyone.

6    Q.   Looking at Exhibit Number 73, is that an accurate copy of

7    the clip from the larger portion of the video?

8    A.   Yes.  I recognize the scene.

9         MR. MALLARD:  If I could move Exhibit Number 73 into

10   evidence, Your Honor.

11        MR. SULTAN:  No objection.

12        THE COURT:  Admitted.

13        (Government Exhibit 73 received in evidence.)

14        MR. MALLARD:  If you could play it and publish it to

15   the jury.

16   BY MR. MALLARD:

17   Q.   And if you could describe to the jury what we are looking

18   at.

19   A.   We are looking at a wooded area surrounding -- there was

20   sort of an apartment complex and a school, I believe, where the

21   outer limits of our search area, where the car was located, the

22   apartment complex and then a school.  There was a wooded area

23   with several paths, and we were checking that area for any

24   infrared radiation, so any heat.  Heat would be recognized

25   currently as white.  Anything that you'd see bright white would

1   be warmer than the black environment around it.

2   Q.   And are you communicating with the officers on the ground

3   at the time?

4   A.   We are.

5   Q.   And how are you doing that?

6   A.   We have radios on board the helicopter for pretty much

7   anywhere in the state.  We're able to come right up on that

8   department's frequency and speak directly to the officers on

9   the ground.

10  Q.   It looks like you're zooming in and out.  What's the

11  purpose of that?

12  A.   As we come around in the orbit, if something did catch my

13  eye, say right there it's a little bit warmer than the

14  environment around it, you would want to quickly zoom in,

15  either rule it in or out, and then keep going, keep moving on.

16  Q.   How do you determine vehicles or the other officers on the

17  ground?

18  A.   Very frequently, you know, we'll find out who was in the

19  woods.  And, to be honest, quite often we'll see someone and

20  say, "Okay.  If there's any police officers in the woods, raise

21  your hand," and then we're able to immediately rule that person

22  out.

23  Q.   It looks like you are directed to a certain wooded area

24  during the course of your search there?

25  A.   Yes.

1   Q.   Is that the area that you spent the majority of your time

2   and attention?

3   A.   Yes, it is.

4   Q.   What are these figures there that you just zoomed in on

5   now?

6   A.   So as you can see right there, you can see the K-9 out in

7   front, and then you can see a number of police officers behind

8   the K-9.

9   Q.   Okay.  And what were you doing with respect to these

10  officers as they're there?

11  A.   We were in direct communications with all the officers on

12  the ground.  At one point during the search -- I don't know

13  where this clip picked up.  At one point I was directing a

14  number of officers to a heat signature which I had thought

15  would possibly have been a suspect.

16  Q.   And, ultimately, was that the case?

17  A.   No.  After looking at it for several minutes, I was able

18  to clearly define the object as a deer.

19  Q.   What's this item on here on the right that is sort of

20  glowing a little bit more that doesn't look like an individual?

21  A.   That would be a police cruiser or other vehicle that had

22  been recently used.  And if you can see in that video right

23  there, the difference between a vehicle in the driveway versus

24  a vehicle there, you can tell which ones have been recently

25  driven.

1    Q.    It appears to be one moving, as well?

2    A.    Yes, exactly.

3              MR. MALLARD:  Fast-forward this clip just a little

4    bit.  Maybe two minutes.  Right there.

5    BY MR. MALLARD:

6    Q.    Now, at this point you're sort of in an orbital function;

7    is that right?

8    A.    Yes.

9    Q.    Is this sort of where you maintain the majority of your

10   attention that evening, in this wooded area around this larger

11   complex of buildings?

12   A.    The vast majority, yes.  As the public began to become

13   aware that there was a search, there were some 911 calls about

14   noises in backyards and things like that, I recall later in the

15   evening, and we did check those.  But this would be the bulk of

16   our time was spent on this area surrounding the vehicle.

17             MR. MALLARD:  Fast-forward just a little bit.

18   BY MR. MALLARD:

19   Q.    Did you find anything of interest in the woods beside the

20   suspects that evening?

21   A.    In addition to the deer, we ended up warning a lot of the

22   officers that were on foot in the woods because there was a

23   couple of coyotes -- actually, there they are.  We saw two to

24   three coyotes in the woods.  And I think they were tracking the

25   deer.

1  Q.   So the coyotes were tracking the deer, and the officers

2  were tracking the coyotes?

3  A.   Exactly.

4  Q.   And you were all above them?

5  A.   Yes.

6           MR. MALLARD:  If you could zoom back -- I am going to

7  pull back the exhibit to -- towards the beginning.

8  BY MR. MALLARD:

9  Q.   Are you familiar with the general area of this particular

10 zone?

11          THE COURT:  Mr. Mallard, it sounds like you are sort

12 of starting another topic, and we are not going to finish it

13 before lunch, the short lunch break.  So I'm going to recess

14 until 12:30, and then we'll resume with him.

15          MR. MALLARD:  Thank you, Your Honor.

16          THE CLERK:  All rise for the jury.

17          (The Jury is not present for the following.)

18          THE COURT:  What do you want to do about the exhibit?

19          MR. SULTAN:  I'm happy to make a suggestion, basically

20 if the Court wants to spend a few minutes going through it.

21 It's going to have to be kind of looking at it line by line.

22 I'm ready to do that.

23          THE COURT:  Okay.  I have to handle something else at

24 12:00, too.  So I just need to be efficient about it, okay.

25          MR. MALLARD:  I think Mr. Sultan and I can consult,

1    and I think we can probably reach an agreement.

2           MR. SULTAN:  Maybe we should do that and not take the

3    Court's time.

4           THE COURT:  Why don't I come back out at 12:25.

5           MR. SULTAN:  That's great.

6           (Luncheon recess at 12:01 to 12:26 p.m.)

7           MR. MALLARD:  I think the court has an updated 16.1.

8           THE COURT:  I have the one you gave me this morning.

9           MR. MALLARD:  Right.

10          THE COURT:  Yes.

11          MR. MALLARD:  Mr. Sultan and I have agreed that the

12   further two columns, the search term and URL, which are the

13   pieces that contain the content, are going to be redacted sort

14   of as a general matter, except for a couple of items which the

15   government would offer as sort of indicia of common use and

16   pattern.  So everything on page 1 will be gone, page 2.  We've

17   agreed up until essentially page --

18          THE COURT:  If you agreed, I don't need to know

19   exactly what you agreed to.  Are there any disputes?

20          MR. MALLARD:  The disputes are --

21          MR. SULTAN:  There are 13 in dispute.  Twelve of them

22   are about guns, and then there's an Attorney Jessica Tripp.

23   Thirteen are about guns, and then there's Jessica Tripp.  So

24   those are the ones we disagree about.

25          MR. MALLARD:  It might make sense to start from the

 1     back working forward.

 2             THE COURT:  All right.  That's fine.  Just give me a

 3     date and entry.

 4             MR. MALLARD:  Mr. Sultan is objecting to 1042, which

 5     is on January 26, 2019.

 6             MR. SULTAN:  If you're starting backwards, let's start

 7     at 1061.

 8             MR. MALLARD:  Sure.  Jessica Tripp, attorney.

 9             THE COURT:  All right.  I'm going to take that one

10     out.

11             MR. SULTAN:  1043 is the next one we disagree on,

12     right?

13             MR. MALLARD:  1043, yes, is how to build your own

14     AK-47 Glock or AR-15.

15             MR. SULTAN:  There are no such weapons in this case,

16     Your Honor.

17             MR. MALLARD:  The government would argue that that's

18     when they're, as Dennis Martin indicated, getting ripe and

19     getting the firearms for the incident, and that firearms being

20     searched for is consistent with the plan and would corroborate

21     his testimony.

22             MR. SULTAN:  There are searches about Glocks going all

23     the way back to December 16.  This case has nothing to do with

24     a Glock.

25             THE COURT:  Well, let me look at the whole chunk of

 1    them.  Give me the numbers.

 2             MR. SULTAN:  There's a big bunch.  550 to 557.

 3             THE COURT:  Five --

 4             MR. SULTAN:  550 to 557 on December 16.

 5             THE COURT:  Yup.  What are the others?

 6             MR. SULTAN:  567 on December 17.

 7             THE COURT:  Wait a minute.  Hold on a second.  Five --

 8             MR. SULTAN:  567.

 9             THE COURT:  Let me just mark these so I can go back

10    and take a look at them.

11             I'm going to take -- 567 is out just because of the

12    time relationship.

13             MR. SULTAN:  How about 550 to 557, Your Honor?

14             MR. MALLARD:  Your Honor, I just want to briefly be

15    heard on that.  The Glock 47 is sort of a rather unique thing

16    to be searching for.  It's not like, you know, a pistol

17    tomorrow.  He then searches for Glock 47 about two hours before

18    the robbery, which I think is going to be consistent with the

19    same individual operating the account.  It has sort of an

20    attribution component to it as well.

21             THE COURT:  I hear you, but I don't -- it's just I

22    don't think that in the prejudice probative balance that it

23    comes out.  I mean, there's not been any evidence whatsoever

24    that they started planning this in mid-December.

25             MR. MALLARD:  No, I understand that.

1          THE COURT:  So the same on 549 to 557.

2          MR. MALLARD:  550, you mean?

3          THE COURT:  I marked 549, but did you ask me for 550?

4     Yeah, 550 to 557.  Sorry, that was my bad.

5          MR. SULTAN:  And then you already said 567, Your

6     Honor.

7          THE COURT:  550 to 557 are out.  567 is out.

8          MR. SULTAN:  The next one is 625, AR-15, and 626.

9          THE COURT:  625 and 626.  Same, those are out.

10         MR. SULTAN:  And then the next one is 815 on January

11    13.

12         THE COURT:  815.  What's the testimony going to be

13    about the earliest date they started planning this?

14         MR. MALLARD:  I think it's going to be January 26.

15         THE COURT:  This one's out, too.

16         MR. MALLARD:  So that's 815?

17         THE COURT:  815.

18         MR. SULTAN:  Then we get to January 26.  So 1042, on

19    January 26 at 5:30 p.m., search for Glock 47.  So I'm going to

20    buy a Glock over the Internet and go commit a robbery an hour

21    later?  So I would say under 403, Your Honor, it should be

22    excluded, and 401.

23         THE COURT:  I mean, what is the theory?

24         MR. MALLARD:  Well, I think you heard testimony from

25    Dennis Martin that there are communications.  He gets brought

1        into the group sort of later on.

2                Our position would be that Diovanni Carter formulated

3        the plan to rob the T-Mobile as early as that morning when he's

4        down there visiting it, Googling it.

5                I'd say around 5:30 -- that's about two hours before

6        the robbery, less than two hours before the robbery.  He's

7        Googling firearms.  There's information he handed out at least

8        one of the firearms and other members had firearms.  The fact

9        he's looking at firearms at that time signifies the fact that

10       he's a member of the plan, that he's looking at guns, that he

11       then armed people with other types of guns later on.

12               THE COURT:  I mean, if he made a phone call to someone

13       about getting a gun, I understand that, but I don't understand

14       what's going to happen when you Google Glock 47 two hours

15       before the robbery.  I just want -- what's your theory on that?

16       I don't understand.

17               MR. MALLARD:  It shows a state of mind.  It shows what

18       he's thinking about.  It shows what his interest and activity

19       is.  It shows what he's doing.  At the time he's planning the

20       robbery, he's Googling weapons, firearms in particular, and

21       firearms were used in the robbery less than two hours later.

22               MR. SULTAN:  He's in a firearm state of mind.

23               THE COURT:  What are you going to get when you Google

24       Glock?  You're going to get like --

25               MR. MALLARD:  That's a very specific model number.

```
 1              MR. SULTAN:  There is not a Glock in this case.
 2              THE COURT:  I mean, I see that he's committing a
 3    robbery, or allegedly committing a robbery, and I see that he's
 4    interested in Glock 47s, but I'm having a hard time really -- I
 5    mean, it could have been -- he could be operating like a
 6    firearms ring on the side.  I'm just not sure I can connect
 7    them up.
 8              And I'll tell you, I mean, this case, at least in my
 9    humble opinion, Mr. Sultan may differ, it's being tried super
10    clean.  Everybody's been very careful, and I don't want to put
11    in -- it's highly prejudicial, and I don't understand the link.
12    If I could understand the link -- if he Googled where to buy
13    guns or where to pick up guns or how to operate a gun that he
14    had that he didn't --
15              MR. MALLARD:  I would just tell the court I don't
16    think it's a coincidence that two hours before three men that
17    he armed with firearms, in a vehicle that he's renting that
18    he's planned on, looked at, that he's Googling weapons less
19    than two hours beforehand a certain type of firearm.  The fact
20    he didn't Google the exact make and model of the firearm that
21    he gave to his brother and the cooperating witness and the
22    other guy, I don't think should exclude this evidence from
23    being in front of the jury.  If he searched for firearms at the
24    time, I think it would be relevant.
25              THE COURT:  If he searched for like Dick's Sporting
```

1   Goods gun department, I completely agree with you, right?  He

2   wants to figure out where they are and where he can buy them.

