1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2


3
                                        )
4    UNITED STATES OF AMERICA,          )
                                        )
5            Plaintiff,                  )
                                        )  Criminal Action
6    v.                                  )  No. 1:19-CR-10104-ADB-1
                                        )
7    DIOVANNI CARTER,                    )
                                        )
8            Defendant.                  )
                                        )
9

10          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                   UNITED STATES DISTRICT JUDGE
11

12                         JURY TRIAL
                            DAY 8
13

14                       March 11, 2020
                          9:40 a.m.
15

16         John J. Moakley United States Courthouse
                     Courtroom No. 17
17                  One Courthouse Way
                 Boston, Massachusetts 02210
18

19

20
                    Linda Walsh, RPR, CRR
21                 Kathleen Silva, RPR, CRR
                   Official Court Reporters
22
           John J. Moakley United States Courthouse
23                  One Courthouse Way
                Boston, Massachusetts 02210
24               lwalshsteno@gmail.com
                 kathysilva@verizon.net
25

1     APPEARANCES:

2     On Behalf of the Government:

3          UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Philip A. Mallard
4              AUSA Glenn A. MacKinlay
           One Courthouse Way
5          Boston, Massachusetts 02210
           617-748-3674
6          philip.mallard@usdoj.gov
           617-748-3215
7          glenn.mackinlay@usdoj.gov

8     On Behalf of the Defendant:

9          RANKIN & SULTAN
           By: James L. Sultan, Esq.
10             Kerry A. Ferguson, Esq.
           151 Merrimac Street, Second Floor
11         Boston, Massachusetts 02114-4717
           617-720-0011
12         jsultan@rankin-sultan.com
           khaberlin@rankin-sultan.com

13

14

15
                        Proceedings reported and produced
16                       by computer-aided stenography.

17

18

19

20

21

22

23

24

25

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RYAN BURKE | | | | |
| By Mr. Sultan | | 8-6 | | 8-35 |
| By Mr. Mallard | | | 8-30 | |
| WILLIAM J. WILLIS | | | | |
| By Mr. Sultan | 8-36 | | | |
| By Mr. MacKinlay | | 8-41 | | |

E X H I B I T S

| DESCRIPTION | RECEIVED |
|---|---|
| GOVERNMENT EXHIBITS | |
| 165 ........................................... | 8-43 |
| 166 ........................................... | 8-41 |

| DESCRIPTION | RECEIVED |
|---|---|
| DEFENDANT EXHIBITS | |
| 209 ........................................... | 8-29 |
| 210 ........................................... | 8-39 |

| | PAGE |
|---|---|
| Government Closing Argument By Mr. MacKinlay............ | 8-79 |
| Defendant Closing Argument By Mr. Sultan................ | 8-104 |
| Government Rebuttal Statement By Mr. Mallard........... | 8-121 |

<pre>
 1                    P R O C E E D I N G S
 2          THE COURT:  I have another copy of the instructions
 3   for you redline.  There's a bunch of nits, but there's two
 4   substantive offenses I want to run by you.  The first is I took
 5   out the conduct of counsel charge.  I use that in -- the only
 6   trial I ever used that in was the Insys trial.  It went on for
 7   14 weeks.  There was a lot of acrimony between the parties.  I
 8   felt like it was needed.  I don't think it's needed here.
 9          MR. SULTAN:  What is that, Your Honor?
10          THE COURT:  Conduct of counsel.  It's page 5.
11          MR. SULTAN:  Page 5?
12          THE COURT:  I just don't think there's been anything
13   here -- I feel like giving the instruction is more --
14          MR. SULTAN:  I agree, Your Honor.
15          THE COURT:  I just don't think it's needed in this
16   case.  The conduct was perfectly fine on both sides.  To
17   suggest there may have been any impropriety goes against what I
18   want to do here.
19          The other substantive change that I made was on page
20   24, it's impeachment of witness testimony by a prior
21   conviction.  I moved that right after the cooperating witness
22   charge.  So moved it up a page.  So it was page 24.  Now it's
23   page 23.  And I added, instead of saying "witness," I added
24   Dennis Martin's name.  He's the only one.
25          MR. SULTAN:  I agree, Your Honor.
</pre>

1          THE COURT:  I'm going to give you a redline.  You can
2    look through the rest of them, but I think that's the only
3    substantive one -- substantive two, substantive ones.
4          I understand the government wanted to add sort of
5    basically a Pinkerton instruction to the verdict form.  I'm not
6    going to do that.  I did add aiding and abetting.  When I
7    explain the verdict form to them, I'll explain they can find
8    guilt based on principal, aiding and abetting or Pinkerton.
9          MR. MALLARD:  I was commenting on 4A and 4B.  I think
10   it says "Diovanni Carter brandished the firearm.  Diovanni
11   Carter discharged the firearm."  I don't think it needs to be
12   identified by the defendant having done either of those things.
13         THE COURT:  So I added aiding and abetting language to
14   A and B too.
15         MR. MALLARD:  Okay.  I'm going off the wrong version.
16   I apologize.
17         THE COURT:  That's fine.  He added aiding and abetting
18   to Count Three.  We're going to add it to Count Two as well.
19   So Count Two will say -- see where it says the word "robbery"?
20   I was going to add after that "or aiding and abetting the
21   offense."
22         MR. MacKINLAY:  Yes.
23         MR. MALLARD:  I think that's -- the government would
24   be happy with that if that were to be the case.
25         THE COURT:  So we'll get a redline on that in a

1  minute, before 10:00.  Do I have the red lines for them?

2          LAW CLERK:  I just handed them out.

3          THE COURT:  So you guys have the redlines.  I want

4  them to see the verdict form.

5          LAW CLERK:  I have that.

6          THE COURT:  With the language added to Count Two.

7          LAW CLERK:  I'll be right back.

8          MR. MALLARD:  Your Honor, if I could have the witness

9  resume the stand.

10          THE COURT:  Sure.  That would be great.

11          THE CLERK:  All rise for the jury.

12  (Jury enters.)

13          THE CLERK:  Court is in session.  Please be seated.

14          THE COURT:  Good morning, everybody.

15          JURORS:  Good morning.

16          THE COURT:  I think Mr. Sultan was about to begin his

17  cross-examination of Mr. Burke.  And I remind you you're under

18  oath.

19          THE WITNESS:  Yes, Your Honor.

20          RYAN BURKE, having been previously duly sworn by the

21  Clerk, was examined and testified as follows:

22                          CROSS-EXAMINATION

23  BY MR. SULTAN:

24  Q.   Good morning, Special Agent Burke.

25  A.   Good morning.

1   Q.   Let's start where we left off yesterday on direct

2   examination.

3            MR. SULTAN:  With the court's permission, Hannah,

4   could you please show Exhibit 149 to the witness and to the

5   jury.

6   Q.   Do you have that in front of you, Special Agent?

7   A.   I do, sir.

8   Q.   So you told us this was an analysis you did of when

9   certain phones were in contact with each other during the

10  period of time that you were analyzing, right?

11  A.   That's correct.

12  Q.   Okay.  So I just want to draw your attention to line 3.

13  Can you zoom in on that, please.  Okay.

14            So am I correct that this line of your chart

15  involves -- it refers to two different cell phones associated

16  with Dennis Martin?

17  A.   That's correct.

18  Q.   Okay.  And this shows, does it not, that during the time

19  period that you were looking at, there were 150 calls between

20  the two Dennis Martin phones and the phone associated with

21  Stephan Rosser-Stewart, who you referred to as Puff, right?

22  A.   That's correct.

23  Q.   And this chart also shows, does it not, that during that

24  same period of time there were 239 calls between the two Dennis

25  Martin phones and the Terrell Jackson phone, right?

```
 1   A.    That's also correct.
 2   Q.    You don't know whether Terrell Jackson had a second phone,
 3   do you?
 4   A.    No, I don't.
 5   Q.    So is it fair to say that, based on the number of calls in
 6   the period that you were analyzing, that Martin's phones
 7   contacted either the Rosser-Stewart phone or the Jackson phone
 8   that you're aware of, or vice versa, an average of two or three
 9   times a day during that period of time, roughly?
10   A.    389 total, so.
11   Q.    I'm sorry?
12   A.    389 total times.  I can't do the math quick enough.
13   Q.    Well, for each one.  So you looked at about 50 days,
14   right?
15   A.    Yes.
16   Q.    Okay.  So 150 contacts in 50 days between the Martin
17   phones and the Rosser-Stewart phone, that works out to an
18   average of three a day, right?
19   A.    Right.  Correct.
20   Q.    And 239 contacts between the Martin -- one of the two
21   Martin phones and the Terrell Jackson phone during that same
22   50-day period works out to an average of somewhere between four
23   and five contacts a day?
24   A.    Correct, sir.
25   Q.    Right?
```

1  A.   Yes.

2         MR. SULTAN:  All right.  Can you take that off,

3  please.

4  Q.   All right.  Then let's move on to the rest of your

5  analysis, Special Agent Burke.  You're not a radio frequency

6  engineer, are you?

7  A.   No, I'm not.

8  Q.   And, in fact, you're not an engineer, period, right?

9  A.   No, I'm not.

10 Q.   You don't have any science degree, do you?

11 A.   No, I don't.

12 Q.   And before you started working for the FBI, you worked for

13 the MBTA police, right?

14 A.   I did.

15 Q.   You've never worked for Sprint or for any other phone

16 company, have you?

17 A.   No, I haven't.

18 Q.   In this case, you're a member of the prosecution team,

19 aren't you?

20 A.   I was requested by the prosecution to conduct the

21 analysis.

22 Q.   Okay.  And you've been doing stuff at the behest of the

23 prosecutors, right?

24 A.   Yes.

25 Q.   You don't work for me, right?

1  A.   You didn't ask.

2  Q.   Okay.  You've met with the prosecutors many times, right?

3  A.   Yes.

4  Q.   Okay.  And they told you their theory of the case, didn't

5  they?

6  A.   They did.

7  Q.   Okay.  And they told you exactly what they wanted to be

8  able to show through your work, didn't they?

9  A.   No.  They told me what their theory of the case was and

10  asked if I would review the records to see if they corroborated

11  their suspicions.

12  Q.   You knew that they were trying to connect the 2207 phone

13  to this robbery, didn't you?

14  A.   I know they believed that it was involved.

15  Q.   I don't care what they believed.  That's what they asked

16  you to do, right?

17  A.   No.  They asked me to review the records to see if it was

18  consistent with the location of the robbery, which it was.

19  Q.   Okay.  They told you which phones to include in your

20  analysis, right?

21  A.   They did.  They provided the records to me.

22  Q.   That wasn't your decision.  That was their call, right?

23  A.   That's correct, yes.

24  Q.   And they told you which cell sites to include in your

25  analysis, didn't they?

1    A.    No, they did not.  They asked -- they just gave me the

2    times of the relevant events.

3    Q.    Well, they told you which addresses to look at, right?

4    A.    They told me the address of the residences and the

5    T-Mobile store, yes.

6    Q.    Did they give you any other addresses?

7    A.    They did.  They gave me the address where the getaway car

8    was recovered and the Hertz rental car location.

9    Q.    Let me ask you about another address.

10          You mapped certain locations, right?

11   A.    I did.

12   Q.    Okay.  Did you ever map the location 108 Moraine Street in

13   Brockton?

14   A.    No.

15          MR. SULTAN:  Hannah, could you put on Exhibit 201,

16   please, with the court's permission.  Hard copy.  All right.

17          Let me put on the screen, if I can get some help,

18   what's been -- a copy of what's been marked as 201.  Oh, I

19   don't even need help, look at that.

20          It's hard to see.  May I approach the witness, Your

21   Honor?

22          THE COURT:  Yes.

23   Q.    Special Agent Burke, I'm showing you what's been admitted

24   as Exhibit 201.  Do you see the two addresses that are marked

25   on this map, 521 Belmont Street, that's the site of the

1  T-Mobile store, right?

2  A.   That's correct.

3  Q.   And the 108 Moraine Street, right?

4  A.   Yes.

5  Q.   And you never did anything about 108 Moraine Street,

6  right?

7  A.   I never mapped it, no.

8  Q.   Well, would you agree with me that 108 Moraine Street --

9  and by the way, did you know that Diovanni Carter's grandmother

10 lived at 108 Moraine Street?

11 A.   I do recall that being mentioned recently, yes.

12 Q.   And would you agree that 108 Moraine Street is a short

13 distance away from the T-Mobile store?

14 A.   It's not far, that's correct.

15 Q.   Short distance away; is that fair to say?

16 A.   Sure.

17 Q.   Is it fair to say that a call made to or from 108 Moraine

18 Street very likely used the same cell tower as a call made to

19 or from the vicinity of the T-Mobile store?

20 A.   I would have to look at the layout of the network in that

21 area, but for sure for the time frame just before the robbery,

22 the PCMD measurements that would not have been at 108

23 Moraine --

24 Q.   We'll get to PCMD.  We're talking about cell tower.  Very

25 likely used the same cell tower, right?

1    A.    I can't answer that offhand.

2    Q.    You can't answer that question because you never looked at

3    108 Moraine Street, right?

4    A.    Right.

5    Q.    Now, after you met with the prosecutors and they gave you

6    certain information, you prepared and you knew the theory of

7    the case, right?

8    A.    I did, yes.

9    Q.    You prepared a written report with maps and diagrams in

10   it, right?

11   A.    Yes.

12   Q.    Okay.  And you gave it to them to review, right?

13   A.    I did.

14   Q.    And it wasn't exactly what they were looking for, was it?

15   A.    There were quite a bit of updated reports produced.

16   Q.    Well, that's because they asked you to do it a little

17   differently, right?

18   A.    Slight changes in timeframes and combinations of numbers

19   that were displayed, but nothing substantive.

20   Q.    So at their request you produced a report, a revised

21   report over and over and over again, didn't you?

22   A.    I did.

23   Q.    Okay.  So the first report you produced was back on March

24   26, 2019?

25   A.    That sounds correct.

1  Q.   And then you revised it, another report, on the next

2  month, April 16, 2019, does that sound right?

3  A.   It sounds right, yes.

4  Q.   And then revised it again, a new report, September 3,

5  2019?

6  A.   Yes.

7  Q.   And then you revised it again, another report, October 24,

8  2019?

9  A.   Yes.

10 Q.   Then you revised it yet again and did another report

11 January 23, 2020?

12 A.   Yes.

13 Q.   And you revised it again five days later, did another

14 report, January 28, 2020, right?

15 A.   Correct.

16 Q.   Then you revised it again, did another report, February

17 19, 2020, right?

18 A.   Correct.

19 Q.   Then you revised it a final time, and that's what was

20 introduced into evidence yesterday as Exhibit 146, right?

21 A.   That's correct.

22 Q.   And by the time you did Exhibit 146 a couple of -- just

23 March 9, just a few days ago --

24         Right?

25 A.   Correct.

1   Q.   -- you had it exactly the way the prosecutors wanted it;
2   is that fair to say?
3   A.   Yes.
4   Q.   Now, let's talk a little bit about what you know about
5   cell phones.  A cell phone is like a two-way radio, right?
6   A.   It is.
7   Q.   And it operates using radio waves, right?
8   A.   It does.
9   Q.   And I've got a cell phone, it operates like a transmitter
10  receiver, right?
11  A.   Yes, it does.
12  Q.   It connects to the strongest signal, right?
13  A.   Yes.
14  Q.   Okay.  Not necessarily the closest cell site, correct?
15  A.   Correct.
16  Q.   It depends on a lot of factors, including the height of
17  the site, the wattage of the site, the capacity of the site,
18  the weather, physical obstructions, make and model of the
19  phone, all those things, right?
20  A.   Yes, more or less.  Less about capacity and weather, but
21  for the most part, yes.
22  Q.   But there's a lot of factors --
23  A.   There are.
24  Q.   -- to determine which cell site a phone call connects to?
25  A.   That's correct, sir.

1   Q.   And you said on direct the signal travels at the speed of

2   light?

3   A.   Yes.

4   Q.   Do you happen to know what that is?

5   A.   It's 386,000 miles per second, if I recall.

6   Q.   Would it be 186,282 miles per second?

7   A.   That sounds right.

8   Q.   It's pretty fast, right?

9   A.   It is fast, mind blowing.

10  Q.   The phone must be within the coverage area of a particular

11  cell site to connect to that cell site, right?

12  A.   That's correct.

13  Q.   And the determination of which cell site is going to

14  handle a particular call, that's determined by the network

15  software, right?

16  A.   So the -- at the initiation of a call, a phone is

17  selecting the cell site, and once that call is established, the

18  network has a bit more control over where it's handled.

19  Q.   The network makes some kind of a call or decision as to

20  which site is going to handle that phone call, right?

21  A.   Correct, but it's that initial site that's recorded in the

22  call detail records.

23  Q.   Okay.  Now, some of the information you looked at was cell

24  site location information, right?

25  A.   Yes.

1  Q.   CSLI, cell site location information?

2  A.   Yes.

3  Q.   You looked at that in this case, right?

4  A.   Yes.

5  Q.   And cell site location information, that tells you what

6  cell site was used in a particular call at the beginning of the

7  call and at the end of the call, right?

8  A.   Yes.

9  Q.   Okay.  It doesn't tell you why, right?

10  A.   Well, we know why for the initial.  We wouldn't know -- I

11  guess we wouldn't know why for the end other than --

12  Q.   The records don't tell you why, do they?

13  A.   I guess not, but --

14  Q.   They just tell you -- they tell you the number of the

15  site, right?

16  A.   Right.

17  Q.   Okay.  And the records don't tell you the coverage area of

18  each cell site, do they?

19  A.   No, they don't.

20  Q.   And the coverage areas for each cell site tend to overlap,

21  don't they?

22  A.   There's some overlap, yes.

23  Q.   Okay.  So is it fair to say that all you can say with CSLI

24  data, or cell site location information data, is that the phone

25  was within the coverage area of a particular site during that

1    call or when that call was initiated?

2    A.    Not including per call measurement data, yes, that's

3    correct.

4    Q.    We'll get to that.  I know you want to talk about per call

5    measurement data.

6    A.    It's all CSLI to me, so I just wanted to make the

7    distinction.

8    Q.    We are talking first about just the cell site location

9    information.

10   A.    Just the tower sector, yes, that's correct.

11   Q.    The range of these cell sites vary from one to ten miles,

12   roughly, is that a fair estimate?

13   A.    You might have towers in the middle of the desert that

14   cover ten miles, but not in eastern Massachusetts.

15   Q.    Well, what's the range in eastern Massachusetts?

16   A.    Again, it depends where the tower is in the network and

17   its proximity to other towers.  It's all very customizable by

18   the engineer, but one mile to two miles is probably about

19   average.

20   Q.    But you don't know the actual coverage area of any of the

21   cell sites used in this case, do you?

22   A.    No, we can only estimate with the records.

23   Q.    Do you know how many cell sites for each phone company

24   there were in operation within ten miles of 521, or say five

25   miles, of 521 Belmont Street in Brockton on January 26, 2019?

1  A.   I don't have that memorized.  I could look at a tower

2  list, but...

3  Q.   And you don't know where each of those sites was located,

4  do you?

