UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DIOVANNI CARTER,<br><br>Defendant | Criminal No. 19-CR-10104-ADB |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION AND RESPONSE TO OBJECTIONS TO PRESENTENCE REPORT**

The jury convicted this Defendant of a brazen armed robbery that he organized. This gunpoint robbery alone would merit a lengthy sentence. Rather than face arrest and the potential of another prison sentence for the robbery, the jury heard how this Defendant ordered the three other men in the getaway car (including his younger brother) to shoot at the police. Two of the men followed this Defendant's order, and fired eight rounds at close range.

The Defendant essentially ordered the murder of a police officer through the coordinated gunfire of multiple shooters. During the gunfire, the Defendant urged his brother on. Despite numerous arrests, prosecutions, convictions, and incarcerated sentences for extremely serious incidents dating back to his teenage years, this case proves that the Defendant will not stop inflicting violence on others. The robbery alone would merit a significant sentence, but in the context of this Defendant – who presents with an extensive criminal history, who repeatedly offends despite numerous opportunities, and for whom little to no mitigation is offered – a sentence of 382 months is warranted, and is no greater than necessary to achieve the goals of sentencing. The government acknowledges that thirty-one years is a lengthy period. However, the Defendant must face substantial punishment, and the public must be protected from his ceaseless and senseless violence.

## THE ADVISORY SENTENCING GUIDELINES

On March 12, 2020, the jury found the Defendant guilty of: Count One, charging conspiracy to interfere with commerce by robbery, 18 U.S.C. § 1951(a); Count Two, interference with commerce by robbery, 18 U.S.C. § 1951(a); and Count Three, discharging, brandishing, using and carrying of a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii). Of note, for purposes of sentencing, Count Three carries a mandatory sentence of at least 120 months to be imposed consecutive to any sentence imposed on the underlying offense. See USSG § 2K2.4, n.2.

### I. OFFENSE LEVEL CALCULATION IN PRESENTENCE REPORT[1]

The government adopts Probation's offense level calculation set forth in the PSR, and agrees that the total offense level is 35. See PSR ¶¶111-120. The government recites that calculation here for completeness and ease of reference:

| | |
|---|---|
| *Base Offense Level*: | 20, under USSG § 2B3.1(a) (PSR ¶111). |
| *Offense Characteristics*: | +2, because a victim suffered a bodily injury, under USSG § 2B3.1(b)(3)(A) (PSR ¶112) |
| | +1, because more than $20,000 but less than $90,000 was stolen, under USSG § 2B3.1(b)(7)(B) (PSR ¶113) |
| *Victim Adjustment:* | +6, because the codefendants fired 8 rounds at the pursuing police during the immediate flight from the crime, under USSG § 3A1.2(c)(1) (PSR ¶114) |
| *Role Adjustment:* | +4, because the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, under USSG § 3B1.1(a) (PSR ¶115) |
| *Obstruction Adjustment:* | +2, because the Defendant recklessly created a substantial risk of death or serious bodily injury in the course of fleeing from a law enforcement officer, under USSG § 3C1.2 (PSR ¶116). |

---

[1] References are as follows: presentence investigation report (PSR) are by paragraph (PSR ¶_) or page (PSR, p. _); trial transcript by volume and page (Tr. _, _); trial exhibits by number (Ex. _); and exhibits to this sentencing memorandum by letter (Exhibit _). The U.S. Probation Department is referred to as "Probation."

2

*Total Offense Level:*          35 (PSR ¶120).

Criminal History Category:           10 points (PSR ¶133), Category V (PSR ¶134)
Guidelines Sentence Range:          262-327 months (PSR ¶191)
Mandatory Statutory Imprisonment:   120 months imposed consecutively (PSR ¶¶190, 191)
Total Imprisonment:                 382-447 months

## II.  DEFENDANT'S OBJECTIONS

The Defendant makes a number of objections to the PSR, though only some of the objections affect the offense level calculation. First, he generally objects to the inclusion of information in the PSR that derives from the testimony of CW-1 (PSR, p. 55).

The Defendant also objects to the application of victim adjustment the official victim enhancement under USSG § 3A1.2(c)(1) (PSR ¶114), claiming that it should not apply in the context of a charged count of 18 U.S.C. § 924(c)(1)(A) (PSR, p. 55).

