UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CRIMINAL #19-CR-10104-ADB

_____

UNITED STATES

v.

DIOVANNI CARTER

_____

**DEFENDANT'S SENTENCING MEMORANDUM
(WITH EXHIBITS)**

**INTRODUCTION**

Defendant Diovanni Carter ["Carter"] was convicted following a jury trial of Hobbs Act robbery, Hobbs Act conspiracy, and aiding and abetting the discharge of a firearm in relation to a crime of violence, all arising out of his alleged participation in the armed robbery of a T-Mobile phone store in Brockton on January 26, 2019.  He was acquitted on two other counts charging him with being a felon-in-possession of firearms and ammunition.  According to the evidence presented at trial, Carter's three accomplices entered the phone store, assaulted and threatened the one employee inside, and fled with cell phones and tablets valued at $20,079.00, along with $4,683.00 in cash.  Carter allegedly drove the getaway car.  During the ensuing high-speed flight, several shots were fired by Carter's accomplices at  pursuing police officers.

Carter now comes before the Court for sentencing. According to the Presentence Investigation Report, his guideline range on the two Hobbs Act counts is 262-327 months imprisonment, which exceeds the statutory maximum of 20 years for each count unless the two

maximums are stacked. He also faces a mandatory minimum sentence of 120 months imprisonment on the § 924(c) count, which must be imposed consecutively. Accordingly, based on Probation's calculation, a combined guideline sentence in this case would be more than 30 years.

In its sentencing memorandum filled with purple prose to demonize Carter, the government recommends a sentence of 382 months imprisonment, roughly 32 years. The government alleges that Carter "ordered the murder of a police officer" in this case and relies upon prior charges which were acquitted or dismissed, as well as a rap song allegedly written by Carter, to support its pitch for such a draconian sentence. It is surely not dispositive, but still noteworthy, that the government proposed a plea agreement shortly before trial in which it characterized a recommended sentencing range of **96-170 months** under a binding recommendation for the very same offense conduct as **"a reasonable and appropriate disposition of this case...."** *See Exhibit 8*, appended hereto, at 4-5*(emphasis supplied)*.

It is indisputable that this was a serious, violent crime. A bystander or police officer could have been shot or even killed, though fortunately that did not occur. It is also true and relevant that this is not Carter's first criminal offense. Nevertheless, more than 30 years of imprisonment (or anything close to such a lengthy term) would be a grossly excessive and unjust sentence in this case, both overstating the seriousness of the offense conduct and violating the parsimony principle embodied in 18 U.S.C. § 3553(a). For all the reasons detailed herein, Carter submits that a sentence of 144 months' imprisonment followed by a term of three years of supervised release would be "sufficient, but not greater than necessary" and would thus constitute an appropriate sentence in this case.

I.       **CARTER'S BACKGROUND, CHARACTER, AND PRIOR RECORD.**

Carter, who is 30 years old, grew up in Dorchester, MA. He lived with his mother after his parents separated when he was seven. She suffered from drug addiction and mental illness and subjected Carter to frequent physical and verbal abuse and neglect. She beat him with objects and shot him with a taser when he "misbehaved." Carter's father, whom he saw occasionally, once punched him in the face, knocking him unconscious. When the family was investigated by DSS, Carter was afraid so he lied to cover up the abuse.

Carter's two grandmothers played an important role in providing him with the love and guidance he did not receive from his parents. Carter left home when he was 15 or 16, spent time in the streets hanging out with other young men, and began committing crimes. Unfortunately, Carter's coming-of-age story is not uncommon in the community where he grew up. While his upbringing is no excuse for the crimes he now stands convicted of, it helps to explain why mass, protracted incarceration of Black males in our country is such a prevalent and seemingly intractable problem.

