<pre>
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MASSACHUSETTS

 3    _____

 4    UNITED STATES OF AMERICA,

 5                         Plaintiff,        Criminal Action
                                             No. 19-cr-10104-ADB-1
 6    v.
                                             September 17, 2020
 7    DIOVANNI CARTER,
                         Defendant.          Pages 1 to 51
 8    _____
                                             App No. 20-193
 9

10

11

12
                      TRANSCRIPT OF SENTENCING HEARING
13            BEFORE THE HONORABLE ALLISON D. BURROUGHS
                      UNITED STATES DISTRICT COURT
14                 JOHN J. MOAKLEY U.S. COURTHOUSE
                        ONE COURTHOUSE WAY
15                BOSTON, MASSACHUSETTS   02210

16

17

18

19

20

21                      JOAN M. DALY, RMR, CRR
                         Official Court Reporter
22                 John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 5507
23                  Boston, Massachusetts   02210
                      joanmdaly62@gmail.com
24

25
</pre>

 1    APPEARANCES:

 2

      FOR THE GOVERNMENT:

 3

              PHILIP A. MALLARD
 4            GLENN A. MACKINLAY
              Assistant U.S. Attorneys
 5            U.S. Attorney's Office
              John J. Moakley Courthouse
 6            Suite 9200
              One Courthouse Way
 7            Boston, Massachusetts 02210
              617.748.3674
 8            philip.mallard@usdoj.gov

 9

10    FOR THE DEFENDANT:

11            JAMES L. SULTAN, ESQUIRE
              KERRY A. FERGUSON, ESQUIRE
12            Rankin & Sultan
              1666 Massachusetts Avenue
13            Suite P-16
              Lexington, Massachusetts 02420
14            617.720.0011
              jsultan@rankin-sultan.com
15            khaberlin@rankin-sultan.com

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

      (The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on September 17, 2020.

      The defendant, Diovanni Carter, is present with counsel.  The Assistant U.S. Attorney is present.)

      THE CLERK:  This is criminal matter 19-10104, United States versus Diovanni Carter.  Will counsel identify themselves for the record.

      MR. MALLARD:  Good morning, Your Honor.  Philip Mallard for the United States together with Glenn MacKinlay.

      MR. SULTAN:  Good morning, Your Honor.  James Sultan with Kerry Ferguson for the defendant.

      THE COURT:  All right.  We are here for Mr. Carter's sentencing.  I will tell you that this is the first proceeding I've done in person since they reconfigured the courtroom.  I'm doing it with a mask on.  I think I'm being amplified adequately, but if for any reason anyone is having any trouble hearing me or you need me to repeat anything, just raise your hand or let me know, and I'll do that.  This is new and I'm feeling my way like everybody else.

1         In preparation for today's sentencing, I have

2    received and read the presentence report as revised on

3    July 9 -- is that July 9?  I can't read my own handwriting

4    September 9, 2020; the defendant's sentencing memorandum

5    which was filed on 9/11; the government's sentencing

6    memorandum which was filed also on 9/11; I have read all of

7    the attachments to both sentencing memorandums which included

8    several letters filed on behalf of the defendant; some other

9    paperwork from both sides.  And I have read and received the

10   two victim impact statements.  Also I've listened to the

11   recordings that the government submitted.

12        That's my list of what's been submitted and what I

13   should have read and considered.  Does anybody think I'm

14   missing anything?  Mr. Mallard, Mr. MacKinlay?

15        MR. MALLARD:  I think that is it.

16        THE COURT:  Mr. Sultan?

17        MR. SULTAN:  Nothing else.

18        THE COURT:  Probation?

19        THE PROBATION OFFICER:  No, Your Honor.  You have

20   everything.

21        THE COURT:  I take it nothing has been withheld

22   from the presentence report?

23        THE PROBATION OFFICER:  No, Your Honor.

24        THE COURT:  Mr. Sultan, have you gone over it with

25   your client?

1          MR. SULTAN:  Yes, Your Honor.

2          THE COURT:  Mr. Carter, have you had ample

3  opportunity to review the presentence report and discuss it

4  with your lawyer?

5          THE DEFENDANT:  Yes.

6          THE COURT:  If you guys want to stand up and sit

7  down because you're trying to get your steps in, go ahead.

8  If it's easier to stay seated, that's fine, too.  I'm not

9  going to stand on ceremony about that.

10          There are numerous objections to the presentence

11  report.  By my accounting, Mr. Sultan, I have read and taken

12  notice of objections one through nine and don't think there

13  needs to be anything further resolved or discussed.  Is there

14  any one of those you would like me to dive into in more

15  depth?

16          MR. SULTAN:  I'll just look for a second.

17          THE COURT:  Do you want me to go through them one

18  at a time and tell you what they are if they're not in front

19  of you?

20          MR. SULTAN:  No.  I can see where they are.  Only

21  to the extent one through nine, Your Honor, refer to the

22  facts underlying objection eleven, which is the four points

23  for leadership.  If the Court wants to deal with that all at

24  once, there's no reason to consider the others individually.

25          THE COURT:  Right.  That's my intention, to deal

1   with ten which goes to the six point enhancement and then

2   eleven which goes to the role enhancement.  And I think that

3   once we resolve those two, the others largely take care of

4   themselves.

5              MR. SULTAN:  Agreed.

6              THE COURT:  So with regards to number ten, which

7   goes to the six-level increase in the offense level based on

8   the assault on a law enforcement officer, I'm happy to hear

9   you on it, Mr. Sultan.  But I think that that six points is

10  properly applied, and I am -- that objection is going to be

11  denied.  To the extent that there's -- you want to make the

12  argument around this, I think it's more appropriately made in

13  your sentencing recommendation rather than in the guideline

14  calculation.

15             MR. SULTAN:  That's fine, Your Honor.  I just want

16  to make it clear to preserve that issue and that objection.

17             THE COURT:  Yes.

18             MR. SULTAN:  For the record.

19             THE COURT:  Yes.  So the six points will stay as

20  is.  You also have on objection 11 to the four-level increase

21  for the role in the offense.  After giving that some thought,

22  I'm happy to hear the government on this one.  The

23  government's position is well-founded, and I take their point

24  about the other two individuals, Mr. Boddie and Mr. Noons.

25  But based on the evidence that I saw at trial, I am not

1    prepared to say that there were five other people involved in

2    the offense.  So instead of applying the four-level

3    enhancement on role, I'm going to apply a two-level

4    enhancement on role.  But if you want to be heard on that for

5    the record, Mr. Mallard or Mr. MacKinlay, this is your

6    opportunity.

7              MR. MALLARD:  Your Honor, I would pass on that.

8    But I would just basically incorporate the arguments that I

9    made on pages 6 through 10 of my memorandum in support of

10   sentencing.

11             THE COURT:  As I say, it's not a crazy position for

12   the government to take, but it seemed to me to be a very

13   close call.  And when I feel like there's a close call like

14   that, it goes to the runner, which in this case is the

15   defendant.  I think someone called it, it may have been

16   probation called it, a strong inference of the participation

17   of the other two.  There is certainly an inference there, but

18   I wasn't convinced it was a strong enough to get over the

19   hurdle of preponderance of the evidence.  But I do think he

20   satisfies the criteria for the two-point role enhancement,

21   and I am going to apply that.

22             So with regards to objection 12 which is

23   Mr. Sultan's calculation where he asked that it be a 25 and

24   not a 35, it's going to be a 33 rather than a 35.  Thirteen I

25   don't think needs to be resolved.  I've taken note of it.