3          MR. SULTAN:  Gun shops near me, right.

4          THE COURT:  Right.  I just think it's a very close

5   call, and --

6          MR. MALLARD:  He then Googles a minute later, how to

7   build your own AK-47.

8          MR. SULTAN:  Right.  And how is he going to build an

9   AK-47 before the robbery, Your Honor?

10          MR. MALLARD:  I think it signifies that he's thinking

11   about it, discussing it potentially with the other

12   co-conspirators, the ones that precede Martin, and it

13   definitely shows what this group, before Martin joined it

14   essentially, was doing.

15          THE COURT:  It definitively shows that his client has

16   an interest in a gun.  It definitely shows that.  And I don't

17   think your argument is crazy.  I just think -- I'm just -- let

18   me think about it.  Let's go through these others.  Let's get

19   back to that.

20          MR. SULTAN:  That's all.

21          MR. MALLARD:  That's it.

22          THE COURT:  Didn't you just tell me 1050, 1051?

23          MR. MALLARD:  There's other firearms that he Googles

24   previously, but if the court's going to --

25          MR. SULTAN:  They've agreed everything else comes out.

1          THE COURT:  The Channel 7 breaking news -- did you
2     just tell me 1050 to 1057?  Didn't someone just --
3          MR. SULTAN:  No, there were no others.
4          THE COURT:  I thought someone flagged that for me.
5          MR. SULTAN:  I don't think there were any others, Your
6     Honor.  There were 13 that relate to firearms and there's the
7     one that relates to Jessica Tripp.  Your Honor, the probative
8     value is zero or minuscule and the prejudice is extreme.  And
9     it's just --
10          THE COURT:  Here's the thing:  If he's looking for
11     guns at 5:30, right? -- I mean, how to make your own Glock, I'm
12     not going to let him get in.  But if he's doing a search for a
13     Glock 47, I mean, that may be a search of like where do you get
14     one.
15          MR. SULTAN:  But that's not what the search was -- it
16     doesn't say that's what the search was for.  It's shear
17     speculation that he's looking for a Glock 47 at 5:30.
18          THE COURT:  Two hours before he, on their theory, he
19     commits an armed robbery.
20          MR. SULTAN:  An hour and 40 minutes.  It's shear
21     speculation.  You have the prejudice -- you don't have the
22     link.  There's no link.
23          THE COURT:  If I want to buy something, I might just
24     Google that thing.
25          MR. SULTAN:  But there's no Glock 47 in this case.

```
 1              THE COURT:  Because he didn't find one.
 2              MR. SULTAN:  Well, this is like all fantasy, Your
 3    Honor.
 4              THE COURT:  Except that the time proximity is so close
 5    to the robbery.  If you're planning a robbery, are you -- like
 6    I'm not sure you're -- you're planning an armed robbery, let's
 7    just say, it seems like an hour and a half before the armed
 8    robbery that's what you're focusing on, right?
 9              MR. MALLARD:  It's actually an hour before they left
10    in the car to go down there.  They left I think around 6:40.
11              THE COURT:  I'm going to Google Glock 47 and see what
12    comes up.
13              MR. SULTAN:  If there was a Glock 47 in the case, Your
14    Honor, I'd agree with you.
15              THE COURT:  Glock -- let's see.
16              MR. SULTAN:  I bet you'll get a list of want ads for
17    one.
18              THE COURT:  He's right.  I'm not getting anywhere to
19    buy one.  I'm just getting that it's a brand-new -- it's like a
20    new thing.  Look, I think it's a close call.  But as far as I'm
21    concerned, I feel like it's a tie, and the tie goes to the
22    runner, which in this case is Mr. Carter.  So I'm keeping it
23    out.
24              When do you think you're going to rest?  The reason
25    I'm asking is I have agreed to do the BC moot court on
```

1    Wednesday night.  I'm going to have to leave here at like 3:00

2    or 3:30 unless they cancel it because of the coronavirus.  Are

3    you thinking the jury is going to have been charged by

4    Wednesday afternoon?

5              MR. MacKINLAY:  Possibly.

6              THE COURT:  When do you think you'll rest?

7              MR. MacKINLAY:  I would suggest as early as Tuesday we

8    could rest.

9              THE COURT:  Like Tuesday morning.

10             So if they rest Tuesday morning, what are you going to

11   do, generally speaking, in terms of time?

12             MR. SULTAN:  It certainly won't go past Tuesday, Your

13   Honor.

14             THE COURT:  Do you think you'll have time to close and

15   charge on Tuesday?

16             MR. SULTAN:  I don't know.  Maybe.  I don't want to

17   commit to that, Your Honor.  But even if we did closing and

18   charge on Wednesday morning, Your Honor should be able to

19   attend that 3:30 --

20             THE COURT:  It just means I have to leave somebody

21   else for the deliberating jury.  I'm fine doing that.  I just

22   need to work out the mechanics of it.

23             MR. SULTAN:  I think we'll have a better idea at the

24   end of Monday, Your Honor.  I'm not sure.  I'm not trying to be

25   difficult.  I'm not putting on a long defense, if that's what

1    you're asking.

2           THE COURT:  I understand.  I get what you're saying.

3    Any chance you'll rest on Monday, or do you think Tuesday is

4    the earliest?

5           MR. MacKINLAY:  I don't see any way we rest on Monday,

6    Your Honor.  I absolutely see us going into Tuesday morning.  I

7    do think we will be resting from noon on Tuesday, but that's a

8    very tight window to hit from here.

9           THE COURT:  I know.  I'm not holding you to it.

10          MR. SULTAN:  I'd rather not get that smooshed.  I'd

11   rather do closings and charge Wednesday morning, if we could.

12          THE COURT:  At the very least if I can charge on

13   Tuesday, I'll charge on Tuesday.

14          MR. SULTAN:  That's fine.

15          THE COURT:  Do you have a view on whether we charge

16   first before or after closings?

17          MR. SULTAN:  I've never seen that before, but I saw

18   Your Honor has done that, and I think it's fine.  I think it's

19   a good idea.

20          MR. MacKINLAY:  Agreed.

21          THE COURT:  So I'm not trying to lock you in.  I'm

22   just trying to do some planning here.

23          MR. MacKINLAY:  Sure.

24          THE COURT:  I will give you the charge by Monday

25   morning, and we either -- I'd like to be able to have a charge

1    conference Monday afternoon, but if we can't, we'll do it on

2    Tuesday.  Okay?  All right?

3          Do you want to see if they're done, Karen?  Please

4    don't rush them if they're not done.

5    (A recess was taken 12:43 to 12:47 p.m.)

6          MR. MALLARD:  Your Honor, have you ruled on Exhibit

7    105, that's the Puff conversation?

8          THE COURT:  So I tried to figure out what I could do

9    for a limiting instruction on that.  I can't figure out a

10   limiting instruction, which suggests to me it's problematic.

11   So I'm going to keep that out too.

12         MR. MALLARD:  I'll have that redacted right now.

13         THE COURT:  The one with the street address.

14         MR. MALLARD:  We'll just do number 3.

15         MR. SULTAN:  Which one are you talking about?

16         MR. MALLARD:  Just the one where it's Trouble.

17         THE CLERK:  All rise for the jury.

18   (Jury enters.)

19         JUROR:  Sorry, Your Honor.

20         THE COURT:  It's not your fault.  They send up lunch

21   on time almost every single day, except for today.  So we have

22   less flexibility, but it's fine.  We're doing fine on

23   scheduling.  So no matter.  I hope no one felt like they had to

24   wolf down their lunch.

25         When you're ready, Mr. Mallard.

1           MR. MALLARD:  Thank you, Your Honor.

2    BY MR. MALLARD:

3    Q.   Can I take you back very briefly.  You were talking about

4    that you were searching the area of Carl Ave.

5    A.   That's correct.

6    Q.   Is that the area that you focused your attention on that

7    night?

8    A.   Yes.  As I said earlier, the primary focus of our

9    attention was a large wooded area, which was adjacent to Carl

10   Ave., bordered by a school, a large apartment complex, and the

11   position where the vehicle was located.

12   Q.   And what time did you get there?

13   A.   We arrived on scene at approximately 8:00 p.m., and I

14   believe we started recording video at 8:11 p.m.

15   Q.   All right.  What time did you get out of there?

16   A.   We were on scene for approximately an hour and a half, and

17   then we departed to refuel at Plymouth Airport.

18   Q.   And just in conclusion, you didn't find the suspect you

19   were looking for?

20   A.   No, we did not.

21           MR. MALLARD:  No further questions.

22           MR. SULTAN:  No questions, Your Honor.

23           THE COURT:  Sorry to have made you stay.

24           THE WITNESS:  No problem at all, Your Honor.

25           THE COURT:  You're excused.

```
 1              MR. MALLARD:  The government calls Matthew Kelsch.

 2              THE CLERK:  Please raise your right hand.

 3              (Witness sworn.)

 4              THE WITNESS:  I do.

 5              THE CLERK:  You may be seated.  Please state your name

 6     and spell your last name for the record.

 7              THE WITNESS:  Yes.  I'll spell both just because it's

 8     a little bit different.  It's Mattheu, M-a-t-t-h-e-u.  And the

 9     last name is Kelsch, K-e-l-s-c-h.

10              MATTHEU KELSCH, having been duly sworn by the Clerk,

11     was examined and testified as follows:

12                            DIRECT EXAMINATION

13     BY MR. MALLARD:

14     Q.   Good afternoon, sir.

15     A.   Good afternoon.

16     Q.   Tell us about your background and where you work.

17     A.   I'm employed as a special agent with the Bureau of

18     Alcohol, Tobacco, Firearms and Explosives, or more commonly

19     known as ATF.

20     Q.   How long have you been there?

21     A.   I've been with ATF for just under 20 years now.

22     Q.   Tell us what you started doing when you joined ATF and

23     where you are now?

24     A.   Basically I've been at ATF doing general criminal

25     investigations specializing in arson and explosives
```

1   investigations, and after a series of years, I switched over

2   and worked firearms investigations, and they mainly revolved

3   around trafficking of firearms and illegal use and possession

4   of firearms.

5   Q.   And since then?

6   A.   Since then, or around 2012, I took on a collateral duty,

7   and that duty with ATF was a digital media collection

8   specialist.  It's a fancy name for someone who extracts data

9   from cellular devices like cell phones and other items like

10  that.  ATF has a certification program that agents go through

11  to obtain that qualification.  Shortly after starting that I

12  applied to and was accepted to be part of ATF's forensic

13  examiner certification.  That's a higher level certification,

14  where an agent goes through additional training, and they're

15  allowed to perform forensic examinations of other devices such

16  as computers and whatnot.

17  Q.   So you not only became a digital media collection

18  specialist.  You then went on to become an examiner?

19  A.   Within ATF I did, yes.

20  Q.   What's the difference?

21  A.   Mainly a level of training that's involved with it.  The

22  digital media collection specialist is a shortened course

23  that's run by ATF.  The forensic examiner course is run by some

24  outside agencies and it requires standardized testing and

25  grading and peer review as part of it.

1   Q.   Tell us about the process that you took to become the

2   digital forensic examiner and that particular qualification?

3   A.   So that particular qualification required a number of

4   courses.  Some of them included courses that were offered by

5   vendors or such companies as Cellebrite, which are outside

6   vendors that supply tools to law enforcement and other

7   individuals.  And you attend those courses.  You're given

8   written testing at the end of it, and you're also given

9   examples.

10          So, for example, they will produce a phone that has

11  certain data on it that they've made themselves, and they'll

12  give you a test to see if you can find the information that's

13  on that prepopulated data.  Once you pass those examinations,

14  you're given a certification with them.