5  A.   I don't have them committed to memory, but there's a list

6  that would contain that information.

7  Q.   But you can't tell us that here at this trial; is that

8  fair to say?

9  A.   No, I certainly cannot.

10  Q.   Did you visit any of those sites yourself?

11  A.   No.

12  Q.   Did you do a test drive to determine the range of each of

13  those sites?

14  A.   No, I didn't do a drive test.

15  Q.   Do you know the height, the wattage of each of those

16  sites?

17  A.   The wattage, no.  The height may be contained -- well, the

18  Sprint towers, no, I don't know the height.

19  Q.   You can't give us any of that information, right?

20  A.   No.

21  Q.   Okay.  Did you review any of the maintenance and repair

22  logs on any of these cell sites to determine whether they were

23  in working order on that day?

24  A.   Well, I know all the sites that were used were in working

25  order, but I did not review any other logs for other sites that

1    weren't used.

2    Q.   You didn't review any logs at all, did you, maintenance

3    logs?

4    A.   I don't have access to those logs.

5    Q.   And you didn't ask for access, did you?

6    A.   No.

7    Q.   Now, you produced these charts and diagrams and maps to

8    illustrate the government's theory of the case; isn't that

9    right?

10   A.   Well, I don't think you're phrasing it correctly.  I

11   didn't produce maps to illustrate the government's case.  I

12   produced maps of my analysis, which happens to support the

13   government's case.

14   Q.   Well, let's look at Exhibit 146.

15        MR. SULTAN:  Could you put up page 21, please.

16   Q.   So you talked about this yesterday, right?

17   A.   Yes.

18   Q.   Okay.  And there's -- this lists on the right a bunch of

19   different cell phone calls that were made during that period of

20   time, right?

21   A.   Correct.

22   Q.   Okay.  And then there are bunch of these arcs on the map,

23   right?

24   A.   Yes.

25   Q.   And we're going to talk about per call measurement data in

1  a minute, but those arcs relate to per call measurement data,

2  right?

3  A.   They do.

4  Q.   So let's just look at the second -- say the second arc

5  from the top.  Which call does that arc relate to?

6  A.   I would have to review the records.  I don't have it

7  offhand, but it's one of the calls between 7:05 and 7:13.

8  Q.   So as you sit here today, you can't tell us which of these

9  calls correspond to which of the arcs that you put on the map,

10  can you?

11  A.   The most distant arc is at 7:15.

12  Q.   I didn't ask about the most distant one.  I asked you

13  about the other ones.  There's a big blob of them.  You can't

14  tell us which one goes with which call, can you?

15  A.   Not offhand, no.  But they're all relatively close, so...

16  Q.   Not offhand.  Okay.  Now, you call this a chart?  What do

17  you call this thing we're looking at, a diagram?  What would

18  you call it?

19  A.   A map of the activity between 7:05 and 7:17.

20  Q.   A map.  Okay.  This map is made using some kind of

21  off-the-shelf software, right?

22  A.   Yes.

23  Q.   Anybody can buy that software on Amazon, right?

24  A.   I'm not sure if you can buy it on Amazon.

25  Q.   But it's nothing that's the FBI created in its cell phone

1    lab, is it?

2    A.    We work hand in hand with the company, but it's not an FBI

3    product, no.

4    Q.    It's just an off-the-shelf software package, right?

5    A.    Right.  It's a tool -- it's a product offered by

6    Gladiator.

7    Q.    You don't know what the error rate is for that software

8    package, do you, Special Agent Burke?

9    A.    Well, the program is used to automate the analysis.

10   Q.    Do you know the error rate, sir, yes or no?

11   A.    Zero percent.

12   Q.    Zero percent?

13   A.    The program does what I ask it to do.  So this information

14   is accurate.

15   Q.    It does whatever you ask, right?

16   A.    Right.

17   Q.    And you ask it to do what the prosecutor has asked you to

18   do; isn't that right?

19   A.    No.  I asked it to map out this tower that was used

20   accurately, and also to pick arcs at the appropriate distances

21   provided in the Sprint records.

22   Q.    Now, per call measurement data.  Much of your analysis --

23          MR. SULTAN:  Can you take that off, please.

24   Q.    -- and much of the maps and diagrams in Exhibit 146 that

25   you testified about yesterday, much of that analysis is based

1    on per call measurement data, isn't it?

2    A.    For the Sprint phones, yes.

3    Q.    Okay.  And per call measurement data is abbreviated as

4    PCMD, right?

5    A.    That's correct.

6    Q.    And all those arcs that were on the page we were just

7    looking at, page 21, that's all based on PCMD, isn't it?

8    A.    Yes, it is.

9    Q.    Now, would you agree with me, Special Agent Burke, that if

10   the PCMD data isn't accurate, your analysis isn't accurate

11   either, is it?

12   A.    If it were inaccurate?

13   Q.    Yes.

14   A.    Yes.

15   Q.    You agree with me, right?

16   A.    Well, I believe it is accurate, but yes.

17   Q.    That's not what I asked you.  If it's not accurate, your

18   analysis is no good.  Is that fair to say?

19   A.    Sure.

20   Q.    Okay.  Did you ever hear in the computer world a saying

21   "garbage in/garbage out"?

22   A.    Yes.

23   Q.    If the data you put in is worthless, the analysis at the

24   end is going to be worthless too.  Is that a fair --

25   A.    Of course, yes.

```
 1    Q.    Okay.  All right.

 2               Now, let's look at Government Exhibit 119.

 3               MR. SULTAN:  Could you put that up, please.  With the

 4    court's permission, could that be shown to the jury as well?

 5    Can you zoom in on that a little bit so we can read it.  Why

 6    don't you start at the very top, please, the title.  Thank you.

 7    Okay.

 8    Q.    So Exhibit 119, this is a document that was produced by

 9    Sprint to accompany the data that it provided.  Is that fair to

10    say?

11    A.    Yes.

12    Q.    Okay.  And you've seen this document before, right?

13    A.    I have.

14    Q.    So let's just look at the rest of page 1, please.  So page

15    1 has certain subscriber information on it.  Can you zoom in on

16    the bottom half -- I guess first the top half of it.  Let's go

17    through the whole document.  Okay.

18               And this is -- this is about -- what's the subject

19    number of this document?

20    A.    That would be the phone ending in 2207.

21    Q.    That's the 2207 phone that you were talking about

22    yesterday, right?

23    A.    Yes.

24    Q.    That's the phone that's associated with my client,

25    Diovanni Carter, right?
```

1    A.    Correct.

2    Q.    Okay.

3          MR. SULTAN:  Let's -- can we look at the bottom half

4    of page 1, please.

5    Q.    This is just more stuff about this particular account and

6    how --

7    A.    Yes.

8    Q.    -- what was on the account.  Okay.

9          MR. SULTAN:  Let's look at page 2, please.  Can you

10   zoom in on the first half of page 2.

11   Q.    This is more stuff about the account and the various

12   features of the --

13   A.    Yes.  Various identifiers and features.

14   Q.    Okay.  Can you go to the bottom half of it, please, this

15   page.  Okay.  There's more stuff about --

16         MR. SULTAN:  Can you zoom in a little bit, please.

17   A.    More feature activity.

18   Q.    More features on this account, right?

19   A.    Yes.

20   Q.    Now, let's look at page 3 of this document, please.  Page

21   3 of this exhibit that was introduced by the government as

22   Exhibit 119, page 3 is all blacked out, isn't it?

23   A.    Yes, it is.

24   Q.    Can we go to page 4, please.  Page 4 of this document that

25   was introduced by the government as 119 is all blacked out,

1   isn't it?

2   A.   Yes, it is.

3        MR. SULTAN:   Could you go to page 5, please.

4   Q.   Page 5 of this document that was introduced by government

5   as Exhibit 119 is all blacked out, isn't it?

6   A.   It is.

7        MR. SULTAN:   And let's go to page 6.

8   Q.   Page 6 of this document that was introduced by the

9   government as Exhibit 119, that's all blacked out, right?

10  A.   Yes, it is.

11  Q.   Whose decision was it to black out the last four pages of

12  this document, sir?  Was that your decision?

13  A.   No.

14  Q.   Let me show you another document.

15       MR. SULTAN:   May I approach, Your Honor?

16       THE COURT:   Yes.

17       MR. SULTAN:   Let's go back to page 1, please.

18  Q.   I show you another document, sir.

19  A.   Okay.

20  Q.   Six-page document.  Start at the beginning.  Why don't you

21  compare the first page of that document to page 1 of Exhibit

22  119.

23  A.   It's the same.

24  Q.   It's the same document?

25  A.   It is.

1    Q.   Why don't you go to page 2.  Can we go to page 2 of this

2    document, please.  Page 2 of the document I'm just showing you

3    is the same as page 2 of Exhibit 119, right?

4    A.   Yes, it is.

5    Q.   And you've seen the rest of this document, haven't you?

6    A.   This is a common report sent by Sprint.  So yes.

7    Q.   So why don't you look at pages 3, 4, 5 and 6 of that

8    document.

9    A.   Okay.

10   Q.   Would you agree that that's all part of the same document?

11   A.   Well, yes.

12   Q.   Okay.  Except the copy I've shown you, pages 3, 4, 5 and

13   6, are not blacked out, are they?

14        MR. SULTAN:  I'd offer this as the next exhibit, Your

15   Honor.

16        MR. MALLARD:  I object, Your Honor.

17        THE COURT:  Object or not object?

18        MR. MALLARD:  I do object.

19        THE COURT:  Basis?

20        MR. MALLARD:  Hearsay.

21        THE COURT:  I need to see it.

22        MR. SULTAN:  Do you want me to respond, Your Honor?

23        THE COURT:  Not at the moment.  (Pause.)

24        Response?

25        MR. SULTAN:  It's a business record, Your Honor.  It's

```
 1    part of the same document and completeness.  I'm sorry.  More
 2    than three words.
 3              THE COURT:  Yes.  Business record.
 4              MR. MALLARD:  It goes to -- there's other information
 5    on it that's irrelevant and not -- I think I know where he's
 6    going with it.  I don't have a problem with that part.  There's
 7    just other information that shouldn't probably come in.
 8              THE COURT:  All right.  So I'm not totally sure what
 9    you're talking about, although I'm happy to hear you at sidebar
10    about it, but does pulling off the last two pages solve the
11    objection?
12              MR. MALLARD:  Yes, that's fine.
13              THE COURT:  And then that leaves -- is there anything
14    else that you would want redacted?
15              MR. MALLARD:  I think there's other phone numbers on
16    the preceding pages that don't necessarily pertain to what's
17    going on with I think the cross, which I'm happy to deal with,
18    but I understand the last two pages.
19              THE COURT:  So pull off the last two pages.  Right?
20              MR. SULTAN:  Well, the last two pages, those are going
21    to be admitted, Your Honor.  That's what I want.  Pages 5 and
22    6.
23              THE COURT:  All right.  I need to see you at sidebar.
24              **(SEALED SIDEBAR IN SEPARATE TRANSCRIPT)**
25              THE COURT:  Do you have a number on that, Mr. Sultan?
```

1          MR. SULTAN:  209.

2          (Defendant Exhibit 209 received in evidence.)

3    Q.   Special Agent Burke, I'm showing you page 5, or a portion

4    of page 5 of this document that's been admitted into evidence

5    as Exhibit 209.  Could you please read to the jury the first

6    two paragraphs of what's under "Comments," please.

7    A.   Yes.  "Please see attached records found for the requested

8    time period.  The PCMD records enclosed may not be accurate or

9    complete.  Sprint is unable to explain, certify or testify to

10   the accuracy of these records as they may be erroneous.  PCMD

11   disclaimer:  Please be advised that there are known accuracy

12   variances with Sprint PCMD reporting.  Therefore, Sprint is

13   unable to certify or testify to the accuracy of PCMD records.

14   It is important to understand that the tool used to provide

15   PCMD records was created as a tool for Sprint to oversee the

16   network.  It was not created as a tool to identify customer

17   location, pursuant to exigent circumstance or legal demand.

18   Nevertheless, it has been used in those situations as it is a

19   Sprint record that could possibly lead to customer location."

20   Q.   Okay.  So this PCMD data is precisely what you relied on,

21   correct?

22   A.   It's part of what I relied on, and I do believe it to be

23   accurate.

24   Q.   And it's what you're asking the members of the jury to

25   believe beyond a reasonable doubt, right?

```
 1   A.    Yes, and they should.

 2          MR. SULTAN:  I have no further questions.  Thank you,

 3   Your Honor.

 4          THE COURT:  Redirect examination?

 5          MR. MALLARD:  If I could have that.

 6          MR. SULTAN:  Sure.

 7                        REDIRECT EXAMINATION

 8   BY MR. MALLARD:

 9   Q.    Counsel had you read a couple paragraphs but not the whole

10   thing, right?

11   A.    That's correct.

12   Q.    Let's keep going.

13   A.    "There are several variance factors that may impact the

14   accuracy of the reporting.  Those factors include but are not

15   limited to the use of repeaters, small cells and natural

16   geographic influences.  The records are an accurate

17   representation of what happened during the communication.

18          "The latitude and longitude found on PCMD reporting

19   is not historic GPS for the device."

20   Q.    Are you familiar with this particular disclaimer?

21   A.    I am.

22   Q.    Have you seen it before?

23   A.    Every single time I look at Sprint records.

24   Q.    Does it affect you and what you do?

25   A.    No.  I find Sprint customers in emergencies all the time
```

```
 1   with this information.
 2   Q.    What is your opinion of this disclaimer?
 3   A.    I just think because it's not a billing record, Sprint
 4   doesn't feel comfortable authenticating it for court, but I'm
 5   not sure why.  We do find it to be accurate, and it is
 6   accurate.
 7   Q.    Authenticating means to the keeper of the record, right?
 8   A.    Yes.
 9   Q.    So that would be just some person coming in testifying
10   that this is the record of Sprint; isn't that right?
11   A.    Right.
12   Q.    Now, are you familiar with a gentleman named Justin
13   Darrow?
14   A.    Yes.
15   Q.    Have you had a chance to meet him before?
16   A.    Yes, he's a Sprint engineer.
17   Q.    When did you last see him?
18   A.    In the hallway yesterday.
19   Q.    Before or after he testified?
20   A.    Before.
21   Q.    Probably before?
22   A.    Yes.
23   Q.    And have you had a chance to speak with him in his
24   capacity as a Sprint RF engineer with respect to PCMD
25   engineering data?
```

1  A.   Yes.

2  Q.   How many engineers have you worked with at Sprint over the

3  course of your time with respect to PCMD data?

4  A.   Close to ten probably.

5  Q.   And working in the expert capacity that you serve in with

6  the CAST team and working with those experts from Sprint, what

7  do you do with the PCMD data?

8  A.   We use it to find phones, and Sprint uses it to monitor

9  their network because it's accurate.

10  Q.   Now, looking at the information on the PCMD data, like

11  everything, there's an error rate, it's not always accurate,

12  right?

13  A.   There are factors that could sort of artificially extend a

14  distance, just because if the path had traveled for -- the

15  signal isn't direct, it may take a little bit longer.  So some

16  measurement may be artificially longer.  It could never be

17  shorter.

18        If I may, in addition to that, also within the PCMD

19  report is an estimated latitude and longitudinal coordinate of

20  the device, which we don't use because we have found is not as

21  accurate as the estimated distances.

22  Q.   That's all this disclaimer is doing, is saying there might

23  be known accuracy variations with the PCMD reporting, right?

24  A.   Yes.

25  Q.   In your context, let's go through again some of the

1  circumstances and applications that you used the PCMD data for.

2  A.   If we're trying to locate a fugitive with a Sprint phone

3  or a missing person with a Sprint phone or some other scenario

4  in realtime where someone needs to be located, we immediately

5  request Sprint records and PCMD records and map those out, and

6  that's where we direct our search, and that's where we find

7  people.

8  Q.   Find lost people?

9  A.   Yes.

10  Q.   How many times have you done that successfully?

11  A.   With Sprint's records specifically it's tough to say, but

12  50 plus times.

13  Q.   What about the CAST team as a whole, are you familiar with

14  their use of PCMD and the 70 odd experts that you work with?

15  A.   It's being used by somebody right now probably as we speak

16  to look for somebody.  It's so routine.

17  Q.   And in that routine use, does the CAST team generally as

18  an entity find it to be accurate?

19  A.   Yes.  And that's why we look for if.  That's why we

20  request it.

21  Q.   Now, there was some discussion about how your report had

22  been sort of updated over the course of the last few months.

23  A.   That's correct.

24  Q.   Fair to say that new phone records were obtained as the

25  investigation continued; isn't that right?

1    A.    Yes, it is.

2    Q.    So it started out with only a couple phones; isn't that

3    true?

4    A.    Correct.

5    Q.    Generated a report?

6    A.    Correct.

7    Q.    As search warrants were obtained for additional phones,

8    those numbers were then incorporated into the report?

9    A.    Correct.

10   Q.    To make sure that the phones that we're looking at were

11   accurately mapped and we knew where they were?

12   A.    Yes.

13   Q.    And even up until I think there was a report updated, I

14   think counsel said, sometime in October, it was updated with

15   additional phones trying to ensure locations of phones even up

16   to that point with additional search warrants being obtained

17   and records being given to you for processing and updating?

18   A.    Yes, that's correct.

19   Q.    And that's what the updates were for?

20   A.    Yes.

21   Q.    Not to manipulate the data?

22   A.    No.  The data contained in the report is my analysis.  It

23   has no influence from anyone besides myself.

24   Q.    And you need to update the report when you get new phone

25   records; isn't that right?

1   A.   When we get new phone records or some event becomes

2   relevant or irrelevant, different evidence, many factors.

3          MR. MALLARD:  Can I have one moment?

4          THE COURT:  Yes.

5   BY MR. MALLARD:

6   Q.   Was there any per call measurement data that you reviewed

7   during the course of the time frame on January 26, 2019 that

8   was consistent with activity in the area of 108 Moraine Street?

9   A.   Could you repeat the time frame.  I'm sorry.

10   Q.   During the course of the -- of that slide from that 6:45

11   to 7:05, 7:17 slide?

12   A.   No, there was no activity that would suggest the device

13   was at 108 Moraine Street.

14          MR. MALLARD:  No further questions, Your Honor.

15          THE COURT:  Recross?

16          MR. SULTAN:  Very briefly.

17                      RECROSS-EXAMINATION

18   BY MR. SULTAN:

19   Q.   Special Agent Burke, the truth is you can't pinpoint where

20   any particular phone was located at any particular time, can

21   you?

22   A.   Never, no.

23          MR. SULTAN:  Thank you, sir.

24          THE COURT:  You're excused.  Thank you.

25          THE WITNESS:  Thank you, Your Honor.

1          MR. MALLARD:  The government rests, Your Honor.

2          THE COURT:  Thank you.  The government rests.

3          Mr. Sultan.

4          MR. SULTAN:  Defense calls Officer William Willis,

5    please.

6          THE CLERK:  Raise your right hand, please.

7          (Witness sworn.)

8          THE WITNESS:  I do.

9          THE CLERK:  You may be seated.  State your name and

10   spell your last name for the record.