The Defendant has also objected to the four-level increase for aggravating role as an "organizer or leader organizer or leader of a criminal activity that involved five or more participants" under USSG § 3B1.1(a) (PSR ¶115), claiming that there is insufficient evidence that James Boddie or "Noons" participated in the conspiracy to rob the T-Mobile (PSR, p. 56-58).

Based upon these objections, the Defendant contends that the total offense level should be 25, not 35. See PSR, p. 59. He makes no objection to the criminal history calculation.

## ARGUMENT

## I.  APPLICATION OF THE SENTENCING GUIDELINES

The government bears the burden of proving the facts "supporting an enhancement by a preponderance of the evidence." United States v. Damon, 595 F.3d 395, 399 (1st Cir.2010). In finding the facts supporting an enhancement, "[a] sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009); United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011).

3

### A.     General Objections to Reliance Upon Testimony of CW-1

A sentencing court "must take pains to base [its] sentencing judgments upon reliable and accurate information." United States v. Tavano, 12 F.3d 301, 305 (1st Cir. 1993). Thus, it may take into account "any information that has sufficient indicia of reliability." United States v. Díaz-Arroyo, 797 F.3d 125, 130 n.3 (1st Cir. 2015). In doing so, it has "wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing." United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010).

In this case, the Defendant's general objections to CW-1's testimony and information are based solely on the Defendant's contention that CW-1 lacks credibility. The jury, however, considered CW-1's testimony, and rendered a verdict consistent with it, suggesting that the testimony was deemed credible and reliable, beyond a reasonable doubt. Even so, CW-1's testimony was directly corroborated by the cell phone and digital evidence in the case, which the Defense largely ignored, given its strength. Indeed, as the government noted in rebuttal, the lacunae in the Defense's aggressive attack on CW-1 was the Defendant's phone location and activity proven by records of the phone company. See Tr. VIII 121-124. As such, this Court should confidently overrule the Defendant's general objections to CW-1's testimony and consider it in this context.

### B.     Official Victim Adjustment, USSG § 3A1.2(c)(1)

The Defendant objects to the application of the 6 level official victim adjustment under USSG § 3A1.2(c)(1), claiming that it cannot be applied in the context of a conviction for violating Section 924(c). The Defendant offers no legal basis or citation for this objection, and it should be overruled.

The fact that a Section 924(c) count is separately charged does not preclude the application of the victim-based adjustment under USSG § 3A1.2(c)(1). [2] The Sentencing Guidelines state this point

---

[2] Relatedly, the application of the official victim adjust based upon the shooting does not constitute

4

precisely: "Absent an instruction to the contrary, enhancements under Chapter Two, adjustments under Chapter Three, and determinations under Chapter Four are to be applied cumulatively." See USSG § 1B1.1 n. 4(B).[3]

Furthermore, the application of the official victim adjustment in this case also does not rely upon the same 'facts' or conduct as the conviction for violating Section 924(c). A conviction under 18 U.S.C. § 924(c)(1)(A)(iii) does not require an assault to have occurred, or that the shooter intend to assault anyone or even an intent to shoot the firearm. Indeed, an unintentional or accidental discharge are sufficient to convict. See Dean v. United States, 556 U.S. 568, 577 (2009) ("The 10–year mandatory minimum applies if a gun is discharged in the course of a violent or drug trafficking crime, whether on purpose or by accident."). As a result, the victim adjustment rests upon its own significant and additional facts – namely, the Defendant ordering the other men to shoot and their shared intent to assault and murder, based upon the number of rounds that were fired at close range.[4]

---

double counting. As the First Circuit has observed, "[t]he Sentencing Commission has shown itself fully capable of expressly forbidding double counting under the guidelines when appropriate," United States v. Chiaradio, 684 F.3d 265, 283 (1st Cir. 2012), and it "has not been bashful about explicitly banning double counting in a number of instances." United States v. Lilly, 13 F.3d 15, 19 (1st Cir. 1994) (collecting examples). Accordingly, "when neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, courts should be reluctant to read in a prohibition where there is none." Chiaradio, 684 F.3d at 283 (internal quotation marks and citation omitted); see United States v. Fiume, 708 F.3d 59, 62 (1st Cir.2013) ("Multiple sentencing adjustments may derive from 'the same nucleus of operative facts while nonetheless responding to discrete concerns.'").