Carter was adjudicated delinquent several times beginning at age 15 and committed to DYS. His juvenile offenses included unarmed robbery, possession of a firearm, knowingly receiving stolen property, and resisting arrest. As an adult, he was convicted of possession of a firearm at age 19, possession of crack cocaine and carrying a firearm at age 20, and possession of crack cocaine and domestic battery at age 23.[1] He served a series of short stints in prison for those offenses.

The government devotes much of its sentencing memorandum to Carter's prior record, labeling him a "top-tier violent offender." *Gov. Sentencing Memorandum*, p. 15. The prior cases the government relies on include several dismissed cases and an outright acquittal. None of that

---

[1] Carter was convicted of several other, minor offenses as well.

apparently matters to the government if it interferes with the dark picture it is determined to paint.

The government even asks the Court to consider a rap song allegedly written and performed by Carter as part of its sentencing calculus. *Gov. Sentencing Memorandum*, p. 13. It is well-settled that reliance on song lyrics or music videos to cast a defendant in a pejorative light for sentencing purposes is forbidden absent extrinsic evidence that makes such expression specifically relevant to motive or state of mind in a particular case. *United States v. Alvarez-Nunez*, 828 F.3d 52 (1st Cir. 2016). There, in rejecting the assumption of the government and the sentencing judge that the defendant's lyrics and music video accurately reflected his motive, state of mind, personal characteristics and the like, the Court stated:

> But this assumption ignores the fact that much artistic expression, by its very nature, has an ambiguous relationship to the performer's personal views. That an actress plays Lady Macbeth, or a folk singer croons "Down in the Willow Garden," or an artist paints "Judith Beheading Holofernes," does not, without more, provide any objective evidence of the performer's motive for committing a crime, of his personal characteristics (beyond his ability to act, sing, or paint, as the case may be), or of any other sentencing factor.

*Id.* at 57. In short, this was a cheap shot which should be ignored by the Court.

Despite his personal and legal struggles, Carter graduated from Hyde Park High School in 2008. Over the past decade, he has held a series of temporary warehouse and construction jobs. He was also working as an artistic manager for Nuumusic Studio in Brockton at the time of his arrest in this case in 2019. (A letter from the owner of Nuumusic describing Carter's role there, submitted in connection with his detention hearing last year, is appended hereto as *Exhibit* 7.)

Carter's positive character traits are described in letters to the Court from close family

members and friends, appended hereto as *Exhibits 1-6*, respectively.² His paternal grandmother, dren.Nancy Carter, who has been Carter's primary caretaker and support person for much of his life, describes him as "reliable," "courteous," and "calm." She notes that Carter wants to continue to be "a caring and involved parent" to his children. In her view, Carter has matured since his arrest on these charges 18 months ago, and is "finally ready to change for the better." *Exhibit 1*.

Shaatrona Sims, Carter's fiancée, has been in a relationship with him for the past 15 years and describes him as her "best friend." She notes that Carter "has always been there for his family," and "has always been a provider." She describes him as "graceful, smart, and kindhearted," adding that he "wants to be a better person." According to Ms. Sims, Carter has a "close bond" with their older child, and she would like to see him have the opportunity to develop a similar connection with their infant son. *Exhibit 2*. Carter was living with Sims and their two children when he was arrested in this case in March, 2019.

Tanairis Pereya, who has been close friends with Carter for seven or eight years, describes him as "industrious and hardworking," "community-minded," and a "loving father." *Exhibit 3*. Karen Quilter, a longtime family friend, describes Carter as "responsible, reliable, and trustworthy," adding that he is "a decent person who deserves a second chance in life." *Exhibit 4*. Randy Campbell, Carter's football coach during his adolescence, describes him as "quiet, shy, and respectful." *Exhibit 5*. Malorie Hanora, Executive Director of Families for Justice as Healing, describes Carter as a "kind person" who "makes every effort to be a loving presence in the children's daily lives despite his incarceration" and is "ready to change his life." *Exhibit 6*.