1    Same with 14.  Fifteen, 16 and 17 have been taken care of by

2    amendments to the report.  And 18 again is the math total

3    where Mr. Sultan is objecting to the 35, and again that's to

4    a 33.  So that is by my accounting a resolution of all the

5    objections.

6            Does anybody want to be heard or comment further on

7    any of those before we move on?

8            MR. MALLARD:  No, Your Honor.

9            MR. SULTAN:  No, Your Honor.

10           THE COURT:  With those rulings in play, the

11   guideline calculation, I'm going to run through it, but it's

12   essentially the guideline calculation in the presentence

13   report minus two points based on my ruling for role.  So

14   that's a 20-point base offense level.  Two points for the

15   injury to the store manager, one point for loss, six points

16   on the victim enhancement, two points for role, two points

17   for obstruction which gets us to a 33.

18           Criminal history points are 10 which puts him in a

19   Criminal History Category five.  That comes to a guideline

20   range of 210 to 262 months, a supervised release range goes

21   up to three years on Counts 1 and 2, five years on Count 3.

22   The fine range, I think, is $35,000 to $350,000.  I don't

23   believe restitution is an issue, and the special assessment

24   would be $300, which is $100 on each count.

25           The government, Mr. Sultan, probation, do I have

1    that calculation correct?

2              MR. MALLARD:  Your Honor, I believe you have the

3    guidelines correct with respect to the 33 and category 5.

4              THE COURT:  Mr. Sultan?

5              MR. SULTAN:  It's correct, Your Honor.

6              THE COURT:  Got that right?

7              THE PROBATION OFFICER:  Correct.

8              THE COURT:  Excellent.  Mr. Mallard or

9    Mr. MacKinlay, the government's recommendation, please.

10              MR. MALLARD:  Your Honor, the government is

11    recommending the low end of the guidelines, and we do object

12    to essentially the Court's finding of the plus two versus the

13    plus four.  We are recommending the low end.  I think in this

14    case -- Obviously the memorandum was submitted with the

15    guidelines being higher at a 382 months, but we would be

16    recommending the low end of the guidelines as calculated by

17    the Court which is 330 months to 382 months as currently

18    stated by the Court's calculation.

19              THE COURT:  Hold on.  You're essentially

20    recommending 210 months which is the guideline range plus the

21    120 months on and after which gets you to 330?

22              MR. MALLARD:  That's correct, Your Honor.  Give me

23    one moment.  I'm going to do the math on how many years that

24    is.

25              It's essentially 27 and a half years, Your Honor.

1    While the government's argument in the memorandum certainly

2    reflected the 31 number, we would be looking for 27 and a

3    half as currently calculated by the Court.

4              THE COURT:  Okay.

5              MR. MALLARD:  We also have Officer Robinson is here

6    to allocute, and I would like to read Mr. Dertelus' victim

7    impact statement into the record if possible.

8              THE COURT:  I would formally let Mr. Sultan make

9    his recommendation and then circle back to the victims.  But

10   Mr. Sultan, do you have any objection to doing the victims

11   now and then you make your recommendation?

12             MR. SULTAN:  Of course not, Your Honor.

13             THE COURT:  All right.  Go ahead, Mr. Mallard.

14             MR. MALLARD:  Your Honor, I would first read

15   Mr. Dertelus' statement.  Just so the Court is clear and the

16   record is clear, Mr. Dertelus is the store clerk who was in

17   the store at the time of the robbery.  He states as follows:

18             "The incident that had taken place on January 26,

19   2019, has impacted my life both personally and

20   professionally.  I recently began to learn how to manage my

21   personal anxiety.  The incident that took place at

22   approximately 7:11 p.m. continues to shock me because it is

23   something I would only watch happen to innocent people on TV.

24   This has now become my reality.  I'm writing this statement

25   on September 3, 2020.  It has now been a year and seven

months since this incident took place, yet it continues to
cross my mind bitterly every day.  How could I let this
happen?  I felt an overarching feeling of helplessness.  The
area I was working was known for having crimes around the
area.  This was one significant factor in deciding whether I
wanted to accept this promotion for work or not.  I'm a calm,
laid back individual, and I am the type to help and to give
to others when I can.  Since this took place, I have worked a
lot less closing shifts.  I am seeking a remote opportunity
somewhere where I'd be moving around a lot.  I would rather
work safely from my home.

        "On days that I am closing, the incident would
continuously hover and constantly play in my mind.  Not only
did this incident impact me, but it has impacted my close
friends and family.  They worry about me daily, my mental
health, constantly checking in to see if I am all right.  I
can wake up every day and wear this smile attempting to keep
a positive energy around others.  I cannot get over how my
life could have been taken from me only because I woke up
that Saturday morning and decided to go to work.

        "I continue to be very angry that this happened to
me.  There's nothing I can do about that life altering
experience.  I can only think positively for myself and
continue to strive to become a better person than I was the
day before.  All the suspects in the incident should be held

accountable regardless of whether they were inside the store or not.  I've decided not to appear at today's sentencing simply because this is something I will never forget, and I want to put this behind me.  I'm trying to move forward with my life.

"I'm a person that holds everything in and finds my own way in dealing with my issues.  Like most people I wake up and get ready to make my day better than my last.  I go to work and prepare for a better tomorrow, but it seems that this incident has put a significant shadow of despair on me mentally.  I come from a background where I was taught the importance of hard work and that it would always pays pay off in the long term.  Growing up my parents made sure our family did not grow up around a violent neighborhood.  They made sure we received an education.

The examples are that at my age having leadership positions, being a manager in a retail sales environment. The average person may not take on their day as seriously as I do.  I'm always ready to tackle a new challenge and get another achievement.  I am always looking out for others, and I always try my hardest in supporting people in the best way I can.

"As for the defendant, all I can say is I hope you do better with yourself, your future, and make something positive with your life.  I did not have any foresight of

1   what happened on that day, and unfortunately I cannot

2   forget."

3               THE COURT:  And the officer is here as well?

4               MR. MALLARD:  He is, Your Honor.

5               THE COURT:  He's welcome to make his statement

6   also.

7               MR. MALLARD:  From the witness stand?

8               THE COURT:  Wherever he wants.  That one is clean,

9   and that one is clean.  So take your pick.  Can you please

10  identify yourself for the record.

11              MR. ROBINSON:  My name is Silverson Robinson.  I'm

12  an officer at Brockton Police.  Good morning.  I've been a

13  police officer in Brockton for 22 years.  I came to the U.S.

14  from Barbados.  My family is here today.  I was ten years

15  old.  After a short period of time in Boston living we moved

16  to Brockton.  After graduating from Brockton High, I served

17  four years in the Navy as an Electrician's Mate Third Class.

18  I was honorably discharged, proud of my service to this

19  country that took me in and my family.

20              "I started with the Brockton Police six years later

21  in '98.  I've been married to my wife for 26 years.  I have

22  four children, Your Honor.  Three boys, one girl.  My eldest

23  son is an electrical engineer.  My second is an accountant.

24  He's going to be 27 at the end of the month.  My second

25  oldest just turned 24.  I have two other children.  They're

both still in college.  And what I do I do for them, I do for
you, and I do for the community.  I work nights as a
patrolman for 21 years, never worked days but one year.  My
wife and children have dealt with the difficulty of my hours
and stress of my job.  I've been struck twice by vehicles.
I've even been jumped on, no apparent reason.  I spent many
nights away from my family.  I've dealt with difficult calls.
I've responded to many dead bodies, and I've helped victims
along the way in violent crimes.  This is the first time I've
been shot at.