15          We do the same in the computer environment, where

16  we'll do the same type of testing.  You're given tests, and you

17  get three graded testing that you have peer review on.  Once

18  you complete those three tests, you move on to three tests

19  where you're graded.  Once again, they're normal things.  So

20  they'll give you something like a USB, like a thumb drive or a

21  hard drive from a computer, and you have to analyze that and

22  make sure you're able to find the data that's on there.

23  Q.   Is there any sort of a certification process that you go

24  through or certification that you receive once you go through

25  this process?

1  A.    Yes.  Once you finish that with ATF, you're considered a

2  certified forensic examiner for it.

3  Q.    Do you have any other qualifications and training in this

4  area?

5  A.    Yes.  So fortunately about three years ago, the FBI,

6  Federal Bureau of Investigation, opened up a regional computer

7  forensic lab.  So they have laboratories that are throughout

8  the country, and they are collaborative between the FBI and

9  other state, local and federal agencies.

10        So here in Chelsea, Mass. we opened up an RCFL, as we

11  call it, so Federal Computer Forensic Laboratory, RCFL, and

12  it's comprised of half FBI employees and what they call task

13  force officers, so detectives and investigators from other

14  agencies.  Here in Chelsea we have members from the State

15  Police, Boston Police, Framingham Police, Middlesex Sheriff's

16  Department and others.  And I was fortunate enough to apply for

17  and be accepted to that program.

18        Within that program the FBI has its own forensic

19  examiner certification.  That's a 13-week course.  That's held

20  down in Quantico, Virginia.  Unfortunately it's not 13 weeks

21  straight.  You go down and there's a number of courses,

22  approximately two weeks at a time.  Each one of those courses

23  specialize in different fields.  So some will be for mobile

24  forensics.  Some will be just for Apple computers.  Some will

25  be for Windows computers and whatnot.  Once you complete that

1   entire certification process, you move on to another testing

2   phase, like I described before, where you have to do a test

3   where you're given known data, and you have to produce results.

4           THE COURT:  Okay.  Stop for one second.  I'm going to

5   take mercy on the court reporter and ask you to speak a little

6   bit slower.

7           THE WITNESS:  I'm sorry about that.

8           THE COURT:  It's fine.

9   A.   So you go through a known process, and once you pass that,

10  you are considered a forensic examiner within the FBI.

11  Q.   Is that a current qualification that you now hold?

12  A.   It is, yes.

13  Q.   Are you still associated with that lab?

14  A.   Yes.  Currently I act as a deputy director of that lab.

15  Q.   All right.  Let's kind of break down sort of what you do

16  on a daily basis and what types of information you look at.

17  What are some of the types of devices that you examine and how

18  does that work?

19  A.   Sure.  As a forensic lab -- and myself, even though I'm in

20  the role as deputy director, I'm also an active examiner.  So I

21  supervise examiners in the lab, but I also still do work

22  myself.  That work can be any type of digital media.  So it

23  could be a USB, CDs, DVDs, any type of hard drive in computers,

24  but basically anything that we can take, make a forensic copy

25  of and then analyze later on.

1    Q.   How do you analyze it once you get that forensic copy?

2    A.   So there are a number of different tools that are used to

3    analyze that data.  Specifically in cell phones we use a

4    program called Cellebrite.  There are other programs we use for

5    Windows and Mac computers as well.

6    Q.   Let's talk about cell phones for a second.  What's the

7    process of analyzing a cell phone from start to finish?  Just

8    quickly, but all the way from the beginning to the end.

9    A.   So basically when we receive a cellular phone device,

10   we'll take that device in.  We'll photograph it in its current

11   state.  We'll inspect it and document it.  So we'll notate

12   anything about it, whether it's damaged, if there's anything

13   included with it.  Once we get through that documentation

14   phase, we'll make sure the devices is secure.  Sometimes the

15   devices are on, sometimes they're off.  We'll make sure that

16   they're in a state where they won't wipe, where they couldn't

17   be arrested for any reason.

18          Once we're satisfied that we're at that level, we'll

19   take that device, and it's kind of a two-part process.  The

20   device is hooked up to software.  The majority of the cases

21   it's with a program called Cellebrite, C-e-l-l-e-b-r-i-t-e, and

22   that device will extract the data off the phone device.

23          That data, once it's extracted, isn't something that

24   the normal person could look at.  It's a large file, but you

25   can't click through it and see anything like you would in

1    Windows.

2            That data is then taken and placed into another

3    program that's offered by Cellebrite, something we call

4    Physical Analyzer.  When it goes into that program, it

5    categorizes that data.  So it takes all that data that came off

6    the cell phone that you see when you look at your call logs and

7    your texting, and it takes it and it puts it in little

8    containers.  So if you think about when you go online and you

9    look at your email and you see on the left you may have

10   different folders for your different groups where you keep

11   emails, like your inbox, your outbox, your sent box.  It takes

12   all those artefacts, those individual pieces of data that are

13   on the phone, and it puts it into categories.  So you would

14   have your call log.  You would have emails.  You would have

15   text messages.  And that goes for any type of communication

16   that you have on a phone.

17           It also creates categories for images and videos and

18   other documents, if you had a Word document or Adobe document

19   on there.  It breaks it all down in a way that the examiner

20   could see it and search it.  They could search it visually by

21   scrolling through and seeing the photos, or they could put

22   keywords searches in.  So if you knew phone numbers or names

23   that you wanted to look up, you could do so easily.

24   Q.   So there's a two-part process, extraction and examination?

25   A.   That's correct.

1    Q.   What happens if the phone is password protected?

2    A.   If the phone is password protected, sometimes we have

3    localized tools that we can use to unlock that.  There are

4    other times that we do not -- our lab is not one of the labs

5    that's designated to have some of the more advanced tools.  In

6    cases where we need a more advanced tool, that phone will be

7    shipped out for someone else to extract that data.

8    Q.   Are you familiar with the name Sukhpreet Darhele?

9    A.   Yes, I am.

10   Q.   Who is that?

11   A.   Commonly known to us as Ricky, but he's a contractor that

12   works for ATF and he spends the majority of his time unlocking

13   and extracting data from iPhones in particular.

14   Q.   And if the process is it needs to be unlocked, what

15   happens when it comes back to you?

16   A.   So once that data is extracted, it's placed in a number of

17   files.  The particular machine, which is called GrayKey, that

18   extracts that data, takes each of those files, and it gives it

19   a hash.  A hash is kind of like a digital signature.  So it's a

20   fingerprint for a file.  So every file, no matter what it is,

21   kind of has a digital fingerprint.  It's a hash.  And that hash

22   is just a long number that the computer calculates.  You don't

23   do it by hand.  The computer does it for you.  There's software

24   that calculates that hash.  If any part of that data was

25   changed in any way whatsoever, that digital fingerprint or hash

1    would change.  So when the data is given to us, we're given a

2    number of files that come with that data, and we're given a

3    sheet automatically produced from the GrayKey machinery that

4    gives us a hash for each of those files.

5    Q.   Once you get the stuff back with the GrayKey and the hash,

6    what do you do with it, and how do you actually get it into the

7    examination program?

8    A.   So that data would be copied over.  Normally it's in a

9    thumb drive that's given to us.  They'll make two copies.  One

10   copy that goes into evidence that isn't touched that's saved,

11   and we have a working copy that the examiner works on.  Just in

12   case anything happens to it, we have two copies.  We don't want

13   to lose that data.

14        The working copy is copied over to our network, just

15   a staging area that we have to work on that data, and the first

16   thing we do once we copy that data over is hash it.  So we

17   check that digital fingerprint to make sure that none of that

18   data has changed from copying it from one place to another.

19   Q.   Once it's in the program, what happens next?

20   A.   So once we have that data saved, we can import it into

21   whatever tool we're using.  In most cases it's Cellebrite

22   Physical Analyzer.  Once it goes into that tool, it goes

23   through that whole process that I just explained where it kind

24   of sorts all that data into the different categories and

25   folders so we can see them.

1    Q.   From there, can you then review it and make additional
2    reports and things like that from it?
3    A.   Yes, you can.  You can review it.  You can create reports.
4    You can sort the data.  You can do all sorts of searches and
5    tests on it.
6    Q.   Does the Cellebrite program generate any information about
7    the device or the image of the device that it's then looking
8    at?
9    A.   It does have a tab that gives some basic information about
10   that cellular device, yes.
11   Q.   What type of information is that?
12   A.   Commonly it will give, on an iPhone in particular, it will
13   give the name of the iPhone.  So when you set up an iPhone, you
14   can give it whatever name you want.  It will have whatever
15   email is associated with the person's iCloud account.  It will
16   have an IMEI, which is the -- it's the digital serial number of
17   that device.
18   Q.   Are you familiar with how a cell phone generally operates?
19   A.   Yes.
20   Q.   Let's talk a little bit -- are there things that the cell
21   phone generates in the usual course of its activity?
22   A.   Yes.
23   Q.   Are there things that it stores automatically?
24   A.   Yes.  So there are things that happen on a cell phone when
25   a user uses it.  So if you're, for example, entering a contact

1    on a cellular device, it will save that data for you.  But

2    there are also things that happen in the background that you

3    don't see where it's checking things.  It's also taking that

4    information and saving it in other places that you would never

5    know about.

6    Q.   What happens when a phone makes a call and receives a

7    call?

8    A.   So when anything like that happens on a cell phone, it's

9    saved in something almost like a spreadsheet.  So if you know

10   an Excel spreadsheet, it's got all sorts of columns and rows.

11   They're called databases.  Those databases are populated with

12   different fields.  So for example, in a cell phone call like

13   we're talking about, it would have that database.  It would

14   have a category for each.  So it would have whether it was

15   incoming or outgoing, the date and the time that that phone

16   call was made.  It would have the phone number that was sent or

17   received.  It would have the person's user name that they gave.

18   So if you had someone in your address book, it would link that

19   name to it.  So it puts all that in a database and it stores

20   it.

21   Q.   And same thing with text messaging and other types of

22   conversations?

23   A.   Yes, there are different databases that are located on the

24   phone.  So it's not just one big database.  There are different

25   databases for each category, but they all exist, yes.

1    Q.   What about in terms of web searches and web history?

2    A.   Web searches are also saved in a slightly different

3    format, but they are all saved within the phone.

4    Q.   And is all that type of data accessible from the image

5    that you load into the examination program?

6    A.   Yes.  In many ways we can look at it.  In a way it almost

7    looks like when you're looking at the phone, but we can

8    actually go and look at that actual database, too, and it

9    almost looks like a spreadsheet.  So it's not an image on a

10   phone, but it's the spreadsheet itself that we can see as well.

11   Q.   Is the user able to delete that data or delete those

12   databases at some point in the course of the use of the phone?

13   A.   The user is able to delete information in a database, and

14   then it depends on the software and the hardware as to whether

15   or not it's written over immediately or written over later.

16   Sometimes things are deleted on the database that will remain

17   for a short amount of time before they're written over, but at

18   some point if they're marked to be deleted, it will be deleted

19   or written over at some point.

20   Q.   How do Apple devices communicate among other Apple

21   devices?

22   A.   Apple is a little unique, although other companies are

23   copying this, where they have a messaging service, and other

24   services that are just strictly for Apple.  Obviously

25   everything that usually starts with "i" in Apple.  So it's

1    iMessaging.  You also have FaceTime that's part of that.
2    IMessaging allows any two Apple users -- so if you were on an
3    iPhone or and iPad or some sort of Apple computer, you could
4    message someone back and forth.  That messaging is a little
5    different than text messaging.  Text messaging, when it's sent,
6    goes through the cellular provider.  So if you had an AT&T
7    phone, those text messages would go to AT&T to be sent to
8    whatever person was going to receive it.  If you're both on
9    Apple device, and it's set up for this, that data would go
10   strictly between those two devices using Apple servers.  So
11   that information would never hit the AT&T service, for example.
12           The easiest way to see that is if you're on an iPhone
13   and you're sending a text message, for example, a green bubble
14   would be if you're texting with someone and a blue bubble would
15   be if you're having an iMessage conversation with someone.
16   Q.   And is that type of information retrievable from the image
17   of a phone from the examination device?
18   A.   If it still exists, yes.
19   Q.   All right.  Let's talk about some activity you did in this
20   case.  Okay?
21   A.   Yes.
22   Q.   Showing you what's marked for identification as Exhibit
23   No. 103.
24           MR. MALLARD:  May I approach, Your Honor?
25           THE COURT:  Yes.