11         THE WITNESS:  William John Willis, W-i-l-l-i-s.

12         WILLIAM J. WILLIS, having been duly sworn by the

13   Clerk, was examined and testified as follows:

14                          DIRECT EXAMINATION

15   BY MR. SULTAN:

16   Q.   Good morning, sir.  Tell us where you work, please.

17   A.   Brockton police.

18   Q.   What do you do for the Brockton Police Department?

19   A.   Patrolman.

20   Q.   How long have you worked for the Brockton Police

21   Department?

22   A.   I was employed September of 1998, 22 years.

23   Q.   Okay.  And were you working on January 26, 2019?

24   A.   Yes.

25   Q.   Do you remember what your shift was that day?

1    A.    I'm sorry?

2    Q.    Do you remember what your shift was that day, sir?

3    A.    I was 4:00 to 12:00 shift.

4    Q.    4:00 p.m. to midnight?

5    A.    Yes, sir.

6    Q.    At some point during your shift were you -- did you go to

7    a particular location as a result of radio calls?

8    A.    I responded to a robbery pursuit.

9    Q.    And where precisely did you go?

10   A.    I was on Center Street when the call came in, and we

11   initially I believe entered the pursuit on Bristol and Carl

12   Ave.

13   Q.    And when you got to Bristol and Carl Ave., what did you

14   see?

15   A.    A white Cavalier that was abandoned and a few other

16   officers were there.

17   Q.    A white car?

18   A.    A white car, yes, Malibu.  Sorry.

19   Q.    A Malibu?

20   A.    Yes.

21   Q.    And did you have any role in searching that white Malibu

22   for evidence?

23   A.    Yes.

24   Q.    Tell us what you did, sir.

25   A.    I stayed with the car, secured and searched some of the

1    back contents and the front.

2    Q.   So you searched the car, and you were able to -- did you

3    obtain anything from the car?

4    A.   Yes.

5         MR. SULTAN:  May I approach, Your Honor?

6         THE COURT:  Yes.

7    Q.   Showing you a plastic bag with an item in it, do you

8    recognize what that item is, sir?

9    A.   It's a black wallet.

10   Q.   Have you seen that black wallet before?

11   A.   Yes.

12   Q.   Where did you see it?

13   A.   It was the driver's side rear.  It was in like a

14   compartment, a plastic compartment in the door side.

15   Q.   So this wallet was inside that Malibu when you searched it

16   that evening, right?

17   A.   Yes.

18   Q.   Was that shortly after 7:30 p.m.?

19   A.   About there.

20   Q.   Okay.  Now, I'm going to -- did you open the wallet at

21   all?

22   A.   Yes.

23   Q.   Okay.  So I'm going to do that, too.  Okay?

24   A.   Sure.

25   Q.   So is one of the things that you found in that wallet the

1    item I'm putting in front of you?

2    A.    Yes.

3    Q.    And what do you recognize that item to be?

4    A.    It was an ID of Terrell Jackson.

5    Q.    A Massachusetts ID of Terrell Jackson?

6    A.    Yes.

7              MR. SULTAN:  I'd offer this as the next exhibit, Your

8    Honor.

9              MR. MacKINLAY:  No objection, Your Honor.

10             THE COURT:  It's admitted.  210.

11             (Defendant Exhibit 210 received in evidence.)

12   Q.    And let me show you something else.  Do you recognize that

13   document, Officer Willis?

14   A.    No, sir, I do not.  I don't recognize it.

15   Q.    Do you recognize that as something that was in the wallet?

16   A.    I do not recognize that as being in the wallet, no, sir.

17   Q.    Okay.  Have you ever seen that document before?

18   A.    No, sir.  Not to my recollection.

19   Q.    Okay.  Did you find a white plastic bag next to the

20   wallet?

21   A.    There was a large plastic bag that was stuffed in the

22   center of the seat.

23   Q.    I'm talking about a small transparent plastic bag with

24   some white substance in it.

25   A.    It was a small amount of marijuana in a bag, leafy

1    substance, which I believed to be marijuana near the wallet.

2             MR. SULTAN:  Do you have the exhibits, Karen?

3             THE CLERK:  Just the last --

4             MR. SULTAN:  Thank you.

5             May I show this to the jury, please?  This is Exhibit

6    202.

7             THE COURT:  Yes.

8    Q.   Officer Willis, I'm showing you Exhibit 202.  Does that

9    appear to be the little compartment --

10   A.   Yes.

11   Q.   -- where you found the wallet?

12   A.   Yes.

13   Q.   And do you see that little white bag --

14   A.   Yes.

15   Q.   -- next to that?

16   A.   Clear plastic bag.

17   Q.   I'll show you another close-up of that, which is Exhibit

18   203.  Do you see that white bag?

19   A.   Yes, sir.

20   Q.   Did you see that next to the wallet that night?

21   A.   Yes, sir.

22   Q.   Okay.  Now, in addition to finding some evidence in the

23   car, did you find some evidence in the street?

24   A.   Yes.

25   Q.   What did you find in the street?

1   A.   It was a pair of Adidas running shoes -- not Adidas.   I

2   believe they were Nike shoes.   They were left.

3   Q.   A pair of shoes, right?

4   A.   A pair of shoes.

5   Q.   Did you find a cell phone?

6   A.   A cell phone too, Alcatel cell phone.

7            MR. SULTAN:   Thank you, Officer Willis.   That's all I

8   have.

9            MR. MacKINLAY:   May I approach, Your Honor?

10           THE COURT:   Yes.

11                          CROSS-EXAMINATION

12   BY MR. MacKINLAY:

13   Q.   Officer Willis, a moment ago you were shown a black

14   wallet; is that true?

15   A.   Yes.

16   Q.   Is this the wallet that you recovered?

17   A.   Yes.

18           MR. MacKINLAY:   I'd offer it into evidence, please, as

19   Exhibit No. 166, please, Your Honor.

20           MR. SULTAN:   No objection.

21           (Government Exhibit 166 received in evidence.)

22           THE COURT:   It's admitted.

23           MR. MacKINLAY:   May I have the document camera for the

24   jury.

25   Q.   Officer Willis, where did you find this wallet and the

1   contents?

2   A.    Yes.  I found it on the back seat driver's side.

3   Q.    Left rear seat?

4   A.    Left rear seat.

5   Q.    Was there anything else there with it?

6   A.    There was a license in there.  There was another license

7   underneath it.

8   Q.    When you say "underneath it," do you mean physically

9   underneath it?

10  A.    Physically underneath it, yes.

11            MR. MacKINLAY:  Exhibit 165 for identification.

12            May I approach, Your Honor?

13            THE COURT:  Yes.

14  Q.    I'm showing you an item and ask if you recognize that,

15  Officer Willis?

16  A.    Yes.

17  Q.    What is it?

18  A.    That's the license I found underneath the wallet.

19  Q.    Underneath the wallet in the same left-hand side rear door

20  compartment?

21  A.    Yes, sir.

22            MR. MacKINLAY:  I would offer it into evidence as

23  Exhibit 165, please, Your Honor.

24            MR. SULTAN:  No objection.

25            THE COURT:  It's admitted.

1          (Government Exhibit 165 received in evidence.)

2    Q.   Is that the identification that you found underneath the

3    wallet in that compartment, sir?

4    A.   Yes.

5    Q.   Did you secure that as well as the wallet and turn it in

6    to evidence?

7    A.   Yes.

8    Q.   You were asked a few moments ago on direct examination

9    about a plastic bag that was observed in a couple of the

10   photographs that were taken of the items in that slot.  Do you

11   remember that?

12   A.   Yes.

13   Q.   You mentioned something about marijuana.  What was in the

14   bag?

15   A.   A leafy green substance that looked like marijuana to me,

16   resembling marijuana.

17   Q.   What did you do with the bag?

18   A.   I believe we discarded it.  I didn't take it as evidence.

19   Q.   How much or little was in it?

20   A.   A little bit.  Not even -- personal use weight, I'd say.

21   Q.   Just to be clear, it wasn't a white powder substance?

22   A.   No.

23   Q.   It was what you believed to be a green leafy substance?

24   A.   It was a leafy substance, yes.

25          MR. MacKINLAY:  No further questions of the witness,

```
 1  Your Honor.
 2             THE COURT:  Redirect?
 3             MR. SULTAN:  Nothing further.
 4             THE COURT:  You're excused.  Thank you.
 5             MR. SULTAN:  Your Honor, the defendant, Diovanni
 6  Carter, rests.
 7             THE COURT:  Rebuttal?
 8             MR. MacKINLAY:  No, Your Honor.
 9             THE COURT:  All right.  You've heard all the evidence.
10  I'm going to let you make your first decision here.  So it's
11  11:00.
12             Can you all give me an estimate on length of closing,
13  just for scheduling purposes?  No one's going to hold you to
14  it.
15             MR. MacKINLAY:  Forty, 45 minutes, in that range, Your
16  Honor.
17             MR. SULTAN:  I won't be longer than that.
18             THE COURT:  It looks like around an hour and a half
19  for closings.  I think what I will do is charge them now,
20  release them for lunch, and then have closings.  Does that work
21  for everybody?
22             MR. MacKINLAY:  Yes, Your Honor.
23             MR. SULTAN:  That's fine, Your Honor.
24             THE COURT:  I know you guys haven't been here long
25  enough to know, but Wednesday is always buffalo chicken day.
```

1  So it's a big treat here in the courthouse.  Everybody likes
2  buffalo chicken.
3          All right.  The charge will be no more than an hour
4  but approaching an hour.  And because I give you written copies
5  of it while you're deliberating, I actually have to read it to
6  you in order to make sure that what I say to you and what you
7  have in the jury room are the same.  I am ready to get going
8  now, but if you all would like a stretch or a break before I
9  go, we can do that.
10         JUROR:  I just need to use the bathroom.
11         THE COURT:  We'll take a quick break because I want to
12  get this done.  I want to do it before lunch.  We'll take a
13  quick break now and come back for the charge.
14         THE CLERK:  All rise for the jury.
15  (Jury exits.)
16  (A recess was taken.)
17         THE CLERK:  All rise for the jury.
18  (Jury enters.)
19         THE CLERK:  Court is in session.  Please be seated.
20         THE COURT:  All right.  As I said, I have to read
21  these sort of quid pro quo before giving you a written copy
22  when you go back there.  It's important that what I say and the
23  written copy say the same thing.
24         I'm going to try not to drone, and I will try to read
25  it in as animated and an interesting fashion as I can.

1          It is your job as jurors to find the facts from the

2     evidence admitted in this case.  You will then apply the law as

3     I give it to you to the facts as you find them.  You must

4     follow the law as I explain it to you, whether you agree with

5     that law or not.  Regardless of any opinion you may have as to

6     what the law should be, it would violate your sworn duty as

7     jurors in this case to base a verdict on any view of the law

8     other than that given in my instructions.  You must decide the

9     case solely on the evidence before you and according to the

10    law.

11         Counsel may have quite properly referred to some of

12    the applicable rules of law in the course of trial.  If,

13    however, any difference appears to you between the law as

14    stated by counsel or otherwise reflected in the exhibits and

15    the law as stated by me, you are to be governed by the

16    instructions given to you by me.

17         In following my instructions you must follow all of

18    them and not single out some and ignore others.

19         You must not interpret these instructions, or anything

20    I may have said or done during this trial as a suggestion by me

21    as to what verdict you should return.  That is a matter

22    entirely for you to decide.

23         Your verdict must be based solely on the evidence and

24    according to the law.

25         You may not base your verdict on any personal

1  feelings, prejudices or sympathies you may have about the

2  defendant or about the nature of the crimes with which he has

3  been charged.  You may not consider or be influenced by any

4  possible punishment that may be imposed on the defendant if he

5  is convicted of some or all of the charges.

6       Every person accused of a crime is presumed to be

7  innocent unless and until his or her guilt is proved beyond a

8  reasonable doubt.  This presumption is a fundamental principle

9  of our system of justice.

10      The presumption of innocence means that the burden of

11  proof is always on the government to prove that a defendant is

12  guilty of the crimes with which he is charged beyond a

13  reasonable doubt.

14      This burden never shifts to a defendant.  It is always

15  the government's burden to prove each of the elements of a

16  charged crime beyond a reasonable doubt.  A defendant does not

17  have to prove that he is incident, or even present any

18  evidence.

19      The presumption of innocence alone may be sufficient

20  to raise a reasonable doubt and to require the acquittal of the

21  defendant.  You may not convict the defendant here if the

22  government has failed or was unable to prove every element of a

23  crime charged against him beyond a reasonable doubt.

24      A reasonable doubt is a doubt that a reasonable person

25  has after carefully weighing all of the evidence.  It is a

1    doubt that would cause a reasonable person to hesitate to act

2    in a matter of importance in his or her personal life.  Proof

3    beyond a reasonable doubt must, therefore, be proof of a

4    convincing character that a reasonable person would not

5    hesitate to rely upon in making an important decision.  A

6    reasonable doubt may arise not only from the evidence produced,

7    but also from a lack of evidence.  Reasonable doubt exists

8    when, after weighing and considering all of the evidence, using

9    reason and common sense, jurors cannot say that they have a

10   settled conviction of the truth of the charge.

11          You may not convict the defendant based on speculation

12   or conjecture.

13          You may not convict the defendant if you decide that

14   it is equally likely that he is guilty or not guilty.  If you

15   decide that the evidence would reasonably permit either of two

16   conclusions -- either that he is guilty as charged, or not

17   guilty -- you must find the defendant not guilty.

18          You may not convict the defendant of any charge if you

19   decide that it is only probable, or even strongly probable,

20   that he was guilty of that charge.  A mere probability of guilt

21   is not guilt beyond a reasonable doubt.

22          The law does not, however, require that the government

23   prove guilty beyond all possible doubt; proof beyond a

24   reasonable doubt is sufficient to convict.  There are very few

25   things in this world that we know with absolute certainty, and

in criminal cases the law does not require proof that overcomes every possible doubt.

Again, the defendant in this case is presumed to be innocent, and the government bears the burden of proving him guilty beyond a reasonable doubt.  If, after fair and impartial consideration of all of the evidence, you have a reasonable doubt as to the defendant's guilt on any charge, it is your duty to acquit him, but if after a fair and impartial consideration of all the evidence you are satisfied beyond a reasonable doubt as to his guilt on a charge, you should vote to convict.

Your verdict must be unanimous on any charge in order to convict the defendant of that charge.  In other words, all of you must agree that the defendant is guilty of a charged offense for you to find the defendant guilty of that charge.

The fact that the prosecution is brought in the name of United States of America entitles the government to no greater consideration than that accorded to any other party to a litigation.  By the same token, it is entitled to no less consideration.  All parties, whether government or individuals, stand as equals before the law.

Like all defendants, Mr. Carter has a constitutional right not to testify.  No inference of guilt, or of anything else, may be drawn from the fact that he did not testify, nor may the fact that he did not testify be discussed or considered

1   by you in any way in arriving at your verdict.  There are many

2   reasons why a defendant would choose not to testify and you

3   should not speculate why Mr. Carter chose not to testify in

4   this case or give it any consideration.  To discuss or consider

5   a defendant's choice not to testify would violate his rights

6   and your oath as a juror.  You must not discuss or consider

7   Mr. Carter's constitutionally protected choice not to testify.

8           The evidence in this case consists of the sworn

9   testimony of witnesses, both on direct and cross-examination;

10  the exhibits that have been received into evidence; and any

11  facts to which the parties have agreed or stipulated or that I

12  took judicial notice of.  A stipulation means simply that the

13  government and the defendant accept the truth of a particular

14  proposition or fact.  Since there is no disagreement, there is

15  no need for evidence apart from the stipulation.  You must

16  accept the stipulation as fact to be given whatever weight you

17  choose.  You should consider all of the evidence, no matter

18  what form it takes, and no matter which party introduced it.

19  You are entitled, however, to give any particular piece of

20  evidence whatever weight you choose.

21          Whether the government has sustained its burden of

22  proof on any charge does not depend upon the number of

23  witnesses it has called or upon the number of exhibits it has

24  offered, but instead upon the nature and quality of the

25  evidence that has been presented.

1          Certain things are not evidence.

2          Arguments and statements by lawyers are not evidence.

3    What they said in their opening statements or what they will

4    say in their closing arguments is intended to help you

5    interpret the evidence, but it is not evidence.  If the facts

6    as you remember them from the evidence differ from the way the

7    lawyers have stated them in their openings, closings or while

8    questioning witnesses, your memory of the facts should control.

9          Questions by lawyers and any information included in

10   those questions standing alone are not evidence.

11         Objections by lawyers are not evidence.  You should

12   not be influenced by any objection or by my ruling on it, and

13   if an answer was not admitted, you should not speculate or

14   guess about what the answer might have been or what an exhibit

15   might have said.

16         Anything that I have struck or instructed you to

17   disregard is not evidence.

18         The indictment is not evidence.

19         And anything you may have seen or heard while court

20   was not in session, and I hope there isn't anything in that

21   category, is also not evidence.

22         As we discussed at the start of this trial, there's

23   direct evidence and circumstantial evidence.  Direct evidence

24   is direct proof of a fact such as testimony from an eye witness

25   that the witness saw something.  Circumstantial evidence is

1    indirect evidence; that is, proof of a fact or facts from which

2    you could draw a reasonable inference that another fact exists,

3    even though it has not been proved directly.

4         You are entitled to consider both direct and

5    circumstantial evidence and may give equal weight to both.  It

6    is for you to decide how much weight to give to any particular

7    piece of evidence, whether direct or circumstantial.

8         Although you may consider only the evidence presented

9    in this case, you are not limited to the plain statements made

10   by witnesses or contained in the documents.

11        You are permitted to draw reasonable inferences from

12   the facts, if you believe those inferences are justified in

13   light of common sense and personal experience.  An inference is

14   simply a deduction or a conclusion that may be drawn from the

15   facts that have been established.

16        Any inferences you draw must be reasonable and based

17   on the facts as you find them.  Inferences may not be based on

18   speculation or conjecture.

19        I'm going to go back to my example on direct and

20   circumstantial evidence.  You see your kid eating a chocolate

21   chip cookie, direct evidence that he ate the cookie.

22   Circumstantial evidence:  You don't see the kid eating the

23   cookie, but the cookies are gone and his face is covered in

24   chocolate.  From that circumstantial evidence, you can draw the

25   reasonable inference that that kid ate that cookie, even though

1  you didn't actually see it.

2          On the other hand, if your kid hates chocolate chip

3  cookies and won't eat them, and the dog looks happy, and your

4  spouse is home and the cookies are still gone, assuming that

5  your kid ate the cookie might not be a reasonable inference,

6  assuming that the dog or your significant other ate the cookie

7  might be the more reasonable inference in that case.

8          Throughout this trial, evidence was sometimes received

9  for a limited purpose only.  That is, it can only be used by

10  you for one particular purpose, and not for any other purpose.

11  I have told you when that occurred and instructed you on the

12  purposes for which the item can and cannot be used.  In this

13  trial, those limiting instructions have often concerned

14  hearsay.  As I instructed you, those statements were admitted,

15  for example, to explain what happened in response to the

16  statement being made, but they may not be considered for the

17  truth of the statement.