[3] By comparison, the government agrees, consistent with the guidelines commentary, that the +7 offense characteristic under USSG § 2B3.1(b)(2)(A) for discharging the firearm does not apply in the context of a charged Section 924(c) count. See USSG § 2K2.4, n. 4 ("If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense.").

[4] Examples from other cases support the application of the USSG § 3A1.2(c)(1) in the context of an accompanying conviction under Section 924(c). See United States v. Patton, 927 F.3d 1087 (10th Cir. 2019) (defendant received +6 for USSG § 3A1.2(c), and was convicted of 18 U.S.C. § 924(c)); United States v. Parsons, 664 Fed.Appx. 187 (3rd Cir. 2016) (defendant received +6 for USSG 3A1.2(c), and was convicted of 18 U.S.C. § 924(c)); United States v. Barnocky, 441 Fed.Appx. 998 (4th Cir. 2011) (defendant received +6 for USSG § 3A1.2(c), and was convicted of 18 U.S.C. §

Consequently, application of the 6 point victim-based adjustment under USSG § 3A1.2(c)(1), in addition to the separate conviction and sentencing under Section 924(c), is proper, and, in this case, appropriately reflects the serious nature of ordering others to shoot at a police officer while fleeing from a crime. See USSG § 1B1.1 n. 4(B) ("In some cases, such enhancements, adjustments, and determinations may be triggered by the same conduct. For example, shooting a police officer during the commission of a robbery may warrant an injury enhancement under §2B3.1(b)(3) and an official victim adjustment under §3A1.2, even though the enhancement and the adjustment both are triggered by the shooting of the officer.").

### C.     Aggravating Role Adjustment Under USSG 3B1.1(a)

The 4 point adjustment for leadership was also properly applied by Probation. This enhancement requires a district court to make "both a status determination -- a finding that the defendant acted as an organizer or leader of the criminal activity -- and a scope determination -- a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guideline." United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995); United States v. Arbour, 559 F.3d 50, 53 (1st Cir.2009).

As the First Circuit has noted, "'[a] defendant acts as a leader if he or she exercises some degree of dominance or power in a criminal hierarchy and has the authority to ensure that others will follow orders" and that "[a] defendant qualifies as an organizer if he or she 'coordinates others so as to facilitate the commission of criminal activity.'" United States v. Monteiro, 871 F.3d 99, 116 (1st Cir. 2017), quoting United States v. Appolon, 695 F.3d 44, 70 (1st Cir. 2012). "Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the

---

924(c)); United States v. Varner, 598 Fed. App. 389 (6th Cir. 2015) (Rule 32.1 decision) (defendant who robbed T-Mobile and rammed received +6 for USSG § 3A1.2(c), and was convicted of 18 U.S.C. § 924(c)).

6

fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1(a), n.4.

### *Leadership*

At trial, there was ample testimony and documentary evidence proving the Defendant's role as leader of the group under essentially each of the factors set forth in the guidelines. To start, CW-1 testified to the Defendant's leadership role in detail. "Diovanni was" the only one "talking about a robbery," and explained the plan: "[t]here was a T-Mobile that's easy to hit." Tr. IV 19-20. 182-185. The Defendant handed CW-1 the black .380 caliber handgun, knew where the T-Mobile was, and drove the group there (Tr. IV 19-26). When they reached the T-Mobile, the Defendant also called the shots and told the others that it was the right time to strike: "Diovanni was like, 'Yo, there's only two people in there. Now's the right time to get them.'" Tr. IV 28-31. The Defendant also remained in the vehicle, consistent with his position of leadership and oversight.

After the robbery, the Defendant continued to drive and had a destination in mind that was not Boston. See Tr. IV 33-38. When confronted by CW-1 about where they were going, the Defendant reasserted his authority and control over what the group was doing and where they were going, rebuffing CW-1 by saying "I got this. Chill. I got this." Tr. IV 92.

The Defendant also coordinated with a fifth man "Noons," to sell the phones, Tr. IV 37, and after bailing from the car, was in contact with a sixth man, James Boddie, who would facilitate his escape that night. See Ex. 146. Most significantly, the Defendant ordered the other robbers to "[g]et the boys up off us," i.e., "shoot at the police" -- and two of them did, right on cue. See Tr. IV 38-40. This fact alone proves the Defendant's leadership and decision-making on behalf of the group, who followed his directives. In sum, the Defendant "planned the robbery," "recruited people to help with the robbery," "provided the guns" and "provided the car." Tr. IV 182-185. He also, as would be shown, had a backup plan and means to escape from the police.