---

² These letters were all written several months ago. Carter's sentencing hearing was originally scheduled for July 7, 2020 and was continued as a result of the COVID-19 pandemic.

## II.    OFFENSE CONDUCT.

Having presided over the two-week trial in this case, the Court is well-aware of the evidence respecting Carter's offense conduct. There are, however, several points that merit emphasis in arriving at a fair and just sentence. First, there was no evidence that Carter ever entered the cellphone store or personally brandished or fired a weapon during the robbery or its aftermath. Second, although the government's cooperating co-defendant, Dennis Martin, testified that Carter provided him and the other participants with firearms prior to the robbery, there is no credible evidence to support that allegation. The government claims that the jury "considered [Martin's] testimony and rendered a verdict consistent with it, suggesting that the testimony was deemed credible and reliable...." *Gov. Sentencing Memorandum*, p. 4. Yet the government conveniently ignores the fact that the jury acquitted Carter of both felon-in-possession counts in the face of Martin's testimony. So it is fair to infer that the jury rejected some of Martin's testimony as false. Moreover, Martin admitted that he used the very same Ruger .380 handgun he used during the T-Mobile robbery to commit an armed robbery of a convenience store in Quincy just a few weeks earlier. *Tr.* (3/5/20), pp. 15-16. Accordingly, the claim that Carter provided the others with firearms should not be credited by the Court.

Third, the government asserts over and over and over again that Carter "ordered the murder of a police officer" and committed attempted murder during the course of the post-robbery flight. *Gov. Sentencing Memorandum*, pp. 1,6,7,12,16. The only evidence that Carter told his accomplices to shoot at the police was the self-serving, uncorroborated testimony of Dennis Martin. And there was no testimony, not even from Martin, that Carter ordered or attempted to murder anyone.

Fourth, contrary to the position taken by Probation and the government, it has not been

proven that anyone participated in this crime other than Carter and the three other men who have been charged. The Presentence Report (¶29) alleges that just after the robbery, Carter called someone named "Noons" in an effort to sell the stolen phones. But the only evidence that such a call took place was the testimony of Dennis Martin, an unreliable and incredible witness. The fact that Carter's phone made a call shortly after the robbery says nothing about the identity of the recipient or the substance of the call. In any event, even if Martin were telling the truth, there is no evidence that "Noons" had any prior knowledge that the robbery would occur or that he played any role in arranging or conspiring to commit it. So he was not a participant.

The PSR also alleges (at ¶¶ 12-15,115) that an individual named James Boddie conspired to rob the cellphone store by casing it on the afternoon of the robbery. For its part, the government also speculates that Carter spent the night following the robbery at Boddie's residence in Brockton. *Gov. Sentencing Memorandum,* pp. 9-10 Yet even if Boddie was in the T-Mobile store on the afternoon before the robbery, there was absolutely no proof that he was "casing" it for a robbery. Significantly, there were apparently no phone calls between Boddie and any of the alleged robbers that afternoon. The government's theory that Boddie was assisting with the robbery is rank speculation, not proved by a preponderance of the evidence. Moreover, even if Carter had spent the night following the robbery at Boddie's residence, as the government surmises, that would not make Boddie a participant in the robbery itself. Accordingly, this speculative "participation" theory should be rejected by the Court.

Finally, both the government and Probation claim that Carter was the leader/organizer of the phone store robbery. This allegation is based solely on the testimony of Dennis Martin, who has an obvious interest in minimizing his own role and exaggerating Carter's in order to curry favor with

the government.³ Since Martin cannot be relied upon, his uncorroborated characterization of Carter as the leader/organizer of this crime must be deemed unproven for sentencing purposes.