         "On January 26, 2019, on the eve of my daughter's
birthday, I left home and went to work for my usual 4 to 12
shift.  You left home, sir, with the intention of committing
a crime.  Sometime during that night our paths crossed while
performing my duties and yours while engaged in criminal
activity.  During the commission of your crime, I attempted
to stop you, but you decided that you would not let me or
anyone else stop you from getting away.  That decision
resulting in shots being fired at me and the cruiser I was
operating.

         "You obviously did not care if it had taken my life
or injured me in any way.  Your only concern was getting away
from me and my fellow officers.  You wanted to get away
without having to be held responsible for your foolishness
and criminal decision.  The night after you were apprehended,

1    I continued working.  The night after your friends were

2    apprehended, I continued working as usual until the end of my

3    shift thinking that I was fine.  As we can see, I'm not fine.

4            "While driving home I started reflecting on

5    everything that had occurred.  Just the thoughts made me

6    begin to shake like I am now.  The reality of what had taken

7    place, what could have happened came into mind.  The reality

8    that you were willing to kill me, an officer, to escape.  The

9    next day while sitting in church, it was Saturday, Sunday

10   morning, the full impact of your reckless actions fully hit

11   home.  I had to leave and go home because again I couldn't

12   stop shaking.  I kept thinking over and over that you would

13   have taken my life without thought or hesitation.  It would

14   never have bothered you one bit if any of those bullets had

15   entered the cruiser and into my body and ended my life.

16           "I started thinking and still up to this day think

17   of all that you would have robbed me and my family of.  You

18   would have taken away my opportunity to grow old with my wife

19   and enjoy my retirement in my older years, the opportunity to

20   watch my children grow and accomplish their dreams, the

21   opportunity to see grandchildren to be born, and to be there

22   for my parents as they got older and needed assistance.

23           "One year, eight months later I am still affected

24   by your actions of that night.  I become nervous when faced

25   with certain situations, and my anxiety level is much higher

1    than it ever was before.  I am less trusting, more conscious

2    of where I am and what is going on around me, especially

3    while at work.

4         "Today I noticed there's cameras on the train.

5    Why?  I don't know.  I'm not going to stand here and pretend

6    to be big bad cop.  My children will tell you that I'm not.

7    I give everybody a fair shake.  January 27, 2019, I was

8    afraid, very afraid, the kind of fright that is hard to

9    describe.  You endangered my life and could have taken it

10   along with all that matters to me, my loved ones.  I have

11   come to terms and accepted what took place that night has

12   affected me.  It will for a long time.  But I will not let it

13   define the person that I am, and I will continue to persevere

14   and grow from it.

15        "I am here today to inform you I am still on the

16   job.  I am still working to take people like you off the

17   streets.  I will not let your actions deter me from my main

18   objective as a law enforcement officer to patrol the streets

19   of Brockton and protect innocent citizens from criminals like

20   you, criminals whose only objective is to get what they want

21   without regard for anyone or anything, but their own selfish

22   desires.

23        "Today I will leave here and return to my career.

24   I will leave here and go home with my loved ones, to continue

25   to celebrate more birthdays.  My daughters and my son and I

1    will spend time and celebrate life and those that I care

2    about and care about me.  I will continue my life.  You, on

3    the other hand, will not have the opportunity to return home

4    and you will not be able to return to your loved ones.

5            "I say this, Your Honor, I know what I signed up

6    for.  I'd do it again.  But we must make a decision on what's

7    going to happen today.  I thank you for listening to me.  And

8    I thank the U.S. Attorney's Office.  Thank you."

9            THE COURT:  Thank you, Officer Robinson.  I know

10   those victim impact statements are not an easy thing to do.

11   Mr. Sultan, your recommendation, please.

12           MR. SULTAN:  Thank you, Your Honor.  I'll do my

13   best to speak through the mask.  I will take Your Honor's

14   offer on remaining seated if that's okay.

15           Your Honor, based on the sentencing memoranda

16   submitted last Friday, this is the biggest disparity in

17   sentencing recommendations I've ever encountered in 40 years

18   of practicing law in this court.  And I acknowledge that the

19   government today has reduced its recommendation from 32 years

20   to 27 and a half years.  But I don't think -- I don't think

21   that really changes the thrust of the comments I'm about to

22   make.

23           Many years ago I clerked for a federal judge who

24   told me that sentencing is the hardest part of the job.  Such

25   a grave decision, such an exercise of power over another

1    human being to take away a person's liberty and decide as a

2    matter of judicial discretion how long that individual will

3    be locked up in a cell, deprived of his family, his friends,

4    fresh air, a glimpse of the sky and all of the other

5    pleasures of life large and small that we take for granted.

6           I certainly don't suggest that sentencing Diovanni

7    Carter will be an easy decision for Your Honor in this case,

8    but it's such an important decision.  Now, with respect to

9    the offense conduct, Your Honor, I'm not going to belabor

10   that because Your Honor presided over the trial.

11          I do want to acknowledge that, as is quite obvious,

12   this was not a victimless crime.  Both Officer Robinson and

13   Gary Dertelus were both doing their jobs.  They were both

14   severely traumatized by what happened.  No one should have to

15   go through that.  And Mr. Carter must be held jointly

16   responsible for what happened and for the consequences of

17   those actions.  Fortunately, no one was seriously hurt, but

18   that doesn't change the fact that this was a serious crime.

19          Your Honor has done the guideline calculation, and

20   I'm not going to talk about that anymore other than to note

21   the guideline calculation including the consecutive 924(c)

22   sentence on its face involves double counting or even triple

23   counting because the defendant is getting multiple points

24   added for what amounts to the same action of shots being

25   fired during the flight.  And while that may be perfectly

1    appropriate and lawful under current legal precedent, what it

2    means is that the guideline calculation ends up overstating

3    the seriousness of the offense.  And beyond that, Your Honor,

4    the case *Dean*, the Supreme Court's case in *Dean*, which I

5    cited in my memo, it's a very important case, Your Honor.

6    And that case says very clearly that a sentencing court faced

7    with substantive underlying crimes plus a 924(c) count should

8    take the mandatory minimum piece into account in deciding how

9    much more incremental punishment is necessary in order to

10   come up with an overall sentence which is sufficient but no

11   greater than necessary.

12          This was Chief Justice Roberts' decision.  He gave

13   an example which really struck me.  He said in that case

14   there was actually a 30-year mandatory minimum, I think,

15   under 924(c), and he said there's nothing that prevents a

16   judge from imposing a 30-year mandatory minimum under 924(c)

17   and a 30-day sentence, I think he said, for the underlying

18   offenses as long as they are imposed consecutively.

19          So the fact that there is a mandatory minimum and

20   the fact that it has to be imposed consecutively does not

21   mean that there is a ten-year bump.  It doesn't mean that you

22   figure out how much time is necessary for Mr. Carter to serve

23   for his Hobbs Act violations and then just add another ten

24   years.

25          *Dean* says that's not what the Court should do.

1      Yes, the Court has to obviously in this case impose the

2      ten-year mandatory minimum.  But the issue remains what is

3      the overall amount of time that is sufficient but not greater

4      than necessary in order to punish Mr. Carter for his crimes.