1    Q.    Do you know what this is?

2    A.    Yes, I do.

3    Q.    What is it?

4    A.    This is a USB drive that was prepared from our digital

5    forensic branch in Sterling, Virginia, and sent up here for

6    examination.  This would have held data that was extracted from

7    a phone.

8    Q.    And are you familiar with the device from which it was

9    extracted?

10   A.    Yes, I am.

11          MR. MALLARD:  May I approach again?

12          THE COURT:  Yes.

13          MR. MALLARD:  Exhibit 102, counsel.

14   Q.    To the best of your knowledge, is that the data extracted

15   from Exhibit 102?

16   A.    Yes, it is.

17   Q.    Tell us about what you did with Exhibit 103.

18   A.    So the data that was contained on this was handled in just

19   the same way that I explained to you earlier.  Once it was

20   received and documented, the data was transferred over so I

21   could work on it.  So I'm not going to work on -- I don't work

22   on any of the original evidence.  It gets transferred over.  I

23   check those digital fingerprints or hashes to make sure they

24   have remained the same.  And then the particular data would be

25   entered in the Cellebrite Physical Analyzer program and sorted

1    out so that I could begin examining it.

2    Q.   Did you verify the hash of the data on Exhibit 103 with

3    the information you received from the digital forensics branch?

4    A.   Yes, I did.

5          MR. MALLARD:   If I could have for the witness Exhibit

6    103.1.

7    Q.   Is that the information to which you compared the hash?

8    A.   Yes.  It's a little hard to see at this point, but if we

9    look here, we have information at the top that basically -- if

10   we look at the different rows here, the third one down is the

11   IMEI, which is a 19-digit serial number.  The next one down

12   would be the phone number that is associated with the device.

13   The device model is the actual model of the phone.  In this

14   case it was an iPhone 8 Plus.

15          If we're able to go to the bottom of the page.

16   You've been hearing me talk about these hashes.  So each time

17   you see it here, there's three hashes, the file system hash,

18   the memory hash, and keychain hash.  A hash is really just a

19   series of numbers, but that is the digital fingerprint.  That

20   number remains with that data no matter how many times you copy

21   it.  If it doesn't change, it will always produce that same

22   hash time and time again.

23   Q.   Did you verify the hash of Exhibit No. 103 with the

24   information that you had have received off of Exhibit 103.1?

25   A.   Yes, I did.

1    Q.    What was the result?

2    A.    They were all the same.

3    Q.    What did you do once you verified the hash?

4    A.    Like I said before, once the hash is verified, the data

5    was input into the tool to be analyzed.

6    Q.    Did you have a chance to analyze the data from that

7    particular device?

8    A.    Yes, I did.

9          MR. MALLARD:  And I'm going to ask for just the

10   witness, Madam Clerk, Exhibit 104.5.

11   Q.    If you could zoom in on the bottom three columns there.

12   Do you know what this is, Exhibit No. 104.5?

13   A.    Yes, I do.

14   Q.    What is it?

15   A.    So the tool that I used allows you to produce different

16   reports.  So just different printouts of data that you may want

17   to, I guess, save in a form that's able to be looked at.  So in

18   this particular case we're looking at a contact that was saved

19   in this particular phone here.  So the first column, where it

20   says "contact" on the top --

21   Q.    I'll stop you right there.

22   A.    I'm sorry.

23   Q.    Did you generate this document?

24   A.    Yes, I did.

25   Q.    Was this generated from the forensic image that we talked

1  about, Exhibit No. 103?

2  A.   Yes, it was.

3  Q.   Was it generated in a forensic process through the

4  Cellebrite examination?

5  A.   Yes, it was.

6  Q.   Does this document accurately reflect the content of the

7  phone for this particular inquiry?

8  A.   Yes, it does.

9       MR. MALLARD:  Your Honor, I would move Exhibit 105.1

10  into evidence.

11       MR. SULTAN:  No objection.

12       THE COURT:  Admitted.

13       (Government Exhibit 105.1 received in evidence.)

14  A.   This is a Cellebrite extraction report.  You can produce a

15  number of these depending on what you bookmark.  So in the tool

16  I'll go through and I'll highlight things that I want to create

17  reports.  This is one item that I bookmarked and then created

18  into a report.

19  Q.   Let's just start at the top right there, where it says

20  "Tag," "Created," "Modified," do you see that on the top right?

21  A.   Yes.

22       MR. MALLARD:  If we could zoom in on that.

23  Q.   Whose contact is this, or what does this information

24  reflect?

25  A.   So this data is showing when I actually bookmarked it to

1  produce it into a report.  That's when I did that.  It

2  documents that date and time.

3  Q.   This is your examination time?

4  A.   The exam was started before then, but this is when I

5  actually created this particular report.

6  Q.   I understand.

7       MR. MALLARD:  Let's zoom out there and zoom in on the

8  bottom three columns there.

9  Q.   What are we looking at here?

10  A.   So we see three columns here.  The first is contact.  So

11  that's at the top.  I know it's tough to see.  It's the name of

12  "Trouble."  That's the name that this particular contact would

13  have been saved at in the device.  Under that, that whole long

14  listing is just the location of where that was saved on the

15  phone.

16  Q.   And what's the next area over here, time-stamp?

17  A.   The time stamp is the date and time that was given to that

18  particular artefact, so when that contact was created by that

19  device.

20  Q.   And UTC negative five, what's that?

21  A.   So most devices operate in a universal time.  It used to

22  be called Greenwich Time.  Now it's Universal Time.  Here in

23  New England we are, depending on Daylight Savings Time, we are

24  five hours behind that time.  So it says minus five.  So

25  subtracting five hours to put it into our time zone here in the

1    Eastern time zone.

2    Q.   What's the phone number -- I guess the larger question is,

3    this is a report of a specific contact from the device?

4    A.   Yes, it is.

5    Q.   What's the phone number that this contact is associated

6    with?

7    A.   So if you look over in the right-hand side under entries

8    it's associated with phone number 617-704-2207.

9    Q.   And that's the contact associated with the name Trouble?

10   A.   Yes, it is.

11   Q.   Did you have a chance to take a look through the device as

12   a general matter, the image, and see if there was any activity

13   with this -- well, first, what phone number was associated with

14   the device itself?

15   A.   This particular device, I don't know if I have the number

16   in front of me.  It was on a prior extraction report that we

17   looked at.

18           MR. MALLARD:  If we could pull up Exhibit 103.1.

19   Q.   Is the phone number for the device listed on this

20   document?

21   A.   It is, yes.  That would be listed where we see phone

22   number of 508-408-3998.

23   Q.   That's the phone number of the device you were looking at?

24   A.   That's correct.

25   Q.   If we could go back to 104.5.  Did you have a chance to

1    review the content of the extraction, the image that you were

2    looking at, for whether there was any -- essentially any

3    activity with that 2207 number associated with Trouble?

4    A.    I did.

5    Q.    And what was the result of your review for that?

6    A.    I did not find any.

7    Q.    There were essentially no pieces of activity between the

8    two?

9    A.    That's correct.

10   Q.    Let me ask you this question:  Have you had a chance to

11   review the call detail records related to the 3998 phone?

12   A.    Yes, I have.

13   Q.    Based upon your review of those records, did you observe

14   contact between the 3998 phone and the 2207 phone?

15   A.    Yes, I did.

16   Q.    And would those contacts or the communications on the call

17   detail records have been reflected in the device as a general

18   matter?

19   A.    Can I explain that?

20   Q.    Yes.

21   A.    Not to confuse -- I know we talked about a lot here.

22   Before we were talking about text messaging where iMessages

23   don't go through the cell phone provider.  We're talking about

24   just phone calls here.  So all phone calls do go through the

25   service provider.  So in this particular case, I looked at call

1    records that were provided by the service provider that

2    documented this 2207 number as having had communication with

3    this phone.

4    Q.    3998?

5    A.    Correct.  I just don't want to get confused when we're

6    talking about messages and calls.  Now we're talking about

7    actual physical phone calls.

8    Q.    In the usual course, would the phone calls be reflected in

9    image for the 3998 phone that you were examining?

10   A.    Yes.  I would expect to see all of those in a call log on

11   the phone.

12   Q.    Did you see them in the call log on the phone?

13   A.    I did not.

14   Q.    Why would they not be there?

15   A.    Using the call detail records from the phone company in

16   comparison, the explanation for them not being on the phone

17   would be a user had deleted them from the call log on the

18   device.

19           MR. MALLARD:  If I could turn to exhibit -- for just

20   the witness, Exhibit 104.2.

21   Q.    What are we looking at here on this particular exhibit?

22   A.    So this is the same exact report that we saw before.  It's

23   just for a different contact.  So in this case we have a

24   contact by the name of Darius in the upper left-hand corner.

25   This contact was created on January 6 of 2019, and the phone

1    number associated with that contact is 857-212-7918.

2    Q.   Is this another contact report you generated from the

3    device?

4    A.   Yes, it is.

5    Q.   Does this accurately reflect the information obtained from

6    the device?

7    A.   Yes, it does.

8    Q.   I'd ask that this be moved into the -- moved into

9    evidence, Your Honor.

10           MR. SULTAN:  Which one?  What's the number, please?

11           MR. MALLARD:  104.2.

12           MR. SULTAN:  No objection.

13           THE COURT:  Admitted.

14           (Government Exhibit 104.2 received in evidence.)

15           MR. MALLARD:  Can I publish it to the jury, please?

16   Q.   For this particular contact, what's the name of this

17   contact?

18   A.   Once again, it's Darius.

19   Q.   All right.  When was that created?

20   A.   January 6 of 2019.

21   Q.   What is the phone number for that particular call?

22   A.   857-212-7918.

23   Q.   Did you have a chance to review the image, the 3998 phone

24   image, for any contact and activity with the 7918 phone number

25   here associated with Darius?

1    A.    Yes, I did.

2    Q.    What were the results of that review?

3    A.    I found no communications.

4    Q.    Did you have a chance to review call detail records

5    relating to the 3998 phone and review them with respect to

6    whether there was call activity with the 7918 phone?

7    A.    Yes, I did.

8    Q.    What was the result of that?

9    A.    There were calls that were made between this phone and

10   that 7918 number.

11   Q.    You did not find reflection of those calls on the physical

12   device you were looking at?

13   A.    No, I did not.

14   Q.    What would explain that?

15   A.    Once again, a user would have had to remove that data from

16   this device.

17          MR. MALLARD:  If I could have for the witness, Madam

18   Clerk, Exhibit 104.4.

19   Q.    What are we looking at here, sir?

20   A.    Once again, it's another contact report that I produced

21   using the Cellebrite tool.

22   Q.    Is it an accurate report?

23   A.    Yes, it is.

24   Q.    What's the name of the contact for which this report

25   pertains?

1    A.    This one is Puff, P-u-f-f.

2          MR. MALLARD:  I'd move this into evidence, Your Honor,

3    as Exhibit 104.4.

4          MR. SULTAN:  No objection.

5          THE COURT:  Admitted.

6          (Government Exhibit 104.4 received in evidence.)

7    Q.    If you could just explain what we're looking at in this

8    particular exhibit.

9    A.    Once again, we see another contact.  This one with the

10   name of Puff created on January 7 of 2019, and the phone number

11   attributed to that is 617-291-6983.

12   Q.    Did you have a chance to review the device for

13   communications between the device and this particular phone

14   number?

15   A.    Yes, I did.

16   Q.    And there was some communications on the device; is that

17   fair to say?

18   A.    Yes, there was.

19   Q.    Did you have a chance to specifically review the device

20   for communication between the Puff contact ending in 6983 and

21   the phone 3998 that you were examining for the date of January

22   6, 2019?

23   A.    For that specific date?  There was a range of dates when

24   there was communication.

25   Q.    But did you have a chance to review for whether there was

 1    communications on just January 26, 2019?

 2    A.   Yes, I did.

 3    Q.   And was there any?

 4    A.   Not on that date, no.

 5    Q.   Did you have a chance to compare the call detail records

 6    for the 3998 phone on January 26, 2019 with respect to whether

 7    there were communications with the 6983 number associated with

 8    Puff for January 26, 2019?

 9    A.   Yes, I did.

10    Q.   And what was the result of that?

11    A.   There were.

12    Q.   And you didn't find reflections of those calls on that

13    date in the device?

14    A.   No, I did not.

15    Q.   What would explain that?

16    A.   Once again, a user would have deleted that information

17    from the device.