18          You do not have to accept the testimony of any witness

19  if you find that the witness is not credible.  You must decide

20  which witnesses to believe, considering all of the evidence and

21  drawing upon your common sense and personal experience.  You

22  may believe all of the testimony of a witness, or some of it,

23  or none of it.  You alone are the judges of the witnesses'

24  credibility.

25          In deciding whether to believe the testimony of the

1    witnesses, you may want to take into account such factors as

2    their conduct and demeanor while testifying; any apparent

3    fairness or unfairness they may I have displayed; any interest

4    they may have in the outcome of the case; any prejudice or bias

5    they may I have shown for or against any party; their

6    opportunities for seeing and knowing the things about which

7    they testified; the reasonableness or unreasonableness of what

8    they said while testifying; and any testimony or other evidence

9    that tends to support or contradict their versions of the

10   events.

11          The testimony of a witness may be discredited or

12   impeached by showing that he or she previously made statements

13   that are inconsistent with his or her present testimony.  If a

14   witness made inconsistent statements about any material matter,

15   you have a right to distrust the testimony of that witness in

16   other respects.  You may reject all of the testimony of that

17   witness or give it such credibility as you think it deserves.

18          In making this determination, you may consider whether

19   the witness purposely made a false statement or whether it was

20   an innocent mistake; whether the inconsistency concerned an

21   important fact, or whether it had to do with a small detail;

22   whether the witness had an explanation for the inconsistency,

23   and whether that explanation appealed to your common sense.

24   Sometimes people make innocent mistakes, particularly as to

25   unimportant details; not every contradiction or inconsistency

1  is necessarily important.  You alone are the judges of the

2  witnesses' credibility.

3         If you find that a witness previously made statements

4  that were the same as, or similar to, what the witness said in

5  the courtroom, you may also consider evidence of these kinds of

6  statements in determining the facts of this case.

7         You have heard people -- you have heard testimony from

8  persons described as experts.  An expert witness has special

9  knowledge or experience that allows that witness to give an

10  opinion.

11         An expert is allowed to express his or her opinion on

12  those matters about which he or she has special knowledge or

13  training.  Expert testimony is presented to you on the theory

14  that someone who is experienced in the field can assist you in

15  understanding the evidence or in reaching an independent

16  decision on the facts.

17         You may accept or reject such testimony in whole or in

18  part.  In weighing the testimony, you should consider the

19  factors that generally bear upon the credibility of a witness,

20  as well as the expert witness's education and experience, his

21  or her reasons for testifying, the soundness of the reasons

22  given for the opinion and all other evidence in the case.  You

23  should not, however, accept a witness's testimony just because

24  he or she is an expert.  Nor should you substitute such

25  testimony for your own reason, judgment, and common sense.

1          Again, you alone decide how much of any witness's

2     testimony to believe, and how much weight it should be given.

3          You have heard the testimony of people who work in law

4     enforcement or who are employed by the federal or state

5     government.  The fact that someone may be employed as a law

6     enforcement or other government official does not mean that his

7     or her testimony is necessarily deserving of more or less

8     consideration or greater or lesser weight than that of other

9     witnesses.

10         Further, it is quite legitimate for opposing counsel

11    to try to attack the credibility of a witness who is a law

12    enforcement or other government official on the grounds that

13    his or her testimony may be colored by personal or professional

14    interest in the outcome of the case.

15         As with all witnesses, it is your decision, after

16    reviewing all of the evidence, whether to accept the testimony

17    of the witness in whole or in part or not at all and give that

18    testimony whatever weight, if any, you find it deserves.

19         You've heard testimony that law enforcement conducted

20    certain tests and you have heard the results of those tests.

21    You may consider that testimony as you would any other evidence

22    and give it such weight as you believe it may deserve under the

23    circumstances.  Likewise, you may make reasonable inferences

24    from the fact that certain tests were inconclusive, that

25    certain tests were not conducted, or that certain investigative

techniques were not used.  Any such inferences, however, should
not be based on unfounded speculation or conjecture about what
the results of such tests or techniques might have been.  There
is no legal requirement that the government use any specific
investigative techniques or tests or all possible tests or
techniques to prove its case.

You have heard the testimony of a witness, Dennis
Martin, who testified to participating in the robbery at issue
in this case.  Mr. Martin entered into a plea and cooperation
agreement with the government.  He and his family have already
received some benefits from the government and he may receive
other benefits such as a reduction in his sentence if certain
conditions are satisfied.

Some people in this position are entirely truthful
when testifying.  Still, you should consider the testimony of
Mr. Martin with particular care and caution.  He may have had a
reason to make up stories or to exaggerate what others did
because he wants to help himself.  You must determine whether
his testimony was affected by any interest in the outcome of
this case, any prejudice for or against the defendant, or by
any of the benefits he or his family have received or that he
hopes to receive from the government as a result of entering
into a cooperation agreement.  You may consider a guilty plea
and the terms of a cooperation agreement in assessing the
credibility of a witness that has pled guilty to an offense,

1    but you are not to consider Mr. Martin's guilty plea as

2    evidence against Mr. Carter in any way.  In other words, you

3    may not infer that Mr. Carter engaged in criminal conduct or

4    had criminal intent on the basis that someone else pled guilty

5    to the same crimes that he is charged with.

6            It is for you to decide whether Mr. Martin testified

7    truthfully as his cooperation agreement requires, whether to

8    accept all, part or none of his testimony, and what weight, if

9    any, to give to that testimony.

10           You have heard evidence that Mr. Martin has been

11   convicted of a crime.  You may consider that evidence, together

12   with other pertinent evidence, in deciding how much weight to

13   give to his testimony.

14           Testimony by a witness as to identity must be received

15   with caution and scrutinized with care.  The government's

16   burden of proof extends to every element of each crime charged,

17   including the burden of proving beyond a reasonable doubt the

18   identity of an alleged perpetrator of an offense.

19           In evaluating the accuracy of an eyewitness

20   identification, you may consider the risks of identification or

21   misidentification under stress and the influence of suggestive

22   identification procedures.

23           Although the government is required to prove that the

24   defendant is guilty beyond a reasonable doubt, the government

25   is not required to call all possible witnesses who may have

 1    some knowledge about the facts of the case or to produce all

 2    possible documents which may bear on the case.  You must decide

 3    whether the government has met its burden based on the evidence

 4    that has been presented.

 5         Charts or chalks prepared by the government were shown

 6    to you during the trial for purposes of explanation or

 7    illustration.  You will not have the chalks or charts with you

 8    during your deliberations because they are not themselves

 9    evidence or proof of any facts.  You may, however, consider the

10    testimony given in connection with those materials.

11         You have heard recordings of conversations and seen

12    transcripts of those conversations.  The tapes will be

13    available to you in the jury room.  I remind you that the

14    evidence is what is on the tapes.  The transcripts were to help

15    you understand what was said on the tapes.  Any time there is a

16    variation between a tape and a transcript, you must be guided

17    solely by what you heard on the tape and not by what you saw in

18    the transcript.  Again, it is what you hear on the tape that is

19    evidence, not what's on the transcript.

20         As I indicated at the beginning of trial, you have

21    been permitted to take notes, but some cautions apply.  You

22    should bear in mind that not everything that is written down is

23    necessarily what was said.  When you return to the jury room to

24    discuss the case, do not assume simply because something

25    appears in somebody's notes that it necessarily took place in

1    court.  Notes are an aid to recollection, nothing more; the

2    fact that something is written down does not necessarily mean

3    it is necessarily accurate.

4         The numbers assigned to the exhibits are for

5    convenience and in order to ensure an orderly procedure.  You

6    should draw no inference from the fact that a particular

7    exhibit was assigned a particular number or that there may be

8    gaps in the number sequence, and it makes no sense difference

9    whether an exhibit was introduced by the government or the

10   defendant.

11        Some of the people who may have been involved in the

12   events you have been hearing about are not on trial.  There is

13   no requirement that all members of a conspiracy be charged and

14   prosecuted or tried together in one proceeding.  Your task is

15   limited to considering the charges contained in the indictment

16   and only as to the defendant before you.

17        This case, like most criminal cases, began with an

18   indictment.  The indictment is not evidence or proof of guilt.

19   The indictment is simply an accusation -- it is the means by

20   which defendants are charged with crimes and brought before

21   this court.

22        The indictment in this case charges the defendant with

23   five separate offenses.

24        Count One charges Mr. Carter with conspiring to

25   interfere with commerce by robbery.

1          Count Two charges him with interfering with commerce

2     by robbery.  That is committing the actual robbery, rather than

3     just agreeing to commit the robbery.

4          In Count Three of the indictment, Mr. Carter is

5     charged with discharging, brandishing, using, or carrying a

6     firearm in relation to the robbery or aiding and abetting the

7     discharge, brandishing, use or carrying of the firearm.

8          Lastly, in Counts Four and Five of the indictment,

9     Mr. Carter is charged with possessing a firearm or ammunition

10    after having been previously convicted of a crime that is

11    punishable by imprisonment for more than a year.

12         The defendant is not on trial for any act or any

13    conduct not specifically charged in the indictment.

14         The indictment alleges that the conspiracy charged in

15    Count One took place on or about January 26, 2019 to on or

16    about March 13, 2019.  The other counts each allege that the

17    offense took place on or about January 26, 2019.  Where the

18    indictment charges that a crime is committed on or about a

19    certain date or dates, the government must prove beyond a

20    reasonable doubt that the crimes were committed on a date

21    reasonably near the date alleged in the indictment, but it is

22    not necessary for the government to prove that the crimes were

23    committed precisely on the date charged.

24         In determining whether the defendant conspired as

25    charged, you need not find that the conspiracy existed during

1   the entire period charged.  It is sufficient that you find that

2   the conspiracy was in existence during the approximate time

3   period alleged in the indictment and that the defendant was a

4   member of the conspiracy during at least some of that period.

5          All right.  I'm going to now turn to the law

6   applicable to each of the five counts.  It can be a little

7   dense.  So I'm going to give you fifteen seconds to stand up,

8   stretch, refocus yourself and we'll get going on that.  So a

9   little break.  No one's going to do it?

10          Count One, conspiracy to interfere with commerce by

11  robbery.

12          As I said, the defendant is charged in Count One

13  conspiring to interfere with commerce by robbery and then

14  charged in Count Two with actually committing or aiding and

15  abetting the commission of the robbery.  These are different

16  offenses with different elements that need to be proven beyond

17  a reasonable doubt, although there is obviously some overlap in

18  the elements of each offense.  I will first address the

19  conspiracy count and then the crime of interfering with

20  commerce by robbery.

21          The defendant is accused of the crime of conspiring to

22  commit a robbery that would have had the effect of obstructing,

23  delaying or affecting interstate commerce.  For you to find the

24  defendant guilty of this crime, you must be convinced that the

25  government has proven each of the following things beyond a

reasonable doubt:

First, that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to commit a robbery that, if successful, would have had an effect on interstate commerce.

And second, that the defendant willfully joined the agreement.

A conspiracy is an agreement, spoken or unspoken.  The conspiracy does not have to be a formal agreement or involve everyone sitting down together and working out all of the details.

But the government must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime.  Mere similarity of conduct among various people, or the fact that they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, but you may consider such factors.

To act willfully means to act voluntarily and intelligently and with the specific intent that the underlying crime be committed -- that is to say, with bad purpose, either to disobey or disregard the law -- not to act by ignorance, accident, or mistake.  The government must prove two types of intent beyond a reasonable doubt before the defendant can be said to have willfully joined the conspiracy:  an intent to

1    agree and an intent, whether reasonable or not, that the

2    underlying crime be committed.  Mere presence at the scene of a

3    crime is not alone enough, but you may consider it among other

4    factors.  Intent may be inferred from the surrounding

5    circumstances.

6         Proof that the defendant willfully joined in the

7    agreement must be based upon evidence of his own words and/or

8    actions.  You need not find that the defendant agreed

9    specifically to or knew all of the details of the crime, or

10   knew every other co-conspirator or that he participated in each

11   act of the agreement or played a major role, but the government

12   must prove beyond a reasonable doubt that he knew the essential

13   features and general aims of the venture.  Even if the

14   defendant was not part of the agreement at the very start, he

15   can be found guilty of conspiracy if the government proves that

16   he willfully joined the agreement later.  On the other hand, a

17   person who has no knowledge of a conspiracy, but simply happens

18   to act in a way that furthers some object or purpose of the

19   conspiracy, does not thereby become a co-conspirator.  The

20   government does not have to prove that the conspiracy succeeded

21   or was achieved.  The crime of conspiracy is complete upon the

22   agreement to commit the underlying crime, in this case

23   interference with commerce by robbery.

24        The term "interstate commerce" means commerce between

25   any point in the state and any point outside the state.  It is

1    only necessary that the government prove beyond a reasonable

2    doubt that there's a realistic probability that the crime as

3    charged in the indictment had some slight or minimal effect on

4    interstate commerce, or the potential for such an effect.  It

5    is not necessary for you to find that the defendant knew or

6    intended that his actions would affect interstate commerce.

7    This definition of interstate commerce applies to both Counts

8    One and Two.

9         "Robbery" means unlawfully taking or obtaining

10   personal property from another, against his will, by means of

11   actual or threatened force or violence, or fear of injury to

12   his person or property or property in his custody or

13   possession.  This definition also applies to both Counts One

14   and Two.

15        In Count Two, the defendant is accused of the crime of

16   actually committing a robbery that had the effect or would have

17   had the effect of obstructing, delaying or affecting interstate

18   commerce.  For you to find the defendant guilty of this crime,

19   you must be convinced that the government has proven each of

20   the following things.

21        First, that the defendant knowingly and willfully

22   obtained property from the T-Mobile store located at 521

23   Belmont Street in Brockton.

24        Second, that the defendant did so by means of robbery.

25        Third, that the robbery affected interstate commerce.

1          Again, interstate commerce and robbery have the same

2     meanings as we discussed with regard to Count One.  A robbery

3     is completed as soon as property is taken.  It does not matter

4     if the property is recovered or later returned.

5          As I will explain in greater detail shortly, there are

6     two other means by which the defendant may be found guilty of

7     Count Two even if he did not personally commit all the

8     essential elements of the offense.  First, if the government

9     proves beyond a reasonable doubt that the defendant conspired

10    to commit the crime and knew that it was reasonably foreseeable

11    the crime would be committed by a co-conspirator.  This is

12    known as "Pinkerton liability."

13          Second, the defendant may be found guilty of this

14    crime if the government proves beyond a reasonable doubt that

15    the defendant aided and abetted the commission of the crime.

16    This means that he took an affirmative step to help or cause

17    the crime to be committed, and intended that the crime be

18    committed by another or that he caused the crime to be

19    committed.  We'll get back to Pinkerton and aiding and abetting

20    in just a minute.

21          In Count Three, the defendant is charged with the

22    crime of brandishing, discharging, using, or carrying a firearm

23    during and in relation to a crime of violence.  For you to find

24    the defendant guilty of this crime, you must be satisfied that

25    the government has proven each of the following things beyond a

1 | reasonable doubt:

2 | First, that the defendant committed the crime of

3 | interference with commerce by robbery, described in Count Two,

4 | and second that the defendant knowingly used or carried a

5 | firearm during and in relation to that robbery.

6 | I instruct you that interference with commerce by

7 | robbery as charged in Count Two of the indictment is a crime of

8 | violence.

9 | The word "knowingly" means an act was done voluntarily

10 | and intentionally, not because of mistake or accident.

11 | To "carry" a firearm means to move or transport the

12 | firearm on one's person or in a vehicle or container.  It need

13 | not be immediately accessible.  To "use" a firearm means to

14 | employ the firearm actively, such as to brandish, display,

15 | strike with, discharge or attempt to discharge it, or even to

16 | refer to it in a way calculated to effect the underlying crime.

17 | "During and in relation to" a crime means that the firearm must

18 | have played a role in the crime or been intended by the

19 | defendant to play a role in the crime.

20 | With respect to a firearm, the term "brandish" means

21 | to display all or part of the firearm, or otherwise make the

22 | presence of the firearm known to another person, in order to

23 | intimidate that person, regardless of whether the firearm is

24 | directly visible to that person.  The brandishing of a firearm

25 | must be done intentionally, which means that it cannot be

 1   accidentally displayed or made known to another person.

 2          "Discharge" means that the weapon was fired.

 3   Discharge does not require an intent to fire the weapon, and

 4   includes accidental discharges during the crime of violence.

 5          As with Count Two, the defendant can also be found

 6   guilty based on "Pinkerton liability" or aiding and abetting

 7   even if he personally did not commit all of the elements of the

 8   charged offense.

 9          First, under "Pinkerton," the defendant can be found

10   guilty if the government proves beyond a reasonable doubt that

11   the defendant conspired to commit the underlying crime and knew

12   that it was reasonably foreseeable that the underlying crime

13   would be committed by a co-conspirator.  For this offense, it

14   must have been reasonably foreseeable to the defendant that a

15   co-conspirator would use, carry, brandish, or discharge the

16   firearm during the commission of the robbery.  Again, this is

17   known as "Pinkerton liability."  I will specifically instruct

18   you on this form of liability in greater detail shortly.

19          Second, the defendant may be found guilty as an aider

20   and abettor if the government proves beyond a reasonable doubt

21   that the defendant took an affirmative step to help or cause

22   the crime to be committed, and intended that the crime be

23   committed by another or that he caused the crime to be

24   committed by another.  To find the defendant guilty of aiding

25   and abetting the crime of using, carrying, brandishing, or

1    displaying a firearm during and in relation to a crime of

2    violence, the government must prove that the defendant knew the

3    firearm would be used, carried, brandished, or discharged, or

4    caused it to be used, carried, brandished, or discharged during

5    the commission of the crime of violence.

6           Again, we'll get back to aiding and abetting and

7    "Pinkerton" in a minute.

8           If you find the defendant guilty of using or carrying

9    the firearm during the commission of a crime of violence, you

10   must then determine whether or not the government has proven

11   beyond a reasonable doubt that the firearm was also brandished

12   or discharged during and in relation to the crime.  You'll be

13   asked to indicate on the verdict form whether you found the

14   firearm to have been brandished or discharged or both.

15          Again, for you to find that the firearm was

16   discharged, you do not need to find that the defendant

17   specifically intended that the firearm be discharged during the

18   commission of the offense.  You are simply to consider whether

19   the government has proven beyond a reasonable doubt that the

20   firearm was discharged, and not whether the discharge was

21   accidental or intentional.

22          Now to get back to "Pinkerton" liability and aiding

23   and abetting.

24          "Pinkerton liability" is only relevant if you find the

25   defendant guilty of the conspiracy charged in Count One.

1        If, consistent with my instructions, you find beyond a

2   reasonable doubt that the defendant was guilty of the

3   conspiracy count (Count One), then you may also, but are not

4   required to, find him guilty of the substantive crimes charged

5   in Count Two and Count Three if you find each of the following

6   elements beyond a reasonable doubt:

7        First, that someone committed the substantive crime

8   charged in Counts Two and/or Three.

9        Second, that the person you find committed the

10  substantive crime was a member of the same conspiracy as the

11  defendant.