The digital and documentary evidence in this case also corroborated CW-1's testimony on the Defendant's leadership in specific and detailed ways. The Defendant's phone and Google history documented his presence in Brockton and scouting of the robbery location early that morning, and that afternoon when Boddie entered the store, consistent with CW-1 description of the Defendant's knowledge of the store. See e.g., Tr. V, 170-177 (search history); VII, 184-185. Ex. 116 (search history); Ex. 146 (cell site location information maps). The getaway car was rented for the Defendant by another person, and he used it as part of the plan to commit the robbery. See Tr. III, 152-160; IV, 18-22; Ex. 37, 80 (rental records identifying Defendant as authorized driver).

Another salient point is that the Defendant at 31 years old, is the eldest of the four robbers, suggesting his leadership status among the younger Defendants.[5] The Defendant was also the common link among all the robbers; he was older brother to Darius Carter, and had phone connectivity to Rosser-Stewart, CW-1, Boddie and Noons. See Tr. VII 215-221; Ex. 149. None of the other participants had this documented connection to all the persons in the vehicle, the fence (Noons), and Boddie. Cf. Ex. 149. Consequently, the Defendant's phone records corroborate the Defendant's leadership because he was only individual capable bringing these participants together.

*Number of Participants*

The trial testimony proved that six persons were participants in the criminal activity that the Defendant led. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1 cmt. 2.[6] There can be little dispute that the four men in the vehicle participated in the robbery. Beyond that, Probation also properly counted Boddie and Noons as participants in the criminal activity.

---

[5] Darius Carter is 29 (born 1991), Rosser-Stewart is 28 (born in 1992), and CW-1 is 25.

[6] See USSG § 3B1.1(a), cmt. 3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

CW-1 identified Noons at trial as the person whom the Defendant spoke with right after the robbery as they were driving away. Tr. IV 37. The phone number for Noons was identified through phone records to end in 2029. The phone call with Noons was also listed on the phone records for the Defendant's phone, and those records proved the call took place at the time CW-1 said that it did: right after the robbery, while driving away, at the precise location where the covert GPS tracking device was at that moment. See Tr. VII 195-199; Ex. 146.

On the other hand, James Boddie's participation in the criminal activity is proven through surveillance images, CSLI and call detail records. Though not introduced at trial, surveillance video showed that Boddie entered the T-Mobile store at 2:21 p.m. on the day of the robbery. See PSR ¶112.[7] The CSLI for the Defendant's phone and Rosser-Stewart's phone showed they were using cell sites in Brockton at the time Boddie entered the store. See PSR 13; Ex. 146.

After the robbery, the testimony and exhibits proved the Defendant made repeated calls to Boddie, ultimately remained at Boddie's house at 82 Carl Avenue overnight, and received a ride home from Boddie the next morning. See Tr. VII 162-215; Ex. 146 (CSLI maps). Additionally, the calls between the Defendant and Boddie ceased during this period, consistent with their being in the same physical location, and the Defendant successfully evading apprehension. Cf. Ex. 146. Phone records also showed Boddie made calls to Darius Carter and Stephan Rosser-Stewart in close succession with the Defendant's own call Darius. See PSR ¶77; Ex. 146; Tr. VII 209-214. This sequence of calls suggested coordination in their efforts to contact the codefendants, and proves Boddie's involvement. See PSR ¶77; Tr. VII 209-214. Testimony at trial also showed that Boddie

---

[7] To the extent that the Defendant objects to this, the government has attached the surveillance images as Exhibit A (PSR ¶13), and still images of the same clothing worn by Boddie that were seized during the execution of a search warrant at 82 Carl Avenue, as Exhibit B (PSR ¶14). Further, the government submits a recorded jail call made by Boddie, where, at approximately 3 minutes and 40 seconds into the call, he identifies himself in the surveillance images contained in Exhibit A that were shown to him by SA Simmons during the execution of a search warrant at 82 Carl Avenue (who Boddie misidentified as a U.S. Marshal) (PSR ¶15), as Exhibit F.

had deleted all of the activity on his phone for the night of the robbery during the period of 4:08 p.m. to 11:54 p.m. See Tr. V, 156-156. Furthermore, Boddie also deleted all activity with the Defendant from his phone, and deleted all activity with Rosser-Stewart taking place on January 26, 2019. See Tr. V, 138-145. As such, Boddie played a role in scouting the location before the robbery, assisted with the Defendant's evasion of the police that night, made attempts to locate the codefendants who had already then been apprehended, and drove the Defendant home the next morning. From all of this, the evidence at trial proved that Boddie and Noons were participants in the criminal activity far beyond a preponderance of the evidence.