### III. SUMMARY OF APPLICABLE LAW.

#### A. Guidelines Calculation.

Carter objects to the upward adjustment for his role-in the-offense set forth in ¶115 of the PSR. As noted above, the only evidence to support the allegation that Carter was the leader/organizer of this robbery is the partially-discredited and disbelieved testimony of Dennis Martin, a biased and unreliable witness. Accordingly, the government has failed to prove that Carter should be assessed any upward role adjustment under U.S.S.G. §3B1.1. Even if the Court did decide to credit Martin's story and treat Carter as the leader/organizer of this robbery, the offense did not involve five or more participants, and the offense conduct was not "otherwise extensive." Accordingly, the four-level upward adjustment for role-in-the-offense is clearly excessive and unwarranted. Carter's applicable guideline range should be revised downward.

Overall, the Guidelines calculation by Probation, endorsed by the government, is rife with double (and even triple) counting. Thus, Carter is assessed a six-level upward adjustment pursuant to U.S.S. G. §3A.1.2(c)(1) based on the shots fired by his accomplices at pursuing police officers during the flight. He gets two more points under U.S.S.G. §3C1.2 because he "recklessly created a substantial risk of death or serious bodily injury in the course of fleeing from a law enforcement officer." And he also faces a 10-year mandatory minimum, consecutive sentence under 18 U.S.C. §924( c) for the same discharge of the same firearms during the same flight. This double (or triple)

---

³ Martin has still not been sentenced for his role in the robbery. Presumably, the government is awaiting the disposition of the pending cases against Carter's other two co-defendants before asking the Court to sentence him.

counting in neither fair nor reasonable, and it artificially inflates the applicable guideline range. Even if such piling on were legally permissible under current law, it shouldn't be, and Carter objects to it in order to preserve the issue.

### B. The Sentencing Statute and the Parsimony Principle.

While the correct calculation of the guideline range remains the starting point for federal criminal sentencing, it has been the case since *United States v. Booker*, 543 U.S. 220 (2005), that the guidelines are advisory, not mandatory. Since the core principle embodied in the sentencing statute, 18 U.S.C. § 3553, is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in § 3553(a)(2), the Court reserves the discretion to vary from an advisory guideline range because it finds that the range is "greater than necessary" because of specific, case-based considerations, general, policy-based considerations, or both. *See Spears v. United States*, 555 U.S. 261, 264-265 (2009); *Kimbrough v. United States,* 552 U.S. 85, 110 (2007). Thus, for example, a sentencing judge may impose a variant sentence on the grounds that double-counting in a particular case, while legally permissible, would result in a sentence "greater than necessary" to fulfill the purposes of §3553(a)(2). *See, e.g., United States v. Hernandez-Fierros*, 453 F. 3d 309, 313 (6th Cir. 2006). *See also United States v. Robertson*, 309 Fed. Appx. 918 (6th Cir. 2009) (unpublished).

### C. Cases Involving a Mandatory Minimum, Consecutive Sentence Under §924(c).

In a case such as this, where the Court must impose a mandatory minimum, consecutive sentence for a conviction of 18 U.S.C. §924(c) in addition to a sentence for underlying drug crimes or crimes of violence, the Court may take into account the duration of that mandatory sentence in arriving at a total sentence for all offenses that is sufficient, but not greater than necessary, to fulfill

the objectives of sentencing. *Dean v. United States*, ___ U.S. ___, 137 S.Ct. 1170, 1176-1177 (2017). It is the **total** sentence imposed for all counts of conviction which must be fair. Indeed, as the Court noted in *Dean*, nothing in the language of §924 (c) "prevents a district court from imposing a 30-year mandatory minimum sentence under §924(c) and a one-day sentence for the predicate violent or drug trafficking crime, provided those terms run one after the other." *Id.* at 1177.

**IV.     OTHER RELEVANT CONSIDERATIONS.**

    **A.     Proposed Plea Agreement.**

Shortly before trial, the parties engaged in plea negotiations which culminated in the government's preparation of a proposed plea agreement. Under that proposed agreement, appended hereto as *Exhibit 8*, Carter would plead guilty to the three counts against him pursuant to F.R.Crim.P. 11(c)(1)(C). The agreement provided for a binding sentencing range of not less than 96 months and not more than 170 months imprisonment, contingent upon the Court's acceptance of the agreement.