5              THE COURT:  Can I interrupt you, Mr. Sultan?  I

6      don't totally understand your double counting argument or

7      your triple counting argument.  He gets two points for what

8      happens in the store, right?

9              MR. SULTAN:  I'm not talking about that, Your

10     Honor.  Yeah.

11             THE COURT:  There's definitely the 924(c) on the

12     shots being fired.  But where else are you thinking that's

13     being double counted?

14             MR. SULTAN:  He gets the 924(c) for the shots being

15     fired.  He gets six additional points because the shots were

16     fired at a law enforcement officer, and he gets two

17     additional points because reckless conduct during the flight

18     endangered other people.

19             So I understand that technically the way the

20     guidelines are interpreted today, those just all get added on

21     and that's all fine.  But as a practical matter, he is

22     being -- it's kind of a piling on, Your Honor, and he is

23     being hit repeatedly for really the same exact offense

24     conduct, which is other accomplices firing shots during the

25     flight.  I'm not making a legal argument.  I'm making an

1  equitable argument.

2        THE COURT:  I just want to really understand what

3  you're saying.  The chase could be the reckless conduct,

4  right, irrespective of the shots being fired?

5        MR. SULTAN:  It could be parsed that way, Your

6  Honor.  The mere fact that the car was driving, whatever, 70

7  miles an hour within city limits, sure, I understand.  It can

8  be parsed that way.  But in reality basically for the flight,

9  for what happened during the flight he's being given eight

10 points on the guideline calculation plus ten years.  And

11 that's an awfully heavy hit, and I submit that overstates the

12 overall seriousness of the offense.

13        That's in essence the argument.  But I think the

14 *Dean* argument, Your Honor, is that you can't just figure out

15 the proper sentence for the robbery conduct and then just add

16 ten.  *Dean* says that's not the way to do it.  That's exactly

17 what probation did, and that's exactly what the government is

18 urging the Court to do.  And I would urge the Court to follow

19 *Dean* and reject that incremental approach for the more

20 wholistic approach that the First Circuit has adopted really

21 almost since *Kimbrough* but certainly over the past decade.

22        Your Honor, with respect to Mr. Carter's background

23 and character, let me just speak about that for a few

24 minutes, if I may.  As the Court now knows, Mr. Carter

25 experienced a terribly abusive childhood.  He was beaten

1    regularly by his mentally ill, drug addicted mother.  She

2    tasered him.  She struck him with objects.  She neglected

3    him.  Imagine the impact of that betrayal on a young child.

4    That was his upbringing.

5           Nevertheless, to Mr. Carter's credit, he has

6    developed into a caring and involved parent to his own

7    children.  And I know the Court has read the letters.  The

8    letter of Shaatrona Sims, his fiancé, the letter of his

9    grandmother, Nancy Carter, and the other letters which I

10   think attest to those qualities.

11          So he's now 30 years old.  He's an intelligent and

12   articulate and a sensitive man.  He has many years left.

13   He's far from a lost cause.  Whether he will spend most of

14   the rest of his life in prison for this offense is really up

15   to you.  And I submit that he should not.

16          Now, let me talk about two particular guideposts

17   that have sort of been used throughout the years with respect

18   to sentencing.  And those guideposts are proportionality on

19   the one hand and avoiding unwarranted disparity on the other.

20          Let me first talk about proportionality.  The

21   government refers to Mr. Carter as a "top tier violent

22   offender" suggesting that he, therefore, must be sent to

23   prison now for 27 and a half years.  That characterization

24   just brought to my mind memories of a lot of other cases in

25   this courthouse that I'm familiar with.  Going way back to a

1    case I worked on back in the 1980's, the Angiulo case, where

2    the leaders of the Boston mafia, who had led the Boston mafia

3    for decades were tried before Judge Nelson.  RICO case,

4    numerous predicate murder offenses, Judge Nelson described it

5    as "the most serious case I've ever sat on".

6            In 1986 at the end of that lengthy trial, Francesco

7    Angiulo received a sentence of 25 years.  Donato Angiulo

8    received a sentence of 20 years.  Sammy Greenough received a

9    sentence of 20 years.  Those people were top tier violent

10   offenders.

11           And think of another case, more recent case, John

12   Martorano, who admitted to being a hit man for the mafia and

13   murdering 20 people.  He became a government witness.  He was

14   sentenced in 2004 to 14 years.  He was a top tier violent

15   offender.

16           I think that the Court should consider other recent

17   cases in this courthouse, different kinds of cases, serious

18   cases involving rich, white defendants who have had

19   opportunities in life that Mr. Carter could only dream of

20   when he was being beaten and tasered by his own mother.

21           Consider, for example, a case Your Honor knows

22   well, the Insys case.  The longest sentence meted out after

23   that lengthy trial, I believe, was 66 months.  How many

24   thousands of Americans died as a result of the criminal

25   offenses committed by the defendants in that case?  Consider

1    the Varsity Blues case.  Dozens of wealthy privileged parents

2    who bribed and cheated their children's way into elite

3    universities.  The sentences meted out in those cases ranged

4    from probation up to I believe a maximum of nine months in

5    prison.

6           Now, I understand no guns were discharged.  No one

7    was struck in the head.  But as Woody Guthrie once wrote, and

8    speaking about the bank robber Pretty Boy Floyd, "Some will

9    rob you with a six gun and some with a fountain pen."

10          27 and a half years for Diovanni Carter, where is

11   the proportionality in there?

12          The other principle I want to talk about, Your

13   Honor, is the principle of avoiding unwarranted disparities.

14   So what I did and submitted to the Court on that issue, which

15   was illuminating to me was I provided to the Court as an

16   exhibit to the sentencing memo a table of the 77 sentences

17   meted out for robbery in this district over the past decade.

18   I tried to get them all.  I may have missed one or two, but I

19   Was not cherry-picking.  I'll tell the Court that.

20          In two-thirds of those cases, the sentencing judges

21   downwardly varied from the guideline sentencing range.  And

22   not a single one of those 77 sentences, Your Honor, was

23   longer than 272 months.  Out of 77 cases.  I understand every

24   case is different.  But does Diovanni Carter really deserve

25   five more years in prison than every one of those other

1   robbery defendants in this courthouse over the past ten

2   years?  What the government is asking for is grossly

3   disproportionate.  It's way beyond the pale.  It's out of

4   line.

5          And finally, Your Honor, I need to talk about the

6   proposed plea agreement in this case, which is something I

7   ordinarily would not bring up after trial.  But I have to

8   bring it up.  I understand that Mr. Carter decided not to

9   sign that agreement.  And instead he exercised his

10  constitutional right to go to trial.  And I understand the

11  government, of course, is not bound by that unsigned

12  agreement and is free to advocate for any sentence it wants.

13  But there is something going on here which is truly

14  disturbing and wrong.

15         Just before trial the government was prepared to

16  characterize 8 to 14 years as a reasonable and appropriate

17  sentence for Diovanni Carter in this case, 8 to 14 years.

18  Now it says that a 27 and a half year sentence is necessary

19  and appropriate for the very same offense conduct by the very

20  same defendant.  So what changed?  It's obvious.  Mr. Carter

21  is being penalized by the government for going to trial, big

22  time.