18             MR. MALLARD:  Now, if I could have just for the

19    witness, Your Honor, Exhibit No. 105.  It's a little difficult

20    here, but if we could just continue down to the next page.  The

21    next page.

22    Q.   Sir, are you familiar with this being sort of a text

23    message conversation between the 6983 phone and the 3998 phone

24    that was recovered from the device?

25    A.   Yes, I did produce a report that documented the text

1    messages between those two parties.

2    Q.   Is this that record with sort of a large number of

3    redactions from it?

4    A.   Yes, it is.

5    Q.   Now, does this accurately reflect the item that you

6    retrieved from the device?

7    A.   It does.

8    Q.   And it looks like there's just the one entry here.  We

9    have number 30.  Do you see that?

10   A.   I do.

11   Q.   Does this item here, Exhibit 30, or item 30, accurately

12   reflect the information you extracted from the 3998 phone?

13   A.   Yes, it does.

14        MR. MALLARD:  Your Honor, I would ask that Exhibit 105

15   as redacted be moved into evidence.

16        MR. SULTAN:  No objection.

17        THE COURT:  Admitted.

18        (Government Exhibit 105 received in evidence.)

19   Q.   What are we looking at here with respect to this

20   conversation?

21   A.   This is an SMS message, or more commonly referred to as a

22   text message.

23   Q.   Let's step back.  SMS, what's that?

24   A.   Short message service.

25   Q.   Is that different than the iPhone-to-iPhone discussion we

1   were having before?

2   A.   Yes.  This goes through the phone service provider rather

3   than directly between the two users.

4   Q.   Okay.  So these are stored separately than the iPhone

5   communications to iPhone communications?

6   A.   They are somewhat stored in the same database, but they're

7   categorized differently.

8   Q.   Categorized differently?

9   A.   Yes.

10  Q.   So what are we looking at here in terms of content?

11  A.   This is from -- obviously we're talking about the 3998

12  phone.  This is a box.  So this is an incoming text message

13  that came from the phone number of 617-291-6983, with a contact

14  name of Puff.  This is created or sent on January 18, 2019 at

15  12:49 p.m.

16  Q.   And is there a message associated with this text message?

17  A.   Yes.

18  Q.   What is the text message?

19  A.   The message is, "You and Trouble don't have to hit me up

20  anymore.  I'm good."

21  Q.   And that is coming from Puff to the 3998 phone?

22  A.   That's correct.

23        MR. MALLARD:  If I could have just for the witness,

24  Madam Clerk, Exhibit 104.3.

25  Q.   What is 104.3?

1    A.    So this goes back to some of the contact reports that I

2    produced.  It's another contact report.  This time for a

3    contact under the name of Ma, M-a.

4    Q.    And is this an accurate extraction of the information from

5    the cellular device you were looking at with the 3998 phone?

6    A.    Yes, it is.

7    Q.    Does it accurately reflect the information that you

8    observed on the phone?

9    A.    It does.

10          MR. MALLARD:  Your Honor, I move this into evidence as

11   Exhibit 104.3.

12          MR. SULTAN:  No objection.

13          THE COURT:  Admitted.

14          (Government Exhibit 104.3 received in evidence.)

15   Q.    Tell us what we are looking at here, sir.

16   A.    Once again, we see the contact name of Ma in the upper

17   left-hand corner.  This particular contact was created on

18   January 26 of 2019 at 9:27 p.m., and it's attributed to the

19   phone number 617-704-1312.

20          MR. MALLARD:  If I could have split screen with

21   Exhibit 94.2, please.  Could you zoom in on the contact

22   information on the left side.  And then we're going to zoom in

23   again on the right side, the phone number 1312.  Let's go back

24   to just 104.3 in just one second.  Now just back to 104.3.

25   Q.    Now, "created date," what did that signify?

1    A.   Yes.  The date the contact was added to the user's

2    contacts or address book within their device numbers.

3    Q.   Did you see any call logs or other activities between the

4    3998 phone and the number associated with Ma and that

5    particular contact?

6    A.   Not on that date, no.

7    Q.   If I could have for the witness, Madam Clerk, Exhibit No.

8    106.  Well, first, if I could have Exhibit 144 for the witness.

9    Do you know what this is, sir?

10   A.   I do.

11   Q.   What is that?

12   A.   This is subscriber information that's provided by AT&T.

13   Q.   Do you know for what particular phone number it pertains

14   to?

15   A.   Yes.  This is for phone number 508-577-6720.

16        MR. MALLARD:  Your Honor, I would move Exhibit 144

17   into evidence as self-authenticating, as described in the

18   government's trial brief.

19        MR. SULTAN:  I'm sorry.  I didn't hear the last part.

20        MR. MALLARD:  I would move it in as self-

21   authenticating pursuant to the government's motion.

22        MR. SULTAN:  I don't think it's self-authenticating,

23   Your Honor.  I don't object to it, Your Honor.  I don't think

24   it's self-authenticating.

25        THE COURT:  Okay.  So you're moving in 144?

1          MR. MALLARD:  Yes.

2          THE COURT:  He's not objecting.  So it's admitted.

3          (Government Exhibit 144 received in evidence.)

4    Q.   Do you know what this particular document is?

5    A.   Yes.  This provides subscriber information, if you were to

6    have a cellular device, the information that the company has on

7    file for that user.

8    Q.   What's the phone number associated with this particular

9    subscriber information?

10   A.   So when we look up top where it says "MSISDN," that's the

11   number associated, 508-577-6720.

12   Q.   If you look down a little bit, do you see who the

13   subscriber is?

14   A.   Yes.  It's attributed to a Nancy Carter.

15   Q.   What's the date of the start?

16   A.   February 10 of 2019.

17   Q.   What does that date mean?

18   A.   The date that this particular cell phone service started.

19          MR. MALLARD:  If we could zoom out for a second.  If

20   we could capture down here the user information.  I'm sorry,

21   the billing party as well.

22   Q.   It's listed as the same Nancy Carter as well?

23   A.   Yes, it is.

24   Q.   That's for a phone number ending in -- what number does is

25   end in again?

1  A.   It's 6720.

2        MR. MALLARD:  For the witness, Your Honor, can I have

3  Exhibit No. 106?

4  Q.   Sir, do you know what this is?

5  A.   Yes, I do.

6  Q.   What is it?

7  A.   This is another extraction report I created documenting

8  text messages between two parties.

9  Q.   And what parties was it between?

10 A.   The 3998 device that we have here, and the phone number

11 that we just spoke about that's ending in 6720.

12 Q.   And did you accurately extract it from the device that you

13 were examining?

14 A.   Yes, I did.

15 Q.   And does this report accurately reflect all of the content

16 in that conversation between the 6720 phone and -- I'm sorry,

17 between the 3998 phone and the 6720 phone?

18 A.   Yes, it does.

19        MR. MALLARD:  Your Honor, I would ask this be moved

20 into evidence as Exhibit 106.

21        MR. SULTAN:  No objection.

22        THE COURT:  Admitted.

23        (Government Exhibit 106 received in evidence.)

24        MR. MALLARD:  If we could just start off at the top

25 here.  Let's do the whole from the number sign all the way down

1    to the bottom portion.

2    Q.   So what's the first entry in this series of text messages?

3    A.   So if we look at where it says "Party" in the second

4    column, it's going to say the phone number that sent this

5    message.  So in this case it's the one ending in 6720.  It's an

6    incoming message.  So it came into this person's phone.  The

7    next column over shows the date and time.

8    Q.   And what time does it say?

9    A.   February 13 of 2019 at 1:15 p.m.

10   Q.   And what's the message that was sent?

11   A.   The content of that message is, "Yo Bro.  This Trub."

12   Q.   Let's go to the next column and stop you on this area I

13   highlighted.  What does that row signify?

14   A.   The second message in this report.

15   Q.   And there's some information over here that I'm

16   highlighting.  What's that?

17   A.   That is the date and time that I bookmarked this item to

18   be placed in the report.

19   Q.   So that's your time and date?

20   A.   Yes.

21   Q.   The time and date of the actual content is below where it

22   says "All time stamps"?

23   A.   In the third column from the left, yes.

24   Q.   Okay.  What's the next message?

25   A.   The next message is just a few seconds later.  It's an

1    incoming message, and it says, "This is my trap jack."

2    Q.   And it's from the same 6720 number?

3    A.   All of these would be, yes.

4    Q.   Let's go to the next text message.  What's the next

5    message?

6    A.   This message is, once again, on February 13 at 1:16 p.m.,

7    and this message is incoming, and reads, "Yo, I need like 200.

8    If you can add that to the 100, so I can go half on this rental

9    so that I can go out of town."

10   Q.   What time was that, again?

11   A.   At 1:16 p.m.

12   Q.   From the same phone number, 6720?

13   A.   Yes.

14        MR. MALLARD:  Scroll down.  Thank you.

15   Q.   And what is the next message and who's it from?

16   A.   This is the first outgoing message we see.  So this is

17   going from the 3998 phone back to this 6720 phone.  This is a

18   few hours later at 5:46 p.m., and that message says, "I don't

19   have it, bro."

20   Q.   And is there a response?

21   A.   There is a response a few minutes later.  So it's an

22   incoming message that says --

23        MR. MALLARD:  Can we continue on?  Oh, sorry.  Yeah,

24   right there.

25   Q.   What's the next message?

```
 1    A.    We now have an incoming message at 5:50 p.m.
 2    Q.    From the 6720 number?
 3    A.    Yes.  That says "What you been up to?"
 4    Q.    What's the next message?
 5    A.    It's also another incoming message.  And that one is just
 6    a few seconds later, and it says "Been doing shows and in the
 7    studio."
 8    Q.    Okay.
 9              MR. MALLARD:  Let's continue on.
10    Q.    What is this one, number 8?
11    A.    This is now an outgoing message being sent.
12    Q.    From the 3998 phone?
13    A.    Yes, at 5:28 p.m. and it says --
14    Q.    I'm sorry.  You said, is that 5:50:28 p.m.?
15    A.    5:50 and 28 seconds p.m., yes.
16    Q.    What's the message there?
17    A.    It says, "Shit going through it."
18    Q.    All right.  Let's continue on.  What's the next message?
19    A.    So this is now an incoming message on the same day at
20    5:51 p.m., and it reads "Damn."
21    Q.    And the next message?
22    A.    It's another incoming message.  It's about a minute later
23    that says "That's crazy."
24    Q.    And the next?
25    A.    This is now an outgoing or sent message at 5:52 p.m. that
```

1    says, "Yeah, tell me about it."

2    Q.    The next one?

3    A.    This is now an incoming message that's a little over a

4    minute later that says, "Nothing new."

5    Q.    Let's keep going.

6    A.    This is now an outgoing or sent message at 5:34 p.m.,

7    which is just a couple minutes later.  This says, "Nothing."

8    Q.    All right.  Then we can quickly go through the rest of

9    these text messages.

10   A.    Sure.  It's an incoming message a couple minutes later

11   that says, "Yeah, IMU, bro," sometimes short for I miss you.

12            MR. SULTAN:  I object to the interpretation, Your

13   Honor.  It says what it says.

14            THE COURT:  Sustained.

15   Q.    Were you done?

16   A.    The next is an incoming message at -- we've now changed

17   dates on February 26 at that 11:33 a.m.  And it says "I was in

18   the broke."

19   Q.    That's from the 6720 number?

20   A.    Yes.  They all are.

21   Q.    Let's keep going.

22   A.    It's another incoming message just seconds later that

23   says, "I was gonna tell you to pull down on me."

24   Q.    Keep going.  I think that's the end of it.  Is that

25   correct?

1    A.    Yes.

2    Q.    All right.  I'd like to switch gears a little bit here and

3    take us out of sort of the individual calls.  Did you have a

4    chance to review the device and its activity from the period of

5    about 4:08 p.m. to 11:54 p.m. on the date of January 26, 2019?

6    A.    Yes.

7    Q.    And did you review the call logs of that particular phone

8    for that same period?

9    A.    Yes, I did.

10   Q.    Did you observe call detail activity taking place for that

11   phone?

12   A.    Not located within the device, no.

13   Q.    Did you locate it on the call detail records?

14   A.    Yes, I did.

15   Q.    What conclusion can you draw from that?

16   A.    That a user deleted that data from the device.

17   Q.    I'm going to ask you a couple general questions about the

18   phone, the device as well.

19   A.    Okay.

20   Q.    Did you have a chance to query the phone for any entries

21   or data associated with a Terrell Jackson?