12       Third, that this co-conspirator committed the

13  substantive crime in furtherance of the conspiracy.

14       Fourth, that the defendant was a member of this

15  conspiracy at the time the substantive crime was committed; and

16       Fifth, that the defendant could reasonably have

17  foreseen that one or more of his co-conspirators might commit

18  the substantive crime.

19       If you find all of these elements to exist beyond a

20  reasonable doubt, then you may find the Defendant guilty of the

21  substantive crime charged even though he did not personally

22  participate in the acts constituting the crime or did not have

23  actual knowledge of them.

24       If, however, you are not satisfied as to the existence

25  of any one of these five elements, then you may not find the

1   defendant guilty of the particular substantive crime unless the

2   government proves beyond a reasonable doubt that he personally

3   committed that substantive crime or aided and abetted in its

4   commission.

5        To "aid and abet" means intentionally help someone

6   else commit the charged crime.  To establish aiding and

7   abetting, the government must prove beyond a reasonable doubt:

8        First, that the crime of interference with commerce by

9   robbery, and/or the crime of discharging, brandishing, use and

10  carrying was actually committed by someone.  This person or

11  persons are referred to as the principal or principals.

12       Second, that Mr. Carter took an affirmative act to

13  help or cause the commission of either crime; and

14       Third, that he intended to help or cause the

15  commission of either crime.

16       The second element, the "affirmative act" element, can

17  be satisfied without proof that the defendant participated in

18  each and every element of the crime charged.  It is enough if

19  he assisted in the commission of the robbery and/or with the

20  discharging, brandishing, use or carrying of the firearm or

21  caused either offense to be committed.

22       The third element, the "intent" element requires that

23  the defendant had advanced knowledge of the facts that make the

24  conduct of the principal or principals criminal.  "Advanced

25  knowledge" means knowledge at a time the defendant can opt to

1  walk away.

2        As I mentioned before, for the defendant to be

3  convicted of aiding and abetting the crime of carrying,

4  brandishing, or discharging a firearm during a crime of

5  violence, the government must prove beyond a reasonable doubt

6  that the defendant knew a firearm would be carried, brandished,

7  or discharged during the commission of the crime of violence.

8        A general suspicion that an unlawful act may occur or

9  that something criminal is happening is not enough.  Mere

10  presence at the scene of the charged robbery and knowledge that

11  the robbery is being committed or that a firearm was being

12  discharged, brandished, used or carried during the commission

13  of the robbery is also not sufficient to constitute aiding and

14  abetting.  But you may consider these things among other

15  factors in determining whether the government has met its

16  burden.

17        If a defendant willfully "causes an act to be done,"

18  by another, the defendant is responsible for those acts as

19  though he personally committed them.  To establish that the

20  defendant caused an act to be done, the government must prove

21  beyond a reasonable doubt:

22        First, that another person or persons committed a

23  robbery that affected interstate commerce, and/or used,

24  brandished or discharged a firearm during a crime of violence.

25        And second, that the defendant willfully caused these

1    acts, even though he did not personally commit these acts.

2          The defendant need not perform the crime, be present

3    when it is performed, or be aware of the details of its

4    execution to be guilty of causing an act to be done by another,

5    but a general suspicion that an unlawful act may occur or that

6    something criminal is happening is not enough.  Likewise, mere

7    presence at the scene of the robbery and knowledge that the

8    robbery is being committed are also not sufficient to establish

9    causing an act to be done through another.  But you may

10   consider these among other factors.

11         An act is done "willfully" if done voluntarily and

12   intentionally with the intent that something the law forbids be

13   done -- that is to say with bad purpose, either to disobey or

14   disregard the law.

15         Again, for the defendant to be convicted for aiding

16   and abetting the crime of using, carrying, brandishing, or

17   discharging a firearm during a crime of violence, the

18   government must prove that the defendant knew a firearm would

19   be used or carried during the commission of the crime of

20   violence.

21         The defendant is charged in Counts Four and Five with

22   possessing a firearm after having been convicted of a crime

23   punishable by imprisonment for more than one year.  Count Four

24   charges possession of a .380 caliber black Ruger, serial number

25   37605289 and 13 rounds of .380 caliber ammunition.  Count Five

charges the possession of a .9 millimeter silver Armi Fratelli
firearm, serial number G11503, and a silver Jennings .22
caliber firearm, serial number 290106.  For you to find the
defendant guilty of either count, you must be satisfied that
the government has proven each of the following things beyond a
reasonable doubt:

First, that the defendant has been and knows that he
has been convicted of a felony, that is, a crime punishable by
imprisonment for a term exceeding one year.  This element has
been stipulated to.  You may not, however, infer that
Mr. Carter engaged in the criminal conduct alleged in this
indictment or that it is more likely that he committed the
charged crimes based on the fact that he has been previously
convicted of another felony.  Other than as satisfying this
element of the offense, the fact of Mr. Carter's prior
conviction should not be considered by you for any other
purpose.

Second, that after this conviction, the defendant
knowingly possessed a firearm or ammunition charged in either
or both of Counts Four and Five; and

Third, that the firearm or ammunition you found the
defendant to have possessed moved in interstate commerce, that
is, from one state to another or from a foreign country into
the United States at any time after it was manufactured.  The
travel need not have been connected to the charge in the

1    indictment, need not have been in furtherance of any unlawful

2    activity, and need not have occurred while the defendant

3    possessed the firearm or ammunition.

4         The term "firearm" means any weapon which will or is

5    designed to expel a projectile by the action of an explosive.

6    The term "firearm" also includes the frame or receiver of any

7    such weapon.

8         Again, the word "knowingly" means that the act was

9    done voluntarily and intentionally, not because of mistake or

10   accident.  The term "possess" means to exercise authority,

11   dominion, or control over something.  It is not necessarily the

12   same as legal ownership.

13        Possession includes both actual and constructive

14   possession.  A person who has direct physical control of

15   something on or around his person is in actual possession of

16   it.  A person who is not in actual possession, but has both the

17   power and intention to exercise control over something is in

18   constructive possession of it.  A person must have actual

19   knowledge of the weapon in order to have constructive

20   possession of it.  Briefness of contact alone does not preclude

21   a finding of possession.  Whenever I use the term "possession"

22   in these instruction, I mean actual as well as constructive

23   possession.

24        Possession also includes both sole and joint

25   possession.  If one person alone has actual or constructive

1    possession, possession is sole.  If two or more persons share

2    actual or constructive possession, possession is joint.

3    Whenever I have used the word "possession" in these

4    instructions, I mean joint as well as sole possession.

5          Because the defendant is charged with possessing

6    different firearms in separate counts, for you to find the

7    defendant guilty of both counts, you must find that the

8    defendant possessed the firearm and ammunition -- the firearm

9    or ammunition charged in Count Four at a separate time or place

10   than the firearms charged in Count Five.

11         All right.  My final instructions have to do with how

12   you're going to deliberate.  I'll give you those after

13   closings, but because I have now addressed you directly, I need

14   to give the parties an opportunity, once again, to object to

15   anything I've said to give me a chance to correct it if I've

16   gotten anything wrong.

17              THE COURT:  Do you want to be seen at sidebar?

18              MR. SULTAN:  No, Your Honor.

19              THE COURT:  Do you want to be seen at sidebar?

20              MR. MALLARD:  No, Your Honor.

21              THE COURT:  Okay.  I'm going to release you for lunch.

22   Hope your lunch is up there.

23              THE CLERK:  It will be, or soon.

24              THE COURT:  Karen says it will be.

25              Can you guys do a half hour of lunch today, or would

1   you like the full 45 minutes?  Half hour?  So we will come back

2   in half an hour, which is 20 past 12:00.  We'll get right to

3   closings.  All right?

4              THE CLERK:  All rise for the jury.

5   (Jury exits.)

6              THE COURT:  All right.  See you guys back in half an

7   hour.

8   (A recess was taken 11:50 a.m. to 12:20 p.m.)

9              MR. SULTAN:  Your Honor, I feel the need to put

10  something else on the record to follow up our sidebar.  The

11  government accused me being underhanded.  Your Honor accused me

12  of doing something inappropriate.

13             I try to be a very zealous advocate.  I always try to

14  follow the Rules.  I always try to be ethical.  I don't believe

15  I was underhanded or inappropriate.  I didn't accuse anybody of

16  being underhanded by putting in a redacted document, and I just

17  think that what I did was perfectly appropriate within the

18  bounds of the Rules.

19             And I think that I shouldn't have been accused of that

20  by the government or by the Court.  And I just want to put that

21  on the record, Your Honor.

22             THE COURT:  Well, I stopped him from calling you

23  underhanded and countermanded their description of

24  "underhanded."  Reasonable minds may differ.  I think that what

25  you did served -- crossed the line on the zealousness thing,

1  but you may feel otherwise.

2       The conversation was private.  The evidence came in.

3  The government effectively cross-examined on the point.  So I'm

4  just going to call it "no harm/no foul."

5       I would normally say this after closings and give my

6  assessment of the case, but I think this case by both sides has

7  been exceptionally well tried.  And I think that everybody has

8  been very respectful of everybody else.  I think the trial has

9  been superclean, and for which I thank you all.  So I'm going

10  to --

11       MR. SULTAN:  I appreciate that, Your Honor, but

12  there's now a record where the Court has accused me of doing

13  something inappropriate.  And I just think that that's wrong,

14  and I would ask the Court to reconsider that characterization

15  of what I did.

16       THE COURT:  Linda, put that sidebar under seal,

17  please.

18       THE CLERK:  It was Kathy.

19       THE COURT:  Linda, can you communicate with Kathy.

20  And the court reporter can get it under seal.

21       MR. MALLARD:  I just want to note, Your Honor, I did

22  speak to Mr. Sultan afterwards.  I apologized for the comment,

23  and it was wrong-minded at the time.

24       THE COURT:  It's frustrating for me because it

25  happened right at the end of the trial.  I'm left with very few

1  options if I, in fact, am right, and that was not -- was not

2  how it should have been done.  But look it's no harm/no foul.

3  I think you've done an excellent job representing him, a really

4  excellent job.

5       The cross-examination of the DNA expert was honestly

6  one of the best cross-examinations I've ever seen.  It is what

7  it is.  It's the woof and warp of the trial.  I have my view of

8  how that could have been better handled.

9       You think it was appropriate.  They were probably just

10  frustrated.  They didn't have a chance to call a rebuttal

11  witness, although I think they leveled the field on that with

12  the redirect.  I'll seal the sidebar but --

13       MR. SULTAN:  Thank you, Your Honor.

14       THE COURT:  Karen, can you go get them, please.

15       THE CLERK:  All rise for the jury.

16       (The Jury is present for the following.)

17       THE CLERK:  Court is in session.  Please be seated.

18       THE COURT:  When you're ready, Mr. MacKinlay.

19       MR. MacKINLAY:  May we have the monitors for the

20  members of the jury?

21       THE COURT:  Yes.  When you're ready.

22                   GOVERNMENT CLOSING ARGUMENT

23  BY MR. MacKINLAY:

24       That man is guilty of all five of the crimes for which

25  he's charged, not because I'm telling you so but because the

1    evidence did.  Witness after witness, exhibit after exhibit

2    that we put before you all led to the inescapable conclusion:

3    He orchestrated, he planned, he participated in a robbery of

4    the T-Mobile store.  And he chose and recruited his little

5    brother, Darius, to be part of the robbery crew.

6        Now, my co-counsel promised you at the start last week

7    that we were going to produce evidence to establish the

8    charges.  We delivered the evidence, evidence in a variety of

9    forms.  You heard from not one but two eyewitnesses to the

10   crime, Gardy Dertelus, Officer Robinson.  You heard from a

11   participant in the crime.

12       You heard evidence in a variety of forms, including video

13   evidence, records, forensic evidence, including DNA, ballistics

14   evidence, fingerprint evidence, cell phone evidence, including

15   cell phone records and tracking, which created an avalanche of

16   supporting evidence all fitting together for one conclusion:

17   He's guilty of the crimes charged.

18       You also heard 3Si.  Who knew, who knew that they use

19   these devices, right?  The 3Si tracker, the tracker that looks

20   like an iPhone, any other iPhone, the tracker that made its way

21   into the bag when they robbed the T-Mobile store at 521 Belmont

22   Street.  It's been said that the tracker is the reason we're

23   here.  Well, it's one of the reasons we're here.

24       But there's other reasons we're here.  Because not only

25   was Gardy Dertelus working that night in the T-Mobile store,

1    not only was Officer Robinson working that night on duty and

2    patrolling the city of Brockton, the police officers from the

3    Brockton Police Department and other police departments who

4    supported also were working, working together to hold everybody

5    involved in the robbery accountable.

6         What did you hear that they did in the aftermath of the

7    robbery with the assistance of the 3Si, the tracking device?

8    Dogs, search patterns, helicopters, all kinds of people

9    converging on the area around Carl Avenue where the car crashed

10   and the occupants took off.

11        One person got away, though, and he had help.  He had

12   help.  We'll talk about that in a moment.

13        I want to start with Officer Robinson.  Officer Robinson

14   came here and told you a few things that I want to remind you

15   of.  He said he never lost sight of the white Chevy Malibu from

16   the time that he saw the car until -- the high-speed chases

17   through the roads until the car crashed and the occupants fled.

18   He never lost sight.

19        He told you something else, and I want you to start with

20   this before we review the rest of the evidence.  Four people

21   fled that car.  Four people, right?  You remember him

22   testifying to that.  Four doors open up, and four people took

23   off.  He said -- again, your memory of the evidence controls,

24   but he stays right behind the vehicle with his headlights

25   flashing out, the white Malibu prior to the doors opening.

1    Ask yourself this about Officer Robinson:  How many times

2  do you think he's going to relive that moment in his head?  How

3  many times?

4    Robbery crew headed by him of shooting trying to take his

5  life, and he gets out of the car, bravely I would submit, to

6  chase after them.  And what does he see?  A fourth door.  He

7  only saw three people up to that point.  Remember?  One person

8  was ducking down on the left side.

9    What was his testimony about the fourth person?  "I was

10  alarmed.  I was concerned for my safety."  Is that fact burned

11  into his memory because of the seriousness of the incident and

12  the sheer terror he faced?  I submit to you it was.  Four

13  people fled the car.  He's the fourth.

14    How did he get away?  One person, James Boddie, 82 Carl

15  Avenue, a friend of his, James Boddie.  We know that he got

16  there because the records on the left-hand side show phone

17  calls after the chase concluding, one at 7:46 for nine minutes

18  between the defendant's phone and Boddie's phone with Boddie

19  directing him real time, "Hey, stay on the line.  Stay on the

20  line.  I'll tell you how to get to my place at 82 Carl Street."

21    The car crashed just up the street.  Nine minutes, phone

22  calls between defendant and James Boddie, and then they stop.

23  What does it tell you when they're speaking on multiple

24  occasions in that time frame, and then they stop?  Well,

25  they're together.  There's no need to call at that point,

1  right?  They're at his house.

2      Now, how do you know that?  How do you know he's at the

3  house?  Well, at 8:11 --  so that call ended at 7:55 p.m.

4  Remember the testimony of Chris Malm, the Airwing?  Remember

5  the Airwing, the helicopter flew down from Lawrence, 8:11.

6  8:11 is my memory of the testimony that he arrived.

7      Ask yourself when you saw that infrared camera evidence

8  tracking through the woods if there was anybody there.  You

9  would think you would have found him.  I mean, he found

10  coyotes, he found deer, but he didn't find Diovanni.  Why?

11  He's inside the house at 82 Carl Avenue with Boddie's

12  assistance.  That's why.

13      That brings us to Dennis Martin.  Dennis Martin, in an

14  effort to hold everybody accountable for their role in the

15  robbery, Dennis Martin.  First and foremost before we talk

16  about his testimony, who actually picked Dennis Martin?  Who

17  picked him?  He picked him, picked him to be part of his

18  robbery crew, remember?

19      Phone calls -- "What's up" -- between Rosser-Stewart and

20  Martin.  "What's up," we learned, means, "Hey, let's go do a

21  robbery."  Who knew?  He picked him with his associate,

22  co-conspirator Rosser-Stewart.  He picked him to be part of the

23  robbery crew.

24      And, also, if you think about it, Martin presented himself

25  to law enforcement at the time of his arrest.  What do I mean

 1  by that?  Minutes after the robbery, right, minutes after the

 2  robbery, when the car crashes, which we're going to go through,

 3  and everybody flees, as Robinson told you, where is Dennis

 4  Martin arrested?  A short distance away hiding behind a shed,

 5  doesn't have his shoes on.  You remember the testimony.

 6      What's the two things that he did when he was first

 7  confronted by the police?  First thing he said, really

 8  important, "I didn't shoot the police."  The second thing he

 9  said, "Let me give you a description of the people who were

10  involved."

11      Now, he had heard that Darius Carter had already been

12  arrested so he knew there was only two more left.  What does he

13  do?  He provides descriptions of both of them, Rosser-Stewart

14  and the defendant, which is put out over the radio broadcast to

15  the others searching.  What did we learn about them?  Six foot

16  one, long beard, light complexion.  Does it sound like him?

17      He also looked at a photo of Rosser-Stewart that was

18  provided to him by a female officer, Shannon Morency.  Remember

19  the photograph of Rosser-Stewart, and he identified he was one

20  of the co-conspirators of the robbery crew.  So before any

21  involvement of any significant nature with the government,

22  Martin had already provided help on the scene.

23      Now, no one is asking you to like the man.  He is a type

24  of a person that joined the robbery crew on two words.  "What's

25  up?"  He's a robber.  He's a drug dealer.  And no doubt he

1  caught -- was caught, and that played a significant role in

2  assisting the government, as well.  He was caught on the scene.

3  But he didn't shoot the police.  What is his explanation for

4  not shooting at the police and doesn't have a ring of truth?

5  What does he say?  "More than I bargained for.  More than I

6  bargained for.  I was in for robbery.  I was not involved with

7  this crew to shoot at the police."

8       No evidence to say that he did.  His firearm has

9  ammunition in it.  No evidence of shell casings or firing out

10 of the left side of the car where he was sitting where his

11 identification is.

12      We're asking you to look at his evidence, his testimony,

13 and review some of the evidence that we've introduced to see

14 how it fits, to see how it tends to support it, to see how it

15 corroborates it.

16      But remember something, the police, they kept

17 investigating.  They didn't stop.  They kept investigating.

18 Much of the evidence that was developed and presented to you

19 was really not from that night.  The tracking evidence,

20 forensic evidence, cell phone records all developed after the

21 fact.

22      The police kept investigating.  The ATF kept

23 investigating.  What did they do?  They determined and

24 collected evidence for you to consider to see how it all fits.

25      Let's start with the white Chevy.  He rented it.  You

1    heard from the Hertz folks, and you heard from Carshana Graham.

2    Reluctantly she told you that she rented the car for him.  She

3    explained that she did that.  I'm not going to use it.  He was

4    going to use it.  And she said -- again, your memory

5    controls -- that she thought she would have said to him words

6    to the effect of, "Hey, no one else can drive that car because

7    you're the only authorized driver."

8        Okay.  That's an important factor and a reason I'm going

9    to get to in a minute here.  One authorized driver, Carshana

10   Graham, not involved.  Second authorized driver, defendant,

11   involved.