## II. THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553 REQUIRE A SIGNIFICANT SENTENCE OF 382 MONTHS

Apart from the guidelines sentence range calculation, a significant sentence of more than thirty years is warranted for this case and this Defendant. When considered in isolation, the well-planned armed robbery, which involved three firearms, and a high speed chase would merit a sentence exceeding ten years. When considered in the context of the Defendant's leadership and the gunfire and attempting to murder the pursuing police officer, the proper sentence enters the realm of approximately twenty years. But this Defendant, and his staggering history of wanton violence, firearms offenses, and drug distribution, is the precise individual who warrants a sentence exceeding thirty years for committing this crime, after so many opportunities and chances to conform his conduct to the law. The public must be protected and a thirty-one year sentence is the proper means to do so.

### A. Nature and Circumstances of the Offense

The nature and seriousness of this case cannot be overstated. The Defendant targeted an employee of a cell phone store, at night, with multiple firearms. His coconspirators, including CW-1

and Rosser-Stewart were hardened criminals that had served time together.[8] But among these men, the Defendant clearly was in charge.

Through the Defendant's leadership of the group and cunning skill in planning the robbery, the getaway vehicle would have been otherwise unidentified. The Defendant recruited multiple members, learned the area from earlier trips to Brockton, knew the inside of the store itself, and identified a specific location where he would park the getaway car to conceal it. If the GPS tracking device had not been taken, the Defendants, in all likelihood, would have escaped.

The robbery itself was serious. For his part, Mr. Dertelus was "terrified" and in abject fear for his life. See Tr. II 127-139. As this Court knows from the trial testimony, Mr. Dertelus is a hardworking young man, who had worked his way up and had recently been promoted to store manager of the Brockton location. See Tr. II 123-124. His hardwork, effort, dedication, 12-hour shifts (Tr. II 124), and long nights in the store were met with violence, three guns in his face, and a pistol-whipping. But he was not the only person victimized by this Defendant.

But this Defendant, out of sheer self-preservation, refused to surrender. The high-speed chase through tight residential streets endangered numerous residents. And then, the gunfire that he ordered at the police cruiser that was mere feet from the getaway car[9] reveals how little he thought of potentially taking the life of the officer pursuing him, to say nothing of the numerous citizens who lived nearby. As Officer Robinson described in his testimony, he was driving the lead cruiser in the chase of the getaway car that this Defendant was driving. Once the chase started, it reached between "65, 70" miles per hour. Tr. III, 42.[10] Officer Robinson saw the passenger of the vehicle lean out of

---

[8] See ECF #227 (Rosser-Stewart detention opposition), 234 (Darius carter detention opposition).

[9] See Tr. IV 95 (CW-1 estimating distance of cruiser to getaway car as the distance from him to the prosecutor: "Like me to you, probably a little bit closer.").

[10] The GPS device confirmed he was correct as to the speeds.

the window and start shooting at him. See Tr. III 42-43 ("These guys are shooting at me.").

There is no question why these gunshots were fired at the same time, and in the same direction: the Defendant ordered the other men to shoot at the police, and two of the men did. That fact distinguishes this case and puts the necessity of a thirty-year sentence into context. The Defendant was a leader among hardened criminals, who themselves were willing to fire at the police on command. Moreover, it was not fear, desperation or confrontation that prompted the gunfire, it was the calculated decision after a lengthy chase and inability to lose the pursuing officer.