Ultimately, Carter rejected the proposed agreement and exercised his constitutional right to go to trial. Accordingly, the terms proposed by the government are of no force and effect, and the government is certainly free to advocate for a different sentence at this juncture. Nevertheless, it is hard to ignore the fact that just two weeks before trial, the government was willing to characterize a sentence of not less than 96 months nor more than 170 months as "a reasonable and appropriate disposition of this case...." If a sentence of eight to 14 years was deemed to be "reasonable and appropriate" just before trial, how can a sentence of more than 31 years be "necessary and justified" after trial? *See Gov. Sentencing Memorandum*, p. 18. In a system of criminal justice which relies on the premise (perhaps aspirational) that a defendant should not be penalized for exercising his constitutional right to go to trial, such a huge disparity in sentencing for the very same offense

conduct in the very same case should give the Court considerable pause about what is really going on here.[4]

**B.     Comparison to Other Cases in This District.**

While every case is different and each defendant must be sentenced as an individual, it is illuminating to examine sentences imposed in similar cases in this District over the past decade. Such an examination may assist the Court in avoiding unwarranted sentencing disparities and determining appropriate sentencing proportionality under the sentencing objectives set forth in 18 U.S.C. § 3553(a)(2).

**1.     Overview of recent robbery sentences.**

The table appended hereto as *Exhibit 9* lists the guideline ranges and sentences imposed for all Hobbs Act robbery and bank robbery convictions in the District of Massachusetts over the last decade. This table includes, but is not limited to, cases in which the defendant was convicted under 18 U.S.C. § 924(c) in addition to one or more underlying violent offenses. The purpose of this table is simply to provide the Court with a broad overview of sentencing for such offenses in this District, particularly in terms of comparing the applicable guideline range to the sentence actually imposed. Out of the 77 sentences reflected in this table, a total of 51 (approximately two-thirds) were below the applicable guideline range. Below-guidelines sentences were also imposed in two-thirds of the nine cases where the defendant was convicted of a violation of § 924( c ) in addition to a substantive

---

[4] Of course, Carter recognizes that on a guilty plea, he would probably have received a three-point reduction in offense level for acceptance of responsibility. That relatively small adjustment, however, hardly accounts for the government's advocacy of a sentence now which is two to four times what it characterized as "reasonable and appropriate" just before trial. If the government's change in position isn't simply punishing Carter for exercising his right to go to trial (and deterring others from doing so), how else can it be explained?

violent offense. These overall numbers suggest that the judges of this District, in general, view the Guidelines for these offenses as excessive in a substantial majority of cases.

**2.     Specific sentences.**

As noted above, downward variant sentences were imposed in six of the nine cases involving a mandatory minimum component under § 924(c). Four of those cases are discussed below.

**a.     *United States v. Tufts-Raymond*, No. 14-40023-TSH.**

The defendant in this case committed a spate of eight armed robberies over the course of approximately six weeks and was convicted of multiple counts of bank robbery and Hobbs Act robbery, as well as a violation of § 924(c). He had previously been convicted in state court of armed robbery and possession of a firearm. He faced a guideline range of 219-252 months, including a seven-year mandatory minimum sentence for the § 924(c) violation. Judge Hillman sentenced the defendant to a total of 135 months imprisonment, seven years below the bottom of the applicable guideline range.

**b.     *United States v. Hamilton*, No. 11-10133-RWZ.**

The defendant robbed a bank and fired five shots in the process of fleeing. He was a career offender and faced a guideline range of 308-355 months' imprisonment, including a mandatory minimum of ten years for the § 924(c) conviction. Judge Zobel sentenced him to 168 months, more than 11 years below the bottom of the applicable guideline range.