23         But, Your Honor, the criminal justice system isn't

24  a game.  It's not a hand of poker.  The stakes are enormous

25  and life altering.  One of the factors in the sentencing

1    statute is general deterrence.  Well, think about general

2    deterrence and what the government is doing here.  The effect

3    of jettisoning up their sentencing recommendation from what

4    they would have prepared before trial, so what they are

5    recommending now is quite clear.  It's to deter others from

6    going to trial.  It delivers that message loud and clear.  If

7    you go to trial and get convicted, you're going to get

8    smoked.

9           That is a perverse message.  It's a message that

10   undermines criminal defendants' constitutional rights, the

11   right to go to trial.  It's only a small step from a system

12   where the government tortures people until they confess.

13   We're talking about -- we're not talking acceptance of

14   responsibility, Your Honor.  I understand there's a

15   difference.  But what they're doing here is doubling or

16   tripling what they claim is a fair and appropriate sentence

17   simply because Mr. Carter went to trial.  And that's wrong.

18          In conclusion, Your Honor, sadly, there's nothing

19   particularly unusual about this case.  A young black man who

20   suffered an abusive upbringing and a lousy childhood, started

21   committing crimes at age 15 and now comes before the Court

22   for sentencing for his participation in an armed robbery,

23   like dozens of others with similar backgrounds who are

24   sentenced in this courthouse every year for drug crimes, gun

25   crimes, robberies, and the like.  It's really sad for them,

1    for their families, for the community, for all of us.

2           I've been doing this work for a long time, Your

3    Honor, and sometimes it just feels so hopeless, like such a

4    waste, like we're all just cogs in a vast machine that grinds

5    people to bits.  A system where young black males are locked

6    in elite prisons for decades until the very light of their

7    humanity is snuffed out.

8           Yes, Diovanni Carter rejected that reasonable and

9    appropriate 8 to 14 year plea and exercised his right to go

10   to trial.  Yes, he lost.  But he shouldn't lose everything as

11   a result.  His life matters, too.  These are just words.  But

12   Your Honor gets to decide through your sentencing decision

13   what they mean.  You don't have to sentence Diovanni Carter

14   to 27 and a half years in prison.  You shouldn't do it.

15          I urge you to adopt a 12-year recommendation we

16   have submitted to the Court, a reasonable and appropriate

17   sentence, which will afford Mr. Carter an opportunity to

18   rejoin his family and his community after he spends more than

19   a decade in prison to pay for his crimes.  I urge the Court

20   to recommend that he be designated to a facility as close as

21   possible to Massachusetts so he can maintain a relationship

22   with his children and his family; that he be recommended for

23   RDAP entry; and that he receive credit, Your Honor, since

24   March 5, 2019, which was the date he was originally taken

25   into state custody for these very same offenses.  I thank the

1   Court for listening.

2           THE COURT:  He's been in federal custody since
3   April 19, correct?

4           MR. SULTAN:  That's correct, Your Honor.  He was
5   originally arrested by state authorities on state charges and
6   the state charges were nolle prossed and the federal case
7   went forward.

8           MR. MALLARD:  I'd like to respond and also make my
9   argument in support of sentencing as well.

10          THE COURT:  You should have already done that.  Let
11  me just ask you, Mr. Mallard.  It seems that month between
12  March and April, that has been time that he's gotten no
13  credit for.

14          MR. MALLARD:  I agree he gets all credit since
15  March 5.

16          THE COURT:  March 5 or March 15?  What did you say,
17  Mr. Sultan?

18          MR. SULTAN:  March 5.

19          MR. MALLARD:  Your Honor, I'll start where the
20  defendant ended, which is that there is nothing unusual about
21  this case.  I have a different perspective on that and the
22  facts and the history in this cart for other cases and the
23  facts for this case that that's simply not true.  There are
24  76 cases in the defendant's chart.  He counts the Laperle
25  case twice.  Of those 76 cases there are only three trials.

1    There are 73 guilty pleas, 11 pleas to information.  Of the

2    three trials, all of those sentences in Brown, Rachal, and

3    the other case is Patterson, the Court imposed a low end

4    guideline sentence.  And not a single one of those trials

5    involved a shooting.

6          In fact, of all the cases that are in that chart,

7    most of them are not jobs in banks.  Most of them don't

8    involve firearms.  And all but one do not involve a firearm

9    being fired.  There's only one case where the firearm was

10   shot.  That's United States versus Hamilton.  That's a case

11   before Judge Zobel where she imposed a 168 month sentence on

12   a plea with a defendant who did not shoot at the police.

13         In fact, the facts of that case are that the

14   defendant in Hamilton was trapped in a vestibule that locked

15   and was sort of a man trap.  And the defendant in that case

16   fired his gun to get out of that trap and he had the ten year

17   from and after.

18         Looking at the history in this court, this

19   defendant is in a category unto himself in terms of what he

20   did in this case.  In terms of leadership, what the facts are

21   in terms of shooting at the police, the facts in terms of the

22   victim being pistol whipped, and this defendant having a

23   category five criminal history.  There's only one other case

24   that I'm aware of in this court where the defendant shot at

25   the police during the course of a robbery, and that's United

1    States v. Rosado, which is before Judge Sorokin for

2    sentencing next week.  Even that case the defendant in there

3    is completely distinct and the facts are completely separate

4    from this.  In Rosado there's one man, a bank robbery, and

5    firing upon an officer who confronted him while he's leaving

6    the bank.  By comparison, this defendant engaged in a lengthy

7    chase.  In his attempt to evade the police, he specifically

8    and intentionally ratcheted up the violence towards the

9    police.  It was a calculated decision.  Even in that case,

10   which is a plea, the low end of the guideline is 262 months.

11          The next thing I would like to talk about with

12   respect to the defendant's memorandum and also what he argued

13   is the nature of the plea offer.  And I don't want to get too

14   much into it because it's irrelevant.  First, there's no

15   aspect of the factors that would entitle this Court to look

16   at what the government has purposely offered any more than

17   the Court is entitled to look at what the defendant

18   previously offered to plead to in terms of a number.  If he

19   had offered to plead to a greater sentence, the Court

20   couldn't consider that either.  It's immaterial and

21   irrelevant to the Court's duties today.

22          Second, it should be excluded under Federal Rule of

23   Evidence 408.  There's a line of cases -- United States v.

24   Verdoorn, 520 F.2d 193 under the Eighth Circuit; United

25   States v. Alexander, 679 F.3d 721 out of the Eighth Circuit;

1  United States v. Jason, 612 F.3d 471 out of the Sixth

2  Circuit; the United States v. Christianson, Arizona 2016

3  Westlaw 1753600 at asterisk three.  The Court should not

4  consider prior plea offers in this context.

5  And in any event, Your Honor, if the Court happens

6  to glance upon the plea agreement and what the offer was, the

7  numbers there reflect a completely different set of operative

8  facts.  Not the same facts, same offense conduct that was

9  offered.  And he knows that because we had these negotiations

10  and discussions.  That plea agreement differs from what the

11  guidelines are in this Court by the simple fact that he's not

12  being -- in the agreement he's not held accountable for

13  leadership, and he's also not held accountable for ordering

14  the gun fire at the police.  Those facts have demonstrably

15  changed.

16  The fact that the government was willing to be

17  reasonable and give him the opportunity to accept

18  responsibility to a set of facts that did not come in some

19  respect exclusively from the CW who testified with respect to

20  ordering the gun fire, and the leadership was proven

21  independently through documents, was largely predicated upon

22  the cooperator's testimony.  He was given the opportunity to

23  plead to a set of facts that reflected that limited universe,

24  and that changes the guidelines.  And it also was an

25  opportunity to plead to a mandatory minimum that was not the

1    ten.