22   A.    Yes.  I was given a number of phone numbers and names to

23   query, and that was one of them.

24   Q.    Was there any information related to a Terrell Jackson in

25   the phone?

1    A.    No, there was not.

2    Q.    What about with the 781-924-9114 number?

3    A.    There was not any data.

4    Q.    What about any name or association with a Dennis Martin?

5    A.    No, there was not.

6    Q.    And what about with a phone number -- any entries, data or

7    information or activity associated with an 857-719-8349 phone

8    number?

9    A.    There was not.

10   Q.    I'm going to draw your attention to some different

11   activity.

12   A.    Okay.

13   Q.    Did you have a chance to do some other activity in this

14   case?

15   A.    Yes, I did.

16   Q.    What was that?

17   A.    I was able to review some Google search warrant return

18   records.

19   Q.    Tell us a little bit about Google, what it does and what

20   the company is.

21   A.    Google is a massive company that is -- basically it has

22   its hands in a number of tech industries.  I'm sure many of you

23   all know it as a search engine.  So you can Google something

24   and search with it on the Internet, but it also produces

25   hardware.  It produces software.  It maintains a website.  And

1    in doing many of these things, it collects data on users and

2    houses it.  In addition, they also have other very popular

3    applications, such as Gmail for emailing, and other

4    communications.

5    Q.   And is this all user specific and based upon certain

6    accounts that you just create?

7    A.   Yes.  So anything that's housed within Google is attached

8    to that person's Google account.

9    Q.   What kind of data does Google store about individuals?

10   A.   More than you probably think they do.  It depends on

11   settings that the user can define, but in particular it houses

12   all -- all emails are housed in Google servers when you log in

13   through the Internet.  You're actually looking onto their

14   servers where they house the emails.  It saves any searches

15   that you may do in search engines, and it saves search history,

16   as well as visit history, sites that have been visited.

17   Q.   How about email?

18   A.   Yes.  I mentioned it does save all that email.

19   Q.   I guess what I'm saying is in terms of outgoing and

20   incoming?

21   A.   Yes.  It houses -- when you log into your email --

22   everything you see there is actually being housed by Google.

23   It's not locally on your computer.  It's on their servers.

24   Q.   Does Google store and keep that information accurately, in

25   your experience?

1    A.    They do, yes.

2    Q.    How many times have you had the chance to review Google

3    data in the course of your duties as an ATF special agent?

4    A.    Over a hundred times.

5    Q.    And what's the manner by which Google data is obtained

6    from the law enforcement perspective?

7    A.    Normally a law enforcement agency will apply for and get a

8    search warrant for that data, serve it to Google, and then

9    Google will respond to that search warrant with whatever it

10   specifically asks for.

11   Q.    Is it usually delineated by a certain account name?

12   A.    It is, yes.

13   Q.    In your experience, what types of things has Google kept

14   and produced to you in response to those various search

15   warrants that you've obtained and worked on?

16   A.    The most common things that we see when we ask for that

17   data is emails, Internet activities, search histories, photos.

18   There are other types of data that are kept, but we don't see

19   it as commonly as these categories.

20   Q.    The information that Google provides, in your experience

21   has it been accurate?

22   A.    Yes, it has.

23   Q.    And to the best of your knowledge, does Google keep this

24   information in the course of its regular business?

25   A.    Yes, it does.

1    Q.   What's the process that you go through when you get this

2    data back from Google?  How do you start that process?

3    A.   Google normally provides that data in either a link that

4    you can download or a physical copy of it that they send you.

5    That data comes with a cover letter that, once again, goes back

6    to those hashes, those digital fingerprints that will list each

7    of the files they're giving you and the digital fingerprint,

8    and we will receive some sort of container, sometimes called a

9    zip container, where they take a bunch of file and put it into

10   one kind of file that you have to open up.  We will receive

11   that data, open that container and the first thing we'll do is

12   check that hash to make sure it matches.

13   Q.   Sort of in the same way you talked about with the phones?

14   A.   Exactly the same way.

15   Q.   Is the hash information by file?

16   A.   It is, yes.

17   Q.   So Google produces a series of files for different

18   accounts, each of them is hashed?

19   A.   Yes.

20   Q.   And then they're put into a sort of zip file container?

21   A.   Yes.

22   Q.   And that's how they are transmitted to law enforcement?

23   A.   Yes.

24   Q.   How does Google identify the hash for each item?

25   A.   They use a hashing tool, just as we do.  Then they

1    document that hash in a cover letter that's given along with

2    the data.

3    Q.   Okay.  So there's a cover letter that explains it?

4    A.   Yes.

5    Q.   I'm going to --

6         MR. MALLARD:  Your Honor, may I approach?

7         THE COURT:  Excuse me.

8         MR. MALLARD:  May I approach?

9         THE COURT:  Yes.

10        MR. MALLARD:  Exhibit 111, counsel.

11   Q.   Sir, I'm showing you what's been marked as Exhibit 111.

12   Are you familiar with what that is?

13   A.   Yes I am.

14   Q.   What is it?

15   A.   This is a CD that contains Google warrant return data for

16   a particular account.

17   Q.   Do you know the account that it pertains to?

18   A.   Yes.  It's a diormauricecarter.

19   Q.   @gmail.com?

20   A.   That's correct, yes.

21        MR. MALLARD:  I'm going to ask this be marked for

22   identification as Exhibit 111, Your Honor.

23        THE COURT:  Okay.

24

25        (Government Exhibit 111 received in evidence.)

1    Q.   Have you had a chance to review Exhibit No. 111 and its

2    content?

3    A.   Yes, I have.

4    Q.   Did you process it in the manner that you frequently

5    process items forensically?

6    A.   Yes, I did.

7    Q.   How did you do that?

8    A.   In this particular case I used a tool by Magnet Forensics.

9    The data that's given in Google warrants are in text files.  So

10   it's almost like a Word document.  There's just lots and lots

11   of data.  And it's very tough to look at that data with your

12   human eyes and differentiate it.  This tool that I use takes

13   this data and puts it in a format where I can place it into a

14   spreadsheet and sort it and look at it in a way that's easier

15   on the eyes.

16   Q.   Did you forensically hash that data before you looked at

17   it?

18   A.   Yes, I did.

19          MR. MALLARD:  If I could have for the witness Exhibit

20   111.1.

21   Q.   Do you know what this is?

22   A.   Yes, this is a cover lettered that's provided by Google

23   when they provide warrant return data to us.

24          MR. MALLARD:  If you could turn to the second page.

25   And the third page.

1    Q.   What's on the third page there?

2    A.   This is a listing of the files that they included, and the

3    particular hashes for each of the files.

4    Q.   Is that the hash information that you used to verify the

5    integrity of the data on Exhibit 111?

6    A.   Yes, it is.

7    Q.   Tell us about what you did once you got Exhibit 111

8    verified.

9    A.   So once I verified this data to make sure it was accurate,

10   I imported it into a tool that's called Axiom by Magnet

11   Forensics, and that tool, once again, lets me take that data,

12   sort it, and do keyword searches if need be.

13   Q.   First, among that data on 111 would be some what we

14   term -- sorry.

15         Among that data, was there something that would be

16   referred to as subscriber information?

17   A.   That is one of the files they sent, yes.

18         MR. MALLARD:  If I could have Exhibit 112 for the

19   witness, please.

20   Q.   Do you know what this is, sir?

21   A.   Yes.

22   Q.   What is it?

23   A.   This is the text file that has the account information for

24   the account of -- and if you look at the top, it's listed as

25   diormauricecarter.

1  Q.   Is this the information you received from the Google

2  search production on Exhibit 111?

3  A.   Yes, it's one of the files.

4  Q.   And this is an accurate version of it?

5  A.   Yes, it is.

6            MR. MALLARD:  If I could have this admitted into

7  evidence, Your Honor, Exhibit 112.

8            MR. SULTAN:  No objection.

9            THE COURT:  Admitted.

10            (Government Exhibit 112 received in evidence.)

11  Q.   What are we looking at here in terms of the information

12  that's now before the jury?

13  A.   This is the Google subscriber information, so the

14  information they retain when someone created their Gmail

15  account that associates with all the Google suite products.

16  Q.   Okay.  What are some of the points of interest along here

17  in the account?

18  A.   We see the name that was entered by the user when they

19  created the account, and that's Dior Carter.  Under that we see

20  the email address associated with that user, which is

21  diormauricecarter@gmail.com.  We see different services that

22  they belong to that Google suite, the data is kept on, such as

23  Gmail, location history, web and app activity, and YouTube.  It

24  shows a date created for this account, November 16, 2018.  Then

25  if we drop down, we see a line that says SMS and then a phone

 1    number.  That phone number is 617-704-2207.  This is a phone

 2    number associated with the account.  A lot of times providers

 3    ask you for your phone number when you subscribe as part of

 4    authentication.  So if someone else tried to log into your

 5    account, they would ask to send a text message to a particular

 6    device so you could authenticate that you're the actual user of

 7    the account, and that's the number they have on file for that.

 8            MR. MALLARD:  If I could have Exhibit 113 for the

 9    witness, please.

10    Q.   Sir, what's this?

11    A.   This is one of the emails that was found within the data

12    that Google provided.

13            MR. MALLARD:  If we could zoom in on the top there.

14    Q.   What's the date of the email?

15    A.   This is January 16, 2019.

16    Q.   Who's it from?

17    A.   This is from the email address of ordersummary

18    @ticketsatwork.com.

19    Q.   And who's it to?

20    A.   This is to diormauricecarter@gmail.com.

21    Q.   Is this an accurate copy of the email that you received

22    from diormauricecarter Google extraction?

23    A.   Yes, it is.

24            MR. MALLARD:  I move this into evidence, Your Honor,

25    as Exhibit 113.

1           MR. SULTAN:  No objection.

2           THE COURT:  Admitted.

3           (Government Exhibit 113 received in evidence.)

4           MR. MALLARD:  If I could have Exhibit 113 and also

5    Exhibit 80.1.

6    Q.   If I could draw your attention, sir, to the confirmation

7    number there on the email on the left.

8    A.   Yes.

9    Q.   Do you see it there?

10   A.   Yes, I see a confirmation of H9131656981.

11   Q.   I'll highlight the one on the right there.

12   A.   And that is the same exact number.

13          MR. MALLARD:  Okay.  If I could have Exhibit 114 for

14   the witness, please.

15   Q.   What are we looking at here, sir?

16   A.   This is another email that was retrieved from the Google

17   warrant return data.

18          MR. MALLARD:  And this is already in evidence, Your

19   Honor, so can I have this published to the jury?

20          THE COURT:  Sure.  You did not move the admission of

21   111 or 111.1, right?

22          MR. MALLARD:  I did not, Your Honor.

23          THE COURT:  Okay.

24          MR. MALLARD:  This is for the jury.

25   Q.   What is this, sir?

1    A.   This is another email.

2    Q.   Is this an email you obtained from the account for the?

3    diormauricecarter@Gmail?

4    A.   Yes, it is.

5         MR. MALLARD:  If I could have Exhibit 115, which is

6    also already in evidence.

7    Q.   What are we looking at here, sir?

8    A.   It's another email that I retrieved from the Google

9    warrant return data.

10   Q.   Can you explain the times we have up there for Friday,

11   January 25, 2019, what the 0800 means?

12   A.   I'm not exactly sure how they keep their dates on here.

13   I'd have to compare it to the data.  I'm sorry on that one.

14   Q.   Okay.  But it looks like there's a time, and then there's

15   an offset?

16   A.   There's an offset.  Normally that would offset just like

17   Eastern Standard Time.  They're saying they're offsetting it by

18   eight hours.  I haven't had a chance to check this, but that's

19   normally what we'd see on this.

20   Q.   So the time of 09 would reflect an eight-hour offset as

21   opposed to a five-hour offset for Eastern Standard?

22   A.   That's what it normally stands for, yes.

23        MR. MALLARD:  Now, I'm going to ask you for just the

24   witness, Madam Clerk, Exhibit No. 116.