12       What else tells you that the car was driven by the

13   defendant?  Well, let's think about it.  The other people in

14   the car, remember the people in the car, Darius Carter,

15   Rosser-Stewart, and Dennis Martin, these four.  You have

16   evidence from the Registry of Motor Vehicles establishing that

17   one person in the car had a driver's license, the defendant.

18   No one else had a driver's license.  No one else is an

19   authorized user.

20       So you say, well, maybe somebody could have just jumped in

21   and driven the car.  Really now?  What kind of plan would it be

22   if you made yourself and your robbery crew open to being

23   stopped by the police because the person driving couldn't

24   drive.  Of course, they didn't do that.  Of course, it was a

25   driver with a driver's license.  Of course, it was Diovanni

1  Carter.

2       Remember, too, they had to get right before they went

3  down.  Remember the words "get right."  You heard that from

4  Dennis Martin in the conversation of getting ready, preparing.

5  He described it as preparing to do the robbery.  "Get right"

6  also meant go get the guns.  More reason why they're going to

7  be careful driving to a robbery with guns in their car, and

8  they were going to have someone licensed and authorized to

9  drive that vehicle.  This evidence helps support who was

10 driving that vehicle that night.

11      You also know the defendant possessed the vehicle because

12 Samuel Files from the BCI came here and told you he got his

13 fingerprint, which was lifted by Dana Fowler, from the exterior

14 of the car.  Remember that?  I believe it was the right rear

15 section of the car.  And he individualized that to the

16 defendant.

17      I'm not surprised he's driving the car.  This car is

18 rented for him, but more evidence that he possessed it.  And

19 certainly you heard about another print from an Andy Sousa, who

20 has nothing to do with this.  In fact, his print was in the

21 system because of his military involvement.

22      Martin told you that the defendant was a leader of the

23 plan -- leader of the group who made the plan.  What evidence

24 do you have to support that?  Well, he called it an easy hit

25 when he talked to them, the defendant, an easy hit, meaning an

1    easy place to rob.  And how did he know it was an easy hit?

2         Well, the tracking evidence shows that his phone tracked

3    at 5:00 approximately in the morning from Boston to Brockton,

4    and while there, did something that he did for the first time

5    in months of records leading up to that point -- remember you

6    heard from Special Agent Kelsch from the ATF -- that the Google

7    search history of phones attributed to him.

8         What did you learn about that search?  You learned that he

9    Googled "T-Mobile," the place of the robbery.  You learned he

10   Googled "Xtreme Car Rental," which is right in the same area of

11   the robbery.  You can see in the picture the T-Mobile is down

12   to your left, and the Xtreme Car Rental is right up here on the

13   right-hand side.

14        And the tracking evidence of his phone shows that he went

15   from Boston to Brockton.  And, members of the jury, he cased

16   the joint in simple terms.  He did his research.  He cased the

17   joint and said, "It's an easy hit."  We know he's the leader

18   because the records, tracking records, as well as the Google

19   records, support it.

20        You also remember that Martin said Stewart called him,

21   signing the whole plan off, "What's up?"  It was around 6:00 in

22   the evening.  Phone records -- again, you can match up the

23   numbers, but the phone records show incoming calls from

24   Rosser-Stewart to the number associated with Dennis Martin.

25   That's what he asked him.  "Do you want to get involved?

1   What's up?  Let's go get right."  The phone records support him
2   saying he was recruited to join the crew.
3       In addition, Martin said that items were worn in the
4   store, particular items.  He said Darius Carter wore gloves.
5   He described the particular work gloves that you see there.  On
6   the right is where they were found in the car following the
7   apprehension.  And the left, you can make it out, they're on
8   his hands as he brandishes the gun and points it in the
9   direction of Gardy Dertelus, just as Martin told you.
10      He also told you that guns were handed out.  In
11  particular, a gun -- he said that the gun that was in the
12  possession of Darius was the one on the left, the 9 millimeter
13  Armi Fratelli; the one in the middle with the long magazine is
14  the one that he had, which was handed to him when he got in the
15  car; and the one on the right, he indicated, was the one
16  Rosser-Stewart had in the front seat.  He described them.  You
17  can see them.  We are not going to go through the video of the
18  store, but certainly you can see those weapons in the hands of
19  the individuals inside of the store.
20      The next thing that he told you is they got into the
21  vehicle and drove down to the area of the T-Mobile store.
22  Remember that?  And you have a dentist video, and it captured
23  the vehicle, the white Chevy pulling up to the light and
24  stopped.  Remember the testimony of Martin?  He talked about
25  how he looked over his shoulder and looked in the store.

1     Take a look inside the store when that is occurring.  You

2  can actually see Gardy Dertelus in the back of the store.  The

3  dentist video establishes what he said, what Martin said

4  happened at that very time in the car.  But what did he say the

5  defendant said at that time?  "That's it.  It's time.  There's

6  only two in the store."

7     Then they made the block and they parked the car and they

8  went in.  That's tantamount to the agreement.  "It's time.

9  Let's go."  And what did the co-conspirators do?  They go.

10  Armed, gloved, in they go.  One with a bag, Rosser-Stewart.

11     The bag and the guns -- excuse me, the bags were found

12  later.  The white bag was the bag that Martin indicated he used

13  to steal the iPhones, assisting in stealing other items from

14  the store, found in the back seat of the car, right where he

15  said.  The other bag is the bag Rosser-Stewart carried in the

16  front seat, right where he indicated it was left.

17     What else did he say?  "I thought we were going back to

18  Boston, taking a left turn."  Do you remember that one section

19  of his testimony?  He was on West Elm.  He thought he was going

20  to take a left, head up West Street, and go back to Route 24 to

21  Boston to get away.  Instead, he went right.  We now know why

22  he went right.  He was going to James Boddie's house.  That was

23  the plan.  He wasn't going to share that piece of it with the

24  co-conspirators.

25     But the 3Si tracking supports him testifying to that, as

1  well, because it shows the car, which is tracking -- now, you

2  remember, as soon as they went out of that grid, it

3  automatically started the tracking.  And as it started the

4  tracking, it started showing the path of the car with the

5  tracking device in it.  It went to the right, West Elm Street,

6  supporting the route described by Martin.

7      And we hit this point in the discussion review that I

8  really want to highlight for you because at this moment all the

9  things line up, and it's just as if the defendant had signed

10  his name to being the driver of the car.  What do I mean by

11  that?  The 3Si tracker is showing that after the robbery they

12  come out of the store, they've got the guns, they've got the

13  two bags, they run to the car.  You saw it on the dentist

14  video.  And they get into the vehicle, and they take off.  So

15  3Si has them moving.

16      What did Martin say?  He testified once we're moving,

17  Diovanni Carter was on the phone to someone named Noons.

18  Remember that?  Noons is the black figure there, the

19  silhouette.  Noons, that's the number.  What about him?  He,

20  Martin, hears the defendant talking to Noons saying, "Yeah,

21  I've got 30 or 40 of them.  Yeah, line up your people" or words

22  to that effect.  He's going to sell the phones.  That's why

23  they're doing the robbery.  They are looking for a fence,

24  someone to sell the stuff.  They have got this fence.  It was

25  this guy Noons.

1      So Ryan Burke's tracking of the cell phones is consistent

2   with the car moving in that same location.  The 3Si is

3   consistent with it moving at that time, as well, okay, at 7:15.

4   But, also, the phone records indicate that the phone call

5   occurred at that time between Noons and Diovanni Carter's

6   phone.  Now, ask yourself this:  Isn't that good proof that his

7   phone was used and he was answering the call and he was talking

8   to the fence also showing his leadership?

9      There's more.  Remember the call frequency charted with

10   the last witness, how many times people call each other?

11   There's 180 contacts between Noons and Diovanni Carter in just

12   over a month.  180 contacts.  It's his guy.  He's speaking to

13   his guy.  Not anyone else.  No one else would be doing that.

14   No one else would be speaking to Noons but the person who

15   routinely spoke to him.  He told you with his actions of

16   speaking to the fence while driving away that's consistent with

17   what Martin told you.

18      We continue on.  The chase occurs.  Robinson is involved.

19   Other officers are involved.  Speeds are hitting 60, 70 miles

20   per hour.  You know that from 3Si.  You know that from Officer

21   Robinson.  That's what Martin told you.  It continues until

22   they're in an area of Summer Street, and Martin told you he's

23   heard the defendant say words to the effect of, "You've got to

24   get them boys up off me."  He explained what he meant by that,

25   what he understood that to mean.  "Shoot at the police."

1           Now, something happens right after that.  Two people shoot

2     at the police.  You know that that occurred, he said that,

3     because it's spurred them to act.  It spurred them to do

4     something dramatic, take their loaded weapons and start

5     shooting at the police.  He said it.  Martin told you it.  It

6     has a ring of truth, I submit to you.

7           But the positions within the car as described by Martin

8     are also consistent with the physical evidence.

9           Darius Carter is in the back seat of the car.  He had the

10    large silver gun.  Rosser-Stewart is in the front seat with the

11    small silver gun.  You remember that.  Shell casings found, .22

12    shell casings from the small gun in the front seat, consistent

13    with him shooting it.

14          In the back seat they opened the windows, and they leaned

15    out and fired.

16          What do you know about one of the shell casings from the

17    larger gun in the back seat, the 9 millimeter?  Well, Baltazar

18    Goncalves woke up the next morning and found it.  But not

19    before the night before being in his living room and hearing

20    gunshots ringing out in his neighborhood.  Why is it?  You

21    heard he didn't go to the window.  He stayed inside the house.

22    The next morning he did see people searching, police officers.

23    He found the shell casing in the end of his driveway and turned

24    it into the police.

25          What did the ballistician say, Trooper Cochrane?  "It's

1  consistent with being fired ballistically from the gun in the

2  back seat," the gun that Darius Carter used.

3       The .22 caliber that was found, as well -- we'll talk

4  about in a moment -- that also is consistent with firing the

5  shell casing in the front -- that was found in the front seat

6  with one exception.  Because it's a smaller caliber, he

7  couldn't get as good a definitive result.

8       Now, you also heard a series of evidence.  For example,

9  there's no gunshot residue on these individuals.  Well, does

10  that really surprise anyone?  They're leaning out the window at

11  60 miles an hour shooting at the police.  I mean, common sense

12  just dictates that the gunshot residue particles just went

13  right out the window.  So they were not captured by the stubs

14  in an effort to do so.

15       You'll also learn there's no fingerprints recovered from

16  the firearms that were recovered.  That should come as no

17  surprise, as well.  90 percent of the time you don't get a

18  fingerprint from ballistics evidence.  You heard that from two

19  different troopers from the Massachusetts State Police Crime

20  Lab.

21       Then we hit a part of this story that's also corroborated

22  by the evidence.  What did Darius Carter report to the Plymouth

23  County Correctional Facility with on his shoulder?  He got

24  shot.  He had a bullet hole in his shoulder from the front seat

25  passenger, Rosser-Stewart, shooting a small .22 caliber pistol

1   and hit him in the shoulder.  There's a picture of the hole

2   going in and out of his shoulder.  Does that support Martin

3   saying the locations?  Of course it does.  Absolutely.

4   Sometimes truth is stranger than fiction.

5       How did the car stop?  Who remembers that?  How did the

6   car stop?  Not some crash, not speed.  A neighbor, a neighbor

7   came out, heard the police chasing him, and threw a log in

8   front of the white Chevy as it fled.  Crash causing it to hit

9   it -- causing it to crash, damage to the front portion of the

10  vehicle, and a flat tire.

11      Now, how do you know that occurred the way Martin

12  described it?  Officer Almeida, detective, the first witness,

13  said he had swerved to avoid it.  Something small, something

14  important because it brought the car to a stop and ultimately

15  brought the immediate arrest of three of the four individuals.

16      What about Terrell Jackson?  Let's just get this out of

17  the way.  His wallet is found in the car.  You heard from

18  Martin that he requested to get the wallet from Diovanni

19  Carter.  It was left in the car.  He told you he left it with

20  his identification.  You heard evidence today that that's where

21  it was found, in the left rear where Martin sat with Martin's

22  identification.  In it is the identification of Jackson.  And

23  then you heard something else.  You had his phone number.  You

24  heard from Ryan Burke, said his phone was in Boston at 7:10

25  p.m. the night of the robbery.  He can't be in two places at

1    once.

2          Now, you say, well, his phone could be.  Right, he could

3    be down here doing the robbery.  No, no, no.  What did the

4    T-Mobile witness tell you?  He had to have swiped it.  He

5    looked at the records and said, "Terrell Jackson swiped it."

6    He had to physically touch the phone at 7:10 in Boston.  That's

7    the end of the conversation relative to Terrell Jackson.  He

8    had nothing to do with it.

9          You also know from the phones and a variety of sources,

10   including the records from Express where the defendant worked,

11   well, he applied to work on a Friday, went to work on a Monday,

12   decided he didn't want to go to work anymore and quit, saying

13   he's got a lot going on in his life.  Yeah, he sure did.

14         You also heard that the .380 Ruger, the one we described

15   with the long magazine, was handed to him by the defendant.

16   And you heard yesterday from the DNA analyst at the

17   Massachusetts State Police Crime Lab -- and no, we're not

18   asking you to use just that evidence to support the fact that

19   Carter possessed the gun and handed it off.  There is other

20   evidence you can look to to support that, as well, including

21   the evidence from Dennis Martin.  But she did say and testified

22   that the defendant's DNA was a major profile of handler DNA

23   recovered from the .380 gun.

24         What else about the jail call?  This is a call that

25   occurred the very day that Darius Carter -- excuse me, Diovanni

1   Carter was arrested last year, 2019.  This is between his

2   brother commenting on the case.

3            (Audio playing.)

4            What is Darius Carter doing?  He's trying to get word,

5   to warn his brother, the defendant, to shut his mouth because

6   the co-d, Dennis Martin, the co-defendant is snitching.  He's

7   talking to the police.  Affirmative evidence of their both

8   involvement in the robbery.

9            Just a couple of comments on the law because, of

10  course, the Court gave you the law in great detail, and I

11  obviously would strongly urge you to listen to her

12  instructions.  I want to talk just briefly about a couple of

13  things on how the evidence meets it.

14           The first is on conspiracy in Count 1, conspiracy to

15  commit the robbery, a word or two about a conspiracy.  It's

16  just an agreement.  Okay.  It doesn't need to be a written

17  contract.  It doesn't need to be anything formal in nature.  It

18  can be, as I described earlier, just going, your actions to

19  follow the plan, which is what happened here both in Boston

20  when they got in the car and when they got to the T-Mobile when

21  they saw there was only two people present.  Each of the

22  persons involved inside of the car joined the conspiracy with

23  the intent and understanding how it was going to be carried

24  out, that they were going to do a robbery.

25           What about the robbery?  Count 2.  You have the video

1  evidence.  Again, I'm not going to play it.  A terrifying

2  moment for Gardy Dertelus who is forced in the back room at

3  gunpoint with three guns pointed in his face, pistol whipped,

4  and $20,000 approximately of items, cash was taken from him,

5  the property of T-Mobile, done by force, done at gunpoint.  You

6  saw it.  There's really nothing much more to talk about.  The

7  store was robbed and so was he.

8       The robbery has to affect interstate commerce.

9  Hearing evidence from the manager of the T-Mobile store that

10 the items, including iPhones, are manufactured out of the

11 country in China.  The corporate headquarters is in New Jersey.

12 The national headquarters of T-Mobile is in Washington.  The

13 FedEx sends from Texas all over the country.  The store was

14 closed afterwards for a period of time, closed early.  Remember

15 the testimony of Gardy Dertelus?  All those impacted in a very

16 minor way, which is all that's required under the law,

17 interstate commerce, as a result of the robbery.

18       How about Count 3, use of a firearm during and in

19 relation to the crime of robbery?  This means the possession

20 of, the brandishing of or the shooting or discharging of.  From

21 the get-go here we are not saying that he pulled the trigger on

22 any of the guns.  What we are saying is the law holds him

23 responsible regardless.

24       Multiple theories support that.  The Pinkerton theory,

25 whether it's reasonably foreseeable are the words you need to

1    focus on, to Diovanni Carter, that someone was going to

2    brandish a gun during the robbery.  Let's think about that.  He

3    gave them guns and sent them in to do a robbery.  He certainly

4    doesn't think he's going to keep them hidden.  You are going to

5    point them to someone to get them to do what you want them to

6    do.

7          What else?  He directed them to shoot at the police.

8    "Got to get the boys up off me."  Direct evidence of the

9    discharge of his -- direct knowledge, let alone reasonably

10   foreseeable knowledge, that the guns would be used and

11   discharged during the course of the robbery or the getaway.

12   It's all part of the robbery.

13         And what of the firearm offenses?  They are broken

14   out, as the Court described them, as to two counts, Count 4 and

15   Count 5, both allege the same thing but different guns.  First

16   is a stipulation that the defendant is or was at the time a

17   convicted felon and knew such.  And, secondly, you heard from

18   Patrick Briody of the ATF that the firearms and ammunition all

19   traveled in interstate commerce, which is another element of

20   the charges.

21         What about the possession?  Well, Martin says they

22   were handed out.  The DNA says his major profile for the one

23   gun.

24         But what more broadly than that?  What did you hear

25   for evidence right at the beginning of the trip down to

1    Brockton from Boston?  Remember the words, "We got" -- we, "We

2    got to get right.  We got to get right."  And what was the

3    understanding of Martin?  We got to go get guns.  We got to get

4    guns.  Joint possession of each of the guns by each of the

5    members involved in the robbery crew, the law holds them

6    accountable and holds him accountable.

7          A word or two about the plea agreement of Dennis

8    Martin.  I want to talk about a couple of things.  First, take

9    a look at the documents.  They're both in evidence.  There's a

10   mandatory minimum of seven years that he faces in prison.

11   That's the lowest his sentence can be provided by another

12   judge.  Counsel described that.  That's the terms of the

13   agreement.

14         The second part of the plea agreement that I want to

15   remind you of is he gets nothing, nothing in terms of a reduced

16   sentence from another court unless he tells the truth in his

17   testimony here.  His motivation is to be truthful so that he

18   can get a possibility of a reduced sentence.  That's the

19   arrangement.  Take a look at the agreements to confirm that.

20         The final bit of evidence that I want to talk to you

21   about is evidence that we developed and took a long time, a

22   long time to put phone records in, right?  Multiple:  Sprint,

23   T-Mobile, all these different phone records.  And then you

24   heard from Ryan Burke who kind of put it all together, and then

25   you can kind of see how we put all that stuff piece by piece

1    together so that he could tell you where these phones were at

2    certain times.

3            So one of the things he talked about is the

4    connectivity between these individuals.  And the connectivity

5    shows you that, for example, when Boddie and the defendant are

6    together, there's no calls between them.  While although they

7    have lots of calls back and forth in their call frequency, they

8    are showing a relationship.  When they're not together, there's

9    phone calls.  When they are together, there aren't.