Though eight rounds were fired at him at close range, Officer Robinson did not return fire because it would have been unsafe to the residents and community. In contrast, the Defendant cared little about the innocent citizens in their homes who could have been struck by the high-speed gunfire. In fact, one of them testified at trial about how he was at the dinner table with his family when the shooting occurred right outside (Tr. VI 8-12).[11]

Once the getaway car was disabled by a concerned citizen, Officer Robinson got out of his cruiser and continued his pursuit on foot. He expected that this was "going to be a full-on gunfight" (Tr. III 46), but luckily the Defendant was more concerned at that point with getting away, and was willing to sacrifice his brother and coconspirators to do so. In order to escape, the Defendant left his own brother in the woods, alone and bleeding from his shoulder due to a gunshot wound. This was a below-freezing night, and Darius was wearing only a hoodie and sweatpants.

When faced with significant decisions, the Defendant will choose to victimize others, cares little for anyone else, and will prioritize himself over even his own family. These facts of the case suggest the true character of this Defendant and the necessity of a thirty-one year sentence.

---

[11] The Defendant also showed no regard for the potential that children might find the weapons that were discarded. See Tr. III 175-178. Matthew Brewer testified that his niece and nephew live at 105 Litchfield Street, where the .22 Jennings was found; he initially believed the weapon was one of their toys. See Tr. III 175-182.

### B.      Characteristics of the Defendant

Despite having stable residences and numerous family members supporting him through multiple prior incarcerations (PSR 150, 163-167), the Defendant chooses to keep committing serious crimes. As is evident, the Defendant focuses his time and energy pursuing a reputation for violence on the streets. See PSR ¶175. The PSR suggests that the Defendant works only when convenient, and his lack of gainful employment and source of legitimate income bespeaks a life spent trading in violence, firearms and controlled substances.

The Defendant's involvement in a music studio warrants discussion as well. PSR ¶184. It's unclear whether the Defendant was ever actually compensated by the studio, but he produced at least one song. That song, entitled "Plug on Da Phone," (PSR ¶184), features the Defendant under his rap name "T-Trouble," and during the song the Defendant raps about shooting at an individual while that person was with his daughter.[12] His choice of subject matter – shooting at people in front of their family and fighting the case in court by paying "100 for the lawyer" – reveals quite a bit about this Defendant's character and moral composition that this Court should note in imposing a sentence for a robbery and shooting. See Exhibit D and G.

This lack of legitimate work history stands in contrast to the nature of the case. This was no crime of opportunity that could be blamed on a momentary lapse of judgment, or desperation born of substance abuse or addiction. Rather, this crime was the product of a mind honed for years upon victimizing other for personal gain. For example, the Defendant drove well over 100 miles on the day of robbery in order to prepare and execute this crime, procuring firearms, recruiting others, and

---

[12] The government submits the transcript of the lyrics as Exhibit D, and audio file of the song as Exhibit G. The song is publicly available online at https://soundcloud.com/nuumusic_records/7-plug-on-da-phone-ft-t. Additionally, the government notes that this recounting aligns with the facts of the 2012 murder for which the Defendant was charged, and for which a *nolle prosequi* was later entered due to the death of the identifying eyewitness. See Exhibit C (court papers pertaining to the murder case).

13

laying out the specifics of the plan.[13] He was planning this robbery in the early morning hours, and Googling the information he needed throughout the day. From all of this, there is little to no mitigation offered by the history and characteristics of the Defendant. Indeed, the opposite is true.

### C. Prior Criminal Record

The Defendant's criminal history score of 10 reveals that he is a Category V offender. See PSR 133. This signifies that he is in the top 15% of criminal defendant in the federal system, and the sentence should reflect a significant punishment for such a prolific offender.[14]

The Defendant's violence and use of firearms commenced at an early age: his first conviction was for an unarmed robbery in 2005, taking when he was fifteen years old. See PSR ¶122. This robbery took place outside of a Citizens Bank, where the Defendant and four others approached a victim, chased him and tried to steal his wallet and cell phone. While on release for that case, the Defendant stole his grandmother's service weapon and, upon conviction, was committed to DYS until age eighteen. See PSR ¶123.

Though committed to DYS in November 2005, the Defendant was obviously not in physical custody. He was arrested shortly thereafter for receiving of a stolen motor vehicle. See PSR ¶¶124-125. When police tried to pull him over, the Defendant sped off, but was blocked by heavy traffic. The Defendant exited the vehicle and ran away on foot; he was wearing an electronic bracelet at the time. For this offense, the Defendant was committed to DYS until 21 years old. See PSR ¶124.[15]

---

[13] Each trip to and from Brockton was at least 22 miles. See Ex. 146.