**c.     *United States v. LePage*, No. 11-10152-RGS.**

The defendant robbed a bank, putting his gun to the back of a customer's head and pointing the gun at a teller in the process. The defendant had a lengthy criminal record, including convictions for murder, armed robbery, and assault to kill. He faced a guideline range of 272-319 months'

imprisonment, including a seven-year mandatory minimum for the § 924(c) conviction. Judge Stearns sentenced him to 192 months, nearly 7 years below the bottom of the applicable guideline range.

### d.     *United States v. Arthur*, No. 12-10025-DJC.

The defendant and his co-defendant robbed a cell phone store at gunpoint. They led the clerk into a back room, duct-taped her mouth, tied her hands and legs, and threatened to kill her. The defendant, who had a lengthy criminal record, had spent 19 of his previous 22 years in prison (including 11 years in federal prison) and was on federal supervised release at the time he committed the crime. He faced a guideline range of 262-327 months, including a mandatory minimum of seven years for the § 924(c) conviction. Judge Casper sentenced him to 228 months, nearly 3 years below the bottom of the applicable guideline range.

## V.     APPLICATION OF STATUTORY SENTENCING OBJECTIVES.

The sentencing statute, 18 U.S.C. § 3553, requires the Court to impose a sentence which is sufficient, but not greater than necessary, to fulfill the purposes enumerated in § 3553(a)(2). *See Kimbrough*, 552 U.S. at 101. In *United States v. Rodriguez*, 527 F.3d 221, 227-228 (1st Cir. 2008), the Court of Appeals noted that *Kimbrough* required "a more holistic inquiry" and directed sentencing judges to "consider all of the relevant factors" in order to "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." Those goals, as enunciated in the statute, can be broadly characterized as punishment, general deterrence, incapacitation, and rehabilitation. They are not to be treated as a laundry list or applied piecemeal to arrive at an appropriate sentence. Rather, they should all be considered as a group. *Rodriguez*, 527 F.3d at 228.

There is no question, of course, that Carter should be punished severely for the crimes he

stands convicted of. According to the jury's verdict, Carter participated in the armed robbery of the T-Mobile store and is legally responsible for the shots fired by his accomplices during the robbers' subsequent flight from the scene. Those are serious, violent crimes that warrant a substantial term of imprisonment. Of course, the Court should also take into account that all the stolen goods (valued at less than $25,000) were recovered undamaged and that the only physical injury suffered by anyone was an abrasion on the head of the store manager, Gardy Dertelus.[5]

At the same time, it should be kept in mind that the draconian, combined sentencing range of more than 30 years which Carter faces under the Guidelines is due in substantial part to the government's discretionary decision to charge him with a violation of § 924(c), in addition to the underlying Hobbs Act offenses. Particularly in the absence of any evidence that Carter personally brandished or discharged a firearm, the government easily could have chosen to forego that additional sentencing club, but it elected to include that count in the indictment. That decision necessarily added ten years to the combined guideline range for the very same offense conduct since §924(c) mandates a minimum sentence which must be served consecutively.

But while the Court is now obligated to impose at least the ten-year sentence mandated by § 924(c), it need not inflate Carter's total sentence by that same amount simply because the government chose to charge the case as it did. Indeed, doing so would violate the parsimony principle embodied in 18 U.S.C. § 3553, as well as the holistic approach endorsed by *Kimbrough,*

---

[5] In typically dramatic and hyperbolic fashion, the government declares that Mr. Dertelus' "career and life have been irrevocably altered" and that "[e]very late night that Mr. Dertelus works for the rest of his life will understandably conjure memories of the terror he faced...." *Gov. Sentencing Memorandum, p. 16.* According to the PSR (¶105), there have been no victim witness statements submitted as of September 9, 2020. Query whether the government is simply making this description up?