2           So in this context, Your Honor, the seriousness was

3    reflected in the agreement.  We were looking for 14 years.

4    The guidelines now without acceptance of responsibility and

5    with the plus ten from and after, they're essentially in

6    line.  It would have been a 24 with the plus ten under that

7    calculation with acceptance.  But now he receives no

8    acceptance and plus two for leadership, the swing of five and

9    then five years from and after added to the five that he

10   would have faced.

11          I'd also like to just briefly mention the double

12   counting.  There are two incidents involving the firearms.

13   First, in the store with the gun being brandished and

14   Mr. Dertelus being struck; and then the second incident where

15   the gun fire happened.  He receives no increase in the

16   guidelines, I believe it's under (b)2, for use of the firearm

17   even though he used them in two separate occasions.

18          He doesn't receive two 924(c)'s, although the facts

19   support it.  Because that would be 924(c) stacking, and that

20   is no longer permissible under the law.  To say he's being

21   double counted, in fact, it's exactly the opposite.  He's

22   receiving the benefit of a combined 924(c) for arguably two

23   separate instances that would qualify on their own.  The

24   924(c), even if the guns were never produced during the

25   robbery, would have been satisfied by the shooting.  If there

was no shooting, the brandishing, which was a seven, would
have been satisfied by the robbery in the store by itself.  I
just don't understand what counsel is getting at because
there is, in fact, no addition for the guideline.

I'd like to return back to my regular argument for
sentencing, Your Honor.  I'll just note with respect to the
victim impact statements, Mr. Dertelus was 22 at the time of
his testimony.  He was 21 at the time of the incident.  He
was already the store manager.  He references hard work and
his dedication to making something of himself.  He's a young
man.

While in comparison, Officer Robinson is looking
towards retirement.  Both are hard working and serious
individuals who take their jobs seriously.  They were both
met because of their hard work and diligence with gun play.
Mr. Dertelus being struck, Officer Robinson being fired at.

What I want to just emphasize for the Court as the
Court listens to Mr. Robinson's statement is he represents
what's the best in law enforcement.  He was fired upon
multiple times in the heat of an incredibly difficult and
stressful situation, chasing the suspects down.  And as those
doors flew open, the testimony was vivid, live, clear at this
point he expected a gun fight.  But he did not fire his gun
afterwards.  There was no additional fire from the Brockton
Police at all that night.

1          They pursued these defendants, chased them down in

2     the woods knowing that these defendants had already fired at

3     them.  And the level of restraint that they displayed that

4     night represents the best of what law enforcement can be.

5     The restraint, the professionalism, and I would submit to

6     this Court the bravery and courage of Officer Robinson to get

7     out of that car, chase them down, one man against four,

8     knowing that they're willing to shoot, they're willing to

9     fire, and they just did.

10          Nature and planning and circumstances of this case

11     also merit the Court's attention.  There were multiple trips

12     to Brockton even just that day Googling the location,

13     planning this out, preparation including other men.  The

14     Court heard direct testimony about recruitment, meeting up,

15     gathering of firearms.  And the men who were not just

16     willy-nilly there.  They had masks, gloves, they were

17     readying to.  They had a bag to carry the stolen goods in,

18     and the firearms were loaded.

19          The execution of the plan was focused and

20     disciplined.  They drove directly there from Boston.  They

21     parked on a side street.  They couldn't see the car and the

22     quick escape into Brockton after the robbery demonstrated

23     exactly the type of crime that this is.  All in all, this was

24     an extremely vicious robbery by multiple people coordinated

25     by one individual, Diovanni Carter.  The danger to the police

and community can't be overstated as well, Your Honor.  There
was a high speed chase in residential streets at night.  The
Court has the street view images of the tightness of those
streets, extremely dense residential area.  It captures every
turn, acceleration, twist, every braking and speeding up,
every turn onto major roads.  A witness that the Court heard
was at the dinner table on Summer Street with his family when
he heard the gunfire outside his house.  That was the moment
when the defendant was ordering the shooting.

He wanted the police to be in a position where they
wouldn't -- where the police wouldn't continue the chase, so
they'd stop and the defendant could get away.  And while no
one was hit in terms of the police that night, there was a
gun shot victim.  His own brother was struck.  Nothing about
this crime was out of desperation or fear.  This wasn't a
situation where there was extensive drug addiction or some
sort of bender that was being --

This robbery wasn't to get money for drugs.  This
wasn't money to pay rent or some other sort of desperate
means or nature.  This was extremely well planned.  He had a
reasonable car, multiple firearms, a cell phone that he was
using extensively, Google account, to plan and prepare.  And
that fact alone also distinguishes this from essentially all
of the robbery cases referenced by the defendant which are
largely borne under substance abuse and problems in that

1    respect.

2         This defendant's criminal history and the past

3    cases that are clear on his record indicates that this was

4    not his first experience with violence and robbery and guns.

5    He knew his way around firearms.  His past convictions and

6    even the arrests indicate he knows what they are.  In fact,

7    his Google search history had an extensive amount of gun

8    searches.  We had to exclude a lot of that Google search

9    history because he was so interested in guns, it would have

10   prejudiced the jury.

11        So to say it's not unusual, in fact, it really is.

12   He was an enthusiast.  He was enthusiastic about firearms.

13   He was enthusiastic about his brother firing his firearm at

14   Officer Robinson from the car as he said in the trial, and

15   the trial testimony supported it, "Yeah, D, yeah, D", as his

16   brother fired those shots.

17        There's one argument that the defendant can't make

18   here, and that is this case is some sort of anomaly for the

19   defendant or not reflective of his character.  The criminal

20   history again tells that story.  In the past 15 years the

21   defendant has been convicted of robbery, theft, firearms

22   offenses, drug offenses, shootings, and even an arrest for

23   murder.  That's who this defendant is.

24        For a lesser defendant who was not top tier, these

25   brushes with the law would have had a chastening effect,

especially those that don't result in conviction.  Here they didn't.  At some point all these different brushes and experiences reveal an insight into the character of the defendant and who he is.  The insight is really simple.  He will continue to do this.

I'd like to say this crime is the pinnacle of his criminal career, but it's not.  He's been accused of greater crimes in courtrooms.  And yet here we are.  After being arrested for murder and avoiding it, I'm not saying he's responsible for that murder.  It's simply not a conviction.  It doesn't matter.  But he sat in a courtroom with life without parole on the horizon, a prospect of that and he emerged clean.  He beat that case.  Now that was five years ago.  Since then the criminal cases have only continued.

In fact, he seems emboldened given the number of serious cases that have happened since then over the past four years.  The defendant in this case left his own brother behind bleeding in the woods on a below freezing night wearing sweat pants and a sweat shirt.  He's chosen not just crime but violent crime and firearms time and time again.  Just another instance where the defendant's enthusiasm for violence is clear, not just obvious from the case but also from the evidence.

Specific deterrence is also something the Court should consider, and it's a difficult concept.  And I think

1    it's going to be extremely difficult for this Court to look
2    at anything else except an extremely long sentence to satisfy
3    specific deterrence considering the fact that the defendant
4    has already faced extensively serious charges, beat them and
5    here we are.