25   Q.   Are you familiar with what this is, sir?

```
 1   A.    I am, yes.

 2   Q.    What is it?

 3   A.    So this is one of the text documents that's received from

 4   the Google return.  And this one is particular to searches.

 5   Q.    And is this sort of the raw data that was received from

 6   Google?

 7   A.    It is, yes.

 8   Q.    This is before you put it into your tool?

 9   A.    Yes.

10   Q.    What does it contain?

11   A.    This particular case we see sites that were visited, terms

12   that were searched for, and images that were viewed.

13   Q.    How is this information that is captured on this raw

14   document, 116, generated?

15   A.    This is generated from the data that Google houses and

16   generated in a text file.

17   Q.    Generated automatically by Google by their servers?

18   A.    It is, yes.

19   Q.    So there's no one punching away to store the information?

20   A.    No.  This is all automated.

21   Q.    So it's computer generated as well?

22   A.    It is.

23   Q.    And stored as well at the time these were created?

24   A.    Yes.

25   Q.    And this is the stuff that you get that you put into your
```

1    program?

2    A.    It is, yes.

3          MR. MALLARD:   If I could have 116.1 for the witness.

4    Q.    Are you familiar with what this document is?

5    A.    Yes, I am.

6    Q.    What is it?

7    A.    So this is that same data set.  It's just been placed in a

8    spreadsheet that makes it easier to search and view.

9    Q.    There's also some redactions in there as well?

10   A.    There are, yes.

11   Q.    Let's talk about the different column headings and what

12   they mean.

13   A.    Yes.  Can we zoom in on the column heading at the top?

14   Q.    First, I'll have to lay a foundation for them to be in

15   evidence.

16   A.    I just couldn't read it the way it was.

17   Q.    That's fine.  Does Exhibit 116.1 accurately reflect the

18   content of Exhibit No. 116 that was received from Google,

19   barring, of course, the redactions and information that's not

20   contained?

21   A.    Yes, it does.

22   Q.    How do you know that?

23   A.    Because I created this from that data.

24   Q.    And did the tool that you use -- does the tool that you

25   used accurately generate this format of that underlying data?

1    A.   It does, and I also compare the raw data to this to make

2    sure that it's transferred over properly.

3              MR. MALLARD:  Your Honor, I ask to move 116.1 into

4    evidence.

5              MR. SULTAN:  No objection.

6              THE COURT:  It's admitted.

7              (Government Exhibit 116 received in evidence.)

8    Q.   Tell us about the information that's stored here for

9    116.1.

10   A.   This is the same information I spoke of before.  It's from

11   Google search history, Internet history, and that includes the

12   term searched for, sites visited and images viewed.

13             MR. MALLARD:  Let's go all the way down to the 36th

14   page, please.  Can we zoom in on the bottom there.  Two above

15   that, please.  And can we go all the way to -- that's great.

16   Q.   What are we looking at here, for example?  Can you explain

17   what these columns show?

18   A.   Yes.  The first column on the left is just the line item.

19   It gives us a number when we're talking about a row to specify

20   it.

21             The next column is the date and time that that

22   artefact was created.  This has been adjusted for Eastern

23   Standard Time.  The third column is the type of search, whether

24   it was a search, a site visited or image viewed.  And the

25   fourth column on the right-hand side that we see magnified here

1    is what was searched for or the site that was visited.

2    Q.    Tell us what was searched for on numbers 1019 and 1020.

3    A.    So it was a typed-in search for Xtreme Rentals, Brockton,

4    Mass.

5    Q.    Then what about 1020?

6    A.    The same.

7    Q.    Let's go down to the next entry.  What was searched for

8    there?

9    A.    Once again, on January 26, 2019 we see a new search this

10   time for a search for T-Mobile near me.

11   Q.    That's entry 1022?

12   A.    It is, yeah.

13   Q.    Let's go to the next page.  Can we zoom in on the

14   first six -- five entries there.  What are we looking at here?

15   A.    So we're looking at rows 1023 through 1027 on January 26

16   of 2019 and all they are all searches for T-Mobile near me.

17   Q.    Are they all different times?

18   A.    Yes.

19   Q.    What does that mean?

20   A.    There were multiple searches for that same search term of

21   T-Mobile near me.

22           MR. MALLARD:  Let's zoom out there.  Skip over --

23   let's go to the next four.

24   Q.    What are we looking at here?

25   A.    We're looking at rows 1029 to 1032 on January 26, 2019,

1    and they are more searches for T-Mobile near me.

2              MR. MALLARD:  If we could close that down.  Let's go

3    to the one at 1040 -- this one there.

4    Q.   What's being searched for there at 1041?

5    A.   Row 1041 on January 26 is a search for Hertz Rental Car,

6    30 Park Plaza, Boston, Mass.

7              MR. MALLARD:  Let's now blow up the next series of

8    searches going forward.  Let's start here at 1045.

9    Q.   What's being searched for there?

10   A.   So here, once again, on January 26 we're seeing a visited

11   site.  So the site that was visited here was Universal Hub.

12   Q.   How about the next site below that?

13   A.   Enterprise News.

14   Q.   When was that searched for?

15   A.   So in row 1046, that was on January 26, 2019 at 9:19 p.m.

16   Q.   Are you familiar with the Enterprise News website?

17   A.   I am, yes.

18   Q.   What is it?

19   A.   It's a --

20             MR. SULTAN:  Objection, Your Honor.

21             THE COURT:  Basis, foundation?

22             MR. SULTAN:  He's just reading the record, Your Honor.

23   He's not interpreting them.  Saying what the entries mean --

24             THE COURT:  If he can lay a foundation for it, he can

25   have it.

1   Q.   Have you ever visited enterprisenews.com?

2   A.   I have.

3   Q.   Do you know what it is?

4   A.   I do.

5   Q.   What does it pertain to?

6   A.   It is a website that hosts local news in the Brockton

7   area.

8   Q.   What about Exhibit 1047?

9   A.   That would be a visit to that same site just to a -- if we

10  look to the right of the enterprisenews.com website, we see

11  it's under the news category and under the category of crime.

12  Q.   What about the next entry?

13  A.   The same site visited again just 20 minutes later.

14  Q.   Okay.

15          MR. MALLARD:  Let's continue on.

16  Q.   Sir, what are we looking at here?

17  A.   So, once again, we're in rows 1054 through 1060.  These

18  start on January 26 and go into January 27, but these are sites

19  either searched for or visited.

20  Q.   There's a search here at 10:17 p.m. on January 26, 2019?

21  A.   Yes.  That's in row 1055.

22  Q.   It's for a Twitter site, is that right, Stacos?

23  A.   That's correct, yes.

24  Q.   There's additional searches that keep going, is that fair

25  to say?

1   A.    There is.

2   Q.    Are you familiar with what's known as a pattern of life

3   analysis?

4   A.    Yes.

5   Q.    What does that mean?

6   A.    That's where an investigation we will either follow

7   someone physically to see what they do in their day to

8   establish a pattern of life, or with digital means, we can look

9   at the usage that they commonly have on their devices to see

10  what their normal routine would be on that device.

11  Q.    In terms of this particular set of documents, why don't we

12  scroll back to probably the tenth page in.  You said there was

13  a search there around that time for twitter.com/stacos, right?

14  A.    There was, yes.

15  Q.    There was also searches for Universal Hub.  There was also

16  a search for universalhub.com?

17  A.    Yes, I'm familiar with that site too.

18         MR. MALLARD:  Let's keep going down.

19  Q.    If we go back up to November 30, item 256, do you see that

20  there?

21  A.    If you could zoom in, that would be great.  Row 256 is a

22  visit to that Twitter with Stacos again.

23  Q.    Okay.  Let me see if I can find some more here.  Stand by.

24  If we could go to number 6 -- I'm sorry -- 559 and 560.  Do you

25  see some activity there?

1    A.   We see that same Twitter site accessed two more times in

2    December of 2018.

3    Q.   How about 560?

4    A.   So we're talking about 559 and 560.

5    Q.   Let's go down to 561.

6    A.   In 561 we see a search for Universal Hub in December of

7    2018.

8    Q.   If we go to 700 -- I'm sorry 698, 699, 700 and 701.

9    A.   So in rows 698 through 701 we see searches and sites that

10   were visited in January of 2019, both for that same Twitter

11   Stacos site and Universal Hub.

12   Q.   Can we go to 898, 899, 900 and 901.  What are we looking

13   at here?

14   A.   So in rows of 898 through 901 we're looking at the January

15   16 date, and we see sites that were searched for and visited.

16   Q.   Can we go to row 908 and 909.  What are we looking at

17   here?

18   A.   We're looking again at 908 and 909 on January 16, and we

19   see a searched for and visited site for Tickets At Work.

20   Q.   Can we go to 942 through 951, please.

21   A.   So in 942 through 591 we're going from January 19 of 2019

22   through January 21 of 2019, but we see searches and sites

23   visited for Universal Hub, bpdnews and tire shops near me, as

24   well as a Hertz Rental Car, 30 Park Plaza, and Goodyear.

25   Q.   Have you had a chance to review the entirety of the search

1    history without the redactions?

2    A.    I have, yes.

3    Q.    Have you had a chance to review it for when the term

4    T-Mobile was searched for?

5    A.    Yes.

6    Q.    When was the first time throughout the entirety of this

7    data set that T-Mobile was searched for?

8    A.    That was on January 26.

9    Q.    Is that the only date in which it was searched for?

10   A.    Yes.

11   Q.    Did you do other permutations of T-Mobile?

12   A.    I did.  I used the word "mobile," which would capture if

13   it was T hyphenated or T-Mobile, and those were the hits that

14   came up.

15   Q.    This range of documents spans from the first page, which

16   is on what date, on the first page, which is -- it looks like

17   November 15, 2018?

18   A.    That's correct.

19   Q.    And what's the last page of records?

20   A.    That would be February 2, 2019.

21   Q.    Okay.  Did you have a chance to search for when the first

22   instance of the enterprisenews.com was ever searched for on in

23   this particular account history?

24   A.    I did, yes.

25   Q.    When was that?

```
 1   A.    January 26.

 2   Q.    At that 9:19 p.m. entry that we discussed?

 3   A.    That's correct.

 4   Q.    That was the first time Enterprise was ever visited?

 5   A.    Yes.

 6              MR. MALLARD:  I have no further questions for this

 7   witness, Your Honor.

 8              THE COURT:  How long do you think you have,

 9   Mr. Sultan?

10              MR. SULTAN:  I'm sorry, Your Honor, probably ten or

11   fifteen minutes.

12              THE COURT:  Let me check with the jury.

13              Ten or fifteen minutes, is that all right with

14   everyone?  Sure?

15              Go ahead.

16              Did I hear an objection over there?  That's fine.

17              MR. SULTAN:  Okay?

18              THE COURT:  Yup.

19              MR. SULTAN:  Thank you.

20                          CROSS-EXAMINATION

21   BY MR. SULTAN:

22   Q.    Good afternoon, Special Agent Kelsch.

23   A.    Good afternoon.

24   Q.    You told us that Google collects information on its users,

25   right?
```

1    A.    Correct.

2    Q.    So everybody who clicks on a Google icon on their

3    computer, Google is saving what happened next, right?

4    A.    That depends.

5    Q.    Well, they collect data on -- it depends on what?

6    A.    So when you are either on your computer or on your mobile

7    device, you can be signed into your Google account.  So it

8    depends whether or not you are signed into your Google account.

9    I could go into your computer and not sign in, and it wouldn't

10   save that data on my account because I wasn't signed in.

11   Q.    So if you went onto my Google account, that search would

12   come up under my name, right, not yours?

13   A.    If you were logged in, yes.

14   Q.    Okay.  And people have -- can get to their Google account

15   from all kinds of devices, right?

16   A.    They can, yes.

17   Q.    Laptop computers?

18   A.    Correct.

19   Q.    Desktop computers?

20   A.    Correct.

21   Q.    Mobile phones?

22   A.    Yes.

23   Q.    Gaming consoles, like PlayStations and Xboxes?

24   A.    Some do allow for web browsing and some don't.  It depends

25   on the console.

1   Q.   As long as somebody is logged into their Google account,

2   anybody who goes on to that device and searches for something

3   is going to come up under the name of the subscriber, right?

4   A.   As long as you are logged into that account, it would be

5   attributed to that account, yes.

6   Q.   Okay.  So all you can tell us is the name of the account

7   that those searches were made on, right?

8   A.   That's correct.

9   Q.   You can't tell us who was using that account when any

10  particular search was made, can you?

11  A.   I'm not able to directly state that, no.

12  Q.   In fact, the records that you got from Google, they don't

13  even tell you what device was accessed at the time that search

14  was made, do they?

15  A.   Those do not.

16  Q.   You can't tell us that information about any of those

17  searches that you just testified to on direct examination, can

18  you?