10           What about the tracking evidence, more importantly?

11   The tracking evidence is described by Ryan Burke from the FBI

12   yesterday and then finishing this morning.  Using the data that

13   he received from the records and using his experience and

14   training that he has, what did he use in this map to show you

15   the path of travel of the phones at issue, the three phones

16   listed at the top?

17           The defendant's phone, more specifically, tracks from

18   Boston, tracks down to Brockton between 6:45 and 7:17 the night

19   of the robbery.

20           What does it show you moments later at the exact time

21   of the robbery which occurred at approximately 7:10?  All of

22   those phones are in the area and hitting off the tower right

23   near the T-Mobile store.  His technology and the records put

24   them all at the location of the T-Mobile store at the time of

25   the robbery.  Powerful evidence, I submit to you, of their

1  involvement and participation

2          And, finally, what about after the flight, which is

3  consistent, I would submit to you, with the tracker, the 3Si

4  tracker evidence.  What did you learn about Carl Avenue where

5  the car crashed and where Boddie lived?  Later, from 7:30 to

6  9:30, the car, the phones are located, in particular the

7  defendant's phone, in the area of Carl Avenue.  That was his

8  phone.  He had it with him.  He used it to get in touch with

9  Boddie to get away, but the trail was followed by Ryan Burke.

10          In conclusion, after considering all of the evidence,

11  the witnesses and exhibits we provided to you, I'm going to ask

12  you to return a verdict finding the defendant guilty of each of

13  the five charges.  And I'm going to ask you to go on to Count

14  3, Section 4A and 4B of the verdict form, to check the box as

15  proven that the defendant was involved and was responsible for

16  brandishing the gun and also was responsible for the discharge

17  of the gun.

18          MR. SULTAN:  May we approach briefly, Your Honor?

19          THE COURT:  Yes.  Why don't you all take a stretch

20  before we swap.

21          (At sidebar.)

22          MR. SULTAN:  Your Honor, I didn't want to interrupt,

23  but I object to the government's statement that Mr. Martin has

24  to do at least seven years.  My understanding is that if they

25  file a 5K motion, the sentencing judge will be free to sentence

1    below that number.  And if I'm right, then I would ask the

2    court to give a correction.

3            THE COURT:  What's the exhibit number?

4            MR. MALLARD:  I don't have it in front of me.

5            MR. SULTAN:  89 or 90 are the cooperation agreement.

6            THE COURT:  And it's in the cooperation agreement?

7            MR. MALLARD:  It's in the plea agreement, Judge.  The

8    cooperation agreement describes the 5K motion.  It does not

9    describe a motion under 3553(e) which would get him under the

10   mandatory minimum.  Counsel is wrong on that.  5K does not get

11   him below the mandatory minimum.

12           MR. SULTAN:  Well, 3553(e).

13           MR. MALLARD:  It's not in any agreement.  There is no

14   reference to -- there's no agreement to a 3553(e).

15           THE COURT:  They don't agree to go below.  They don't

16   agree to the motion that would let the judge go below the

17   mandatory minimum.

18           MR. SULTAN:  So they are precluded by the agreement;

19   is that the way Your Honor --

20           THE COURT:  Is that the position you're taking?

21           MR. MALLARD:  That's the position we're taking.

22           MR. SULTAN:  I don't know why it would be precluded.

23   I agree it's not referenced specifically in the agreement, Your

24   Honor.

25           THE COURT:  Neither one of them say anything about the

 1  mandatory minimum.  And you're not going to file anything to

 2  get him below the mandatory minimum?

 3          MR. MALLARD:  No.

 4          MR. MacKINLAY:  It's not in the agreement, Your Honor.

 5  We will not be doing that.  Absolutely not.

 6          THE COURT:  Okay.

 7          (End of sidebar.)

 8                  DEFENDANT CLOSING ARGUMENT

 9  BY MR. SULTAN:

10          Good afternoon.

11          (Jurors in unison:  Good afternoon.)

12          The government will get another chance to address you

13  after I sit down, but this is my last chance to talk to you at

14  this trial directly.  So I want to start by thanking all of you

15  for your service.  You are truly the heart and lungs of our

16  system of criminal justice.  You stand or sit between the

17  government as the accuser and an ordinary citizen as the

18  accused.

19          You come from different walks of life, from all over

20  Eastern Massachusetts, from Billerica to Westport to everywhere

21  in between.  You were drafted into this service.  You all

22  sacrificed to be here and to serve this very important role

23  that is so critical to our system of criminal justice.  And on

24  behalf of myself and on behalf of my partner, Kerry Ferguson,

25  and on behalf of my client, Diovanni, I just want to thank you.

1          Now, since I have a lot to say, and since I don't get

2     another chance, I may refer to my notes from time to time as

3     I'm speaking with you.  I hope you won't hold that against me

4     or against my client.

5          At the beginning of this trial, during the opening

6     statements, I told you that this case really came down to one

7     thing.  Do you find Dennis Martin to be a reliable and

8     trustworthy person?  And that really hasn't changed.  That's

9     really where we are at the end of the trial.

10          I told you I expected the government would present a

11     parade of other witnesses, and that's happened, too.  I think

12     they presented 44 other witnesses and well over 100 exhibits.

13          All of that evidence amounted to little or nothing

14     that helps you decide what you have to decide, not was there a

15     robbery at the T-Mobile store.  I told you in the opening

16     statement that's true.  That happened.  Those three men did go

17     into the T-Mobile store and rob it that night.  You didn't need

18     a parade of witnesses and exhibits to prove that.  Those three

19     men aren't on trial.  My client, Diovanni Carter, is on trial.

20     And all of that other stuff didn't really help you decide that

21     and certainly didn't prove it.

22          Now, you just heard the government's story.  And, in

23     effect, what the government is asking you to do to convict

24     Diovanni is to engage in speculation and conjecture.  But you

25     heard Judge Burroughs just before lunch, the beginning of her

1    instructions.  She told you, among many other things, you may

2    not convict the defendant based on speculation or conjecture.

3    You can't do that.  You need proof.  You need proof beyond a

4    reasonable doubt, and that's not even close in this trial, not

5    even close.

6            Now, I'm not going to present to you any diagrams or

7    maps or photos or recordings.  All of that stuff is really

8    designed to sway you.  Now, social scientists tell us that that

9    stuff works, but I don't think you'd be fooled.

10           I know I'm dating myself, but when I grew up there was

11   a show on TV called *Dragnet*.  And the detective on that show,

12   Sergeant Joe Friday, and he would go out and interview

13   witnesses.  And he would walk up to a woman, and she'd say

14   "What do you want to know?"

15           And he'd respond, "Just the facts, ma'am."

16           Well, let's just talk about the facts.  That's what

17   we're here for.  Not conjecture, not speculation, not stories.

18   The facts, the evidence.

19           And the government's evidence in this trial really

20   consisted of two parts.  Dennis Martin, the centerpiece of

21   their case, and some other stuff.  So let's start with the

22   other stuff, and then we'll turn to Mr. Martin.

23           So what's the other stuff?  Well, DNA, that was part

24   of their case.  You heard from Kira Snyder, the DNA analyst.

25   You heard from Sharon Salem, the woman who swabbed the Ruger,

1    among other things.  And I don't mean any disrespect to these

2    people.  They were very nice women.  They're doing their jobs.

3          But as jurors, you have to look critically at the work

4    they did in this case.  They're trying to convict my client of

5    serious crimes based on the work they did in this case at that

6    lab.  So what was the evidence about that?

7          Well, Sharon Salem, she told you there was three

8    different pieces of evidence.  This stuff needs to be done

9    right.  This stuff needs to be done carefully.  We all know

10   about forensic science and how it is important.  It can provide

11   real important information when it's done right.

12         Three pieces of evidence:  the Ruger gun, the

13   magazine, and the ammunition.  What did she do?  She swabbed

14   all of that stuff together and stuck that swab in a tube.  So

15   as she told you, there's no way to know what came from what

16   anymore.  She admitted that's not what the protocols say you're

17   supposed to do, but that's the way she did it.  And then she

18   turned it over to Kira Snyder to analyze it.

19         So Kira Snyder goes through her steps.  And the first

20   step she goes through, she does the -- she does the extraction

21   and then she does the quantification.  And she's doing this

22   first ST -- it's called STR testing.  And lo and behold, what

23   does she discover?  More than two-thirds of the DNA on that

24   combined swab is female.  She doesn't put that in her report.

25   She doesn't mention that.

1          Then she goes on and she decides, well, I'm only

2    interested in males.  That's really who we're after here are

3    guys.  So she does this second kind of testing, the Y-STR

4    testing, right?  And she does the Y-STR testing.  She concludes

5    that there is a combination of DNA on that combined swab with

6    everything smushed together of at least four different males on

7    that swab.  She can't identify any individual.  She tells you

8    that.  She can't identify somebody with Y-STR.

9          And what else do we find out about the work she did on

10   this case?  Well, it was a positive control, a positive control

11   that's supposed to be DNA in there so we know that the test is

12   operating correctly.  She ran a positive control.  There was no

13   DNA.  Oops.  That's a problem.

14         There's negative controls.  There's not supposed to be

15   anything in the negative controls so we know there's no

16   contamination.  Oops.  There was DNA in the negative control.

17   That's a problem.

18         She just kept right on rolling.  She said, "Oh,

19   contamination in our lab, very rare occurrence."

20         Well, I showed her, and we now have in evidence six

21   different instances of contamination on this very same kind of

22   testing, Y-STR testing, the same kind of testing she did in

23   this case, six instances of contamination over a 20-day period.

24   Six times contamination.  She admitted if there's

25   contamination, the results are going to be invalid, the results

1   are unreliable.  Six times in a 20-day period.  There's

2   contamination in the STR part of that lab.

3          What kind of a DNA lab is this?  They want you to rely

4   on this evidence beyond a reasonable doubt to convict Diovanni

5   Carter of serious crimes.  Are you kidding me?

6          You heard from Mr. Yoon yesterday.  Mr. Yoon typed

7   Diovanni's buccal swab, his profile.  Okay.  Well, Mr. Yoon had

8   a contamination problem, too, if you recall, in his work, but

9   he typed Diovanni's profile.  And we learned that 2,500 to

10  3,000 males in the state of Massachusetts would have that exact

11  same profile, including all of Diovanni's male relatives.  Is

12  that Diovanni's DNA on that sample?  It could be.  It's

13  possible.  We don't know that it isn't.  Proof beyond a

14  reasonable doubt.

15         And if somehow you decide they prove Diovanni's DNA

16  was on that sample, well, we don't know when it was put on

17  there.  We don't know how it was put on there.

18         You heard Kira Snyder, she even told you about

19  secondary transfer.  I shake her hand, she touches the

20  microphone, my DNA ends up on the microphone, even though I

21  never touched the microphone.

22         We don't know anything about that DNA.  Proof beyond a

23  reasonable doubt?  That's the DNA.

24         Well, what other stuff did they present to you?  Well,

25  there's the cell phone stuff, a whole lot of cell phone stuff.

1    Yesterday was a really long day, maybe it was the day before.
2    They all kind of run together.  But what is all that cell phone
3    stuff about?  Today you saw Exhibit 119.  That's the exhibit
4    the government put in with all those pages blacked out.  And
5    then you saw Exhibit, I think it's 209, the same document where
6    those pages are not blacked out.

7            And what did Sprint itself say about this PCMD data,
8    which is what Special Agent Burke was relying on?  They said it
9    may be inaccurate.  It may be unreliable.  This is the company
10   itself.  This is what they say about that data.  It's not to be
11   used to tell where somebody was located, or where their phone
12   was -- a particular phone was located even though some people
13   like to use it that way.  It's not proof beyond a reasonable
14   doubt.

15           And all this stuff about the phones, basically they're
16   trying to prove guilt by association or proof by location.
17   Well, Diovanni was talking to these other people who were
18   involved; and, therefore -- therefore, Diovanni is involved?
19   That's not how we convict people of serious crimes in this
20   country if you are talking on the phone with somebody who
21   happens to be involved in a crime.

22           Or by location.  The 2207 phone was in Brockton.
23   Well, okay, it was in Brockton.  Does that mean he was
24   participating in the robbery of the T-Mobile store?  Does it
25   prove that?  He's got family living less than a mile from the

1   same location.  And what's the evidence that Diovanni Carter

2   even had that phone that day?  No evidence of that.  They just

3   want you to speculate that, well, he probably had that phone.

4        All of that cell phone stuff does not amount to any

5   proof that Diovanni Carter was involved in this robbery.  Did

6   he talk to some of these people?  Probably.  But even probably

7   is not enough.

8        Judge Burroughs told you this morning that even if you

9   find -- even if there is a probability, even a strong

10  probability in your minds that Diovanni was involved in this,

11  that's still not enough to convict him.  And they don't even

12  have a strong probability.

13       They have speculation and conjecture.  That's what

14  they have, and that's not something that you can rely on in a

15  court of law under our system of criminal justice.

16       Well, so what other stuff do they present?  Oh,

17  there's Google search stuff.  Well, there's -- there were

18  Google searches on a Google account linked to Diovanni Carter

19  "T-Mobile near me."  Well, that's certainly proof that he

20  committed an armed robbery?  Give me a break.  I mean, that's

21  like throwing a bunch of stuff against the wall and hoping that

22  something will stick.  That's not proof.

23       And then what other stuff do they present?  Well,

24  there's James Boddie.  Their whole theory, oh, Diovanni Carter,

25  he was headed for James Boddie's house.  And he somehow got

1   away because he got into James Boddie's house and he hid there

2   so he wouldn't be captured.  That's a great story.  Is there

3   any proof at all that happened?  None.  It's just speculation

4   and conjecture.

5          Officer Robinson, what did he tell you about this car

6   he was bravely following, that these robbers are shooting at

7   him?  He said the driver looked lost.  He didn't know where he

8   was going.  Is that consistent with Diovanni on his way to

9   James Boddie's house?  Of course not.  No evidence at all about

10  James Boddie or his role in anything.  It's just speculation.

11  It's just a story.

12         Could it be true?  I suppose it could be true.  You

13  can make up any story you want, but that's not what we're here

14  for.  We're not here for stories.  It's not proof.

15         What else do they have?  What other stuff did they put

16  on?  Well -- oh, the prosecutor told you about this Noons,

17  somebody named Noons.  Was there any evidence at this trial,

18  other than from the mouth of Dennis Martin, and we'll get to

19  him, about someone named Noons?  Just another part of the story

20  they're making up.  It's not proof beyond a reasonable doubt.

21         And then they have this call that they just played for

22  you, a call from Darius Carter to his parents.  "Tell Diovanni

23  to keep his mouth shut."

24         Well, maybe Diovanni knew something about Darius being

25  involved in this robbery.  They're brothers.  Maybe he knew

1    something.  Maybe Darius was worried that Diovanni was going to

2    provide information that was going to hurt Darius.  The fact

3    that Darius is concerned about whether Diovanni keeps his mouth

4    shut, that doesn't prove that Diovanni was involved.

5    Speculation, conjecture, that's all that is.

6           Now, we'll get to Dennis Martin.  I want to make sure

7    I didn't forget anything before we get to Mr. Martin.

8           Oh, one other thing that you saw during the

9    prosecutor's closing.  All this pointing at Diovanni Carter,

10   pointing at him over and over and over, what does that prove?

11   Is that proof?  It's not proof.  That's pointing.

12          So let's get to Mr. Martin because he's really what

13   this case is about.  Do you want to rely and trust Mr. Martin?

14   Do you find him to be a trustworthy individual?

15          Now, Judge Burroughs told you several things this

16   morning about your evaluation of Mr. Martin's testimony, and

17   what the judge says in this courtroom goes.  So let me just

18   read to you some of the things that she said, if I may.

19          She told you to consider Dennis Martin's testimony

20   with particular care and caution.  She told you he may have a

21   reason to make up stories because he wanted to help himself.

22   You think?

23          So what kind of a person is Dennis Martin?  Well, you

24   learned he was deported to the United States at age 18 for,

25   among other thing, armed robbery.  You learned that in the six

1    years since, he's been convicted of multiple crimes:  assault

2    and battery, larceny, drug dealing, and armed robbery while

3    masked.  You've learned he's been on probation several times

4    and has had his probation revoked.

5          Dennis Martin is a man who lies and cheats and steals

6    and drug deals his way through life.  Is this the kind of

7    person that you want to find to be reliable and trustworthy?

8    This is the person the government has brought you.  This is who

9    he is.  He lied repeatedly to police officers.  He's lied

10   repeatedly to courts.  He lied in this very courthouse to Judge

11   Woodlock last August.

12         And what are some of the lies he told in this case,

13   long before he came to court today?  That night, the night he

14   was caught after robbing a T-Mobile store, "I never had a gun."

15   We know that's a lie.  You saw the videotape.  "Some white

16   woman, some white girl came and took the guns."  That's another

17   thing he said that night.  Well, you know that's a lie.  The

18   guns were found by the police.

19         What else did he say?  He said, "Oh, this ammunition

20   that was on him," he has -- he said -- he told the police that

21   night he had no idea where that ammunition came from.  Another

22   lie.

23         He told the police that nobody struck the store

24   employee.  You know that's a lie.  You heard from poor

25   Mr. Dertelus who was hit on the head with a gun.  Why would you

1   believe a single thing Dennis Martin said.

2          Now, you got to see Dennis Martin testify from the

3   witness stand, the government's star witness presented to you

4   under a cooperation agreement.  Sat right there just a few feet

5   away from you and testified.  Well, direct examination went

6   fine.  He had gone over that repeatedly with the prosecution

7   team.  That went fine.  He was able to get out his whole story

8   under direct examination.  No problem.

9          But then we came to cross-examination.  The Supreme

10  Court in a case, quite a few years ago now, said -- called

11  cross-examination the greatest legal engine ever invented for

12  the discovery of the truth.  And you saw that, the truth of

13  that statement right before your eyes in this courtroom when

14  Dennis Martin was on cross-examination.

15         Think about his affect, how he squirmed, how he looked

16  down, how he wouldn't have any eye contact, not just with me

17  but with you.  How he tried to avoid answering my questions,

18  claiming he didn't understand the simplest questions because he

19  didn't want to answer them.

20         Martin didn't want to admit anything until I showed

21  him his own words, either on paper or in a recording, and then

22  he had to own up to it or say he didn't understand.  But unless

23  I -- until I showed him his own words, he wouldn't admit to

24  anything.  Is that the kind of person you want to trust and

25  rely on in a serious case?

1          So what were some of the things that Dennis Martin

2     finally owned up to on cross-examination?  Well, we learned

3     that the name of the woman he was with that day was Amanda

4     Barata.  He had never given the government that name, but he

5     knew the name.  He knew exactly who she was.

6          And, in fact, he had sent somebody, one of his pals,

7     to beat her up after he was put in jail.  Why did he want her

8     beaten up?  Why didn't he want the government to know who she

9     was?  Was he worried that she might say something that would

10    ruin his whole little plan of getting out of this mess by

11    falsely implicating Diovanni Carter?

12         What else did we learn when he was on

13    cross-examination?  Well, we learned that he had a cell phone,

14    one of his two cell phones that he didn't want the government

15    to get.  He really didn't want them to get that cell phone.  He

16    told his mother, "Don't let them have that cell phone.  Tell

17    them my little brother broke it."