[14] Based on the 2019 data from the United States Sentencing Commission, only 8.6% of offenders in the federal system score higher than the Defendant (Category VI), and 5.5% of offenders score in the same category as the Defendant (V). See United States Sentencing Commission, Figure 7, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/FigureO7.pdf

[15] As the docket number reflects, the Defendant was indicted a youthful offender for this case, which permits sentencing in the Department of Youth Services and commitment to adult facilities. See Mass. Gen. Laws c. 119, §§ 52, 58.

This sentence also proved to be a commitment in name only, because the Defendant was not held in custody and resumed committing crimes while 18. The PSR also notes with respect to his juvenile detention that "[w]henever he returned home, he was typically detained again a week or two afterwards" and "[t]here were a few times when he was listed in escape status or absent without leave status for months at a time with parole warrants." PSR ¶123.

The Defendant crimes continued and accelerated. The Defendant has been arrested for firearms offenses on four occasions, and convicted twice. See PSR ¶¶127, 129, 141 (murder and firearms possession), 144 (pending Indictment from 2018). He has repeatedly violated probation, and was charged with murder while on probation for a firearms offense, for which he had served three years in state prison. These convictions stand out among numerous arrests for serious crimes that did not result in conviction.[16] Though category V, the Defendant's adult criminal record is arguably underrepresented. For example, a number of drug crimes were reduced from distributive crimes to mere possessory offenses or dismissed, and his serious juvenile life felonies do not score, due to age. See PSR ¶¶127, 128, 132. In sum, this Defendant is a top-tier violent offender, who merits a sentence commensurate with the extremely serious crime committed here and his extraordinary criminal history.

### D.     This Court Must Protect the Public

A thirty-one year sentence is no greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). To start, a sentence of this length adequately reflects the seriousness of the offense. As the evidence proved, this Defendant ordered two gunmen to fire at a police officer, from mere feet away. Mere fortuity prevented this extremely serious case from reaching a much more

---

[16] These arrests for "'serious prior crimes and recidivist behavior' are 'proper considerations at sentencing'" so long as the sentencing court does not place "undue weight on either the arrests themselves or their underlying conduct" United States v. Diaz-Rivera, 957 F.3d 20, 27 (1st Cir. 2020), quoting United States v. Marrero-Perez, 914 F.3d 23-24 (1st Cir. 2019).

tragic end. The community faced danger from the gunfire and the high speed chase, and the large manhunt that was undertaken to apprehend these Defendants. Law enforcement demonstrated remarkable courage in continuing their pursuit through the night and successfully apprehending the other defendants without any further gunfire.

This, of course, is to say nothing of Mr. Dertelus, a young man whose career and life have been irrevocably altered by the crime orchestrated by the Defendant. Every late night that Mr. Dertelus works for the rest of his life will understandably conjure memories of the terror he faced, terror which this Defendant orchestrated.

A lengthy sentence will also serve the goal of specific deterrence and just punishment. Even though he has been arrested many times, and repeatedly violated probation, the measure of leniency that the Defendant received in state court has only emboldened him. Indeed, the Defendant's criminal history demonstrates how stubbornly he has clung to crime, violence, and firearms, despite multiple young children, persistent and extensive family support (PSR ¶¶149, 150, 167), significant prior prison sentences, a not guilty verdict on an Indicted firearm case (PSR ¶144), and avoiding trial for an extremely serious murder Indictment in 2015. See PSR ¶141. Each of these prior interactions with the justice system has failed to impress upon the Defendant that further crimes, especially violent crimes, are unacceptable. The time has come for a lengthy sentence that will specific deter this Defendant from committing further crimes and punish him for the terror and violence he brought to Mr. Dertelus, Officer Robinson and the community.

A 382 month sentence will also serve the goals of general deterrence and promoting respect for the law. Far from a simple robbery, or even armed robbery, this Defendant escalated his crime to attempted murder and a near shootout with police. This Court must impose a lengthy sentence in order to deter other offenders, who may face the same decision as the Defendant: to fire at police in order to facilitate their escape. This Court should ensure that the sentence does not embolden and encourage criminals to compound their crimes by targeting police and endangering the public to

escape arrest.