*Rodriguez*, and their progeny. That is precisely the point of the Supreme Court's decision in *Dean*, which explicitly invited the sentencing judge to take the §924(c) mandatory minimum sentence into account in determining how much additional punishment for the underlying substantive crimes was necessary to attain a fair sentence for the defendant's offenses as a whole. In any event, Carter is necessarily going to lose his liberty for a substantial portion of his life, and he won't get to help raise his children, and his children will grow up without their father. Surely that is punishment enough.

As for general deterrence, any sentence which will send Carter to federal prison for more than a decade for this crime will surely communicate to the public that those who chose to participate in even a single armed robbery will pay a very heavy price. No one is suggesting that he should receive a mere "slap on the wrist." There is no evidence or any reason to believe that a greater number of future robberies will be deterred if Carter is required to spend 32 years in prison, rather than 12 years.

In light of Carter's prior record, the Court could reasonably consider whether a longer sentence is needed to incapacitate him in order to prevent him from committing further crimes. Significantly, Carter has never served a substantial term of incarceration before, and he has not previously been to federal court. His prior offenses were committed when he was in his teens or early 20s. Carter's grandmother, who probably knows him better than anyone, believes that he has matured since his arrest in this case and is "finally ready to change for the better." He is facing more than a decade of imprisonment. Accordingly, despite the government's hyperbole, a longer sentence is not warranted in the interests of specific deterrence.

Finally, given the length of the mandatory minimum, Carter's need for rehabilitation, counseling, and training within the Bureau of Prisons can be met without adding years or decades to his sentence. Carter surely would benefit from counseling to address the impact of the abuse he

suffered as a child. He would also benefit from participation in the RDAP intensive drug treatment program to address his substance abuse. And he would benefit from job training to the extent such programs are made available to him. All of those needs can be met within the context of the 144-month sentence recommended herein.

## VI. DISCUSSION AND RECOMMENDATION.

The imposition of a fair and appropriate sentence for Diovanni Carter poses a particular challenge to the Court because the starting point, as dictated by the Guidelines coupled with the consecutive §924 (c) minimum, is so unreasonably high. There is, of course, an institutional pressure to base a sentence on the Guidelines, varying from that range incrementally to the extent that the Court deems a variance to be warranted. Thus, where the starting point as calculated by Probation is 32 to 37 years imprisonment, some might view a sentence of "merely" 25 or 28 years as lenient.

That is simply not the case here. First, the Guidelines substantially overstate the seriousness of Carter's offense conduct. Even if the double (and triple) counting for the same offense conduct (high-speed flight; assault on pursuing officers; discharge of firearm during flight) may be legally permissible under current law, it results in a grossly distorted and excessive guideline range. Moreover, the consecutive sentence mandated by §924(c) ups the ante by an additional ten years, further inflating the starting point.

Fortunately, based on *Kimbrough* and *Dean*, the Court is free to put that starting point to one side and, instead, determine a fair sentence which fulfills the statutory objectives enumerated in §3553 and is no greater than necessary. Based on all the facts and circumstances, as detailed herein, Carter submits that a sentence of 144 months imprisonment followed by 3 years of supervised release

is appropriate.  Consigning him to prison for a longer time would be excessive, unreasonable, and violate the parsimony principle which underlies the sentencing statute.

Carter further requests that the Court recommend that he be classified to a penal institution as close to Massachusetts as possible to facilitate his relationship with his children during their formative years and maintain close ties with his family.  He requests that the Court recommend that he be screened by the Bureau of Prisons for the RDAP program and that he receive mental health counseling.  Finally, he requests that he be given credit for time served since March 5, 2019, when he was arrested on state charges arising out of this same offense conduct.

Respectfully submitted

**DIOVANNI CARTER**

By his attorneys,

/s/ James L. Sultan
James L. Sultan, BBO #488400
Kerry A. Ferguson, BBO #672649
Rankin & Sultan
151 Merrimac Street, 2nd Floor
Boston, MA 02114
(617) 720-0011

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 11, 2020.

/s/ James L. Sultan