6            If you can face that on the horizon and prevail and
7    still find yourself here for this crime, I'm not sure the
8    threat of prosecution or lengthy sentencing will ever cause
9    him to conform himself to the law.  As a result, specific
10   deterrence in this case needs to be delivered in the form of
11   direct and experienced incarceration.  Probation supervised
12   release hanging over his head, these things clearly mean
13   nothing to him and will mean nothing going forward.

14           He will continue to commit crimes and expects to
15   face little to no punishment as he has in the past.  General
16   deterrence should also be of significant concern to this
17   Court.  Shooting at the police because they are the police in
18   order to effect escape is at the peak of dangerousness.  It
19   borders on the edge of targeting law enforcement and to some
20   respect the system itself.  To target officers that you know
21   are armed and necessarily must subdue an armed assailant
22   loose in the community, it merely reveals the boldness of
23   this defendant.

24           The sentence that you should impose should be
25   mindful of the message sent.  The government urges the Court

1    to err on the side of deterrence.  I'm asking the Court to

2    impose the low end of the guidelines here.  27 and a half

3    years is a significant sentence.  The government acknowledges

4    that.  This defendant has earned it, earned it through his

5    criminal history, past, his convictions, what he's done since

6    then, and what he did on that night.  The Court should impose

7    the low end of the guidelines in this case and impose a

8    sentence of 27 and a half years.

9            THE COURT:  Mr. Sultan, do you want to be heard

10   again?

11           MR. SULTAN:  I'll be brief, Your Honor.  I just

12   want to make two points if I may.  Thank you.  First, I

13   understand why the government doesn't want to talk about the

14   proposed plea agreement and wants Your Honor to ignore it.

15   As I understand it, the rules of evidence don't apply to

16   sentencing hearings.  The facts did not change.  All that

17   changed is that the defendant exercised his right to go to

18   trial.  That's the only thing that changed.

19           Second point, Your Honor, Mr. Mallard just told the

20   Court he will do this again.  He doesn't know that any more

21   than I know that he won't do this again.  Nobody knows that.

22   But if he's forced to spend more than 4,000 days in prison,

23   hopefully that will persuade him.  When he's in his 40s, when

24   he gets out to go down a different road.  That's really all

25   that the system can hope for, and we can hope for, unless

1    he's just going to be locked up for the rest of his life and

2    the government is coming basically as close as they can to

3    trying to do that.

4           So I would urge the Court to ignore that prediction

5    from the prosecution, which is really baseless.  Thank you,

6    Your Honor.

7           THE COURT:  Mr. Carter, you have an opportunity to

8    address me before I impose sentence if you want to.

9           THE DEFENDANT:  Good morning to everybody.  Good

10   morning, Your Honor.  The matter that gets us here today, you

11   and every individual here including myself [indiscernible]

12   encounter problems.  At times we feel overwhelmed, and we

13   feel all is failed.  One thing I can say is all the

14   situations are not made to be great.  When you face that

15   uncomfortable circumstance, it makes you take a step back and

16   self reflect and it shapes you into the person you're going

17   to be moving forward.

18          What each individual faces outside [indiscernible].

19   In my mind regards with how much I used to worry about if I

20   was going to die on the streets or not.  My parents were

21   absent the majority of my life.  I lived carelessly.  I

22   eventually thought the world was against me.  Being forced to

23   grow up young and fast.  I carried a lot of my childhood

24   through my troubles.  I was living on my own, sleeping in

25   hallways, jumping house to house.  One failed attempt after

another.  I was struggling to figure out how I was going to

eat every day, put clothes on my back.  People in the streets

accepted me for who I was and not who I was trying to be, so

I believed that they loved me.

I pushed a lot of people out of my life not

communicating with them for long periods of time.  But in the

back of my mind I thought my mother and my father would

rescue me like super heroes and take away the pain and

suffering.  Because without them I wouldn't be here right now

despite all of the failed attempts that my grandparents tried

to make.

It's because of my parents, being now that I'm

getting older and I've got a family of my own, I've done

everything in my power to assure them that they are loved and

well taken care of and not blind about false appearance.

They restored in me what family and love is.  Listening and

communicating has been key dealing with them.  It's one of

the most valuable things in the world.

I don't know how to do everything right.  I do a

lot of things that ain't right.  I know I do, Your Honor.

I'm like everyone else though.  I'm not better than anyone

else.  I'm just a human being just like you.  I truly feel

that this is a blessing in disguise so I can move forward.

The journey has already begun, and I'm taking it and will

continue to take steps to better myself because if I fail, my

1    family is going to fail, too.  It has to start with me.  Hard

2    work doesn't happen overnight.  It will pay off in the long

3    term.

4            I appreciate all the love and support I've got from

5    family and friends up to this point.  It means a lot.  I

6    would like to thank my attorneys for the hard work and

7    support as well.  Thank you.

8            THE COURT:  All right.  I think you all know what

9    my job is here.  I need to consider and I have considered

10   what a reasonable sentence would be in this case.  In coming

11   to that decision I considered the advisory guideline

12   sentencing range, the nature and circumstances of the crime,

13   Mr. Carter's personal and criminal history and

14   characteristics, as well as the need for the sentence to

15   reflect the seriousness of the offense, promote respect for

16   the law, just punishment, adequate and general and specific

17   deterrence and to avoid unwanted sentencing disparities as

18   well as all the other factors set forth in 18 U.S.C. 3553(a).

19           I want to respond to some things that both sides

20   have said.  Mr. Sultan, as always you have done an incredibly

21   energetic and thorough job for your client, and I think

22   everybody in this room recognizes that you've done excellent

23   work in this case.  That being said, I have to disagree with

24   some of the things that you said.

25           The situation here is sad.  It's sad for a lot of

1    reasons.  But this is not happening to Mr. Carter because he

2    is a young black male.  And although I need to concern myself

3    with Mr. Carter and what the rest of his life is going to

4    look like and what his family's life is going to look like, I

5    also need to consider and take into account all of the other

6    young black people that are out in the community trying to

7    make lives for themselves and are doing it in the shadow of

8    gun fire where they live.

9          No kid should have to worry about that, be them

10    black, white, or any other color.  I understand that Black

11    Lives Matter is a cause celeb right now, and I fully embrace

12    that.  But I am also not going to be put in a position where

13    I need to do things because people are young black males.  I

14    don't love the pressure coming in that direction.  I think

15    that there's no question that Mr. Carter has had a difficult

16    life, and he talks now about self-reflection.  But there have

17    been many many opportunities for self-reflection along the

18    way that he has not taken advantage of.

19          When I think about a sentence for him, it's clearly

20    going to be a long sentence and a well-earned sentence here.

21    But I feel pain for his grandmother, who I assume is sitting

22    back there, and his fiancé and his children who are the real

23    losers in this.  That is on my mind.  But it should have been

24    on Mr. Carter's mind a lot sooner than it was.  And he knew

25    that he had kids and he had a family and that their futures

1    in many ways rode on his back, and he still nonetheless chose

2    to go out and plan and execute that robbery.

3           Mr. Sultan, you said that the government is doing

4    the best they can to put Mr. Carter in jail for the rest of

5    his life.  You said their recommendation is disproportionate

6    and out of line.  I'd like to say if they wanted to put him

7    in jail for the rest of his life they could have recommended

8    the top of the guideline range instead of the bottom.

9           I think it is difficult to argue that their

10   recommendation is disproportionate and/or out of line when

11   it's right in line with the guidelines that are imposed in

12   this country.