19  A.   They do not have that data, no.

20  Q.   Now, someone is logged into a subscriber's account.

21  Google will collect data on every single search that person

22  makes, right?

23  A.   Yes.

24  Q.   And you used the phrase or the prosecutor asked you about

25  something, pattern of life investigation, right?

1  A.   Yes.

2  Q.   That's when you as an agent can look at all the searches

3  that a citizen is making over a period of months and kind of

4  try to figure out like what they are interested in, stuff like

5  that?

6  A.   Sure.  Yes.

7  Q.   Pattern of life is kind of a fancy name for that kind of a

8  search, right?

9  A.   It would be, for example, if someone's habits every day

10  were to get up at 8:00 a.m. and check a particular site every

11  morning, we would see that as pattern of life, and we would

12  expect to see that every day, yes.

13  Q.   And you've been doing this for a bunch of years, right,

14  looking at this kind of data?

15  A.   Yes, I have.

16  Q.   Looking at people's search histories, right?

17  A.   Yes, I have.

18  Q.   It's not unusual for people to check out news websites, is

19  it?

20  A.   It is not.

21  Q.   People do that every day all the time multiple times,

22  right?

23  A.   Certain people do, yes.

24  Q.   Many people do.  Is that fair to say?

25  A.   Very fair, yes.

```
 1  Q.   There's nothing particularly suspicious or sinister about

 2  somebody checking out a news site, whether it's the Boston

 3  Globe or the New York Times or the Brockton Enterprise, right?

 4  A.   No, not suspicious unless it has to do with particular

 5  timing in the case.

 6  Q.   Ah.

 7          Well, in this case you got the search history from

 8  Google, right?

 9  A.   Yes, I did.

10  Q.   And that search history that you got was -- you got part

11  of November 2018?  Right?

12  A.   Correct.

13  Q.   And you got all of December of 2018, right?

14  A.   That was included in part of it, yes.

15  Q.   And you got all of January of 2019, right?

16  A.   Yes.

17  Q.   And you got a little bit of February of 2019, right?

18  A.   That is correct.

19  Q.   Okay.  And so on this account, you've looked at the search

20  history, right?

21  A.   I did, yes.

22  Q.   There were searches on news sites in November of 2018,

23  right?

24  A.   Yes, there were.

25  Q.   The jury saw some of them a few minutes ago, right?
```

1  A.   They did, yes.

2  Q.   There were searches on news sites during December of 2018,

3  right?

4  A.   There was, yes.

5  Q.   There were searches on news sites in January of 2019,

6  right?

7  A.   There were, yes.

8  Q.   There were searches on news sites in February of 2019,

9  right?

10  A.   For those two days.  I don't have a specific memory if

11  there were, but there may have been.

12  Q.   Okay.  So the pattern of life of the person or persons who

13  were using that particular site on whatever devices they were

14  using them on, they had a pattern of looking at news sites.

15  Was that part of their pattern of life, Agent Kelsch?

16  A.   It was, yes.

17  Q.   Now -- and that's not an uncommon pattern of life, right?

18  A.   It is not.

19  Q.   Now, let me just ask you about a couple of other things.

20  You've been trained in Google and searching Google phones,

21  right?  Is that something you do?  Android phones.

22  A.   Yes, I have.

23  Q.   And you told us that Google collects a lot of information

24  about its users, right?

25  A.   They do.

1   Q.   Okay.  And one of the things that Google collects on its

2   users from mobile devices like Android phones is specific

3   location information; isn't that right, Special Agent Kelsch?

4   A.   In this particular case, it was an iPhone, but do you want

5   to talk about Android phones?

6   Q.   I'm asking you a question about technology.  I don't know

7   what phone you're referring to.  We're talking about Google

8   right now.  Okay?

9   A.   Yes.

10   Q.   Okay.  Google collects specific location information from

11   Android phones and keeps it in something called Sensorvault.

12   Are you familiar with that?

13   A.   So they may collect that, if it's enabled in the phone.

14   Q.   So if I've got an Android phone and location is enabled,

15   Google is collecting -- and this is GPS, right?

16   A.   It will collect GPS data, yes.

17   Q.   Google is collecting precise GPS information on where that

18   phone goes 24/7, right?

19   A.   It's setting dependent.  So the user would have to have

20   those settings turned on.  But if they are turned on, yes, it

21   can collect that data.  It's not continuous data.  It's

22   continuous data that's linked to certain artefacts in the

23   phone.  So it's not following you 24 hours a day, but if you

24   were to do certain things --

25   Q.   Like move from one room to another?

1    A.   Not that specific, no.

2    Q.   Move from one street to another?

3    A.   Not on movement.

4    Q.   Well, what is it tracking then?

5    A.   It tracks certain artefacts.

6    Q.   What's an artefact?

7    A.   So an artefact is if we're looking on a device, an

8    artefact is any type of data that we can glean off of any

9    little piece of data.

10   Q.   Well, is movement one of the artefacts that Google

11   collects on people?

12   A.   No.

13   Q.   Well, how is it collecting GPS location information if

14   it's not collecting GPS location information?

15   A.   So, for example, if you were using Google maps going from

16   one location to another, then, yes, it has some GPS tracking.

17   Other times it would collect is if you did a specific search or

18   took a photograph and had that enabled, it would.  But the

19   phone by no means follows you 24 hours a day wherever you go.

20   Those points have to be attributed to an artefact.  So you do

21   something on the phone that captures that location at that

22   time.  It's not continuous.

23   Q.   And Google saves that stuff, right?

24   A.   If those things are turned on, then yes.

25   Q.   Okay.  So just one last subject.  I don't want to keep

 1  anybody.

 2           You talked about some information that was deleted

 3  from this phone that you did an extraction on, right?

 4  A.   Yes.

 5  Q.   And based on your long experience doing this kind of work,

 6  is it fair to say that people often delete stuff from their

 7  phones?

 8  A.   I'd say I see some people that delete continuously, and

 9  some people that never delete.  It ranges the entire gambit

10  between each.

11  Q.   But plenty of people delete stuff from their phones,

12  right?

13  A.   Some people do, yes.

14  Q.   For all kinds of reasons, right?

15  A.   I can't guess as to their reasons, but people delete from

16  their phones.

17  Q.   It happens all the time, right?

18  A.   It does.

19  Q.   Thank you, Special Agent.

20           MR. SULTAN:  No further questions, Your Honor.

21           MR. MALLARD:  Very briefly.

22                        REDIRECT EXAMINATION

23  BY MR. MALLARD:

24  Q.   Sir, we talked about Google and other persons using Google

25  accounts on cross there.

1   A.   Yes.

2   Q.   Google accounts are password protected, right?

3   A.   They are, yes.

4   Q.   How long does the password remain active before it needs

5   to be reentered on various devices?

6   A.   It depends.  Normally you're not going to give your device

7   to someone else to log into.  On your device, it's your login.

8   That would be more on a web browser that you may check your

9   email on somebody else's computer, and that only stays active

10  until that browser window is closed.  If that browser window is

11  closed, that password is no longer active.

12  Q.   There was discussion about location history being saved by

13  Google.

14  A.   Yes.

15  Q.   Does the Google save location history for, for instance,

16  the diormauricecarter@gmail.com account?

17  A.   There was none.

18  Q.   So there was none?

19  A.   No.

20  Q.   Why would that be the case?

21  A.   I don't have a specific answer to that.  Just that Google

22  did not collect any in that particular case.

23  Q.   What are some of the reasons it would not be saved or

24  stored?

25  A.   We see more of that data on someone who has a Google

1    Android phone.  So one reason could be that the person used

2    some other phone than Android.

3    Q.    Okay.  What about if location services were turned off?

4    A.    Then that would also be the case.

5    Q.    You talked a little bit about specific -- you talked about

6    deletions and the practices of persons deleting things from

7    phones.

8    A.    Yes.

9    Q.    And that particular phone that you examined, the Boddie

10   phone, was there a specific period in which certain items had

11   been deleted?

12   A.    Yes.  When I look at the phone and when I look at this, I

13   look at the normal amount of call logs, calls going in and out,

14   text messages going in and out, and if I see there's a regular

15   amount, and there's a certain time period where there are none

16   and then those calls and texts continue again, that, combined

17   with call detail records that may come from a cell phone

18   provider, would allow me to say that a specific date and range

19   periods of data had been deleted.

20   Q.    In this case you testified that it was from about

21   5:00 p.m. to about midnight on January 26, 2019?

22   A.    That's correct, yes.

23          MR. MALLARD:  No further questions, Your Honor.

24

25

```
 1                    RECROSS-EXAMINATION
 2   BY MR. SULTAN:
 3   Q.   Just on the subscriber point.  If I'm logged into my
 4   Google account on a PlayStation at my house, okay, for example,
 5   unless I log out, log off, anybody can use that account on that
 6   device, right?
 7   A.   I don't have any particular experience with PlayStation,
 8   when to comes to Google accounts.  I could answer it on other
 9   accounts.  We don't see a lot of that when it comes through.
10   Q.   Okay.  How about a desktop computer?
11   A.   Okay.
12   Q.   If I'm logged into my Google account on my desktop
13   computer and I don't log off, and I go somewhere for a day or
14   two days or two hours, someone else can sit down and do a
15   Google search and it's going to come up under my subscriber
16   information, isn't it?
17   A.   That is possible, yes.
18   Q.   Thank you, sir.
19           THE COURT:  You're excused.
20           THE WITNESS:  Thank you, Your Honor.
21           THE COURT:  Guys, thanks all for the extra ten
22   minutes.
23           I want you to go to bed tonight, tomorrow night and
24   Sunday night and pretend I said each one of these things to
25   you:  Keep an open mind, no conversation with anyone and no
```

1    extracurricular research or homework.  I know this is a long

2    stretch, and I don't want my instructions to dissipate over the

3    course of the three days.  So completely put it out of your

4    mind.  I think it's going to be a beautiful weekend.  Don't

5    think about this again until you get back here on Monday.  So

6    you won't be thinking about it or talking about it

7    inappropriately.

8         We'll start at 10:00 on Monday morning.  Can I ask the

9    parties to stay for just a minute.

10        THE CLERK:  All rise for the jury.

11   (Jury exits.)

12        THE COURT:  I'm working on the jury instructions and

13   I'm just trying to simplify them a little bit.  I want to run a

14   couple things by you before you go for the weekend.

15        The government's instructions you identify -- you

16   identify the robbery as taking place at a T-Mobile store that

17   does business as -- and the phones being taken either from the

18   store or from Mr. Dertelus, if that's how you pronounce his

19   name.  Is there any objection to me just identifying the

20   robbery at the T-Mobile at that address?

21        MR. SULTAN:  No, Your Honor.

22        MR. MALLARD:  That's fine.

23        THE COURT:  Is that all right?  I think that

24   simplifies it.

25        The definition of robbery, you included all that

1    language about taking from a person or their friends or their

2    family or all that.  Can all that friends and family stuff come

3    out, just to conform it to the facts of the case?  Is that all

4    right?

5              MR. MacKINLAY:  Yes.

6              MR. SULTAN:  Yes.

7              THE COURT:  And lastly, the brandishing charge.  I'm

8    not clear on what the law allows, and I'm not clear on what you

9    intend with regard to -- are you limiting it to the use of a

10   firearm in the store, or are you considering the firing of the

11   gun from the car during the chase being part of the crime?

12             MR. MALLARD:  I think that the firing of the gun

13   during the chase is also part of the crime, Your Honor.

14             THE COURT:  Okay.  The instructions are not really

15   clear on that, but okay.  Let me futz around, and I'll give you

16   a draft on Monday.  Okay?

17             Anything else before we go?

18             MR. SULTAN:  No, Your Honor.

19             MR. MALLARD:  No, Your Honor.

20             THE COURT:  I'll be around 9:30 Monday morning if

21   anyone has anything.  Okay.

22             MR. SULTAN:  Have a good weekend.

23             THE COURT:  Thanks.  You all, too.

24             MR. MALLARD:  Thank you.

25   (The proceedings adjourned at 2:13 p.m.)

1              C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8              We certify that the foregoing is a correct transcript

9    from the record of proceedings taken March 6, 2020 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14   /s/ Kathleen Mullen Silva              4/15/20

15   Kathleen Mullen Silva, RPR, CRR             Date
     Official Court Reporter
16

17
     /s/ Linda Walsh                        4/15/20
18   Linda Walsh, RPR, CRR                       Date
     Official Court Reporter
19

20

21

22

23

24

25