18         Why didn't he want the government to have that cell

19    phone?  If you look at his cooperation agreement -- his

20    cooperation agreement, which is, I think, Exhibit 90, says he

21    has to provide all things that the government asks.  If they

22    want some piece of evidence that he has, he has to give it up.

23    His cooperation agreement says he can't protect anybody.  He

24    has to give all answers.  He didn't comply with his cooperation

25    agreement.  He didn't tell them Amanda Barata's name because he

 1    didn't want them to find her.

 2            He didn't give up that cell phone because he didn't

 3    want them to see that cell phone and what was on that cell

 4    phone because that might have messed up his whole little plan,

 5    too.

 6            What else did we learn?  We learned he was dealing

 7    drugs from jail.  Was that part of his deal with the

 8    government, too?

 9            And we learned something else really important that he

10    owned up to.  He admitted that just a few weeks before he

11    robbed the T-Mobile store he did another armed robbery, an

12    armed robbery with his friend Stephan Rosser-Stewart, a

13    convenience store.  He wasn't sure if it was in Quincy, but he

14    remembered that robbery.

15            And he also admitted on cross-examination that when he

16    did that robbery just a few weeks before he did the T-Mobile

17    robbery, he used the same gun, the Ruger, the Ruger .380.  He

18    had that gun.  He didn't need Diovanni Carter to give it to him

19    on January 26th.  He had it.  He had just robbed another place

20    a few weeks earlier, hadn't gotten caught.  That's a very

21    important piece of information that he had to own up to on

22    cross-examination.

23            Who was he covering up for?  Was he covering up for

24    his friend Terrell Jackson, who called hundreds and hundreds of

25    times and whose wallet and ID were in that car?  Was he

1  covering up for Amanda Barata, his friend and business partner,

2  I think he agreed, called her, whose name he didn't want the

3  government to know?  Somebody else.  Who knows?  I don't know

4  the answer to that.

5       But we do know that he falsely implicated Diovanni

6  Carter in an effort to trade Diovanni Carter's liberty for his

7  own and get a lenient sentence.  We do know that.

8       Now, unfortunately, the government bought the story

9  that Martin was telling.  They gave him his cooperation deal.

10  He's looking for a lenient sentence despite his long record,

11  despite what he did that night.  He doesn't have his lenient

12  sentence yet.  He's still waiting for it.  He hasn't been

13  sentenced.  They're holding that over his head.

14       He told you on cross-examination he needs the

15  government to file this motion, a motion saying that Dennis

16  Martin has cooperated, has provided substantial assistance to

17  the government in the prosecution of somebody else.  That's his

18  golden ticket.  That's what he needs to get what he's looking

19  for.  That hasn't happened yet.  He's still waiting for his

20  ship to come in.

21       So do you think that he has an incentive to please the

22  government, to say what they want him to say at this trial so

23  that he'll get his golden ticket?  Isn't that pretty obvious

24  that he's got that motive, that he's got a reason to falsify

25  his story in order to help himself?  Isn't that what you saw

1   right in front of you on the witness stand?

2          You know, each and every one of you, you deal with

3   people every day.  You make judgments about who you can trust,

4   who you can rely on.  You know how to do that.  It's part of

5   life.  I would submit that each of you has kind of a built-in

6   mechanism.  We can call it a B.S. detector.  You've got your

7   own B.S. detector, every one of you.  You know it.  You know

8   when someone is telling you something that you can't trust and

9   rely on.

10          Well, use your B.S. detector, each of you, and I'm

11   confident that you'll make the right decision about Dennis

12   Martin and whether you can trust and rely on what he said in

13   this courtroom to convict my client.

14          One of my real heroes in the law, former Supreme Court

15   Justice William O. Douglas, once wrote, "Any person faced with

16   the awesome power of government is in great jeopardy even

17   though innocent."

18          You saw that, the truth of that on display here, too.

19   The awesome power of the government, the power -- the resources

20   they have, bringing in dozens of agents and law enforcement

21   officers, and all kinds of analysis and diagrams and

22   helicopters and records and subpoenas and searches, all of

23   that.  They have the power to take all -- to do all of that,

24   the power to give somebody leniency to buy their testimony.

25   They have that power, too.  That's a lot of power.  That's a

1    lot of power the government has, that they can bring to bear on

2    any individual citizen.

3           All that Diovanni Carter has is me and Kerry Ferguson.

4    That's it.  But, you know, that's where you come in.  That's

5    where you come in.  You come in to kind of level the playing

6    field because it's not up to the government to decide whether

7    or not somebody is guilty of a crime in our country.  You get

8    to decide that.  That's your call and only your call, and that

9    is part of what makes our country a free country.

10          I submit it was an insult to you, each and every one

11   of you, and to our system of criminal justice for the

12   government to make the deal they did with Dennis Martin and

13   bring him in here to peddle his lies to you.  That's not

14   justice, but it's your decision.  Thankfully, it's your

15   decision.

16          Diovanni's fate is in your hands, and I ask you to

17   return a verdict that each of you will be proud of.  I ask you

18   to find Diovanni Carter not guilty of each and every charge.

19          Thank you.

20          THE COURT:  The government has an opportunity to do a

21   brief rebuttal.  Are you going to rebut, Mr. Mallard?

22          MR. MALLARD:  Yes, Your Honor.

23          THE COURT:  You guys want to stand up and stretch

24   before we start while he's walking up there?  If you want to,

25   you can.

```
 1                 GOVERNMENT REBUTTAL STATEMENT
 2   BY MR. MALLARD:
 3             The defendant just gave their closing, and the one
 4   thing you didn't hear him argue at all was that someone else
 5   had Diovanni's Carter's phone that night.  Diovanni Carter had
 6   it.  He had it that whole day, that whole night, right outside
 7   the store in Winnifred Street, right where Dennis Martin said
 8   he was waiting for them after they robbed the store.
 9             He had it on him while he was driving, just like
10   Dennis Martin said, taking the right, not the left to the
11   highway, taking a right when he made the call to Noons to try
12   and sell the phones.  That's Diovanni Carter's guy, Noons,
13   ending in 2029.
14             The phone was in Diovanni Carter's hands.  It never
15   left.  He used it on the 25th to call his work.  He used it on
16   the 28th to say he's not going back.
17             To hear defense counsel tell it -- and he talked a lot
18   about Dennis Martin, but you heard his testimony -- he's just a
19   common criminal.  A man with drug dealing, an armed robbery in
20   his background.
21             He's not going around sprinkling DNA on guns that
22   match this defendant's profile.  He's not in a position to know
23   at the time he identifies Diovanni Carter that his cell site
24   records are going to place him outside the store.  He is not in
25   a position to know that DNA is going to be found on the gun or
```

1  match to Diovanni Carter eight months later.

2          He's also not in a position to know on January 29th

3  that this defendant's Google history that very morning would

4  show searches for "T-Mobile" for the first time ever or that at

5  9:19 his Google records would show a search for *Brockton*

6  *Enterprise* two hours after the robbery for the first time ever.

7          These are things that Dennis Martin couldn't know,

8  would have no idea would exist, and would have no idea that the

9  government would go and get and put into evidence for you.

10         Dennis Martin may be a lot of things, but he's not a

11 killer.  He didn't shoot his gun at the officers that night.

12 And for all the things that counsel accused him of, that's not

13 him.

14         You do know who is of that character and of that

15 caliber.  You heard testimony about why the men shot their

16 guns.  They shot their guns because Diovanni Carter told them

17 to.  And you know they shot their guns at the order of someone

18 because both guns fired within that same window, eight or nine

19 seconds.  If you don't expect gunfire, you're not going to be

20 shooting right after you hear it.  But both men shot at roughly

21 the same time in the same direction.

22         One of those bullets struck Darius Carter, went

23 through and through.  That was Stephan.  And the other gun

24 fired by Darius Carter, the casing found by Baltazar Goncalves,

25 linked directly to that gun.

1          Now, Dennis Martin is just the beginning of this

2     investigation.  He gave a name, identified a photograph of

3     Stephan, and then identified another photograph of Diovanni

4     Carter that night.  What followed and what you heard throughout

5     the course of this trial were the results of that

6     investigation.

7          To say this case lives and dies by Dennis Martin

8     really kind of ignores everything that we spent the last week

9     and a half doing.  All this evidence is about putting you in a

10    position to better evaluate what he told you about that night

11    and also to independently prove the same facts.

12          Because really what Dennis Martin says is just a story

13    from one perspective.  But now with the fulsome evidence that

14    you heard from the cell site and the Google, you were now able

15    to get into the mind of Diovanni Carter a little bit in terms

16    of what he was searching for, see who he's calling.  You get a

17    piece of the story that Dennis Martin has no idea about.

18          You know as jurors where Diovanni Carter went that

19    night because this defendant, Diovanni Carter, was calling

20    James Boddie over and over and over again to get to the house

21    before the helicopter came.  Dennis Martin had no idea about

22    that.  He was already arrested.  That's what this trial is

23    about.  That's what this evidence is that you heard proved to

24    you.

25          This was the defendant's plan that fell apart.  The

1  defendant managed to get away because he happened to know

2  someone that lived in the area, just a few houses down the

3  street.  Every piece of evidence you heard over the course of

4  this trial proves it.  And all of the evidence puts this

5  defendant, Diovanni Carter, in the driver seat of that car, in

6  the driver seat of this plan.  And, to put it bluntly, the maps

7  and phone records you heard yesterday from Ryan Burke

8  essentially ends all discussion about that.

9       Diovanni Carter got away that night, but he cannot run

10  from the evidence that you heard over the course of this trial.

11  You've heard, seen, watched, seen zoomed in on, expanded,

12  searched through phone records, video.

13       Return a verdict consistent with all that evidence --

14  return the verdict that the evidence, when you really consider

15  it, the only verdict consistent with the evidence -- and find

16  him guilty of all five counts.

17       Thank you.

18       THE COURT:  All right.  You are about three minutes

19  away from beginning your deliberations.  I want to say a few

20  words about your deliberations.

21       Each of you must decide the case for yourself, but you

22  should do so only after considering all of the evidence and

23  listening to reasoning of your fellow jurors.

24       You should not hesitate to reconsider your views from

25  time to time and to change them if you are persuaded, if that

1    is appropriate.  Do not come to a decision simply because other

2    jurors insist it is right, and do not surrender an honest

3    belief about the weight and effect of the evidence just to

4    reach a verdict.

5              Your verdict must be unanimous as to each of the

6    questions I'm going to ask you to answer on the verdict form.

7              I'm going to ask Juror Number 1 -- that's you -- to

8    serve as the foreperson.  The foreperson will have the same

9    voice, the same vote as the other deliberating jurors.  The

10   fact that one of you is the foreperson does not give that

11   person any special status in your deliberations.  You are all

12   equal.  The foreperson will act to the extent accountable as a

13   moderator of the discussion and will serve as the jury's

14   spokesperson.

15             The foreman's most important obligation is to ensure

16   that any juror who wishes to be heard on a material issue has a

17   full and fair opportunity to be heard by his or her fellow

18   jurors.

19             If you as a group decide to take a recess during your

20   deliberations, you should stop talking until the recess is

21   over.  Do not discuss the case during a recess when not all

22   jurors are present.

23             If it becomes necessary during your deliberations to

24   communicate with me, you may do so by sending a note to the

25   court officer who will be standing outside of your door.

1          No member of the jury should ever attempt to

2     communicate with me accept by simply signed writing.  If you do

3     communicate with me, do not tell me in the note how you stand

4     numerically or otherwise in any issue before you until after

5     you have reached a verdict.  You are not to communicate with

6     anyone but me about the case outside the jury room and then

7     only in writing.

8          In turn, I will communicate with you in writing or

9     orally here in open court on anything concerning the case.

10         On matters touching simply on the arrangements for

11    your meals schedule and convenience, you're free to communicate

12    with either the court officer or Karen, and that can be done

13    orally rather than in writing.

14         After you've reached unanimous agreement on the

15    verdict, your foreperson will fill in the verdict form, sign

16    it, date it, tell the court officer outside your door that you

17    are ready to return to the courtroom.

18         Once you return to the courtroom, your foreperson will

19    deliver the completed verdict form as directed in open court.

20    Here is a copy of the verdict form.

21         We're going to send up a copy of the jury instructions

22    for each one of you.  We typically only send up one verdict

23    form.  If for some reason you want more, just let us know.

24    We'll get you some more.  You'll see the first page is the

25    cover sheet to the verdict form, and then there's one page for

1    each count, essentially.

2         So the first page is for Count 1, conspiracy to

3    interfere with commerce by bribery.  You check off not guilty

4    or guilty.

5         Count 2, interference with commerce by bribery.

6    Again, you check off not guilty if you find that the government

7    has not proven each element of the offense beyond a reasonable

8    doubt.  You check guilty if you find that they have.  And that

9    can be either on the theory of participating directly, him

10   participating as an aider or abetter, or under Pinkerton

11   liability.

12        Count 3, the same thing.  That's the brandishing,

13   using, or carrying a firearm.  So not guilty if the government

14   hasn't met its burden.  Guilty, and you may find guilt proved

15   under any one of the three theories:  Committed the acts

16   himself, he was an aider or abetter, or under Pinkerton

17   liability.

18        And then you see it's like a decision tree here.  If

19   you answer not guilty on Question 3, you go to Question 5,

20   which is the fourth count.  If you do answer guilty on Count 3,

21   you have to answer two more questions, 4A and 4B.  And that is,

22   basically:  Do you find that the government proved beyond a

23   reasonable doubt that he brandished the firearm in relation to

24   the crime?  And 4B, I'll ask that if you find that he

25   discharged the firearm in connection with the crime, and you

1    can check off one of those, none of those.  You can find proven

2    or not proven as to both of them or none of them.

3            Count 4 and Count 5 are felon in possession of a

4    firearm or ammunition, and those you just check off guilty or

5    not guilty.

6            And then you'll see the very last page.  It just says

7    that your deliberations are complete, and you should notify the

8    court security officer in writing that you've reached a

9    verdict.

10           As far as I'm concerned, you are ready to begin your

11   deliberations.  Does anyone want to be heard at sidebar before

12   I send them out?

13           MR. MacKINLAY:  No, Your Honor.

14           MR. SULTAN:  No, Your Honor.

15           THE COURT:  So off you go.  The case is yours now.

16   The jury instructions, the verdict form, and the exhibits will

17   be up very shortly.  Okay.

18           THE CLERK:  All rise for the jury.

19           THE COURT:  I'm sorry.  You last three are the

20   alternates.  You three are alternates.  We are going to seat

21   you in a separate room.  They're going to have six feet between

22   each of you, if that's what you want to do.  We may need to

23   substitute you in.  We just never know.  So it's important that

24   you stay pristine.  So you have to keep an open mind.  You

25   can't talk about the case, and you can't do any other research

1   while you're sitting in that room.

2         So I don't know how long we're going to want to go

3   today.  But after today, you can certainly bring in phones,

4   laptops, and books, and anything else you want, to keep

5   yourself entertained.  And if you want to kind of wander around

6   back there, you can do that, too.

7         You already have your phones.  So you can bring

8   Monopoly or something tomorrow, if you are still here.  I'm

9   sorry.  I know it can be frustrating to be the alternates.  But

10  especially when we're picking a jury for a three-week trial, we

11  have to make sure that we have 12 when it all ends.

12        And you guys have all been amazing about showing up.

13  And even with the uncertainty of the coronavirus, everyone has

14  been here.  And we haven't needed to use an alternate, but we

15  may still have to use an alternate.  So we are going to keep

16  you here and ready.

17        All right.  You can take them out, Karen.

18        THE CLERK:  Okay.

19        (Recess taken from 2:00 to 2:37 p.m.)

20        MR. MALLARD:  The government is content with the

21  exhibits.

22        MS. FERGUSON:  The defense is content, as well.

23        THE CLERK:  Thank you.

24        (Recess taken from 2:39 to 2:53 p.m.)

25        THE CLERK:  All rise for the jury.

 1                    (The Jury is present for the following.)

 2                    THE CLERK:  Court is in session.  Please be seated.

 3                    THE COURT:  I am really sorry about this.  When I

 4       thought the trial was going to last three weeks, I agreed to be

 5       at Boston College.  And, of course, the way of the world, the

 6       day I charge you is the day I am supposed to be there by 3:30,

 7       so I have to leave right at 3:00.

 8                    We are going to give you the option of staying, which

 9       you really control your schedule.  Once you're deliberating,

10       there's another judge that would be prepared to answer any

11       questions.  But I understand from Karen that you want to leave

12       now and come back at 10:00 tomorrow morning, which is

13       absolutely fine.

14                    From my perspective, it's even better so you don't put

15       any pressure on you in terms of time of putting on a verdict.

16       And I would like to thank you when it's all over.  So I think

17       that works out great.

18                    I don't typically, unless one of the parties has an

19       alternative request, I don't typically bring you into the

20       courtroom in the morning.  When you are all here, you can

21       start.  You understand that you are not to start before anyone

22       gets here.

23                    Anyone feel they want to see them in the courtroom?

24                    MR. SULTAN:  No, Your Honor.

25                    MR. MacKINLAY:  No, Your Honor.

```
1              THE COURT:  Same thing at the end of the day.  If

2     you're still deliberating at the end of the day tomorrow, just

3     let us know when you want to leave.  The only thing I ask is

4     that you not sneak off and not tell us because we'll all be

5     sitting around waiting to hear from you.

6              And we'll provide the same accommodations in terms of

7     breakfast and lunch.  And if you decide that for whatever

8     reason you want to work through dinner, just let us know in

9     advance to get you enough food to make sure that that happens.

10             So now you've heard the whole case and middle of

11     deliberating -- at least starting to deliberate.  And this is

12     supposed to be, as you all understand, a group decision.  So it

13     remains important that you not do any thinking about this or

14     collaborating about this when you're not all together in the

15     group.  So just put it out of your mind tonight.

16             And, as I say, it's supposed to be a collective

17     decision made just within this group.  And, even more

18     important, that you not talk to anybody else about the case and

19     let them influence your thinking on it.  And, again, no

20     extracurricular research, which I am sure I've made more than

21     clear in my instructions.  Your decision must be based on what

22     happens in this courtroom.  So no homework nor extra research.

23             Anything else anyone wants to say?

24        MR. SULTAN:  No, Your Honor.

25        MR. MacKINLAY:  No, Your Honor.
```

1          THE COURT:  So you've decided on 10:00 tomorrow.

2     That's great.  We'll sort of see you at 10:00 tomorrow.  But

3     once you are all there, go ahead and start deliberating.  Okay.

4     Thanks very much.  And, again, sorry about this.

5          THE CLERK:  All rise for the jury.

6          (Adjourned at 3:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS     )

6

7

8            We certify that the foregoing is a correct transcript

9   from the record of proceedings taken March 4, 2020 in the

10  above-entitled matter to the best of my skill and ability.

11

12

13

14

15  /s/ Kathleen Mullen Silva                    4/15/20

16  Kathleen Mullen Silva, RPR, CRR               Date
    Official Court Reporter
17

18

19  /s/ Linda Walsh

20  Linda Walsh, RPR, CRR
    Official Court Reporter
21

22

23

24

25