As noted above, crimes of robbery, theft, illegal firearms, controlled substances and assault have characterized this Defendant's life, and the small amount of time between his offenses indicates how frequently he reoffends, often within weeks of release. For example:

- On January 13, 2009: the Defendant escaped from a DYS facility and police went to his residence and located the Defendant, and in his bedroom, officers founds 50 bags of marijuana and a box of ammunition. See PSR ¶127. The Defendant pled guilty on June 30, 2009, and was placed on probation.

- On December 8, 2009, the Defendant was arrested and five bags of crack cocaine and marijuana were found. The Defendant was on probation at the time, and found in violation. See PSR ¶128. The Defendant pled guilty on June 18, 2010, and was placed on probation.

- On July 30, 2010, the Defendant was arrested for possessing a loaded firearm. He ultimately pled guilty and was sentenced to three years in prison, followed by probation. See PSR ¶129. He would remain on this probation until his Indictment for Murder in 2013.

- On June 24, 2013, once released from the three-year prison sentence, the Defendant was again arrested, for possessing crack cocaine. See PSR ¶130. On March 17, 2014, the Defendant pled guilty and received 9 months.[17]

- On July 6, 2013, a few days after his prior arrest, the Defendant was arrested for battery on a pregnant victim in Georgia, using a false name. See PSR ¶131. The Defendant pled guilty and received a suspended sentence.

- On December 18, 2013, the Defendant was Indicted for a murder taking place in June 2013. See PSR ¶141; Exhibit C. On February 18, 2014, the Defendant was found in violation of probation for the July 2010 gun case and sentenced to two years in prison. On April 21, 2015, about eighteen months later, the murder case was dismissed when the identifying witness died. The Defendant remained in custody to serve the remainder of the two years prison sentence imposed for the probation violation.

- On March 3, 2016, shortly after release from the two-year prison sentence, the Defendant was arrested for a firearms offense. See PSR ¶144. On November 30, 2017, the Defendant prevailed at trial and was found not guilty.

---

[17] The government notes that Probation misstates disposition date in the PSR (PSR ¶130, 6/25/13), which is of significance, because the date of incarceration stated in the PSR would preclude commission of the Georgia offense. See Exhibit E (docket, showing disposition on March 17, 2014).

- On August 9, 2018, the Defendant was arrested in relation to a July 2018 shooting. <u>See</u> PSR ¶136. The case was dismissed over the Commonwealth's objection January 4, 2019.[18]

Tellingly, three weeks after the dismissal of the 2018 shooting case (PSR 136), the Defendant targeted the T-Mobile store because it would be easy. PSR ¶18. And then, when his efforts to flee were unsuccessful, he attacked the police as well, by ordering the other robbers to shoot. The Defendant's enthusiasm for violence and gunfire were best captured by the Defendant's own words as he urged his brother on: "yeah D," "yeah," "yeah." Tr. IV, 96.

Not only is this Defendant a violent offender, not only is he a leader of other violent offenders, not only does he have a serious criminal record, but this Defendant continues to distinguish himself through crime. The Defendant has clearly demonstrated his predatory nature in this case, and proven it time and again. The public must be protected from him for the foreseeable future. A sentence of thirty-one years is necessary and justified in order to deter him, properly punish him, and protect the public.

## CONCLUSION

Despite repeated opportunities and near-misses with the justice system on serious cases, the Defendant continues to choose to commit crimes and target other people for personal gain. Through this robbery and shooting, and over the last 15 years, as reflected in his criminal history of arrests, convictions, and incarcerations, this Defendant has demonstrated who he is, and loudly declared that he will continue to choose violence and crime if given the opportunity. For the foregoing reasons, the government recommends that the Court sentence the Defendant to a term of imprisonment for 382 months, followed by five years of supervised release.

---

[18] This shooting case is now pending in Suffolk Superior Court under Docket No. 2084CR0134.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | ANDREW E. LELLING<br>United States Attorney |
| By: | |
|  | */s/ Philip A. Mallard*<br>PHILIP A. MALLARD<br>Assistant U.S. Attorney<br>United States Attorney's Office<br>1 Courthouse Way, Suite 9200<br>Boston MA 02210<br>617-748-3674 |

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

|  |  |
|---|---|
|  | */s/ Philip A. Mallard*<br>PHILIP A. MALLARD |
| Date:   September 10, 2020 | Assistant U.S. Attorney |