13          And lastly -- I have two more things I want to say.

14   Second to lastly, in terms of the plea agreement, there are a

15   lot of good reasons for this Court not to consider a plea

16   agreement, but I do feel that one aspect of it needs to be

17   commented on.  I was a prosecutor for a long time, and I was

18   a criminal defense attorney for a long time, and I've seen

19   both sides of this.

20          And I don't think it's fair to the government to

21   characterize a different recommendation in a plea agreement

22   as punishment for going to trial.  Particularly with someone

23   like Mr. Carter where the evidence against him was likely the

24   weakest of all the co-defendants because he was the one that

25   did not go into the store and wasn't on videotape.

1              So rather than being punishment for going to trial,

2     I think a better characterization is that they were taking

3     into account litigation risk.  All of that being said, the

4     sentence that they're asking for is a long one.  I listened

5     to what Mr. Carter said, and I do think that there is a

6     measure of self-reflection in what he said.  I also think

7     there was a lot of self-reflection in the two victim impact

8     statements.  And I think those two men, Officer Robinson and

9     Mr. Dertelus were very courageous to come forward and give

10    the sorts of personal statements that they did.  And I need

11    to take that into account as well.

12             So Mr. Sultan, all of that being said, I hear you

13    on your arguments.  I don't think that there is inappropriate

14    double counting.  If there was anything that could be

15    characterized as double counting, it would be the obstruction

16    and the six level enhancement.  And my sentence will reflect

17    the fact that those two largely or somewhat overlap.  The

18    government is not inappropriate nor is probation having

19    counted them separately.

20             I don't need to discount the sentence for that, but

21    I am talk taking it into account.  I also want to impose a

22    sentence, Mr. Carter, that gives you some hope for the

23    future.  There's no question it's going to be a long

24    sentence, but I want you to think about how you can improve

25    yourself and how you can be there for your kids and the rest

1    of your family.  I am going to sentence you to less than your

2    attorney wants.  Which I should also add, Mr. Sultan, it

3    seems to me that you're asking for a lower sentence than he

4    would have gotten in the plea agreement.  Right?  The plea

5    agreement was --

6                 MR. SULTAN:  8 to 14.

7                 THE COURT:  8 to 14 and you're asking for 12 now.

8                 MR. SULTAN:  Yes.

9                 THE COURT:  You're asking for a lower sentence.  As

10   I said, I don't believe that the government is punishing him

11   for going to trial, but I'm certainly not going to give him

12   the benefit of acceptance of responsibility after.  He is not

13   going to get -- I think your recommendation is thoughtful but

14   too low.

15                 So this is what I'm going to do:  Pursuant to the

16   Sentencing Reform Act of 1984 and having considered the

17   sentencing factors enumerated at 18 U.S.C. 3553(a), it is the

18   judgment of the Court that the defendant, Diovanni Carter, is

19   hereby committed to the custody of the Bureau of Prisons to

20   be imprisoned for a term of 270 months.  That term consists

21   of 150 months on Counts 1 and 2 to run concurrently and 120

22   months on Count 3 to be served consecutively.  That's 150

23   plus 120 which is 270.

24                 I am going to make a judicial recommendation that

25   the defendant attend vocational training, so that he can

1   enter the work force upon release.  I am going to recommend

2   he participate in the Bureau of Prisons RDAP program due to a

3   substance abuse history and based on the informal

4   prescreening that was performed by probation.

5          And I will recommend if he completes the RDAP

6   program he be considered for the Bureau of Prisons

7   Alternative Community Placement Program which will allow him

8   to transition to a treatment setting as an alternative to a

9   residential re-entry program.  I will also make a judicial

10  recommendation that he participate in the probation office's

11  CARE program during the term of supervised release if he's

12  deemed to be an appropriate candidate.

13         Upon release from prison he'll be placed on

14  supervised release for a term of five years.  That is three

15  years on Counts 1 and 2, five years on Count 3, to run

16  concurrently.  Within 72 hours of release from the custody of

17  the Bureau of Prisons the defendant shall report in person to

18  the probation department in the district to where he is

19  released.

20         I will judicial recommendation that he consider

21  participation in the probation office's Restart program

22  during supervised release if he's deemed to be an appropriate

23  candidate.  I'm not going to impose a fine as I don't think

24  he has the ability to pay.  No forfeiture in this case,

25  Mr. Mallard?

1          MR. MALLARD:  No forfeiture, Your Honor.

2          THE COURT:  While under the probation office's

3     supervision, the defendant shall comply with the following

4     terms and conditions:  The standard conditions.  He can't

5     commit another federal, state or local crime.  You may not

6     unlawfully possess a controlled substance.  You may not

7     unlawfully use a controlled substance.  You'll be subject to

8     a drug test within 15 days of release and at least two

9     periodic drug tests thereafter not to exceed 104 tests per

10    year.  You'll have to give DNA samples as directed by the

11    probation office and comply with any other standard

12    conditions that are in place at the time of your release.

13         In terms of special conditions.  You may not

14    knowingly have any contact, direct or indirect, with the

15    cooperating witness in this case.  You are to participate in

16    a program for substance abuse counseling as directed by the

17    probation office with the same testing limitations we just

18    discussed.  That is, not to exceed 104.

19         You are prohibited from drinking alcohol to excess.

20    Massachusetts State law which is currently .10 blood alcohol

21    level.  You must participate in a behavioral program as

22    directed by the probation office.  That can include group

23    sessions led by a counselor or participation in a program

24    administered by the probation office.  You must participate

25    in a vocational services training program as directed by

1    probation.  That's for things like job readiness, training or
2    skills developments.
3            You must use your true name and cannot use any
4    falsifying information.  And if you have the money, you're
5    going to have to contribute to the cost of evaluation,
6    treatment, and programming.  If not, you don't need to.
7    Special assessment of $300.  I am going to recommend that he
8    be housed as close as possible to Massachusetts to allow him
9    time with his family and children.  And the date of the
10   sentence will run from March 5, 2019, to give him credit for
11   all of the time that he has spent in prison.
12           I want to make something else clear, Mr. Carter.  I
13   have wrestled with this.  If anything, I erred on the side of
14   too low.  I've taken into account, to the extent there was
15   double counting, I've taken into account your personal
16   history.  I thought very hard about the statement that
17   Mr. Robinson and the other victim in this case made.  I'm
18   hoping that what I'm giving you, which is 22 and a half
19   years, will be enough.
20           This case went to trial.  I understand your
21   attorney might appeal.  And I want to make clear that if
22   there is any disagreement with any of the rulings that I made
23   in sentencing today that I fully believe that the 22 and a
24   half years is an appropriate sentence.  I've given long and
25   hard thought to giving a longer sentence, but I think all

1 things considered that that is an appropriate sentence taking

2 into account all the arguments of your counsel.  If this

3 comes back to me, I'm apt to impose the same sort of sentence

4 because I think it's appropriate in the case to the extent

5 that the guidelines allow me to do that.  Anything else from

6 the government?

7     MR. MALLARD:  Not from the government, Your Honor.

8     THE COURT:  Mr. Sultan?

9     MR. SULTAN:  No, Your Honor.

10     THE COURT:  Probation?

11     THE PROBATION OFFICER:  No, Your Honor.

12     THE COURT:  The case is recessed.  Thanks,

13 everyone.

14     (Court recessed at 10:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    - - - - - - - - - - -

2                        CERTIFICATION

3

4          I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                    January 15, 2020

11

12   _____          _____

13   Joan M. Daly, RMR, CRR              Date
     Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25